IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC. | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.: 19-1642-RGA-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| BECKMAN COULTER, INC., | ) ) | ██████████████ |
| Defendant. | ) | **REDACTED - PUBLIC VERSION** |

## <u>DEFENDANT'S MOTION FOR LEAVE TO AMEND</u>

Pursuant to Federal Rule of Civil Procedure 15(a), Beckman Coulter, Inc. ("BCI") hereby seeks leave to file its Second Amended Answer and Counterclaims against Sysmex Corporation and Sysmex America, Inc..  The grounds in support of the motion are set forth in BCI's letter brief filed simultaneously with this motion.

Pursuant to Local Rule 15.1(b), attached to this motion as Exhibit A is the proposed amended pleading, the Second Amended Answer and Counterclaims of Defendant Beckman Coulter, Inc.. Attached as Exhibit B is the redline showing in what respect the proposed amended pleading differs from the pleading which it amends.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

LEYDIG, VOIT & MAYER, LTD
David M. Airan
Wesley O. Mueller
Aaron R. Feigelson
Nicole E. Kopinski
Wallace H. Feng
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL  60601-6745
(312) 616-5600

Dated: April 12, 2021            *Attorneys for Beckman Coulter, Inc.*

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1.1

I, Melanie K. Sharp, Esquire, hereby certify pursuant to Local Rule 7.1.1 that counsel for

Beckman Coulter, Inc., ("BCI") has made a reasonable effort, including through written

exchanges and telephonically, to reach agreement with counsel for Sysmex Corporation and

Sysmex American, Inc. on BCI's Motion for Leave to Amend.

*/s/ Melanie K. Sharp*
Melanie K. Sharp (No. 2501)

27980191.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC. | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  19-1642-RGA-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| BECKMAN COULTER, INC., | ) ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER**

AT WILMINGTON, this ____ day of _____, 2021, the Court having

considered Defendant's Motion for Leave to Amended and the material submitted in support of

and in opposition thereto;

IT IS HEREBY ORDERED that Defendant's Motion is GRANTED, and the amended

pleading attached as Exhibit A to Defendant's motion shall be docketed.


_____
United States Magistrate Judge

27980191.1

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  19-1642-RGA-CJB **JURY TRIAL DEMANDED** |
| v. | ) ) | ██████████████ |
| BECKMAN COULTER, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## SECOND AMENDED ANSWER AND COUNTERCLAIMS OF
## DEFENDANT BECKMAN COULTER, INC.

Defendant Beckman Coulter, Inc. ("BCI"), by and through its undersigned attorneys, hereby answers each of the numbered paragraphs of the Complaint filed September 3, 2019, by Plaintiffs Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively "Plaintiffs").  Except as expressly admitted below, BCI denies each allegation of Plaintiffs' Complaint.

### NATURE OF THE ACTION

1.      BCI admits that this action purports to state a claim under the patent laws of the United States for infringement of United States Patent Nos. 10,401,350 entitled "Sample Analyzer and Computer Program Product" ("the '350 Patent") and 10,401,351 entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").  BCI admits that Exhibits A and B appear to be copies of the '350 patent and '351 patent, respectively.  BCI denies the remaining allegations in paragraph 1.

**THE PARTIES**

2.       BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

3.       BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

4.       BCI admits that the Plaintiffs are named on the face of the patents in suit as the purported assignees of the '350 and '351 Patents.

5.       Admitted.

6.       BCI admits that it makes, offers to sell, sell and exports hematology analyzer systems, including products sold as the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, DxH 900, DxH 900 SMS, DxH 900-2, DxH 900-2 SMS, DxH 900-3, and DxH 900-3 SMS, which Plaintiffs identify as "the Accused Products."  BCI denies that Plaintiffs further characterizations of the Accused Products are accurate, and further denies that any of the Accused Products infringe the '350 and '351 Patents.

**Jurisdiction and Venue**

7.       This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest that purported patent infringement claims arise under the Patent Laws of the United States, Title 35 of the United States Code.

8.       This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest this Court's subject matter jurisdiction over a purported patent claim.

9.       To the extent this Paragraph contains legal conclusions, no answer is required. BCI admits that it is incorporated in the State of Delaware and does business in Delaware, and it

2

does not contest that this Court may exercise personal jurisdiction over it for purposes of this action.  BCI denies the remaining allegations of this paragraph.

10.    This paragraph contains legal conclusions to which no answer is required.  BCI does not contest venue in this district for purposes of this action, but it disputes that this is the most appropriate or convenient venue for this action.

**THE PATENTS**

11.    BCI admits that the '350 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '350 Patent was duly and legally issued, denies that the '350 Patent is valid, and denies that the '350 Patent is enforceable.

12.    Denied.

13.    BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '350 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

14.    BCI admits that '351 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '351 Patent was duly and legally issued, denies that the '351 Patent is valid, and denies that the '351 Patent is enforceable.

15.    Denied.

16.    BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '351 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

**THE ACCUSED PRODUCTS**

17.    BCI admits that the Accused Products are sold as "hematology analyzers." To the extent this Paragraph contains conclusions of law, including regarding the scope of the '350 and '351 Patent claims or the alleged infringement, including based on this paragraph's use of the

3

terms such as "analyzer," "a plurality of detectors" and "multi-mode detector," no answer is required and BCI disputes Plaintiffs' characterizations of the '350 and '351 patent.

18.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that it products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

19.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that its products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

20.     Because BCI denies that its products infringe any asserted claims, BCI denies the allegations of this paragraph.

21.     Denied.

22.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

23.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 23 of the Complaint as calling for a legal conclusion, and therefore denies the same.

24.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

25.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 25 of the Complaint as calling for a legal conclusion, and therefore denies the same.

26.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

27.    BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 27 of the Complaint as calling for a legal conclusion, and therefore denies the same.

28.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

29.    BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 29 of the Complaint as calling for a legal conclusion, and therefore denies the same.

30.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

31.    BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 31 of the Complaint as calling for a legal conclusion, and therefore denies the same.

32.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

33.    BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July

2015, respectively.  BCI objects to the remaining allegations of paragraph 33 of the Complaint as calling for a legal conclusion, and therefore denies the same.

34.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

35.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 35 of the Complaint as calling for a legal conclusion, and therefore denies the same.

36.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

37.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 37 of the Complaint as calling for a legal conclusion, and therefore denies the same.

38.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

39.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 39 of the Complaint as calling for a legal conclusion, and therefore denies the same.

40.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

41.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 41 of the Complaint as calling for a legal conclusion, and therefore denies the same.

42.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

43.     BCI admits that Exhibits E is a document entitled "Performance Evaluation of Body Fluids on the UniCel DxH 800 Coulter Cellular Analysis System," published in 2009.  BCI objects to the remaining allegations of paragraph 43 of the Complaint as calling for a legal conclusion, and therefore denies the same.

44.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

45.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 45 of the Complaint as calling for a legal conclusion, and therefore denies the same.

46.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

47.     BCI objects to the allegations of paragraph 47 as calling for a legal conclusion, and therefore denies the same.

48.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

49.     BCI objects to the allegations of paragraph 49 as calling for a legal conclusion, and therefore denies the same.

50.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

51.     BCI objects to the allegations of paragraph 51 as calling for a legal conclusion, and therefore denies the same.

52.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

53.     BCI objects to the allegations of paragraph 53 as calling for a legal conclusion, and therefore denies the same.

54.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

55.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 54 of the Complaint as calling for a legal conclusion, and therefore denies the same.

56.     Denied.

**COUNT I – [Alleged] Patent Infringement: U.S. Patent No. 10,401,350**

57.     BCI restates and incorporates each of its responses to paragraph 1-56 as if fully set forth above.

58.     Denied.

59.     BCI admits that it is not presently aware that it is directly licensed to the '350 patent or that Plaintiffs provided "authority" in connection with the '350 patent.  BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 62 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same. BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '350 Patent. BCI denies all remaining allegations of this paragraph.

60.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '350 patent are satisfied at least as of the date of service of this complaint upon BCI." BCI admits that 35 U.S.C. § 287(a) includes the following two sentences: "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." BCI denies all remaining allegations of this paragraph.

61.     Denied.

**COUNT II – [Alleged] Patent Infringement: U.S. Patent No. 10,401,351**

62.     BCI restates and incorporates each of its responses to paragraph 1-61 as if fully set forth above.

63.     Denied.

64.     BCI admits that it is not presently aware that it is directly licensed to the '351 patent or that Plaintiffs have provided "authority" in connection with the '351 patent. BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same. BCI denies that any license or "authority" is

required "to practice the subject matter claimed by the '351 Patent.  BCI denies all remaining allegations of this paragraph.

65.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '351 patent are satisfied at least as of the date of service of this complaint upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies all remaining allegations of this paragraph.

66.     Denied.

## RESPONSE TO PRAYER FOR RELIEF

BCI denies all allegations not specifically admitted herein, and further denies that Plaintiffs are entitled to the judgment and relief requested in the Prayer for Relief.  Rather, the Complaint should be dismissed with prejudice with a finding of no infringement and invalidity in favor of BCI.

## AFFIRMATIVE DEFENSES

Without any admission as to the burden of proof, burden of persuasion, or the truth of any allegation in Plaintiffs' Complaint, BCI states the following affirmative defenses:

## <u>First Affirmative Defense</u>

Plaintiffs' complaint fails to state a claim upon which relief may be granted.

10

## Second Affirmative Defense

BCI has not infringed, and does not infringe any claim of the '350 Patent and '351 Patent, literally, under the doctrine of equivalents, directly or indirectly, contributorily, by inducement, or in any other manner.

## Third Affirmative Defense

The asserted claims of the '350 Patent and of the '351 Patent are invalid for failing to comply with the conditions and requirements for patentability set forth in the United States Patent Laws, including, without limitation, in 35 U.S.C. §§ 101, 102, 103, 112, for double patenting, and the rules, regulations, and laws pertaining thereto.

## Fourth Affirmative Defense

Plaintiffs' allegations are inadequate to state a claim of willfulness under 35 U.S.C. § 285.

## Fifth Affirmative Defense

Plaintiffs cannot satisfy the requirements applicable to their request for injunctive relief and have an adequate remedy at law.

## Sixth Affirmative Defense

As described in detail below with respect to BCI's Fifth Counterclaim, the '350 Patent and '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents while prosecuting the '350 Patent and '351 Patent before the U.S. Patent & Trademark Office.

## Seventh Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands. Plaintiffs, through their attorney agents, obtained access to confidential information of Defendant, which it then wrongfully misappropriated, in violation of a Protective Order issued by the U.S. District Court

for the Northern District of Illinois, to draft and prosecute the claims of '350 Patent and '351

Patents.  As a result of this conduct, Plaintiffs are barred from enforcing the '350 Patent and the

'351 Patent against Defendant.

BCI reserves the right to assert all affirmative and other defenses under Rule 8(c) of the

Federal Rules of Civil Procedure, the patent laws of the United States, and any other defenses, at

law or in equity, that may now or in the future be available based on discovery, any other factual

investigation, or any other development relating to this case or any other action.

## COUNTERCLAIMS

Defendant Beckman Coulter, Inc. ("BCI") incorporates herein by reference the

admissions, allegations, denials and Affirmative Defenses contained in the Answer above as if

fully set forth herein. For its Counterclaims against Plaintiffs/Counterclaim-Defendants Sysmex

Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively, "Counterclaim-

Defendants") BCI states as follows:

## THE PARTIES

1.      BCI is a Delaware corporation having its principal place of business in Brea,

California.

2.      According to the Complaint, Sysmex America, Inc. is a Delaware corporation

having its principal place of business at 577 Aptakisic Road, Lincolnshire, Illinois 60069.

3.      According to the Complaint, Sysmex Corporation is a Japan corporation having

its principal place of business at 1-5-1 Wakinohama-kaigandori, Chuo-ku, Kobe, Hyogo, Japan.

## JURISDICTION AND VENUE

4.      These counterclaims arise under the Patent Laws of the United States, 35 U.S.C. §

1 et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Defend Trade Secrets

Act of 2016, 18 U.S.C. § 1836, *et seq*., (collectively, the "Federal Counterclaims") and breach of

12

contract under the laws of the State of Illinois.  This Court has jurisdiction over the subject

matter of the Federal Counterclaims under 28 U.S.C. §§ 1331 and 1338(a) because the

Counterclaims involve questions of federal law and regulation, and pursuant to 28 U.S.C. §§

1367(a), because the Federal Counterclaims are so related to the claims in this action as to form

part of the same case or controversy under Article III of the United States Constitution.  This

Court also has supplemental jurisdiction over the breach of contract counterclaim because such

claims are so related to the Federal Counterclaims and the claims of this action as to form part of

the same case or controversy under Article III of the United States Constitution.

5.     This Court has personal jurisdiction over Sysmex and SAI because, among other

reasons, these Counterclaim-Defendants have consented and subjected themselves to the

jurisdiction of this Court by filing their Complaint against BCI.

6.     To the extent that venue is appropriate for Counterclaim-Defendants' claim

against BCI, venue is also appropriate in this Court for BCI's counterclaims.

7.     There is an actual and justiciable controversy between the parties as to the

infringement, validity and enforceability of United States Patent No. 10,401,350, entitled

"Sample Analyzer and Computer Program Product" ("the '350 Patent") and United States Patent

No. 10,401,351, entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").

## BACKGROUND

8.     The asserted Sysmex '350 Patent and '351 Patent (collectively, "the Asserted

Patents") purport to describe an improvement in hematology analyzers.   The "Field of the

Invention" section of the specification states "[t]he present invention relates to a sample analyzer

and computer program product capable of measuring not only blood, but also body fluids other

than blood such as cerebrospinal fluid (spinal fluid), fluid of the thoracic cavity (pleural fluid),

abdominal fluid and the like."  This description of the invention inaccurately and misleadingly

suggests that prior art systems measured only blood whereas the purportedly novel analyzer of the patent application measured both blood and body fluids.  However, several years before Sysmex filed its earliest related patent application, both BCI and Sysmex had made, used and described hematology systems for measuring both blood and body fluids.

9.      BCI and Sysmex are competitors.  Prior to the critical date of the '350 and '351 patents, both parties made and sold automated hematology analyzers, which performed blood and body fluid tests in clinical laboratories.  These analyzers measured and reported information about the composition of cells in blood and body fluid samples.  For example, the prior art analyzers measured red blood cell counts, white blood counts, hemoglobin and other parameters for blood.  The prior art analyzers also are capable of measuring and reporting body fluid information such as total nucleated cell counts.

**The Sysmex Patents in Suit**

10.     A copy of the '350 patent is attached as Exhibit A to Plaintiffs' Complaint.

11.     A copy of the '351 patent is attached as Exhibit B to Plaintiffs' Complaint.

12.     By paragraph 4 of their Complaint, Plaintiffs allege that they are "the assignees of the Patents, and are the co-owners of the entire right, title, and interest in and to the Patents, including the right to enforce and to recover damages for any current or past infringement of the Patents."

13.     The critical date of the '350 patent for prior art purposes is no earlier than January 31, 2007.

        a.      Sysmex's '350 patent issued from U.S. Patent Application Serial No. 16/214,417 ("the '417 application"), which Sysmex filed on December 10, 2018. Through a series of continuation applications, the '417 application claims priority to U.S.

14

Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.       Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '350 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '417 application claims priority.

14.     The critical date of the '351 patent for prior art purposes is also no earlier than January 31, 2007.

a.       Sysmex's '351 patent issued from U.S. Patent Application Serial No. 16/363,694 ("the '694 application"), which Sysmex filed on March 25, 2019.  Through a series of continuation applications, the '694 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.       Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '351 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '694 application claims priority.

c.       At least certain claims of the '351 patent are not entitled to the benefit of any priority prior to its filing date of March 25, 2019 because they claim subject matter that was not disclosed in any earlier patent application to which the benefit of priority was claimed.

15

15.     The patents in suit issued from a long chain of applications claiming priority to

the '830 application.  Sysmex obtained at least four earlier patents from this chain of

applications, all having the same patent specification and drawings.  These patents include U.S.

Patent 8,440,140 (the '140 patent"), which issued on May 13, 2013 from the '830 application;

U.S. Patent 8,968,661 ("the '661 patent"), which issued on March 3, 2015 from a continuation

(U.S. Patent Application Serial No. 13/891,667) of the '830 application; U.S. Patent 9,933,414,

which issued on April 3, 2018 from a further continuation application (U.S. Patent Application

Serial No. 14/595,319); and U.S. Patent 10,151,746 ("the '746 patent"), which issued on

December 11, 2018 from yet another continuation application (U.S. Patent Application Serial

No. 15/908,339).

16.     This is not the first patent infringement lawsuit brought by Sysmex against BCI

regarding a patent issuing from an application which claims priority to the '830 application.  On

December 11, 2018, Sysmex filed a lawsuit against BCI, asserting infringement of the '746

patent.

17.     On February 13, 2019, Sysmex dismissed without prejudice its lawsuit involving

the '746 patent.

18.     At least the independent claims of the '350 and '351 patent are obvious in view of

the claims in one or more of the prior Sysmex patents issuing from the same chain of

applications, including at least the '746 patent.

**Sysmex's Prior Art Systems**

19.     More than one year prior to the filing date of the patents in suit, Sysmex made and

sold prior art hematology analyzers, including at least the XE-2100, XT-2000i and XT-1800i

analyzers, that were used for measuring both blood and body fluids.

20.     Sysmex or others had stated in printed publications and marketing materials that such prior art hematology analyzers could be used for measuring both blood and body fluids. Sysmex further printed and made manuals available for these analyzers, instructing users on how to operate them for body fluid analysis.  These marketing materials and manuals were publicly available prior to January 31, 2007.  These manuals and marketing materials constitute prior art to the patent applications that became the patents in suit.

21.     The claims of the patents in suit cover Sysmex's own prior art products, or at best cover only obvious software modifications of Sysmex's own prior art products.  These prior art products measured both blood and body fluids.  One such Sysmex prior art product was the XE-2100 hematology analyzer system.

22.     Several figures of the Asserted Patents are copied or derived from prior art printed publications created by Sysmex.  More specifically, Sysmex's prior art hematology analyzers sold prior to January 31, 2007, include the "XE-2100" unit, which Sysmex described in a printed publication entitled, "Operator's Manual, Automated Hematology Analyzer, XE-2100, Main Unit" ( the "XE-2100 Operator's Manual") and attached as Exhibit 1.   Sysmex printed and made the XE-2100 Operator's Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

a.      Figure 1 of the Asserted Patents was copied from the prior art as a portion of Figure 1-1 of the prior art XE-2100 Operator's Manual.  These figures are illustrated below (callout oval added to the Figure 1-1 of the XE-2100 Operator's Manual).



b.      The information of Figure 2 of the Asserted Patents likewise appears in the Sysmex prior art.  Figure 7-25 of the XE-2100 Operator's Manual is entitled

18

"Electrical System Block Diagram of Main Unit," and includes the same components and arrangement as Fig. 2 of the Asserted Patents.



     c.     Figure 3 of the Asserted Patents combines several figures from the prior art XE-2100 Operator's Manual.   Figure 7-5 and 7-6 from the prior art manual are reproduced below.

| Asserted Patents, Fig. 3 (Annotated) | Prior Art XE-2100 Operator's Manual (Annotated) |
|---|---|
|  | |

Additional figures in the prior art XE-2100 that relate to Fig. 3 of the '350 patent include Figs. 7-7 through 7-11, Fig. 7-15, and Fig. 7-17.  Each of these figures illustrates a physical relationship between diluents, sample tubes, sample valve, and an optical detector block.

20

      d.        Figure 4 of the Asserted Patents is substantially identical to Figure 7-4 of the prior art XE-2100 Operator's Manual.

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

      e.        Figure 5 of the Asserted Patents is substantially identical to Figure 7-2 of the prior art XE-2100 Operator's manual.

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

f.      Figure 6 of the Asserted Patents purports to "show[] the HGB detection

unit."  This unit is substantially identical to that illustrated in Figure 7-8 of the prior art

XE-2100 Operator's Manual (reproduced below with an oval added).



g.      The flowchart of Figure 7 of the Asserted Patents includes a description of

an analyzer's operation for processing blood and for processing a body fluid.  The

portion of the flowchart for processing body fluids includes several of the identical steps

for processing blood.  The portion of the flowchart for processing blood was included

with the prior art XE-2100 Operator's Manual.  In addition, Table 1-1 of the prior art

XE-2100 Operator's Manual describes the same sequence and further includes a "Post-analysis check."

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

h.      The screen layout of Figure 8 of the Asserted Patents is shown in several illustrations of the prior art XE-2100 Operator's Manual.  Figure 2-13 is shown as an example screen display of the prior art XE-2100 Operator's Manual.



i.      Figure 12 of the Asserted Patents is substantially identical to that illustrated in Figure 7-12 of the prior art XE-2100 Operator's Manual.



23.     The XE-2100 Operator's Manual discloses every claimed hardware arrangement in the '350 patent and the '351 patent, which were not included in any other reference before the

USPTO during prosecution of the Asserted Patents.  However, despite the significant overlap between the description of the Asserted Patents and the prior art XE-2100 Operator's Manual, Sysmex did not identify or acknowledge the XE-2100 Operator's Manual or any information in the figures or in the specification of the Asserted Patents as "prior art."

24.     In an unrelated Sysmex patent application, U.S. Patent Application Serial No. 11/374,109, ("the '109 application"), Sysmex submitted an Information Disclosure Statement on March 14, 2006, disclosing Chapter 7 of the XE-2100 OPERATOR'S MANUAL.  The '109 application was entitled "Sample Analyzer and Sample Analyzing Method" and pertained to analysis of blood on a hematology analyzer.  It published as U.S. Patent Publication No. 2006/0210438 under 35 U.S.C. § 122(b) on September 21, 2006, and later issued as U.S. Patent No. 9,243,993 on January 26, 2016.  The '109 application specifically references the Sysmex XE-2100 analyzer.  The submitted Chapter 7 of the XE-2100 Operators Manual, made before the critical date of the Asserted Patents, contains the majority of the prior art figures described above, which were also later included in the applications for the Asserted Patents.

25.     The '109 application lists as the first-named inventor Mr. Takaaki Nagai, a senior director of engineering at Sysmex.  Mr. Nagai is the same inventor who is first-named on the Asserted Patents.  On information and belief, from at least March 2006 to the present, Mr. Nagai has actively participated in the process of prosecuting Sysmex patent applications and reviewing patents and prior art.

26.     By no later than March 14, 2006, Sysmex, its attorneys, and inventors of the Asserted Patents, including at least Mr. Nagai, were aware of the XE-2100 Operator's Manual and particularly the contents of Chapter 7.  Nevertheless, Sysmex did not disclose the XE-2100

Operator's Manual as an item of prior art for the Asserted Patent applications or for any application to which the Asserted Patents claim the benefit of priority.

27.    The prior art Sysmex XE-2100 hematology analyzer was described as measuring and analyzing blood and body fluids.

      a.    A printed publication created by Sysmex and entitled "XE-Series Body Fluid Application," a copy which is attached as Exhibit 2, described the use of the XE-series analyzers for both blood and body fluids.  This publication, which has a copyright date of 2004 and metadata showing a last modified date of 2006, is prior art to the Asserted Patents.

      b.    The XE-Series Body Fluid Application publication further states "A logical step in blood cell analysis is the application of automated body fluid testing.  The XE-Series analyzers with XE pro software now brings the power of fluorescent flow cytometry to body fluid analysis."

      c.    Sysmex applied for and received Food & Drug Administration ("FDA") approval for its XE-Series Body Fluid Application in 2004, under 510(K) No. 040073.  Sysmex updated its user manuals for the XE-2100 shortly thereafter to reflect the availability of the XE-2100 for body fluid use. The then-new "Appendix C: Body Fluid Application" section of the XE-2100 Information Processing Unit Operator's Manual ("XE-2100 IPU Manual") (*see, e.g.*, SCorp-Del00117686–702), for example, instructed the user to analyze body fluids on the XE-2100 using "manual mode" and setting the "Discrete" test in a substantially identical manner as described in the Asserted Patents:

| Asserted Patents | Prior Art XE-2100 IPU Manual Appendix C: Body Fluid Application |
|---|---|
| When specifying the BODY FLUID measurement mode, the operator specifies MANUAL mode as the take-up mode, [CBC+DIFF], [CBC+DIFF+RET], [CBC+DIFF+NRBC], or [CBC+DIFFNRBC+RET] as the DISCRETE test, and [BODY FLUID] as the type of sample. In step S4, the Col. 9, lines 35-39 | The body fluid Specimen can be analyzed with Manual Mode. <br><br> CAUTION: • In case of analyzing body fluid specimens, use discrete mode of below from "Discrete" of the Sample No. Setting screen. <br> - "3. CBC+DIFF" <br> - "4. CBC+DIFF+RET" <br> - "6. CBC+DIFF+NRBC" <br> - "7. CBC+DIFF+NRBC+RET" |

28.     The XE-2100 IPU Manual also instructed users to run the XE-2100 differently for body fluid analysis.  For example, the XE-2100 IPU Manual instructed users to check background counts prior to analyzing body fluids to make sure they were in an acceptable range, and if not, to "perform an auto-rinse or blank measurement."  The XE-2100 IPU Manual further instructed users to "select 'Auto Rinse' on the function menu to execute an automatic rinse and background check" when specifically running the XE-2100 for body fluid analysis.  On information and belief, Sysmex printed and made the XE-2100 IPU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

29.     Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application included a version of the XE-Series Body Fluid Application publication as "a draft of the sales literature for the XE-2100 Series, automated hematology analyze (sic), body fluid application."  Although Sysmex designated certain portions of its submission as confidential, Sysmex did not designate the draft XE-Series Body Fluid Application publication as confidential in its submission.  Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application was specifically referenced in a 2006 journal article, by Shen, P. et al., "Cholesterol Crystals Causing Falsely Elevated Automated Cell Count," American Journal of Clinical Pathology 125:358-363

27

(2006), stating "Several manufacturers of automated hematology instruments have obtained FDA approval for performing cell counts on body fluids (for example, Coulter LH750, Beckman Coulter, approval No. 510(K)050057; Sysmex XE-2100, Sysmex, Mundelein, IL, approval No. 510(K)040073; and Advia 120[cerebrospinal fluid WBC, WBC differential, and RBC counts], Bayer, Tarrytown, NY approval No. 510(K)022331)."

30. Despite the relevance of the XE-2100's ability and usage to analyze body fluids in a similar manner and using identical hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the 2004 FDA filing for the XE-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XE-2100 to the USPTO during prosecution of the Asserted Patents.

31. Sysmex sold other prior art hematology analyzers related to the XE-2100 that also had the ability to analyze body fluids in a manner similar to that claimed in the Asserted Patents. For example, in 2006 Sysmex received FDA approval for a Body Fluid Application on smaller hematology analyzers, the XT-1800i and XT-2000i, under FDA 510(K) No. 061150.  The XT-Series Body Fluid Application listed the XE-Series Body Fluid Application as a predicate device.

32. As it did with the XE-Series, in 2006 Sysmex published a marketing publication, "XT-Series Body Fluid Application," (*see, e.g.*, SAI-Del00003411) and updated its XT-2000i/XT-1800i manuals to include a similar section instructing users on how to use those hematology analyzers to analyze body fluids other than blood.  Like the manuals for the XE-2100, the updated XT-2000i/XT-1800i Instructions For Use manuals ("XT-IFU Manual") (*see, e.g.*, SCorp-Del00117489–SCorp-Del00117500) included specific instructions by which the

analyzer was to operate for body fluid analysis, including selection of a manual mode and performing an auto-rinse to ensure background counts are reasonable.

33.     On information and belief, Sysmex printed and made the XT-IFU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

34.     Despite the relevance of the XT-2000i/XT-1800i's ability and usage to analyze body fluids in a similar manner and using at least similar hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XT-Series Body Fluid Application publication, the XT-IFU Manuals, the FDA submission on the XT-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XT-2000i/XT1800i to the USPTO during prosecution of the Asserted Patents.

35.     The XE-2100 contained every claimed hardware arrangement in the '350 patent and the '351 patent, and the software in the Sysmex prior art products either included every additional claimed feature, or at a minimum, would have been understood to be readily modified in a logical manner to include every additional claimed feature.

36.     At a minimum, therefore, the various matter claimed in the patents in suit are either anticipated by, or would have been obvious to a person of ordinary skill in the art based on, Sysmex's own prior art products.

**Prosecution of the Asserted Patents and Sysmex's Failure to Disclose Material Prior Art**

37.     On December 10, 2018 and March 25, 2019, the same dates that Sysmex Corporation filed, respectively, the '417 application that led to the '350 patent and the '694 application that led to the '351 patent, Sysmex's attorney, Mr. Tadashi Horie of the law firm

Brinks, Gilson & Lione, submitted with each application a "Certification and Request for Prioritized Examination."  The USPTO granted Sysmex's requests for expedited examination.

38.     With the '417 application, Sysmex, through the named inventors and prosecuting attorneys, filed Information Disclosure Statements on December 10, 2018 and March 6, 2019, listing over 200 references.  The Information Disclosure Statements were signed by Mr. Horie. By this time, Sysmex, Mr. Nagai and/or Mr. Horie were aware of the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i.  Sysmex, Mr. Nagai and/or Mr. Horie were also aware of the materiality of these prior art references and information to the patentability of the claims.  Despite this awareness, Sysmex and its attorneys withheld from these Information Disclosure Statements the XE-2100 Operator's Manual (including Chapter7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.

39.     On March 19, 2019, the USPTO mailed a Notice of Allowance for the '417 application. On April 17, 2019, the USPTO mailed a Notice of Allowance for the '694 application.  Both Notices of Allowance gave as the sole reason for allowance that "the cited

30

prior art neither teaches nor fairly suggests a sample analyzer comprising" the listed elements of the then-independent claims.

40.     Rather than pay the issue fees, Sysmex instead re-opened prosecution for both of the Asserted Patent applications on June 17, 2019 by filing a Request for Continued Examination, including amendments that significantly amended claim language.  Sysmex also submitted additional Information Disclosure Statements on June 17, 2019 and on June 24, 2019, for each of the Asserted Patent applications.  Mr. Horie signed the Requests for Continued Examination and the Information Disclosure Statements for both applications.  Sysmex, through the named inventors and prosecuting attorneys, again withheld from the PTO the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.  Sysmex, Mr. Nagai and/or Mr. Horie were aware of the materiality of these prior art references and information to the patentability of the amended claims in the '417 and '694 applications.

41.     The PTO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and for the '417 application on July 10, 2019.  Both Notices of Allowance gave as the sole reason for allowance, "the cited prior art neither teaches nor fairly suggests a sample analyzer further comprising the recited controller programmed as claimed."

31

42.     Sysmex paid the issue fees for the '694 application on July 2, 2019 (five days after allowance), and for the '417 application on July 10, 2019 (the same day as allowance).  Mr. Horie signed the Issue Fee Transmittals for both applications.  The Asserted Patents both issued on September 3, 2019, less than nine months after Sysmex Corporation filed the '417 application and less than six months after it filed the '694 application.  Sysmex filed the present lawsuit asserting the Asserted Patents against BCI on the same day.

43.     Sysmex, the Sysmex inventors and prosecuting attorney intentionally withheld the prior art XE-2100 Operators Manual, the prior art XE-Series Body Fluid Application publication, the prior art XE-2100 IPU Manual including the Body Fluid Application appendix, and the prior art XE-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

44.     Sysmex, the Sysmex inventors and prosecuting attorney also intentionally withheld the prior art XT-Series Body Fluid Application publication, the XT-2000i/XT-1800i IFU Manual including the Body Fluid Application appendix, and the prior art XT-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

45.     In addition, Sysmex, the Sysmex inventors and prosecuting attorney intentionally did not inform the USPTO that portions of the Asserted Patent specification were copied or derived from the XE-2100 Operators Manual.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

46.     The Sysmex inventors and prosecuting attorney had an obligation to inform the USPTO that the claimed "analyzers" of the Asserted Patents could not be distinguished from the Sysmex prior art on the basis of hardware components, such as the claimed detectors.  Rather, the subject matter that Sysmex claimed as its invention differed from Sysmex's prior art XE-Series products, if at all, only with respect to software modifications.

47.     At least claim 1 of the '350 patent is anticipated by the sale, offer for sale, and/or use of the XE-2100 analyzer for body fluid analysis, as described in XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed the XE-2100 analyzer's approved, marketed, and document use for analysis of body fluids prior to the critical date.

48.     At least claim 1 of the '350 patent is anticipated by the prior art publications XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission insofar as they are considered a single reference.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed these publications during prosecution of the Asserted Patent applications.

49.     The USPTO further would not have issued the claims of the Asserted Patents (as apparently construed by Sysmex to cover the accused products) if Sysmex had disclosed that every claimed hardware arrangement was in the prior art XE-2100 products and that the software in the prior art XE-2100 products could be readily modified in a logical manner to include every additional claimed feature.

33

50.     It would have been obvious to a person of ordinary skill in the art to implement software changes on the XE-2100 to implement each of the various features claimed in the Asserted Patents.

51.     As a direct result of Sysmex's failures to cite material information to the USPTO, including failures by its employee, Mr. Nagai, and its attorney, Mr. Horie, the US Examiner was unaware of Sysmex's own prior art that either disclosed the claimed inventions or differed from them in only obvious ways.

52.     Sysmex was aware of its own prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, as described and identified above, during the prosecution of the Asserted Patents.

53.     Sysmex knew, during the prosecution of the Asserted Patents, that its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, was material to the patentability of the claims in the Asserted Patents.

54.     Sysmex made a deliberate decision to withhold its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, with an intent to deceive the US Examiner.

55.     But for Sysmex's intentional choice to withhold the prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, the claims of the Asserted Patents would not have issued.

56.     Accordingly, Sysmex's fraudulent conduct before the USPTO was inequitable, and the Asserted Patents are unenforceable.

**OTHER RELATED ACTS OF MISCONDUCT BY SYSMEX**

57.     Sysmex, through its agents and counsel Brinks, Gilson & Lione ("Brinks"),

unlawfully used BCI's confidential, proprietary, and trade secret information to prosecute the

'417 and '694 applications from which the Asserted Patents issued.

58.     Since November 2017, Sysmex and BCI have been involved in another patent

infringement lawsuit entitled *Beckman Coulter Inc. v Sysmex America Inc.*, Civil Action No.

1:17-cv-24049-DPG (S.D. Fla.), which BCI filed in the U.S. District Court for the Southern

District Court of Florida.  The Florida Court subsequently transferred the action to the Northern

District Court of Illinois, where it received Civil Action No. 1:18-cv-6563 ("the Illinois Action").

The Illinois Action, like this action, relates to automated laboratory equipment including

hematology analyzers.  Sysmex, through Brinks and Mr. Horie, took advantage of the discovery

process in the Illinois Action to access confidential, proprietary, and trade secret information

about BCI's analyzers, namely the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel

DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, UniCel DxH 900, UniCel

DxH 900 SMS, UniCel DxH 900-2, UniCel DxH 900-2 SMS, UniCel DxH 900-3, and UniCel

DxH 900-3 SMS hematology analyzers (collectively, the "DxH products").

59.     At all times after BCI produced confidential information through the discovery

process in the Illinois Action, Sysmex and any of its counsel that accessed confidential BCI

information had an obligation to refrain from misappropriating discovery materials for purposes

unrelated to the litigation.  Despite this obligation, Sysmex, through Brinks and Mr. Horie, used

BCI's confidential, proprietary, and trade secret information to amend the claims of the '417 and

'694 applications during prosecution in an attempt to reach the DxH products.  The patent claims

of the Asserted Patents were obtained so that Sysmex could accuse BCI of infringement in the

present action.  Sysmex did not have any patent claims that colorably covered any of BCI's

35

hematology instruments until after its counsel at Brinks obtained confidential information obtained through discovery in the Illinois Action.

60.     BCI has invested considerable time and resources in the research and development of the DxH products.  By misappropriating BCI's confidential, proprietary, and trade secret information relating to the DxH products, Sysmex, through Brinks and Mr. Horie, has not only undermined BCI's competitive position, but also forced BCI to spend significant amount of resources to defend a lawsuit that should not have been brought.

## BCI's Confidential, Proprietary, and Trade Secret Information

61.     BCI is an industry leader in diagnostics and equipment for biomedical research and testing.  BCI's technologies improve the productivity of medical professionals and scientists supplying critical information for improving patient health and delivering trusted solutions for research and discovery.  BCI's technologies are used in thousands of hospitals and laboratory facilities worldwide, including those in the U.S.

62.     To maintain its position as an industry leader, BCI dedicates time and resources to innovation.  Through this process, BCI has accumulated a significant amount of confidential, proprietary, and trade secret information.  The success of BCI's business relies on this information.

63.     In fact, at least part of the competitive edge that BCI enjoys is owed to the confidential, proprietary, and trade secret information that it holds for the DxH products.  Such information includes know-how and facts concerning the development, testing, engineering, and functionality of the DxH products, as well as financial and marketing information relating to the manufacturing and sale of such products.  These trade secrets are neither shared with BCI's customers nor disclosed to the public.

36

64.     Source code is among the trade secrets that BCI holds closely.  As one of BCI's crown jewels, the source code for the DxH products contains intricate details relating to their operations and controls.  The software design for the DxH products also resides within the source code.  Similar to other trade secrets guarded by BCI, source code is not available or accessible to the public.  In fact, only a limited number of employees within BCI have access to the source code for the DxH products.  Keeping this information secret prevents BCI's competitors from reproducing or stealing BCI's crown jewels, enabling BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

### The Illinois Action and the Protective Order

65.     On November 3, 2017, BCI filed a complaint against Sysmex in the Southern District Court of Florida, alleging, *inter alia*, that Sysmex's XN-Series hematology analyzers infringe United States Patent No. 6,581,012 ("the '012 patent").  *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:17-cv-24049-GAYLES (S.D. Fla.).  The '012 patent relates to an automated laboratory software architecture.

66.     On September 19, 2018, the Southern District Court of Florida transferred the case to the Northern District Court of Illinois. *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:18-cv-06563 (N.D. Ill.).  The Illinois Action is ongoing.

67.     Brinks represents Sysmex in the Illinois Action.

68.     Early in the Illinois Action—and before any confidential, propriety, and trade secret information was produced—Sysmex and BCI negotiated for and agreed to be bound by a protective order (the "Protective Order") to protect confidential information produced in discovery from improper disclosure and misuse.

69.     On July 11, 2018, Sysmex and BCI jointly moved the Southern District Court of Florida for entry of the Protective Order, acknowledging that the litigation "may require the production of documents and disclosure of testimony and other information involving trade secrets or confidential research and development or commercial information." (Joint Mot. For Entry of Protective Order, ¶ 1, ECF No. 62.)  The court entered the Protective Order as Docket Item No. 63.  A true and correct copy of the Protective Order is attached hereto as Exhibit 3.

70.     The Protective Order recognizes three categories of protected information.

71.     First, the Protective Order recognizes "Confidential Information" as:

> information concerning a Person's business operations, processes, and technical and development information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure], the disclosure of which is likely to harm, that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

(Protective Order, ¶ 2(c).)

72.     Second, the Protective Order recognizes "Highly Confidential Information – Attorney's Eyes Only" as:

> information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure]  that constitutes business or technical trade secrets or plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court, including particularly sensitive confidential information that a Person believes in good faith cannot be disclosed to a Recipient without threat of injury because such information contains trade secret or other proprietary or commercially sensitive information.

(Protective Order, ¶ 2(d).)

73.     Third, the Protective Order recognizes "Highly Confidential Information – Source Code" as:

> any source code (including comments contained therein), human-readable programming language text that defines software, firmware, or electronic hardware descriptions, object code, Register Transfer Level ("RTL") files, Hardware

38

Description Language ("HDL") tiles, or other hardware description language, live data (i.e. data as it exists residing in a database or databases), or pseudo-source-code (i.e., a notation resembling a programming language but not intended for actual compilation, which usually description of the computations to be carried out) ("Source Code") more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a court combines some of the structure of a programming language with an informal natural-language.

(Protective Order, ¶ 2(e).)

74.    Pursuant to Paragraph 4(a) of the Protective Order, any individual who receives information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" may use the information for the prosecution or defense of the infringement action, but not for any other purposes, such as patent prosecution.

75.    Pursuant to Paragraph 4(b) of the Protective Order, counsel for the parties are responsible for the control and distribution of information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code."

76.    Pursuant to Paragraph 4(c) of the Protective Order, information designated as "Confidential" may be disclosed only to a limited number of individuals, such as the opposing party's litigation counsel, two employees of that party, and experts retained specifically for the litigation.

77.    Pursuant to Paragraph 4(d) of the Protective Order, information designated as "Highly Confidential – Attorney's Eyes Only" or "Highly Confidential – Source Code" may be disclosed only to an even more limited number of individuals, such as the opposing party's litigation counsel and experts retained specifically for the litigation.

78.    Pursuant to Paragraphs 5(a) and 5(c) of the Protective Order, only those who are eligible to view information designated as "Highly Confidential – Source Code" may inspect—

but not copy—the opposing party's source code.  After inspection, limited hard copies of information designated as "Highly Confidential – Source Code" may be produced upon request.

79.     Pursuant to Paragraph 10 of the Protective Order, counsel for the parties are precluded from prosecuting certain patent applications during the pendency of the litigation. Specifically, Paragraph 10 contains a prosecution bar, which states as follows:

> Any person permitted to receive technical information from a producing party that is designated Highly Confidential – Attorney's Eyes Only, or Highly Confidential - Source Code information (collectively "Highly Sensitive Technical Material"), and who obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's Highly Sensitive Technical Material under this Order *shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals*.

(Protective Order, ¶ 10 (emphasis added).)

80.     Under the Protective Order, the parties and their counsel had a duty to maintain the secrecy of any information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" and to restrict the use of such information to only the purposes permitted under the Protective Order.

81.     The Protective Order remains binding on the parties and their counsel after the transfer of the case from Florida to the Northern District Court of Illinois.  In other words, those who receive information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" in the Illinois Action remain obligated to maintain the secrecy of the information and to limit the use of the information to only the purposes permitted under the Protective Order.

82.     Sysmex and BCI also negotiated for and agreed to be bound by a protective order in this Action (the "Delaware Protective Order") to protect confidential information produced in

discovery in this Action from improper disclosure and misuse.  The provisions of the Protective

Order and the Delaware Protective Order, and specifically the paragraphs cited above, are

identical.

### Mr. Horie and Brinks

83.     Mr. Horie is an attorney licensed in the State of Illinois.  Mr. Horie has not filed

an appearance in the Illinois Action, but is one of at least twelve Brinks attorneys who have

represented or assisted Sysmex in the Illinois Action at one point or another.

84.      According to Brinks's website, Mr. Horie has been practicing law at Brinks since

1992 and has been a shareholder at Brinks since 2003.  Brinks also represents Mr. Horie to the

public as having substantial expertise in patent prosecution and litigation with a "deep

background in electrical and computer-related technologies" such as "computer-controlled

medical diagnostic analyzers."

85.     Mr. Horie prosecutes and supervises the prosecution of patent applications on

behalf of Sysmex, including those that relate to "electrical and computer-related technologies"

and "computer-controlled medical diagnostic analyzers."  On information and belief, Mr. Horie

has prosecuted over 100 patent applications for Sysmex since 2003.

86.     Even though he has not filed an appearance with the court, Mr. Horie has been

significantly involved in defending Sysmex in the Illinois Action.  Among other things, Mr.

Horie has ███████████████████████████████████████████████████████

███████████████████████████████████████████████; attended at

least one deposition in which BCI's highly confidential information was discussed; clandestinely

received communications from BCI's counsel relating to confidential and/or highly confidential

information via a Brinks email distribution group; and attended a claim construction hearing for

41

the '012 patent.  Mr. Horie has accessed and reviewed confidential and highly confidential information produced by BCI, including technical information.

87.     In October 2020, as part of ongoing discovery in this Action, Sysmex requested an inspection of BCI's source code for the DxH products.  On October 27, Sysmex identified that Mr. Horie would accompany its technical expert for the source code inspection.  BCI objected to Mr. Horie's participation, citing the Protective Order, and asked for information regarding Mr. Horie's prosecution activities.  On October 28, Sysmex withdrew its request to have Mr. Horie participate in the inspection, without providing any additional information on Mr. Horie's prosecution activities.

88.     At all times relevant to this claim, Mr. Horie and Sysmex's attorneys of record at Brinks were aware of the Protective Order.

89.     At all times relevant to this claim, Sysmex and/or its counsel and Mr. Horie understood their duty under the Protective Order to maintain the secrecy of any confidential or highly confidential information, including source code information, that they receive from BCI and to restrict the use of such information to only the purposes permitted under the Protective Order.

90.     Sysmex and/or its counsel and Mr. Horie also understood their duty under the Protective Order's prosecution bar, which precludes Mr. Horie from "prepar[ing], prosecut[ing], supervis[ing], or assist[ing] in the preparation or prosecution of any patent application pertaining to the field of the invention" of the '012 patent during the pendency of the Illinois Action. (Protective Order, ¶ 10.)

**Breach of the Protective Order and Misappropriation of BCI's Confidential Information**

91.     On information and belief, Sysmex, through Brinks and Mr. Horie, planned to file and maintain a counter-patent infringement suit against BCI as retaliation for accusing Sysmex of infringement.  In particular, Sysmex intended to advance the claim that the DxH products infringe Sysmex's own patents.  Because BCI contended in the Illinois Action that the DxH products practice the claims of the '012 patent, Sysmex had a unique opportunity (through discovery) to learn about the technical features of the DxH products before filing a counter-suit.

92.     By December 2018, BCI had produced over 65,000 pages of documents to Brinks in response to Sysmex's discovery requests.  Many documents were designated as "Highly Confidential – Attorney's Eyes Only," and contained *inter alia*, confidential, proprietary, and/or trade secret information concerning the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

93.     On December 11, 2018, Sysmex sued BCI in the District Court of Delaware, alleging, among other things, that the importation, offer for sale, sale, and exportation of the DxH products infringe the '746 patent.  *See Sysmex America, Inc. and Sysmex Corp. v. Beckman Coulter, Inc.*, No. 1:18-cv-01 951-CFC (D. Del) (the "First Delaware Action").  However, about two months later, and prior to BCI responding to the Complaint in that action, Sysmex filed a notice of voluntary dismissal of the case because it belatedly realized that the claims of the '746 patent were not infringed by the DxH products.

94.     On February 12, 2019, BCI produced to Brinks over 15,000 documents totaling over 125,000 pages in response to discovery requests served in the Illinois Action.  As most of these documents were designated as "Highly Confidential Information – Attorney's Eyes Only," this production contained a substantial amount of confidential, proprietary, and/or trade secret

information relating to the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

95.     In the meantime, Mr. Horie was prosecuting patent applications on behalf of Sysmex while being permitted access to BCI's confidential, proprietary, and trade secret information produced in discovery.  Mr. Horie filed the '417 application on December 10, 2018, filed the '694 application on March 25, 2019, and tended to the prosecution of those applications. The '417 and '694 applications were filed with "Track One" requests in order to expedite their examination by the USPTO.

96.     The subject matter of the '417 and '694 applications relates to the field of invention of the '012 patent.

97.     At no point during the pendency of the Illinois Action did Sysmex or Brinks take any measures to prevent Mr. Horie from reviewing BCI's confidential information.  Nor did Sysmex or Brinks enforce the prosecution bar against him.  The filing and prosecution of the '417 and '694 applications by Mr. Horie, therefore, violated at least the prosecution bar of the Protective Order.

98.     The USPTO mailed a Notice of Allowance for the '417 application on March 19, 2019 and a Notice of Allowance for the '694 application on April 17, 2019.  On information and belief, Sysmex intended to assert any patents issuing from the '417 and '694 applications against BCI—but first, it sought to determine whether the claims of the '417 and '694 applications, as allowed at that time, could either encompass or be amended to encompass the operation of the DxH products.  Instead of paying the issue fees, Sysmex, through Brinks and Mr. Horie, continued to use the tools of discovery to further access confidential, proprietary, and trade secret information relating to the DxH products.

44

99.     In late April 2019, a Brinks attorney of record in the Illinois Action, on behalf of Sysmex, requested an inspection of the source code for the DxH products pursuant to the Protective Order.

100.    Given that the Protective Order specifically provides for the protection of source code information in discovery, Sysmex and Brinks understood the source code for the DxH products is confidential and proprietary to BCI and constitutes trade secrets.

101.    Using discovery permitted under the Federal Rules of Civil Procedure, Sysmex inspected BCI's source code pursuant to the Protective Order.  From May 6, 2019 to May 9, 2019, Sysmex's technical expert and attorney of record examined the source code for the DxH products.

102.    After inspecting the code in the Illinois Action, Sysmex, through Brinks, requested that BCI produce printouts and native files of certain portions of this source code pursuant to Protective Order.

103.    On June 12, 2019, BCI produced the requested printed materials and designated them as "Highly Confidential – Source Code" under the Protective Order.

104.    Accordingly, by June 12, 2019, Mr. Horie, along with other Brinks attorneys, had access to a substantial amount of confidential, proprietary, and trade secret information from BCI relating to (1) the source code for the DxH products and (2) the development, testing, technical features, engineering, and/or functionality of the DxH products.  Despite awareness and knowledge of the Protective Order, Mr. Horie did not cease prosecuting patent applications on behalf of Sysmex, and neither Sysmex nor its counsel took any steps to prevent Mr. Horie's continued prosecution of patent applications.

105.    On June 17, 2019, five days after receiving hard copies of BCI's source code production, Mr. Horie re-opened prosecution for both of the '417 and '694 applications by filing Requests for Continued Examination, including a large number of amendments to the claims in each application.  In the '417 application, Mr. Horie amended 16 of the previously allowed 20 claims and added 8 new claims.  In the '694 application, Mr. Horie amended 20 of previously allowed 28 claims and added 1 new claim.

106.    These amendments significantly changed the claim language and scope of the '417 and '694 applications.

107.    As an example, independent claims 1 and 12 of the '417 application and independent claim 1 of the '694 application were amended to include a feature of a sensing operation that when "performed in the body fluid mode [is] different, at least partially, from the sensing operation performed in the measuring mode."  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019. These patent claims are also materially different from the patent claims of the '746 patent that Sysmex initially asserted but later withdrew in the First Delaware Action.

108.    As another example, independent claim 19 of the '417 application, dependent claims 3-6 and 18 of the '417 application, and dependent claim 17 of the '694 application were amended to include a feature of "automatically initiating" a pre-washing process.  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019.

109.    Mr. Horie submitted these claim amendments and new claims after he and/or others under his supervision had access to confidential information for the DxH products,

including technical information designated by BCI as "Highly Confidential - Attorney's Eyes Only" and/or "Highly Confidential - Source Code," through discovery in the Illinois Action.  On information and belief, Sysmex used Mr. Horie to obtain patents that could cover the features of the DxH products as part of its plan to initiate a retaliatory patent infringement action against BCI.

110.     Mr. Horie, along with the other Brinks attorneys, understood the Protective Order's prohibition against misuse of BCI's confidential, proprietary, and trade secret information, including the information designated as "Highly Confidential – Source Code." Sysmex, through the actions of Mr. Horie, breached the Protective Order at least because it appropriated BCI's trade secret information, e.g., source code, for a purpose unrelated to its defense in the Illinois Action.

111.     The USTPO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and a new Notice of Allowance for the '417 application on July 10, 2019.  Sysmex promptly paid the issue fees.

112.     The Asserted Patents issued from the '417 and '697 applications on September 3, 2019 without further claim amendments.  The Asserted Patents misappropriated the source code information and/or other highly confidential information that Brinks received from BCI in the Illinois Action.

113.     On the same day that the Asserted Patents issued, Sysmex filed the present action against BCI, claiming that the DxH products infringe the Asserted Patents.  Sysmex's promptness in the filing of the present action, at the very least, indicates an eagerness to pursue a retaliatory patent infringement suit against BCI.

**Continued Breach of the Protective Order**

114.    After the issuance of the Asserted Patents, Mr. Horie has continued to file and

prosecute patent applications on behalf of Sysmex.  BCI is unaware of any restriction in Mr.

Horie's access to BCI's confidential, proprietary, and trade secret information since the issuance

of the Asserted Patents.  Nor is BCI aware of any measure taken by Sysmex or Brinks to enforce

the prosecution bar of the Protective Order against Mr. Horie.

115.    Since the entry of the Protective Order in July 2018 for the Illinois Action in the

Southern District Court of Florida, Mr. Horie has prosecuted at least 50 patent applications for

Sysmex, including the Asserted Patent applications.  A list of presently known Sysmex patent

applications that Mr. Horie has prosecuted since July 2018 is attached as Exhibit 4.

116.    The subject matter of many of these applications relates to the field of invention

of the '012 patent.

117.    Mr. Horie's prosecution of these applications is a violation of at least the

prosecution bar of the Protective Order.

118.    In January 2021, BCI took the deposition of Mr. Horie.  During the deposition,

Mr. Horie did not dispute that (1) ███████████████████████████████████; (2)

████████████████████████████████████████████; and (3) ██████

███████████████████

**First Counterclaim**

**(Declaration of Non-Infringement of the '350 Patent)**

119.    BCI realleges and incorporates by reference its allegations in the preceding

paragraphs 1-118.

48

120.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, *inter alia*, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '350 Patent.

121.     The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '350 Patent, either directly, contributorily or by inducement, literally or by equivalents.

122.     BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '350 Patent.

## Second Counterclaim

## (Declaration of Non-Infringement of the '351 Patent)

123.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-122.

124.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '351 Patent.

125.     The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '351 Patent, either directly, contributorily or by inducement, literally or by equivalents.

126.     BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '351 Patent.

**Third Counterclaim**

**(Declaration of Invalidity of the '350 Patent)**

127.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-126.

128.    A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '350 Patent.

129.    The claims of the '350 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

130.    The claims of the '350 Patent are invalid for double patenting.

131.    BCI is entitled to a judicial determination and declaration that the claims of the '350 Patent are invalid.

**Fourth Counterclaim**

**(Declaration of Invalidity of the '351 Patent)**

132.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-131.

133.    A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '351 Patent.

134.    The claims of the '351 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

135.    The claims of the '351 Patent are invalid for double patenting.

136.    BCI is entitled to a judicial determination and declaration that the claims of the

'351 Patent are invalid.

## Fifth Counterclaim

### (Inequitable Conduct)

137.    BCI realleges and incorporates by reference its allegations in the preceding

paragraphs 1-136.

138.    Based on Plaintiffs' filing of this lawsuit and BCI's denial of Plaintiffs'

allegations, an actual controversy has arisen and now exists between BCI and Plaintiffs as to the

enforceability of the '350 and '351 Patents.

139.    As described above, at least one inventor and at least one prosecuting patent

attorney concealed material information from the United States Patent and Trademark Office

("USPTO") during prosecution of the Asserted Patents.  Such at least one inventor and at least

one prosecuting patent attorney concealed material information with an intent to deceive the

USPTO.

140.    The '350 Patent and '351 Patent are unenforceable due to inequitable conduct by

such at least one inventor and at least one prosecuting patent attorney.

## Sixth Counterclaim

### (The Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.)

141.    BCI realleges and incorporates by reference its allegations in the preceding

paragraphs 1-140.

142.    This cause of action arises under the Defend Trade Secrets Act, U.S.C. § 1836 *et*

*seq.*

143.    The Defend Trade Secrets Act defines "trade secret" as any "form and type[] of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

144.    At least BCI's information that is designated as "Highly Confidential – Source Code" in the Illinois Action, including the DxH source code, is a trade secret as defined by the Defend Trade Secrets Act.

145.    This information is not generally known or readily ascertainable by the public. As detailed above, BCI has taken reasonable and affirmative steps to keep the information secret, including, but not limited to, (1) having Sysmex agree to the Protective Order before producing any documents in the Illinois Action; (2) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only a limited number of individuals; (3) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only purposes related to the Illinois Action and not for any other purposes; (4) requiring that Sysmex's counsel refrain from prosecuting any patent applications relating to the field of invention as the '012 patent when counsel has access to information designated as "Highly Confidential – Source Code;" and (5) restricting levels of access to its DxH source code by individuals within BCI.

146.    BCI's information designated as "Highly Confidential – Source Code" derives independent economic value from maintaining its secrecy.  The source code for the DxH products relates to their operations and controls and contains the software design.  Keeping this

information secret from the public prevents BCI's competitors from replicating or stealing the source code, which enables BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

147.   At all times relevant to this claim, and pursuant to the Protective Order, Sysmex, through Brinks, had a legal duty to maintain the secrecy of the information designated as "Highly Confidential – Source Code" and to limit its use to only the purposes permitted under the Protective Order and not for any other purposes such as patent prosecution.

148.   Despite its legal duty, Sysmex, through Brinks and Mr. Horie, used at least BCI's information designated as "Highly Confidential – Source Code" to prosecute the '417 and '694 applications from which the Asserted Patents issued.

149.   Sysmex, through Brinks and Mr. Horie, has misappropriated BCI's trade secrets.

150.   Sysmex's conduct was malicious, deliberate, and willful.

151.   BCI has been damaged by Sysmex's misappropriation of trade secrets at least because it has been forced to spend its monetary resources in defending against the present patent infringement action that, but for Sysmex's misappropriation of BCI's trade secrets, could not have been brought by Sysmex.

152.   Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B)(i) and (ii), BCI is entitled to an award of monetary damages.

153.   Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C), BCI is entitled to exemplary damages.

154.   Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D), BCI is entitled to reasonable attorneys' fees.

**Seventh Counterclaim**

**(Breach of Contract)**

155.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-154.

156.    The Protective Order is a valid and enforceable contract between BCI and Sysmex.

157.    The Protective Order is supported by valuable consideration, including, but not limited to, BCI's agreement to maintain the confidentiality of any of Sysmex's information designated as "Confidential," "Highly Confidential Information – Attorney's Eyes Only," and "Highly Confidential Information – Source Code."

158.    BCI has duly performed all of the terms, conditions, and covenants required to be performed under the Protective Order, to the extent those obligations have not otherwise been excused, prevented, and/or waived by Sysmex.

159.    Sysmex, through its counsel and Mr. Horie, obtained, received, had access to, and/or otherwise learned, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

160.    Sysmex, through its counsel and Mr. Horie, has breached Paragraph 4(a) of the Protective Order at least by using BCI's information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code" in the prosecution of the '417 and '694 applications from which the Asserted Patents issued.

161.    Sysmex, through its counsel and Mr. Horie, breached Paragraph 10 of the Protective Order at least by preparing, prosecuting, supervising, or assisting in the preparation or prosecution of one or more patent applications pertaining to the field of the invention of the '012

patent, including the '417 and '694 applications from which the Asserted Patents issued. Sysmex's prosecution of the '417 and '694 applications, through its counsel and Mr. Horie, occurred after or while obtaining, receiving, having access to, and/or otherwise learning, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

162.    As a direct and proximate result of the breach, BCI has suffered and continues to suffer harm, including the expenditures that it has incurred in defending against the present patent infringement action that, but for Sysmex's breach of the Protective Order, could not have been brought by Sysmex.

## PRAYER FOR RELIEF

WHEREFORE, BCI prays that the Court enter judgment in its favor and against Counterclaim-Defendants as follows:

a.    Dismissing the Complaint with prejudice and entering a judgment in BCI and against Plaintiffs/Counterclaim-Defendants;

b.    Denying each request for relief made by Plaintiffs.

c.    Declaring that BCI has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, any valid claims of the '350 Patent and the '351 Patent;

d.    Declaring that the claims of the '350 Patent and the '351 Patent are invalid;

e.    Declaring that the '350 Patent and the '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents before the U.S. Patent & Trademark Office;

f.    Declaring that Sysmex has violated the Defend Trade Secrets Act due to its misappropriation of BCI's trade secrets;

g.      Declaring that Sysmex has breached the Protective Order;

h.      Declaring this case is exceptional and awarding BCI its attorneys' fees pursuant to 35 U.S.C. § 285;

i.      Awarding BCI monetary damages due to Sysmex's violation of the Defend Trade Secrets Act and Sysmex's breach of the Protective Order;

j.      Declaring that BCI's trade secrets have been maliciously and willfully misappropriated by Sysmex and awarding exemplary damages and reasonable attorneys' fees pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b)(3)(C) and (D);

k.      Declaring that Sysmex is an involuntary trustee of the subject matter disclosed and claimed in the Asserted Patents in constructive trust for the benefit of BCI;

l.      Awarding BCI its costs and expenses in defending against Plaintiff's claims; and

m.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Defendant BCI hereby demands trial by jury in this action.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

LEYDIG, VOIT & MAYER, LTD
David M. Airan
Wesley O. Mueller
Nicole E. Kopinski
Aaron R. Feigelson
Wallace H. Feng
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL  60601-6745
(312) 616-5600

*Attorneys for Beckman Coulter, Inc.*

Dated: April 09, 2021

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on April 09, 2021 I caused to be electronically filed a true and correct copy of First Amended Answer and Counterclaims of Defendant Beckman Coulter, Inc. with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on April 09, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

James R. Sobieraj
Robert S. Mallin
Joshua James
Daniel A. Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
ashoffstall@brinksgilson.com

/s/  Melanie K. Sharp
_____
Melanie K. Sharp (No. 2501)

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BECKMAN COULTER, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| ~~BECKMAN COULTER, INC.,~~ | ) |
| | ) |
| ~~Counterclaim-Plaintiff~~ | ) |
| | ) |
| ~~v.~~ | ) |
| | ) |
| ~~SYSMEX CORPORATION and SYSMEX AMERICA, INC.,~~ | ) |
| | ) |
| ~~Counterclaim-Defendants.~~ | ) |

C. A. No.:  19-1642-RGA-CJB ~~Civil Action No. 1:19-cv-01642-RGA~~

**JURY TRIAL DEMANDED**

███████████████

~~Judge Richard G. Andrews~~

## ~~FIRST~~SECOND AMENDED ANSWER AND COUNTERCLAIMS OF DEFENDANT BECKMAN COULTER, INC.

Defendant Beckman Coulter, Inc. ("BCI"), by and through its undersigned attorneys, hereby answers each of the numbered paragraphs of the Complaint filed September 3, 2019, by Plaintiffs Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively "Plaintiffs").  Except as expressly admitted below, BCI denies each allegation of Plaintiffs' Complaint.

## NATURE OF THE ACTION

1.      BCI admits that this action purports to state a claim under the patent laws of the United States for infringement of United States Patent Nos. 10,401,350 entitled "Sample

Analyzer and Computer Program Product" ("the '350 Patent") and 10,401,351 entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").  BCI admits that Exhibits A and B appear to be copies of the '350 patent and '351 patent, respectively.  BCI denies the remaining allegations in paragraph 1.


## THE PARTIES

2.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

3.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

4.      BCI admits that the Plaintiffs are named on the face of the patents in suit as the purported assignees of the '350 and '351 Patents.

5.      Admitted.

6.      BCI admits that it makes, offers to sell, sell and exports hematology analyzer systems, including products sold as the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, DxH 900, DxH 900 SMS, DxH 900-2, DxH 900-2 SMS, DxH 900-3, and DxH 900-3 SMS, which Plaintiffs identify as "the Accused Products."  BCI denies that Plaintiffs further characterizations of the Accused Products are accurate, and further denies that any of the Accused Products infringe the '350 and '351 Patents.

## Jurisdiction and Venue

7.      This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest that purported patent infringement claims arise under the Patent Laws of the United States, Title 35 of the United States Code.

8.     This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest this Court's subject matter jurisdiction over a purported patent claim.

9.     To the extent this Paragraph contains legal conclusions, no answer is required. BCI admits that it is incorporated in the State of Delaware and does business in Delaware, and it does not contest that this Court may exercise personal jurisdiction over it for purposes of this action.  BCI denies the remaining allegations of this paragraph.

10.     This paragraph contains legal conclusions to which no answer is required.  BCI does not contest venue in this district for purposes of this action, but it disputes that this is the most appropriate or convenient venue for this action.

**THE PATENTS**

11.     BCI admits that the '350 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '350 Patent was duly and legally issued, denies that the '350 Patent is valid, and denies that the '350 Patent is enforceable.

12.     Denied.

13.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '350 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

14.     BCI admits that '351 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '351 Patent was duly and legally issued, denies that the '351 Patent is valid, and denies that the '351 Patent is enforceable.

15.     Denied.

16.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '351 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

3

## THE ACCUSED PRODUCTS

17.     BCI admits that the Accused Products are sold as "hematology analyzers." To the extent this Paragraph contains conclusions of law, including regarding the scope of the '350 and '351 Patent claims or the alleged infringement, including based on this paragraph's use of the terms such as "analyzer," "a plurality of detectors" and "multi-mode detector," no answer is required and BCI disputes Plaintiffs' characterizations of the '350 and '351 patent.

18.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that it products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

19.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that its products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

20.     Because BCI denies that its products infringe any asserted claims, BCI denies the allegations of this paragraph.

21.     Denied.

22.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

23.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 23 of the Complaint as calling for a legal conclusion, and therefore denies the same.

24.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

25.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 25 of the Complaint as calling for a legal conclusion, and therefore denies the same.

26.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

27.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 27 of the Complaint as calling for a legal conclusion, and therefore denies the same.

28.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

29.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 29 of the Complaint as calling for a legal conclusion, and therefore denies the same.

30.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

31.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 31 of the Complaint as calling for a legal conclusion, and therefore denies the same.

32.      BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

33.      BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 33 of the Complaint as calling for a legal conclusion, and therefore denies the same.

34.      BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

35.      BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 35 of the Complaint as calling for a legal conclusion, and therefore denies the same.

36.      BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

37.      BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 37 of the Complaint as calling for a legal conclusion, and therefore denies the same.

38.      BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

39.      BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July

2015, respectively.  BCI objects to the remaining allegations of paragraph 39 of the Complaint as calling for a legal conclusion, and therefore denies the same.

40.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

41.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 41 of the Complaint as calling for a legal conclusion, and therefore denies the same.

42.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

43.     BCI admits that Exhibits E is a document entitled "Performance Evaluation of Body Fluids on the UniCel DxH 800 Coulter Cellular Analysis System," published in 2009.  BCI objects to the remaining allegations of paragraph 43 of the Complaint as calling for a legal conclusion, and therefore denies the same.

44.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

45.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 45 of the Complaint as calling for a legal conclusion, and therefore denies the same.

46.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

7

47.     BCI objects to the allegations of paragraph 47 as calling for a legal conclusion, and therefore denies the same.

48.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

49.     BCI objects to the allegations of paragraph 49 as calling for a legal conclusion, and therefore denies the same.

50.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

51.     BCI objects to the allegations of paragraph 51 as calling for a legal conclusion, and therefore denies the same.

52.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

53.     BCI objects to the allegations of paragraph 53 as calling for a legal conclusion, and therefore denies the same.

54.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

55.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 54 of the Complaint as calling for a legal conclusion, and therefore denies the same.

56.     Denied.

**COUNT I – [Alleged] Patent Infringement: U.S. Patent No. 10,401,350**

57.     BCI restates and incorporates each of its responses to paragraph 1-56 as if fully set forth above.

58.     Denied.

59.     BCI admits that it is not presently aware that it is directly licensed to the '350

patent or that Plaintiffs provided "authority" in connection with the '350 patent.  BCI is without

knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 62 of the Complaint with respect to licenses that BCI is not a direct party to but may

be a beneficiary of, and therefore denies the same.  BCI denies that any license or "authority" is

required "to practice the subject matter claimed by the '350 Patent.  BCI denies all remaining

allegations of this paragraph.

60.     This paragraph contains vague legal conclusions to which no answer is required.

It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287

with respect to the '350 patent are satisfied at least as of the date of service of this complaint

upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the

event of failure so to mark, no damages shall be recovered by the patentee in any action for

infringement, except on proof that the infringer was notified of the infringement and continued to

infringe thereafter, in which event damages may be recovered only for infringement occurring

after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies

all remaining allegations of this paragraph.

61.     Denied.

**COUNT II – [Alleged] Patent Infringement: U.S. Patent No. 10,401,351**

62.     BCI restates and incorporates each of its responses to paragraph 1-61 as if fully

set forth above.

63.     Denied.

64.     BCI admits that it is not presently aware that it is directly licensed to the '351

patent or that Plaintiffs have provided "authority" in connection with the '351 patent.  BCI is

without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same.  BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '351 Patent.  BCI denies all remaining allegations of this paragraph.

65.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '351 patent are satisfied at least as of the date of service of this complaint upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies all remaining allegations of this paragraph.

66.     Denied.

## RESPONSE TO PRAYER FOR RELIEF

BCI denies all allegations not specifically admitted herein, and further denies that Plaintiffs are entitled to the judgment and relief requested in the Prayer for Relief.  Rather, the Complaint should be dismissed with prejudice with a finding of no infringement and invalidity in favor of BCI.

## AFFIRMATIVE DEFENSES

Without any admission as to the burden of proof, burden of persuasion, or the truth of any allegation in Plaintiffs' Complaint, BCI states the following affirmative defenses:

**First Affirmative Defense**

Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**Second Affirmative Defense**

BCI has not infringed, and does not infringe any claim of the '350 Patent and '351 Patent, literally, under the doctrine of equivalents, directly or indirectly, contributorily, by inducement, or in any other manner.

**Third Affirmative Defense**

The asserted claims of the '350 Patent and of the '351 Patent are invalid for failing to comply with the conditions and requirements for patentability set forth in the United States Patent Laws, including, without limitation, in 35 U.S.C. §§ 101, 102, 103, 112, for double patenting, and the rules, regulations, and laws pertaining thereto.

**Fourth Affirmative Defense**

Plaintiffs' allegations are inadequate to state a claim of willfulness under 35 U.S.C. § 285.

**Fifth Affirmative Defense**

Plaintiffs cannot satisfy the requirements applicable to their request for injunctive relief and have an adequate remedy at law.

**Sixth Affirmative Defense**

As described in detail below with respect to BCI's Fifth Counterclaim, the '350 Patent and '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents while prosecuting the '350 Patent and '351 Patent before the U.S. Patent & Trademark Office.

11

### Seventh Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands.  Plaintiffs, through their attorney agents, obtained access to confidential information of Defendant, which it then wrongfully misappropriated, in violation of a Protective Order issued by the U.S. District Court for the Northern District of Illinois, to draft and prosecute the claims of '350 Patent and '351 Patents.  As a result of this conduct, Plaintiffs are barred from enforcing the '350 Patent and the '351 Patent against Defendant.

BCI reserves the right to assert all affirmative and other defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defenses, at law or in equity, that may now or in the future be available based on discovery, any other factual investigation, or any other development relating to this case or any other action.

### COUNTERCLAIMS

Defendant Beckman Coulter, Inc. ("BCI") incorporates herein by reference the admissions, allegations, denials and Affirmative Defenses contained in the Answer above as if fully set forth herein. For its Counterclaims against Plaintiffs/Counterclaim-Defendants Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively, "Counterclaim-Defendants") BCI states as follows:

### THE PARTIES

1.      BCI is a Delaware corporation having its principal place of business in Brea, California.

2.      According to the Complaint, Sysmex America, Inc. is a Delaware corporation having its principal place of business at 577 Aptakisic Road, Lincolnshire, Illinois 60069.

3.      According to the Complaint, Sysmex Corporation is a Japan corporation having its principal place of business at 1-5-1 Wakinohama-kaigandori, Chuo-ku, Kobe, Hyogo, Japan.

## JURISDICTION AND VENUE

4.      These counterclaims arise under the Patent Laws of the United States, 35 U.S.C. §~1 et seq. and, the Declaratory Judgment Act, 28 U.S.C. §§ ~2201 and 2202, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836*, et seq*., (collectively, the "Federal Counterclaims") and breach of contract under the laws of the State of Illinois.  This Court has jurisdiction over the subject matter of these the Federal Counterclaims under 28 U.S.C. §§ 1331 and 1338(a) because the Counterclaims involve questions of federal law and regulation, and pursuant to 28 U.S.C. §§ 1367(a), because the Federal Counterclaims are so related to the claims in this action as to form part of the same case or controversy under Article III of the United States Constitution.  This Court also has supplemental jurisdiction over the breach of contract counterclaim because such claims are so related to the Federal Counterclaims and the claims of this action as to form part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over Sysmex and SAI because, among other reasons, these Counterclaim-Defendants have consented and subjected themselves to the jurisdiction of this Court by filing their Complaint against BCI.

6.      To the extent that venue is appropriate for Counterclaim-Defendants' claim against BCI, venue is also appropriate in this Court for BCI's counterclaims.

7.      There is an actual and justiciable controversy between the parties as to the infringement, validity and enforceability of United States Patent No. 10,401,350, entitled "Sample Analyzer and Computer Program Product" ("the '350 Patent") and United States Patent No. 10,401,351, entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").

## BACKGROUND

8.       The asserted Sysmex '350 Patent and '351 Patent (collectively, "the Asserted

Patents") purport to describe an improvement in hematology analyzers.   The "Field of the

Invention" section of the specification states "[t]he present invention relates to a sample analyzer

and computer program product capable of measuring not only blood, but also body fluids other

than blood such as cerebrospinal fluid (spinal fluid), fluid of the thoracic cavity (pleural fluid),

abdominal fluid and the like."  This description of the invention inaccurately and misleadingly

suggests that prior art systems measured only blood whereas the purportedly novel analyzer of

the patent application measured both blood and body fluids.  However, several years before

Sysmex filed its earliest related patent application, both BCI and Sysmex had made, used and

described hematology systems for measuring both blood and body fluids.

9.       BCI and Sysmex are competitors.  Prior to the critical date of the '350 and '351

patents, both parties made and sold automated hematology analyzers, which performed blood

and body fluid tests in clinical laboratories.  These analyzers measured and reported information

about the composition of cells in blood and body fluid samples.  For example, the prior art

analyzers measured red blood cell counts, white blood counts, hemoglobin and other parameters

for blood.  The prior art analyzers also are capable of measuring and reporting body fluid

information such as total nucleated cell counts.

### The Sysmex Patents in Suit

10.     A copy of the '350 patent is attached as Exhibit A to Plaintiffs' Complaint.

11.     A copy of the '351 patent is attached as Exhibit B to Plaintiffs' Complaint.

12.     By paragraph 4 of their Complaint, Plaintiffs allege that they are "the assignees of

the Patents, and are the co-owners of the entire right, title, and interest in and to the Patents,

14

including the right to enforce and to recover damages for any current or past infringement of the Patents."

13.    The critical date of the '350 patent for prior art purposes is no earlier than January 31, 2007.

a.    Sysmex's '350 patent issued from U.S. Patent Application Serial No. 16/214,417 ("the '417 application"), which Sysmex filed on December 10, 2018. Through a series of continuation applications, the '417 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.    Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '350 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '417 application claims priority.

14.    The critical date of the '351 patent for prior art purposes is also no earlier than January 31, 2007.

a.    Sysmex's '351 patent issued from U.S. Patent Application Serial No. 16/363,694 ("the '694 application"), which Sysmex filed on March 25, 2019.  Through a series of continuation applications, the '694 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.    Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective

15

filing date of the '351 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '694 application claims priority.

      c.     At least certain claims of the '351 patent are not entitled to the benefit of any priority prior to its filing date of March 25, 2019 because they claim subject matter that was not disclosed in any earlier patent application to which the benefit of priority was claimed.

15.     The patents in suit issued from a long chain of applications claiming priority to the '830 application.  Sysmex obtained at least four earlier patents from this chain of applications, all having the same patent specification and drawings.  These patents include U.S. Patent 8,440,140 (the '140 patent"), which issued on May 13, 2013 from the '830 application; U.S. Patent 8,968,661 ("the '661 patent"), which issued on March 3, 2015 from a continuation (U.S. Patent Application Serial No. 13/891,667) of the '830 application; U.S. Patent 9,933,414, which issued on April 3, 2018 from a further continuation application (U.S. Patent Application Serial No. 14/595,319); and U.S. Patent 10,151,746 ("the '746 patent"), which issued on December 11, 2018 from yet another continuation application (U.S. Patent Application Serial No. 15/908,339).

16.     This is not the first patent infringement lawsuit brought by Sysmex against BCI regarding a patent issuing from an application which claims priority to the '830 application.  On December 11, 2018, Sysmex filed a lawsuit against BCI, asserting infringement of the '746 patent.

17.     On February 13, 2019, Sysmex dismissed without prejudice its lawsuit involving the '746 patent.

18.     At least the independent claims of the '350 and '351 patent are obvious in view of the claims in one or more of the prior Sysmex patents issuing from the same chain of applications, including at least the '746 patent.

**Sysmex's Prior Art Systems**

19.     More than one year prior to the filing date of the patents in suit, Sysmex made and sold prior art hematology analyzers, including at least the XE-2100, XT-2000i and XT-1800i analyzers, that were used for measuring both blood and body fluids.

20.     Sysmex or others had stated in printed publications and marketing materials that such prior art hematology analyzers could be used for measuring both blood and body fluids. Sysmex further printed and made manuals available for these analyzers, instructing users on how to operate them for body fluid analysis.  These marketing materials and manuals were publicly available prior to January 31, 2007.  These manuals and marketing materials constitute prior art to the patent applications that became the patents in suit.

21.     The claims of the patents in suit cover Sysmex's own prior art products, or at best cover only obvious software modifications of Sysmex's own prior art products.  These prior art products measured both blood and body fluids.  One such Sysmex prior art product was the XE-2100 hematology analyzer system.

22.     Several figures of the Asserted Patents are copied or derived from prior art printed publications created by Sysmex.  More specifically, Sysmex's prior art hematology analyzers sold prior to January 31, 2007, include the "XE-2100" unit, which Sysmex described in a printed publication entitled, "Operator's Manual, Automated Hematology Analyzer, XE-2100, Main Unit" ( the "XE-2100 Operator's Manual") and attached as Exhibit 1.   Sysmex printed and made

17

the XE-2100 Operator's Manual publicly available prior to January 31, 2007.  This manual

constitutes prior art to the Asserted Patent applications.

      a.     Figure 1 of the Asserted Patents was copied from the prior art as a portion

of Figure 1-1 of the prior art XE-2100 Operator's Manual.  These figures are illustrated

below (callout oval added to the Figure 1-1 of the XE-2100 Operator's Manual).



| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|

FIG.1

Figure 1-1: Sysmex XE-2100 Hematology Analyzer

      b.     The information of Figure 2 of the Asserted Patents likewise appears in

the Sysmex prior art.  Figure 7-25 of the XE-2100 Operator's Manual is entitled

18

"Electrical System Block Diagram of Main Unit," and includes the same components and arrangement as Fig. 2 of the Asserted Patents.



c.　　　Figure 3 of the Asserted Patents combines several figures from the prior art XE-2100 Operator's Manual.　 Figure 7-5 and 7-6 from the prior art manual are reproduced below.

| Asserted Patents, Fig. 3 (Annotated) | Prior Art XE-2100 Operator's Manual (Annotated) |
| --- | --- |



Additional figures in the prior art XE-2100 that relate to Fig. 3 of the '350 patent include Figs. 7-7 through 7-11, Fig. 7-15, and Fig. 7-17.  Each of these figures illustrates a physical relationship between diluents, sample tubes, sample valve, and an optical detector block.

d.      Figure 4 of the Asserted Patents is substantially identical to Figure 7-4 of the prior art XE-2100 Operator's Manual.



e.      Figure 5 of the Asserted Patents is substantially identical to Figure 7-2 of the prior art XE-2100 Operator's manual.



f.      Figure 6 of the Asserted Patents purports to "show[] the HGB detection

unit."  This unit is substantially identical to that illustrated in Figure 7-8 of the prior art

XE-2100 Operator's Manual (reproduced below with an oval added).



g.      The flowchart of Figure 7 of the Asserted Patents includes a description of

an analyzer's operation for processing blood and for processing a body fluid.  The

portion of the flowchart for processing body fluids includes several of the identical steps

for processing blood.  The portion of the flowchart for processing blood was included

with the prior art XE-2100 Operator's Manual.  In addition, Table 1-1 of the prior art

XE-2100 Operator's Manual describes the same sequence and further includes a "Post-analysis check."

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|



h.      The screen layout of Figure 8 of the Asserted Patents is shown in several

illustrations of the prior art XE-2100 Operator's Manual.  Figure 2-13 is shown as an

example screen display of the prior art XE-2100 Operator's Manual.



i.      Figure 12 of the Asserted Patents is substantially identical to that

illustrated in Figure 7-12 of the prior art XE-2100 Operator's Manual.



23.     The XE-2100 Operator's Manual discloses every claimed hardware arrangement

in the '350 patent and the '351 patent, which were not included in any other reference before the

USPTO during prosecution of the Asserted Patents.  However, despite the significant overlap between the description of the Asserted Patents and the prior art XE-2100 Operator's Manual, Sysmex did not identify or acknowledge the XE-2100 Operator's Manual or any information in the figures or in the specification of the Asserted Patents as "prior art."

24.      In an unrelated Sysmex patent application, U.S. Patent Application Serial No. 11/374,109, ("the '109 application"), Sysmex submitted an Information Disclosure Statement on March 14, 2006, disclosing Chapter 7 of the XE-2100 OPERATOR'S MANUAL.  The '109 application was entitled "Sample Analyzer and Sample Analyzing Method" and pertained to analysis of blood on a hematology analyzer.  It published as U.S. Patent Publication No. 2006/0210438 under 35 U.S.C. § 122(b) on September 21, 2006, and later issued as U.S. Patent No. 9,243,993 on January 26, 2016.  The '109 application specifically references the Sysmex XE-2100 analyzer.  The submitted Chapter 7 of the XE-2100 Operators Manual, made before the critical date of the Asserted Patents, contains the majority of the prior art figures described above, which were also later included in the applications for the Asserted Patents.

25.      The '109 application lists as the first-named inventor Mr. Takaaki Nagai, a senior director of engineering at Sysmex.  Mr. Nagai is the same inventor who is first-named on the Asserted Patents.  On information and belief, from at least March 2006 to the present, Mr. Nagai has actively participated in the process of prosecuting Sysmex patent applications and reviewing patents and prior art.

26.      By no later than March 14, 2006, Sysmex, its attorneys, and inventors of the Asserted Patents, including at least Mr. Nagai, were aware of the XE-2100 Operator's Manual and particularly the contents of Chapter 7.  Nevertheless, Sysmex did not disclose the XE-2100

25

Operator's Manual as an item of prior art for the Asserted Patent applications or for any application to which the Asserted Patents claim the benefit of priority.

27.    The prior art Sysmex XE-2100 hematology analyzer was described as measuring and analyzing blood and body fluids.

    a.    A printed publication created by Sysmex and entitled "XE-Series Body Fluid Application," a copy which is attached as Exhibit 2, described the use of the XE-series analyzers for both blood and body fluids.  This publication, which has a copyright date of 2004 and metadata showing a last modified date of 2006, is prior art to the Asserted Patents.

    b.    The XE-Series Body Fluid Application publication further states "A logical step in blood cell analysis is the application of automated body fluid testing.  The XE-Series analyzers with XE pro software now brings the power of fluorescent flow cytometry to body fluid analysis."

    c.    Sysmex applied for and received Food & Drug Administration ("FDA") approval for its XE-Series Body Fluid Application in 2004, under 510(K) No. 040073.  Sysmex updated its user manuals for the XE-2100 shortly thereafter to reflect the availability of the XE-2100 for body fluid use. The then-new "Appendix C: Body Fluid Application" section of the XE-2100 Information Processing Unit Operator's Manual ("XE-2100 IPU Manual") (*see, e.g.*, SCorp-Del00117686–702), for example, instructed the user to analyze body fluids on the XE-2100 using "manual mode" and setting the "Discrete" test in a substantially identical manner as described in the Asserted Patents:

| Asserted Patents | Prior Art XE-2100 IPU Manual Appendix C: Body Fluid Application |
|---|---|
| When specifying the BODY FLUID measurement mode, the operator specifies MANUAL mode as the take-up mode, [CBC+DIFF], [CBC+DIFF+RET], [CBC+DIFF+NRBC], or [CBC+DIFFNRBC+RET] as the DISCRETE test, and [BODY FLUID] as the type of sample. In step S4, the Col. 9, lines 35-39 | The body fluid Specimen can be analyzed with Manual Mode.<br><br>CAUTION:  • In case of analyzing body fluid specimens, use discrete mode of below from "Discrete" of the Sample No. Setting screen.<br>  - "3. CBC+DIFF"<br>  - "4. CBC+DIFF+RET"<br>  - "6. CBC+DIFF+NRBC"<br>  - "7. CBC+DIFF+NRBC+RET" |

28.    The XE-2100 IPU Manual also instructed users to run the XE-2100 differently for body fluid analysis.  For example, the XE-2100 IPU Manual instructed users to check background counts prior to analyzing body fluids to make sure they were in an acceptable range, and if not, to "perform an auto-rinse or blank measurement."  The XE-2100 IPU Manual further instructed users to "select 'Auto Rinse' on the function menu to execute an automatic rinse and background check" when specifically running the XE-2100 for body fluid analysis.  On information and belief, Sysmex printed and made the XE-2100 IPU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

29.    Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application included a version of the XE-Series Body Fluid Application publication as "a draft of the sales literature for the XE-2100 Series, automated hematology analyze (sic), body fluid application." Although Sysmex designated certain portions of its submission as confidential, Sysmex did not designate the draft XE-Series Body Fluid Application publication as confidential in its submission.  Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application was specifically referenced in a 2006 journal article, by Shen, P. et al., "Cholesterol Crystals Causing Falsely Elevated Automated Cell Count," American Journal of Clinical Pathology 125:358-363

27

(2006), stating "Several manufacturers of automated hematology instruments have obtained FDA approval for performing cell counts on body fluids (for example, Coulter LH750, Beckman Coulter, approval No. 510(K)050057; Sysmex XE-2100, Sysmex, Mundelein, IL, approval No. 510(K)040073; and Advia 120[cerebrospinal fluid WBC, WBC differential, and RBC counts], Bayer, Tarrytown, NY approval No. 510(K)022331)."

30.     Despite the relevance of the XE-2100's ability and usage to analyze body fluids in a similar manner and using identical hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the 2004 FDA filing for the XE-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XE-2100 to the USPTO during prosecution of the Asserted Patents.

31.     Sysmex sold other prior art hematology analyzers related to the XE-2100 that also had the ability to analyze body fluids in a manner similar to that claimed in the Asserted Patents. For example, in 2006 Sysmex received FDA approval for a Body Fluid Application on smaller hematology analyzers, the XT-1800i and XT-2000i, under FDA 510(K) No. 061150.  The XT-Series Body Fluid Application listed the XE-Series Body Fluid Application as a predicate device.

32.     As it did with the XE-Series, in 2006 Sysmex published a marketing publication, "XT-Series Body Fluid Application," (*see, e.g.*, SAI-Del00003411) and updated its XT-2000i/XT-1800i manuals to include a similar section instructing users on how to use those hematology analyzers to analyze body fluids other than blood.  Like the manuals for the XE-2100, the updated XT-2000i/XT-1800i Instructions For Use manuals ("XT-IFU Manual") (*see, e.g.*, SCorp-Del00117489–SCorp-Del00117500) included specific instructions by which the

analyzer was to operate for body fluid analysis, including selection of a manual mode and performing an auto-rinse to ensure background counts are reasonable.

33.     On information and belief, Sysmex printed and made the XT-IFU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

34.     Despite the relevance of the XT-2000i/XT-1800i's ability and usage to analyze body fluids in a similar manner and using at least similar hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XT-Series Body Fluid Application publication, the XT-IFU Manuals, the FDA submission on the XT-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XT-2000i/XT1800i to the USPTO during prosecution of the Asserted Patents.

35.     The XE-2100 contained every claimed hardware arrangement in the '350 patent and the '351 patent, and the software in the Sysmex prior art products either included every additional claimed feature, or at a minimum, would have been understood to be readily modified in a logical manner to include every additional claimed feature.

36.     At a minimum, therefore, the various matter claimed in the patents in suit are either anticipated by, or would have been obvious to a person of ordinary skill in the art based on, Sysmex's own prior art products.

**Prosecution of the Asserted Patents and Sysmex's Failure to Disclose Material Prior Art**

37.     On December 10, 2018 and March 25, 2019, the same dates that Sysmex Corporation filed, respectively, the '417 application that led to the '350 patent and the '694 application that led to the '351 patent, Sysmex's attorney, Mr. Tadashi Horie of the law firm

Brinks, Gilson & Lione, submitted with each application a "Certification and Request for Prioritized Examination."  The USPTO granted Sysmex's requests for expedited examination.

38.     With the '417 application, Sysmex, through the named inventors and prosecuting attorneys, filed Information Disclosure Statements on December 10, 2018 and March 6, 2019, listing over 200 references.  The Information Disclosure Statements were signed by Mr. Horie. By this time, Sysmex, Mr. Nagai and/or Mr. Horie were aware of the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i.  Sysmex, Mr. Nagai and/or Mr. Horie were also aware of the materiality of these prior art references and information to the patentability of the claims.  Despite this awareness, Sysmex and its attorneys withheld from these Information Disclosure Statements the XE-2100 Operator's Manual (including Chapter7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.

39.     On March 19, 2019, the USPTO mailed a Notice of Allowance for the '417 application. On April 17, 2019, the USPTO mailed a Notice of Allowance for the '694 application.  Both Notices of Allowance gave as the sole reason for allowance that "the cited

prior art neither teaches nor fairly suggests a sample analyzer comprising" the listed elements of the then-independent claims.

40.     Rather than pay the issue fees, Sysmex instead re-opened prosecution for both of the Asserted Patent applications on June 17, 2019 by filing a Request for Continued Examination, including amendments that significantly amended claim language.  Sysmex also submitted additional Information Disclosure Statements on June 17, 2019 and on June 24, 2019, for each of the Asserted Patent applications.  Mr. Horie signed the Requests for Continued Examination and the Information Disclosure Statements for both applications.  Sysmex, through the named inventors and prosecuting attorneys, again withheld from the PTO the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.  Sysmex, Mr. Nagai and/or Mr. Horie were aware of the materiality of these prior art references and information to the patentability of the amended claims in the '417 and '694 applications.

41.     The PTO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and for the '417 application on July 10, 2019.  Both Notices of Allowance gave as the sole reason for allowance, "the cited prior art neither teaches nor fairly suggests a sample analyzer further comprising the recited controller programmed as claimed."

42.     Sysmex paid the issue fees for the '694 application on July 2, 2019 (five days after allowance), and for the '417 application on July 10, 2019 (the same day as allowance).  Mr. Horie signed the Issue Fee Transmittals for both applications.  The Asserted Patents both issued on September 3, 2019, less than nine months after Sysmex Corporation filed the '417 application and less than six months after it filed the '694 application.  Sysmex filed the present lawsuit asserting the Asserted Patents against BCI on the same day.

43.     Sysmex, the Sysmex inventors and prosecuting attorney intentionally withheld the prior art XE-2100 Operators Manual, the prior art XE-Series Body Fluid Application publication, the prior art XE-2100 IPU Manual including the Body Fluid Application appendix, and the prior art XE-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

44.     Sysmex, the Sysmex inventors and prosecuting attorney also intentionally withheld the prior art XT-Series Body Fluid Application publication, the XT-2000i/XT-1800i IFU Manual including the Body Fluid Application appendix, and the prior art XT-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

45.     In addition, Sysmex, the Sysmex inventors and prosecuting attorney intentionally did not inform the USPTO that portions of the Asserted Patent specification were copied or derived from the XE-2100 Operators Manual.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

46.     The Sysmex inventors and prosecuting attorney had an obligation to inform the USPTO that the claimed "analyzers" of the Asserted Patents could not be distinguished from the Sysmex prior art on the basis of hardware components, such as the claimed detectors.  Rather, the subject matter that Sysmex claimed as its invention differed from Sysmex's prior art XE-Series products, if at all, only with respect to software modifications.

47.     At least claim 1 of the '350 patent is anticipated by the sale, offer for sale, and/or use of the XE-2100 analyzer for body fluid analysis, as described in XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed the XE-2100 analyzer's approved, marketed, and document use for analysis of body fluids prior to the critical date.

48.     At least claim 1 of the '350 patent is anticipated by the prior art publications XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission insofar as they are considered a single reference.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed these publications during prosecution of the Asserted Patent applications.

49.     The USPTO further would not have issued the claims of the Asserted Patents (as apparently construed by Sysmex to cover the accused products) if Sysmex had disclosed that every claimed hardware arrangement was in the prior art XE-2100 products and that the software in the prior art XE-2100 products could be readily modified in a logical manner to include every additional claimed feature.

50.     It would have been obvious to a person of ordinary skill in the art to implement software changes on the XE-2100 to implement each of the various features claimed in the Asserted Patents.

51.     As a direct result of Sysmex's failures to cite material information to the USPTO, including failures by its employee, Mr. Nagai, and its attorney, Mr. Horie, the US Examiner was unaware of Sysmex's own prior art that either disclosed the claimed inventions or differed from them in only obvious ways.

52.     Sysmex was aware of its own prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, as described and identified above, during the prosecution of the Asserted Patents.

53.     Sysmex knew, during the prosecution of the Asserted Patents, that its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, was material to the patentability of the claims in the Asserted Patents.

54.     Sysmex made a deliberate decision to withhold its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, with an intent to deceive the US Examiner.

55.     But for Sysmex's intentional choice to withhold the prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, the claims of the Asserted Patents would not have issued.

56.     Accordingly, Sysmex's fraudulent conduct before the USPTO was inequitable, and the Asserted Patents are unenforceable.

## OTHER RELATED ACTS OF MISCONDUCT BY SYSMEX

57.     Sysmex, through its agents and counsel Brinks, Gilson & Lione ("Brinks"), unlawfully used BCI's confidential, proprietary, and trade secret information to prosecute the '417 and '694 applications from which the Asserted Patents issued.

58.     Since November 2017, Sysmex and BCI have been involved in another patent infringement lawsuit entitled *Beckman Coulter Inc. v Sysmex America Inc.*, Civil Action No. 1:17-cv-24049-DPG (S.D. Fla.), which BCI -filed in the U.S. District Court for the Southern District Court of Florida.  The Florida Court subsequently transferred the action to the Northern District Court of Illinois, where it received Civil Action No. 1:18-cv-6563 ("the Illinois Action"). The Illinois Action, like this action, relates to automated laboratory equipment including hematology analyzers.  Sysmex, through Brinks and Mr. Horie, took advantage of the discovery process in the Illinois Action to access confidential, proprietary, and trade secret information about BCI's analyzers, namely the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, UniCel DxH 900, UniCel DxH 900 SMS, UniCel DxH 900-2, UniCel DxH 900-2 SMS, UniCel DxH 900-3, and UniCel DxH 900-3 SMS hematology analyzers (collectively, the "DxH products").

59.     At all times after BCI produced confidential information through the discovery process in the Illinois Action, Sysmex and any of its counsel that accessed confidential BCI information had an obligation to refrain from misappropriating discovery materials for purposes unrelated to the litigation.  Despite this obligation, Sysmex, through Brinks and Mr. Horie, used BCI's confidential, proprietary, and trade secret information to amend the claims of the '417 and '694 applications during prosecution in an attempt to reach the DxH products.  The patent claims of the Asserted Patents were obtained so that Sysmex could accuse BCI of infringement in the present action.  Sysmex did not have any patent claims that colorably covered any of BCI's

35

hematology instruments until after its counsel at Brinks obtained confidential information obtained through discovery in the Illinois Action.

60.     BCI has invested considerable time and resources in the research and development of the DxH products.  By misappropriating BCI's confidential, proprietary, and trade secret information relating to the DxH products, Sysmex, through Brinks and Mr. Horie, has not only undermined BCI's competitive position, but also forced BCI to spend significant amount of resources to defend a lawsuit that should not have been brought.

**BCI's Confidential, Proprietary, and Trade Secret Information**

61.     BCI is an industry leader in diagnostics and equipment for biomedical research and testing.  BCI's technologies improve the productivity of medical professionals and scientists supplying critical information for improving patient health and delivering trusted solutions for research and discovery.  BCI's technologies are used in thousands of hospitals and laboratory facilities worldwide, including those in the U.S.

62.     To maintain its position as an industry leader, BCI dedicates time and resources to innovation.  Through this process, BCI has accumulated a significant amount of confidential, proprietary, and trade secret information.  The success of BCI's business relies on this information.

63.     In fact, at least part of the competitive edge that BCI enjoys is owed to the confidential, proprietary, and trade secret information that it holds for the DxH products.  Such information includes know-how and facts concerning the development, testing, engineering, and functionality of the DxH products, as well as financial and marketing information relating to the manufacturing and sale of such products.  These trade secrets are neither shared with BCI's customers nor disclosed to the public.

36

64.     Source code is among the trade secrets that BCI holds closely.  As one of BCI's crown jewels, the source code for the DxH products contains intricate details relating to their operations and controls.  The software design for the DxH products also resides within the source code.  Similar to other trade secrets guarded by BCI, source code is not available or accessible to the public.  In fact, only a limited number of employees within BCI have access to the source code for the DxH products.  Keeping this information secret prevents BCI's competitors from reproducing or stealing BCI's crown jewels, enabling BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

### The Illinois Action and the Protective Order

65.     On November 3, 2017, BCI filed a complaint against Sysmex in the Southern District Court of Florida, alleging, *inter alia*, that Sysmex's XN-Series hematology analyzers infringe United States Patent No. 6,581,012 ("the '012 patent").  *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:17-cv-24049-GAYLES (S.D. Fla.).  The '012 patent relates to an automated laboratory software architecture.

66.     On September 19, 2018, the Southern District Court of Florida transferred the case to the Northern District Court of Illinois. *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:18-cv-06563 (N.D. Ill.).  The Illinois Action is ongoing.

67.     Brinks represents Sysmex in the Illinois Action.

68.     Early in the Illinois Action—and before any confidential, propriety, and trade secret information was produced—Sysmex and BCI negotiated for and agreed to be bound by a protective order (the "Protective Order") to protect confidential information produced in discovery from improper disclosure and misuse.

69.     On July 11, 2018, Sysmex and BCI jointly moved the Southern District Court of Florida for entry of the Protective Order, acknowledging that the litigation "may require the production of documents and disclosure of testimony and other information involving trade secrets or confidential research and development or commercial information." (Joint Mot. For Entry of Protective Order, ¶ 1, ECF No. 62.)  The court entered the Protective Order as Docket Item No. 63.  A true and correct copy of the Protective Order is attached hereto as Exhibit 3.

70.     The Protective Order recognizes three categories of protected information.

71.     First, the Protective Order recognizes "Confidential Information" as:

> information concerning a Person's business operations, processes, and technical and development information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure], the disclosure of which is likely to harm, that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

(Protective Order, ¶ 2(c).)

72.     Second, the Protective Order recognizes "Highly Confidential Information – Attorney's Eyes Only" as:

> information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure] that constitutes business or technical trade secrets or plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court, including particularly sensitive confidential information that a Person believes in good faith cannot be disclosed to a Recipient without threat of injury because such information contains trade secret or other proprietary or commercially sensitive information.

(Protective Order, ¶ 2(d).)

73.     Third, the Protective Order recognizes "Highly Confidential Information – Source Code" as:

> any source code (including comments contained therein), human-readable programming language text that defines software, firmware, or electronic hardware descriptions, object code, Register Transfer Level ("RTL") files, Hardware

Description Language ("HDL") tiles, or other hardware description language, live data (i.e. data as it exists residing in a database or databases), or pseudo-source-code (i.e., a notation resembling a programming language but not intended for actual compilation, which usually description of the computations to be carried out) ("Source Code") more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a court combines some of the structure of a programming language with an informal natural-language.

(Protective Order, ¶ 2(e).)

74.     Pursuant to Paragraph 4(a) of the Protective Order, any individual who receives information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" may use the information for the prosecution or defense of the infringement action, but not for any other purposes, such as patent prosecution.

75.     Pursuant to Paragraph 4(b) of the Protective Order, counsel for the parties are responsible for the control and distribution of information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code."

76.     Pursuant to Paragraph 4(c) of the Protective Order, information designated as "Confidential" may be disclosed only to a limited number of individuals, such as the opposing party's litigation counsel, two employees of that party, and experts retained specifically for the litigation.

77.     Pursuant to Paragraph 4(d) of the Protective Order, information designated as "Highly Confidential – Attorney's Eyes Only" or "Highly Confidential – Source Code" may be disclosed only to an even more limited number of individuals, such as the opposing party's litigation counsel and experts retained specifically for the litigation.

78.     Pursuant to Paragraphs 5(a) and 5(c) of the Protective Order, only those who are eligible to view information designated as "Highly Confidential – Source Code" may inspect—

but not copy—the opposing party's source code.  After inspection, limited hard copies of information designated as "Highly Confidential – Source Code" may be produced upon request.

79.     Pursuant to Paragraph 10 of the Protective Order, counsel for the parties are precluded from prosecuting certain patent applications during the pendency of the litigation. Specifically, Paragraph 10 contains a prosecution bar, which states as follows:

> Any person permitted to receive technical information from a producing party that is designated Highly Confidential – Attorney's Eyes Only, or Highly Confidential - Source Code information (collectively "Highly Sensitive Technical Material"), and who obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's Highly Sensitive Technical Material under this Order *shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals.*

(Protective Order, ¶ 10 (emphasis added).)

80.     Under the Protective Order, the parties and their counsel had a duty to maintain the secrecy of any information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" and to restrict the use of such information to only the purposes permitted under the Protective Order.

81.     The Protective Order remains binding on the parties and their counsel after the transfer of the case from Florida to the Northern District Court of Illinois.  In other words, those who receive information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" in the Illinois Action remain obligated to maintain the secrecy of the information and to limit the use of the information to only the purposes permitted under the Protective Order.

82.     Sysmex and BCI also negotiated for and agreed to be bound by a protective order in this Action (the "Delaware Protective Order") to protect confidential information produced in

discovery in this Action from improper disclosure and misuse.  The provisions of the Protective Order and the Delaware Protective Order, and specifically the paragraphs cited above, are identical.

**Mr. Horie and Brinks**

83.     Mr. Horie is an attorney licensed in the State of Illinois.  Mr. Horie has not filed an appearance in the Illinois Action, but is one of at least twelve Brinks attorneys who have represented or assisted Sysmex in the Illinois Action at one point or another.

84.     According to Brinks's website, Mr. Horie has been practicing law at Brinks since 1992 and has been a shareholder at Brinks since 2003.  Brinks also represents Mr. Horie to the public as having substantial expertise in patent prosecution and litigation with a "deep background in electrical and computer-related technologies" such as "computer-controlled medical diagnostic analyzers."

85.     Mr. Horie prosecutes and supervises the prosecution of patent applications on behalf of Sysmex, including those that relate to "electrical and computer-related technologies" and "computer-controlled medical diagnostic analyzers."  On information and belief, Mr. Horie has prosecuted over 100 patent applications for Sysmex since 2003.

86.     Even though he has not filed an appearance with the court, Mr. Horie has been significantly involved in defending Sysmex in the Illinois Action.  Among other things, Mr. Horie has ███████████████████████████████████████████ ███████████████████████████████████████; attended at least one deposition in which BCI's highly confidential information was discussed; clandestinely received communications from BCI's counsel relating to confidential and/or highly confidential information via a Brinks email distribution group; and attended a claim construction hearing for

41

the '012 patent.  Mr. Horie has accessed and reviewed confidential and highly confidential information produced by BCI, including technical information.

87.     In October 2020, as part of ongoing discovery in this Action, Sysmex requested an inspection of BCI's source code for the DxH products.  On October 27, Sysmex identified that Mr. Horie would accompany its technical expert for the source code inspection.  BCI objected to Mr. Horie's participation, citing the Protective Order, and asked for information regarding Mr. Horie's prosecution activities.  On October 28, Sysmex withdrew its request to have Mr. Horie participate in the inspection, without providing any additional information on Mr. Horie's prosecution activities.

88.     At all times relevant to this claim, Mr. Horie and Sysmex's attorneys of record at Brinks were aware of the Protective Order.

89.     At all times relevant to this claim, Sysmex and/or its counsel and Mr. Horie understood their duty under the Protective Order to maintain the secrecy of any confidential or highly confidential information, including source code information, that they receive from BCI and to restrict the use of such information to only the purposes permitted under the Protective Order.

90.     Sysmex and/or its counsel and Mr. Horie also understood their duty under the Protective Order's prosecution bar, which precludes Mr. Horie from "prepar[ing], prosecut[ing], supervis[ing], or assist[ing] in the preparation or prosecution of any patent application pertaining to the field of the invention" of the '012 patent during the pendency of the Illinois Action. (Protective Order, ¶ 10.)

**Breach of the Protective Order and Misappropriation of BCI's Confidential Information**

91.     On information and belief, Sysmex, through Brinks and Mr. Horie, planned to file and maintain a counter-patent infringement suit against BCI as retaliation for accusing Sysmex of infringement.  In particular, Sysmex intended to advance the claim that the DxH products infringe Sysmex's own patents.  Because BCI contended in the Illinois Action that the DxH products practice the claims of the '012 patent, Sysmex had a unique opportunity (through discovery) to learn about the technical features of the DxH products before filing a counter-suit.

92.     By December 2018, BCI had produced over 65,000 pages of documents to Brinks in response to Sysmex's discovery requests.  Many documents were designated as "Highly Confidential – Attorney's Eyes Only," and contained *inter alia*, confidential, proprietary, and/or trade secret information concerning the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

93.     On December 11, 2018, Sysmex sued BCI in the District Court of Delaware, alleging, among other things, that the importation, offer for sale, sale, and exportation of the DxH products infringe the '746 patent.  *See Sysmex America, Inc. and Sysmex Corp. v. Beckman Coulter, Inc.*, No. 1:18-cv-01 951-CFC (D. Del) (the "First Delaware Action").  However, about two months later, and prior to BCI responding to the Complaint in that action, Sysmex filed a notice of voluntary dismissal of the case because it belatedly realized that the claims of the '746 patent were not infringed by the DxH products.

94.     On February 12, 2019, BCI produced to Brinks over 15,000 documents totaling over 125,000 pages in response to discovery requests served in the Illinois Action.  As most of these documents were designated as "Highly Confidential Information – Attorney's Eyes Only," this production contained a substantial amount of confidential, proprietary, and/or trade secret

43

information relating to the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

95.     In the meantime, Mr. Horie was prosecuting patent applications on behalf of Sysmex while being permitted access to BCI's confidential, proprietary, and trade secret information produced in discovery.  Mr. Horie filed the '417 application on December 10, 2018, filed the '694 application on March 25, 2019, and tended to the prosecution of those applications. The '417 and '694 applications were filed with "Track One" requests in order to expedite their examination by the USPTO.

96.     The subject matter of the '417 and '694 applications relates to the field of invention of the '012 patent.

97.     At no point during the pendency of the Illinois Action did Sysmex or Brinks take any measures to prevent Mr. Horie from reviewing BCI's confidential information.  Nor did Sysmex or Brinks enforce the prosecution bar against him.  The filing and prosecution of the '417 and '694 applications by Mr. Horie, therefore, violated at least the prosecution bar of the Protective Order.

98.     The USPTO mailed a Notice of Allowance for the '417 application on March 19, 2019 and a Notice of Allowance for the '694 application on April 17, 2019.  On information and belief, Sysmex intended to assert any patents issuing from the '417 and '694 applications against BCI—but first, it sought to determine whether the claims of the '417 and '694 applications, as allowed at that time, could either encompass or be amended to encompass the operation of the DxH products.  Instead of paying the issue fees, Sysmex, through Brinks and Mr. Horie, continued to use the tools of discovery to further access confidential, proprietary, and trade secret information relating to the DxH products.

99.     In late April 2019, a Brinks attorney of record in the Illinois Action, on behalf of Sysmex, requested an inspection of the source code for the DxH products pursuant to the Protective Order.

100.    Given that the Protective Order specifically provides for the protection of source code information in discovery, Sysmex and Brinks understood the source code for the DxH products is confidential and proprietary to BCI and constitutes trade secrets.

101.    Using discovery permitted under the Federal Rules of Civil Procedure, Sysmex inspected BCI's source code pursuant to the Protective Order.  From May 6, 2019 to May 9, 2019, Sysmex's technical expert and attorney of record examined the source code for the DxH products.

102.    After inspecting the code in the Illinois Action, Sysmex, through Brinks, requested that BCI produce printouts and native files of certain portions of this source code pursuant to Protective Order.

103.    On June 12, 2019, BCI produced the requested printed materials and designated them as "Highly Confidential – Source Code" under the Protective Order.

104.    Accordingly, by June 12, 2019, Mr. Horie, along with other Brinks attorneys, had access to a substantial amount of confidential, proprietary, and trade secret information from BCI relating to (1) the source code for the DxH products and (2) the development, testing, technical features, engineering, and/or functionality of the DxH products.  Despite awareness and knowledge of the Protective Order, Mr. Horie did not cease prosecuting patent applications on behalf of Sysmex, and neither Sysmex nor its counsel took any steps to prevent Mr. Horie's continued prosecution of patent applications.

105.    On June 17, 2019, five days after receiving hard copies of BCI's source code production, Mr. Horie re-opened prosecution for both of the '417 and '694 applications by filing Requests for Continued Examination, including a large number of amendments to the claims in each application.  In the '417 application, Mr. Horie amended 16 of the previously allowed 20 claims and added 8 new claims.  In the '694 application, Mr. Horie amended 20 of previously allowed 28 claims and added 1 new claim.

106.    These amendments significantly changed the claim language and scope of the '417 and '694 applications.

107.    As an example, independent claims 1 and 12 of the '417 application and independent claim 1 of the '694 application were amended to include a feature of a sensing operation that when "performed in the body fluid mode [is] different, at least partially, from the sensing operation performed in the measuring mode."  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019. These patent claims are also materially different from the patent claims of the '746 patent that Sysmex initially asserted but later withdrew in the First Delaware Action.

108.    As another example, independent claim 19 of the '417 application, dependent claims 3-6 and 18 of the '417 application, and dependent claim 17 of the '694 application were amended to include a feature of "automatically initiating" a pre-washing process.  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019.

109.    Mr. Horie submitted these claim amendments and new claims after he and/or others under his supervision had access to confidential information for the DxH products,

including technical information designated by BCI as "Highly Confidential - Attorney's Eyes Only" and/or "Highly Confidential - Source Code," through discovery in the Illinois Action. On information and belief, Sysmex used Mr. Horie to obtain patents that could cover the features of the DxH products as part of its plan to initiate a retaliatory patent infringement action against BCI.

110.   Mr. Horie, along with the other Brinks attorneys, understood the Protective Order's prohibition against misuse of BCI's confidential, proprietary, and trade secret information, including the information designated as "Highly Confidential – Source Code." Sysmex, through the actions of Mr. Horie, breached the Protective Order at least because it appropriated BCI's trade secret information, e.g., source code, for a purpose unrelated to its defense in the Illinois Action.

111.   The USTPO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and a new Notice of Allowance for the '417 application on July 10, 2019. Sysmex promptly paid the issue fees.

112.   The Asserted Patents issued from the '417 and '697 applications on September 3, 2019 without further claim amendments. The Asserted Patents misappropriated the source code information and/or other highly confidential information that Brinks received from BCI in the Illinois Action.

113.   On the same day that the Asserted Patents issued, Sysmex filed the present action against BCI, claiming that the DxH products infringe the Asserted Patents. Sysmex's promptness in the filing of the present action, at the very least, indicates an eagerness to pursue a retaliatory patent infringement suit against BCI.

**Continued Breach of the Protective Order**

114.    After the issuance of the Asserted Patents, Mr. Horie has continued to file and prosecute patent applications on behalf of Sysmex.  BCI is unaware of any restriction in Mr. Horie's access to BCI's confidential, proprietary, and trade secret information since the issuance of the Asserted Patents.  Nor is BCI aware of any measure taken by Sysmex or Brinks to enforce the prosecution bar of the Protective Order against Mr. Horie.

115.    Since the entry of the Protective Order in July 2018 for the Illinois Action in the Southern District Court of Florida, Mr. Horie has prosecuted at least 50 patent applications for Sysmex, including the Asserted Patent applications.  A list of presently known Sysmex patent applications that Mr. Horie has prosecuted since July 2018 is attached as Exhibit 4.

116.    The subject matter of many of these applications relates to the field of invention of the '012 patent.

117.    Mr. Horie's prosecution of these applications is a violation of at least the prosecution bar of the Protective Order.

118.    In January 2021, BCI took the deposition of Mr. Horie.  During the deposition, Mr. Horie did not dispute that (1) ████████████████████████████████████; (2) █████████████████████████████████████████████████; and (3) ███████ ████████████████████.

**First Counterclaim**

**(Declaration of Non-Infringement of the '350 Patent)**

~~57.~~119.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~56~~118.

58.120.　　A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, *inter alia*, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '350 Patent.

59.121.　　The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '350 Patent, either directly, contributorily or by inducement, literally or by equivalents.

60.122.　　BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '350 Patent.

**Second Counterclaim**

**(Declaration of Non-Infringement of the '351 Patent)**

61.123.　　BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-60122.

62.124.　　A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '351 Patent.

63.125.　　The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '351 Patent, either directly, contributorily or by inducement, literally or by equivalents.

64.126.　　BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '351 Patent.

49

**Third Counterclaim**

**(Declaration of Invalidity of the '350 Patent)**

~~65.~~127.        BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~64~~126.

~~66.~~128.        A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '350 Patent.

~~67.~~129.        The claims of the '350 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

~~68.~~130.        The claims of the '350 Patent are invalid for double patenting.

~~69.~~131.        BCI is entitled to a judicial determination and declaration that the claims of the '350 Patent are invalid.

**Fourth Counterclaim**

**(Declaration of Invalidity of the '351 Patent)**

~~70.~~132.        BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~69~~131.

~~71.~~133.        A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '351 Patent.

~~72.~~134.        The claims of the '351 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

~~73.~~135.        The claims of the '351 Patent are invalid for double patenting.

74.136.       BCI is entitled to a judicial determination and declaration that the claims of the '351 Patent are invalid.

## Fifth Counterclaim

### (Inequitable Conduct)

75.137.       BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-74136.

76.138.       Based on Plaintiffs' filing of this lawsuit and BCI's denial of Plaintiffs' allegations, an actual controversy has arisen and now exists between BCI and Plaintiffs as to the enforceability of the '350 and '351 Patents.

77.139.       As described above, at least one inventor and at least one prosecuting patent attorney concealed material information from the United States Patent and Trademark Office ("USPTO") during prosecution of the Asserted Patents.  Such at least one inventor and at least one prosecuting patent attorney concealed material information with an intent to deceive the USPTO.

78.140.       The '350 Patent and '351 Patent are unenforceable due to inequitable conduct by such at least one inventor and at least one prosecuting patent attorney.

## Sixth Counterclaim

### (The Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.)

141.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-140.

142.     This cause of action arises under the Defend Trade Secrets Act, U.S.C. § 1836 *et seq.*

143.    The Defend Trade Secrets Act defines "trade secret" as any "form and type[] of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

144.    At least BCI's information that is designated as "Highly Confidential – Source Code" in the Illinois Action, including the DxH source code, is a trade secret as defined by the Defend Trade Secrets Act.

145.    This information is not generally known or readily ascertainable by the public. As detailed above, BCI has taken reasonable and affirmative steps to keep the information secret, including, but not limited to, (1) having Sysmex agree to the Protective Order before producing any documents in the Illinois Action; (2) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only a limited number of individuals; (3) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only purposes related to the Illinois Action and not for any other purposes; (4) requiring that Sysmex's counsel refrain from prosecuting any patent applications relating to the field of invention as the '012 patent when counsel has access to information designated as "Highly Confidential – Source Code;" and (5) restricting levels of access to its DxH source code by individuals within BCI.

146.    BCI's information designated as "Highly Confidential – Source Code" derives independent economic value from maintaining its secrecy.  The source code for the DxH products relates to their operations and controls and contains the software design.  Keeping this

information secret from the public prevents BCI's competitors from replicating or stealing the source code, which enables BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

147.    At all times relevant to this claim, and pursuant to the Protective Order, Sysmex, through Brinks, had a legal duty to maintain the secrecy of the information designated as "Highly Confidential – Source Code" and to limit its use to only the purposes permitted under the Protective Order and not for any other purposes such as patent prosecution.

148.    Despite its legal duty, Sysmex, through Brinks and Mr. Horie, used at least BCI's information designated as "Highly Confidential – Source Code" to prosecute the '417 and '694 applications from which the Asserted Patents issued.

149.    Sysmex, through Brinks and Mr. Horie, has misappropriated BCI's trade secrets.

150.    Sysmex's conduct was malicious, deliberate, and willful.

151.    BCI has been damaged by Sysmex's misappropriation of trade secrets at least because it has been forced to spend its monetary resources in defending against the present patent infringement action that, but for Sysmex's misappropriation of BCI's trade secrets, could not have been brought by Sysmex.

152.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B)(i) and (ii), BCI is entitled to an award of monetary damages.

153.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C), BCI is entitled to exemplary damages.

154.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D), BCI is entitled to reasonable attorneys' fees.

**Seventh Counterclaim**

53

**(Breach of Contract)**

155.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-154.

156.    The Protective Order is a valid and enforceable contract between BCI and Sysmex.

157.    The Protective Order is supported by valuable consideration, including, but not limited to, BCI's agreement to maintain the confidentiality of any of Sysmex's information designated as "Confidential," "Highly Confidential Information – Attorney's Eyes Only," and "Highly Confidential Information – Source Code."

158.    BCI has duly performed all of the terms, conditions, and covenants required to be performed under the Protective Order, to the extent those obligations have not otherwise been excused, prevented, and/or waived by Sysmex.

159.    Sysmex, through its counsel and Mr. Horie, obtained, received, had access to, and/or otherwise learned, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

160.    Sysmex, through its counsel and Mr. Horie, has breached Paragraph 4(a) of the Protective Order at least by using BCI's information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code" in the prosecution of the '417 and '694 applications from which the Asserted Patents issued.

161.    Sysmex, through its counsel and Mr. Horie, breached Paragraph 10 of the Protective Order at least by preparing, prosecuting, supervising, or assisting in the preparation or prosecution of one or more patent applications pertaining to the field of the invention of the '012

54

patent, including the '417 and '694 applications from which the Asserted Patents issued. Sysmex's prosecution of the '417 and '694 applications, through its counsel and Mr. Horie, occurred after or while obtaining, receiving, having access to, and/or otherwise learning, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

162.    As a direct and proximate result of the breach, BCI has suffered and continues to suffer harm, including the expenditures that it has incurred in defending against the present patent infringement action that, but for Sysmex's breach of the Protective Order, could not have been brought by Sysmex.

### PRAYER FOR RELIEF

WHEREFORE, BCI prays that the Court enter judgment in its favor and against Counterclaim-Defendants as follows:

a.    Dismissing the Complaint with prejudice and entering a judgment in BCI and against Plaintiffs/Counterclaim-Defendants;

b.    Denying each request for relief made by Plaintiffs.

c.    Declaring that BCI has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, any valid claims of the '350 Patent and the '351 Patent;

d.    Declaring that the claims of the '350 Patent and the '351 Patent are invalid;

e.    Declaring that the '350 Patent and the '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents before the U.S. Patent & Trademark Office;

f.    Declaring that Sysmex has violated the Defend Trade Secrets Act due to its misappropriation of BCI's trade secrets;

g.      Declaring that Sysmex has breached the Protective Order;

h.      Declaring this case is exceptional and awarding BCI its attorneys' fees pursuant to 35 U.S.C. § 285;

gi.      Awarding BCI monetary damages due to Sysmex's violation of the Defend Trade Secrets Act and Sysmex's breach of the Protective Order;

j.      Declaring that BCI's trade secrets have been maliciously and willfully misappropriated by Sysmex and awarding exemplary damages and reasonable attorneys' fees pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b)(3)(C) and (D);

k.      Declaring that Sysmex is an involuntary trustee of the subject matter disclosed and claimed in the Asserted Patents in constructive trust for the benefit of BCI;

l.      Awarding BCI its costs and expenses in defending against Plaintiff's claims; and

hm.      Awarding such other and further relief as this Court may deem just and proper.


**<u>DEMAND FOR JURY TRIAL</u>**

Defendant BCI hereby demands trial by jury in this action.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ ~~Steven W. Lee~~ *Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
~~Steven W. Lee (No. 6676)~~
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
~~slee@ycst.com~~

LEYDIG, VOIT & MAYER, LTD
David M. Airan
Wesley O. Mueller
Nicole E. Kopinski
Aaron R. Feigelson
Wallace H. Feng
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL  60601-6745
(312) 616-5600

Dated: ~~October 1, 2020~~ April 09, 2021

*Attorneys for Beckman Coulter, Inc.*

57

**CERTIFICATE OF SERVICE**

I, ~~Steven W. Lee~~Melanie K. Sharp, Esquire, hereby certify that on ~~October 1, 2020,~~April 09, 2021 I caused to be electronically filed a true and correct copy of First Amended Answer and Counterclaims of Defendant Beckman Coulter, Inc. with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on ~~October 1, 2020,~~April 09, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

James R. Sobieraj
Robert S. Mallin
Joshua James
~~Andrea L. Shoffstall~~
Daniel A. Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
ashoffstall@brinksgilson.com

/s/ ~~Steven W. Lee~~ Melanie K. Sharp

_____

~~Steven W. Lee~~Melanie K. Sharp (No. ~~6676~~2501)

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on April 12, 2021, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on April 12, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

James R. Sobieraj
Robert S. Mallin
Joshua James
Daniel Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
dparrish@brinksgilson.com

*/s/ Melanie K. Sharp*
_____
Melanie K. Sharp (No. 2501)

27980191.1