

**WILMINGTON**
RODNEY SQUARE

**Melanie K. Sharp**
P 302.571.6681
F 302.576.3333
msharp@ycst.com

April 10, 2021

**BY E-FILE AND HAND DELIVERY**

The Honorable Christopher J. Burke
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

REDACTED - PUBLIC VERSION

Re:   *Sysmex Corporation and Sysmex America, Inc. v. Beckman Coulter, Inc.*
       C.A. No.:  19-1642-RGA-CJB

Dear Judge Burke:

I write on behalf of my client, Beckman Coulter, Inc. ("BCI").  We seek leave to amend BCI's Answer and Counterclaims to include (1) the affirmative defense of unclean hands, (2) a claim for breach of contract, and (3) a claim for Sysmex's violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.  These amendments are based on Sysmex's improper access and use of BCI's confidential information—in violation of the protective order entered in another case between the parties—to draft the claims in the patent applications leading to the patents-in-suit.  In accordance with the Scheduling Order (D.I. 29, ¶ 9), a copy of BCI's proposed Amended Answer and Counterclaims, clean and a "blackline" comparison, are attached as Exhibits A and B. BCI does not seek this leave lightly; however, for the reasons set forth below, good cause exists to grant it.

**I.    Plaintiff Used BCI's Confidential Information to Draft the Claims of the Patents-In-Suit in Violation of Protective Order Entered in Illinois**

In 2017, BCI sued Sysmex on a patent covering BCI's flagship hematology analyzer, the DxH 800.  For that case ("the Illinois case") Sysmex chose as litigation counsel the same law firm ("Brinks") that had prosecuted over 400 issued Sysmex patents since 2002.  The parties agreed to a protective order to govern access and use of confidential information, which was entered in July 2018. Ex. C.  The protective order contains a prosecution bar, preventing individuals with access to BCI's confidential information from prosecuting patent applications "pertaining to the field of invention" of the patent asserted in the Illinois case.[1]  Discovery commenced, and BCI produced confidential information regarding its DxH system.  In May 2019, Sysmex's expert and outside attorney spent several days inspecting BCI's DxH source code.  Ex. D. BCI produced hard copies of requested source code on June 12, 2019.  Ex. E.

Five days later, on June 17, 2019, Sysmex significantly amended its pending claims in patent applications 16/214,417 and 16/363,694, to more closely track the operation of BCI's DxH product.  Exs. F, G.  Sysmex filed these amendments through its prosecution counsel, Mr. Tadashi Horie of Brinks.  The amended claims were allowed, resulting in the '350 and '351 patents.  Sysmex filed this lawsuit ("the Delaware case") asserting the patents against BCI on the same day they issued, September 3, 2019.  D.I. 1.

---

[1] An identical protective order has been entered in this case, with an identical prosecution bar.  Sysmex's violations of the Delaware protective order are the subject of a separate discovery motion.

**Young Conaway Stargatt & Taylor, LLP**
The Honorable Christopher J. Burke
April 10, 2021
Page 2

As discovery proceeded in the Delaware case, BCI became concerned that Sysmex, through its counsel, was ignoring the prosecution bar provisions in the Illinois protective order. In particular, while Mr. Horie was prosecuting dozens of Sysmex patent applications on related technology, Sysmex nonetheless attempted to have Mr. Horie accompany its software expert for an inspection of the DxH source code on October 27, 2020. Ex. H. Mr. Horie also had attended at least one deposition in the Illinois case where confidential BCI documents were discussed. Ex. I. Additional details of Mr. Horie's access, including his secret inclusion in a Brinks email distribution group for this litigation ("BGLSysmex012Team@brinksgilson.com"), are found in BCI's proposed amended answer.

On January 15, 2021, BCI took Mr. Horie's deposition. Mr. Horie's deposition testimony confirmed BCI's concerns that ███████████████████████████████████████████ ███████████—including prosecution of the '350 and '351 patents ███████████ ████████████████████████████████████████████████████ Ex. M, 36:16 – 39:19, 42:19-43:12, 176:17-181:25, 197:5-200:9, 205:13-207:11. However, during the deposition, the witness was repeatedly instructed not to answer questions on the grounds of privilege.

Following the deposition, BCI promptly sent Sysmex a letter on February 1, 2021, seeking clarification of Mr. Horie's access to BCI confidential information. Ex. J. On February 14, 2021, Sysmex confirmed that the Mr. Horie had "access to BCI confidential information," but insisted that no impasse had been reached. Ex. K. BCI specifically identified the relief it presently seeks as the meet and confer process continued throughout February and into March. *Id.*

A.     Plaintiff Has "Unclean Hands" With Respect to the Patents-In-Suit

Unclean hands occurs when "misconduct" of a patent holder "has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231 (Fed. Cir. 2018). In *Gilead*, two patents were held unenforceable where one of the patentee's employees violated a nondisclosure agreement (NDA) with the accused infringer's predecessor-in-interest to obtain confidential information. *Id.* at 1240.

Like the patent holder in *Gilead*, here Sysmex has "unclean hands" because it improperly used BCI's confidential information to obtain the patents-in-suit. Sysmex's misconduct is immediately and necessarily related to the Sysmex's attempted enforcement of these patents.

B.     Plaintiff Breached the Protective Order Contract

Numerous courts have held that a protective order is a contract. *See, e.g., Rotex Glob., LLC v. Gerard Daniel Worldwide, Inc.*, No. 1:17-CV-2118, 2019 WL 5102165, at *6 (M.D. Pa. Oct. 11, 2019) ("Finally, in a case such as this where we are called upon to interpret and apply a stipulated protective order that reflected the considered mutual judgment of counsel regarding how best to protect and use sensitive information, we are enjoined to treat the stipulated protective order as a contract . . ."); *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2013 WL 3095106, at *3 (N.D. Tex. June 20, 2013) ("An agreed protective order may be viewed as a contract, and once parties enter an agreed protective order they are bound to its terms, absent good cause to modify or vacate the protective order.") Courts have further acknowledged that a protective order violation can support an independent cause of action for breach of contract. *See, e.g., Wachtell, Lipton, Rosen & Katz v. CVR Energy, Inc.*, 18 F.Supp.3d 414, 420 (S.D.N.Y.

**Young Conaway Stargatt & Taylor, LLP**
The Honorable Christopher J. Burke
April 10, 2021
Page 3

2014) (finding Plaintiff had "plausible argument" in claim for breach of protective order after Defendants allegedly used confidential information produced by Plaintiff for purposes not permitted by protective order); *New Wave Innovations, Inc. v. Greenberg*, No. 14-24544-civ, 2015 WL 5118130, at *4 (S.D. Fla. 2015).

 Sysmex violated its agreement with BCI, as provided in the Illinois protective order, at least by allowing its attorney to prosecute patent applications in the same field of invention while having access to access BCI's confidential information.

C. Plaintiff Violated the Defend Trade Secrets Act

 The information improperly accessed by Sysmex's attorney constitutes BCI trade secrets. The improper use of a competitor's trade secrets to prosecute a patent gives rise to a cause of action under the Defend Trade Secrets Act.  For example, in *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, the Court found that Plaintiff's claim of trade secrets misappropriation is likely to succeed based, in part, on an allegation that Plaintiff's trade secrets were used by Defendant's agents in the filing of Defendant's patent application.  No. 20-CV-3375, 2020 WL 3960451, at *10-12 (N.D. Ill. July 13, 2020).

**II.** **Good Cause Exists for BCI's Amendment**

 The deadline to amend pleadings was September 30, 2020, D.I. 108, but it was a month later that BCI's suspicions were raised by Mr. Horie's attempted access of BCI source code, and BCI immediately responded.  Ex. I.  Given the seriousness of the allegations, BCI continued its investigation and requested Mr. Horie's deposition, which took place on January 15, 2021.  BCI continued to seek information and remedial measures following the deposition, but those efforts have been unsuccessful.  Thus, BCI has diligently investigated the matter and has engaged Sysmex repeatedly to better understand the facts and circumstances surrounding Sysmex's violation of the protective order.

 Plaintiff cannot reasonably argue that it is prejudiced by BCI's amendments, where those amendments are the direct result of its own misconduct.  While BCI expects that some limited fact discovery may be needed to pursue the proposed defense and counterclaims, it does not believe the case schedule will be adversely affected, due to the straightforward and limited nature of the new defense and claims, which do not rest on highly technical issues as may typically be found in patent cases.

 Alternatively, during the most recent meet-and-confer on March 24, BCI raised the possibility of pursuing only the unclean hands defense here, while asserting the contract and DTSA claims in a new lawsuit, which would allow for more extensive discovery.  However, Sysmex on March 29 indicated that it did not find this proposal any more acceptable.  Ex. L.

**III.** **BCI's Amendment is not Futile**

 BCI's proposed amended answer provides (1) the affirmative defense of unclean hands, (2) a claim for breach of contract and (3) a claim for violation of the defend trade secrets act based on the use of BCI's confidential information to draft the claims in the applications leading to the '350 and '351 patents.  These claims are well grounded, and there is good cause to permit them.

**Young Conaway Stargatt & Taylor, LLP**
The Honorable Christopher J. Burke
April 10, 2021
Page 4

                                                     Respectfully,

                                                     */s/ Melanie K. Sharp*

                                                     Melanie K. Sharp (No. 2501)

MKS:mg

cc:     Counsel of Record, Kelly F. Farnan, Esquire (by e-mail)

27977122.1

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BECKMAN COULTER, INC., | ) ) |
| Defendant. | ) )   Civil Action No. 1:19-cv-01642-RGA |
| ―――――――――――――――― | ) |
| BECKMAN COULTER, INC., | )   **JURY TRIAL DEMANDED** ) |
| Counterclaim-Plaintiff | ) ) ■■■■■■■■ |
| v. | )   Judge Richard G. Andrews |
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) ) ) |
| Counterclaim-Defendants. | ) |

**SECOND AMENDED ANSWER AND COUNTERCLAIMS OF**
**DEFENDANT BECKMAN COULTER, INC.**

Defendant Beckman Coulter, Inc. ("BCI"), by and through its undersigned attorneys,

hereby answers each of the numbered paragraphs of the Complaint filed September 3, 2019, by

Plaintiffs Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively

"Plaintiffs"). Except as expressly admitted below, BCI denies each allegation of Plaintiffs'

Complaint.

**NATURE OF THE ACTION**

1.      BCI admits that this action purports to state a claim under the patent laws of the

United States for infringement of United States Patent Nos. 10,401,350 entitled "Sample

Analyzer and Computer Program Product" ("the '350 Patent") and 10,401,351 entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").  BCI admits that Exhibits A and B appear to be copies of the '350 patent and '351 patent, respectively.  BCI denies the remaining allegations in paragraph 1.

## THE PARTIES

2.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

3.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

4.      BCI admits that the Plaintiffs are named on the face of the patents in suit as the purported assignees of the '350 and '351 Patents.

5.      Admitted.

6.      BCI admits that it makes, offers to sell, sell and exports hematology analyzer systems, including products sold as the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, DxH 900, DxH 900 SMS, DxH 900-2, DxH 900-2 SMS, DxH 900-3, and DxH 900-3 SMS, which Plaintiffs identify as "the Accused Products."  BCI denies that Plaintiffs further characterizations of the Accused Products are accurate, and further denies that any of the Accused Products infringe the '350 and '351 Patents.

### Jurisdiction and Venue

7.      This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest that purported patent infringement claims arise under the Patent Laws of the United States, Title 35 of the United States Code.

2

8.      This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest this Court's subject matter jurisdiction over a purported patent claim.

9.      To the extent this Paragraph contains legal conclusions, no answer is required. BCI admits that it is incorporated in the State of Delaware and does business in Delaware, and it does not contest that this Court may exercise personal jurisdiction over it for purposes of this action.  BCI denies the remaining allegations of this paragraph.

10.     This paragraph contains legal conclusions to which no answer is required.  BCI does not contest venue in this district for purposes of this action, but it disputes that this is the most appropriate or convenient venue for this action.

## THE PATENTS

11.     BCI admits that the '350 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '350 Patent was duly and legally issued, denies that the '350 Patent is valid, and denies that the '350 Patent is enforceable.

12.     Denied.

13.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '350 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

14.     BCI admits that '351 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '351 Patent was duly and legally issued, denies that the '351 Patent is valid, and denies that the '351 Patent is enforceable.

15.     Denied.

16.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '351 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

## THE ACCUSED PRODUCTS

17.     BCI admits that the Accused Products are sold as "hematology analyzers." To the extent this Paragraph contains conclusions of law, including regarding the scope of the '350 and '351 Patent claims or the alleged infringement, including based on this paragraph's use of the terms such as "analyzer," "a plurality of detectors" and "multi-mode detector," no answer is required and BCI disputes Plaintiffs' characterizations of the '350 and '351 patent.

18.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that it products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

19.     This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that its products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

20.     Because BCI denies that its products infringe any asserted claims, BCI denies the allegations of this paragraph.

21.     Denied.

22.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

23.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 23 of the Complaint as calling for a legal conclusion, and therefore denies the same.

24.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

25.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 25 of the Complaint as calling for a legal conclusion, and therefore denies the same.

26.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

27.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 27 of the Complaint as calling for a legal conclusion, and therefore denies the same.

28.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

29.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 29 of the Complaint as calling for a legal conclusion, and therefore denies the same.

30.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

31.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 31 of the Complaint as calling for a legal conclusion, and therefore denies the same.

32.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

33.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 33 of the Complaint as calling for a legal conclusion, and therefore denies the same.

34.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

35.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 35 of the Complaint as calling for a legal conclusion, and therefore denies the same.

36.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

37.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 37 of the Complaint as calling for a legal conclusion, and therefore denies the same.

38.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

39.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July

2015, respectively.  BCI objects to the remaining allegations of paragraph 39 of the Complaint as calling for a legal conclusion, and therefore denies the same.

40.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

41.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 41 of the Complaint as calling for a legal conclusion, and therefore denies the same.

42.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

43.     BCI admits that Exhibits E is a document entitled "Performance Evaluation of Body Fluids on the UniCel DxH 800 Coulter Cellular Analysis System," published in 2009.  BCI objects to the remaining allegations of paragraph 43 of the Complaint as calling for a legal conclusion, and therefore denies the same.

44.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

45.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 45 of the Complaint as calling for a legal conclusion, and therefore denies the same.

46.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

47.     BCI objects to the allegations of paragraph 47 as calling for a legal conclusion, and therefore denies the same.

48.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

49.     BCI objects to the allegations of paragraph 49 as calling for a legal conclusion, and therefore denies the same.

50.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

51.     BCI objects to the allegations of paragraph 51 as calling for a legal conclusion, and therefore denies the same.

52.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

53.     BCI objects to the allegations of paragraph 53 as calling for a legal conclusion, and therefore denies the same.

54.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

55.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 54 of the Complaint as calling for a legal conclusion, and therefore denies the same.

56.     Denied.

**COUNT I – [Alleged] Patent Infringement: U.S. Patent No. 10,401,350**

57.     BCI restates and incorporates each of its responses to paragraph 1-56 as if fully set forth above.

58.     Denied.

59.     BCI admits that it is not presently aware that it is directly licensed to the '350 patent or that Plaintiffs provided "authority" in connection with the '350 patent.  BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same.  BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '350 Patent.  BCI denies all remaining allegations of this paragraph.

60.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '350 patent are satisfied at least as of the date of service of this complaint upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies all remaining allegations of this paragraph.

61.     Denied.

**COUNT II – [Alleged] Patent Infringement: U.S. Patent No. 10,401,351**

62.     BCI restates and incorporates each of its responses to paragraph 1-61 as if fully set forth above.

63.     Denied.

64.     BCI admits that it is not presently aware that it is directly licensed to the '351 patent or that Plaintiffs have provided "authority" in connection with the '351 patent.  BCI is

without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same. BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '351 Patent. BCI denies all remaining allegations of this paragraph.

65.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '351 patent are satisfied at least as of the date of service of this complaint upon BCI." BCI admits that 35 U.S.C. § 287(a) includes the following two sentences: "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." BCI denies all remaining allegations of this paragraph.

66.     Denied.

## RESPONSE TO PRAYER FOR RELIEF

BCI denies all allegations not specifically admitted herein, and further denies that Plaintiffs are entitled to the judgment and relief requested in the Prayer for Relief. Rather, the Complaint should be dismissed with prejudice with a finding of no infringement and invalidity in favor of BCI.

## AFFIRMATIVE DEFENSES

Without any admission as to the burden of proof, burden of persuasion, or the truth of any allegation in Plaintiffs' Complaint, BCI states the following affirmative defenses:

**First Affirmative Defense**

Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**Second Affirmative Defense**

BCI has not infringed, and does not infringe any claim of the '350 Patent and '351 Patent, literally, under the doctrine of equivalents, directly or indirectly, contributorily, by inducement, or in any other manner.

**Third Affirmative Defense**

The asserted claims of the '350 Patent and of the '351 Patent are invalid for failing to comply with the conditions and requirements for patentability set forth in the United States Patent Laws, including, without limitation, in 35 U.S.C. §§ 101, 102, 103, 112, for double patenting, and the rules, regulations, and laws pertaining thereto.

**Fourth Affirmative Defense**

Plaintiffs' allegations are inadequate to state a claim of willfulness under 35 U.S.C. § 285.

**Fifth Affirmative Defense**

Plaintiffs cannot satisfy the requirements applicable to their request for injunctive relief and have an adequate remedy at law.

**Sixth Affirmative Defense**

As described in detail below with respect to BCI's Fifth Counterclaim, the '350 Patent and '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents while prosecuting the '350 Patent and '351 Patent before the U.S. Patent & Trademark Office.

**Seventh Affirmative Defense**

Plaintiffs' claims are barred by the doctrine of unclean hands.  Plaintiffs, through their attorney agents, obtained access to confidential information of Defendant, which it then wrongfully misappropriated, in violation of a Protective Order issued by the U.S. District Court for the Northern District of Illinois, to draft and prosecute the claims of '350 Patent and '351 Patents.  As a result of this conduct, Plaintiffs are barred from enforcing the '350 Patent and the '351 Patent against Defendant.

BCI reserves the right to assert all affirmative and other defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defenses, at law or in equity, that may now or in the future be available based on discovery, any other factual investigation, or any other development relating to this case or any other action.

## COUNTERCLAIMS

Defendant Beckman Coulter, Inc. ("BCI") incorporates herein by reference the admissions, allegations, denials and Affirmative Defenses contained in the Answer above as if fully set forth herein. For its Counterclaims against Plaintiffs/Counterclaim-Defendants Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively, "Counterclaim-Defendants") BCI states as follows:

### THE PARTIES

1.      BCI is a Delaware corporation having its principal place of business in Brea, California.

2.      According to the Complaint, Sysmex America, Inc. is a Delaware corporation having its principal place of business at 577 Aptakisic Road, Lincolnshire, Illinois 60069.

3.      According to the Complaint, Sysmex Corporation is a Japan corporation having its principal place of business at 1-5-1 Wakinohama-kaigandori, Chuo-ku, Kobe, Hyogo, Japan.

12

## JURISDICTION AND VENUE

4.      These counterclaims arise under the Patent Laws of the United States, 35 U.S.C. §

1 et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Defend Trade Secrets

Act of 2016, 18 U.S.C. § 1836, *et seq*., (collectively, the "Federal Counterclaims") and breach of

contract under the laws of the State of Illinois.  This Court has jurisdiction over the subject

matter of the Federal Counterclaims under 28 U.S.C. §§ 1331 and 1338(a) because the

Counterclaims involve questions of federal law and regulation, and pursuant to 28 U.S.C. §§

1367(a), because the Federal Counterclaims are so related to the claims in this action as to form

part of the same case or controversy under Article III of the United States Constitution.  This

Court also has supplemental jurisdiction over the breach of contract counterclaim because such

claims are so related to the Federal Counterclaims and the claims of this action as to form part of

the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over Sysmex and SAI because, among other

reasons, these Counterclaim-Defendants have consented and subjected themselves to the

jurisdiction of this Court by filing their Complaint against BCI.

6.      To the extent that venue is appropriate for Counterclaim-Defendants' claim

against BCI, venue is also appropriate in this Court for BCI's counterclaims.

7.      There is an actual and justiciable controversy between the parties as to the

infringement, validity and enforceability of United States Patent No. 10,401,350, entitled

"Sample Analyzer and Computer Program Product" ("the '350 Patent") and United States Patent

No. 10,401,351, entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").

## BACKGROUND

8.      The asserted Sysmex '350 Patent and '351 Patent (collectively, "the Asserted

Patents") purport to describe an improvement in hematology analyzers.   The "Field of the

13

Invention" section of the specification states "[t]he present invention relates to a sample analyzer and computer program product capable of measuring not only blood, but also body fluids other than blood such as cerebrospinal fluid (spinal fluid), fluid of the thoracic cavity (pleural fluid), abdominal fluid and the like."  This description of the invention inaccurately and misleadingly suggests that prior art systems measured only blood whereas the purportedly novel analyzer of the patent application measured both blood and body fluids.  However, several years before Sysmex filed its earliest related patent application, both BCI and Sysmex had made, used and described hematology systems for measuring both blood and body fluids.

9.      BCI and Sysmex are competitors.  Prior to the critical date of the '350 and '351 patents, both parties made and sold automated hematology analyzers, which performed blood and body fluid tests in clinical laboratories.  These analyzers measured and reported information about the composition of cells in blood and body fluid samples.  For example, the prior art analyzers measured red blood cell counts, white blood counts, hemoglobin and other parameters for blood.  The prior art analyzers also are capable of measuring and reporting body fluid information such as total nucleated cell counts.

**The Sysmex Patents in Suit**

10.      A copy of the '350 patent is attached as Exhibit A to Plaintiffs' Complaint.

11.      A copy of the '351 patent is attached as Exhibit B to Plaintiffs' Complaint.

12.      By paragraph 4 of their Complaint, Plaintiffs allege that they are "the assignees of the Patents, and are the co-owners of the entire right, title, and interest in and to the Patents, including the right to enforce and to recover damages for any current or past infringement of the Patents."

14

13.    The critical date of the '350 patent for prior art purposes is no earlier than January 31, 2007.

a.    Sysmex's '350 patent issued from U.S. Patent Application Serial No. 16/214,417 ("the '417 application"), which Sysmex filed on December 10, 2018. Through a series of continuation applications, the '417 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.    Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '350 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '417 application claims priority.

14.    The critical date of the '351 patent for prior art purposes is also no earlier than January 31, 2007.

a.    Sysmex's '351 patent issued from U.S. Patent Application Serial No. 16/363,694 ("the '694 application"), which Sysmex filed on March 25, 2019.  Through a series of continuation applications, the '694 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

b.    Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '351 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA)

15

is January 31, 2008, the date of the earliest United States application to which the '694 application claims priority.

     c.     At least certain claims of the '351 patent are not entitled to the benefit of any priority prior to its filing date of March 25, 2019 because they claim subject matter that was not disclosed in any earlier patent application to which the benefit of priority was claimed.

15.     The patents in suit issued from a long chain of applications claiming priority to the '830 application.  Sysmex obtained at least four earlier patents from this chain of applications, all having the same patent specification and drawings.  These patents include U.S. Patent 8,440,140 (the '140 patent"), which issued on May 13, 2013 from the '830 application; U.S. Patent 8,968,661 ("the '661 patent"), which issued on March 3, 2015 from a continuation (U.S. Patent Application Serial No. 13/891,667) of the '830 application; U.S. Patent 9,933,414, which issued on April 3, 2018 from a further continuation application (U.S. Patent Application Serial No. 14/595,319); and U.S. Patent 10,151,746 ("the '746 patent"), which issued on December 11, 2018 from yet another continuation application (U.S. Patent Application Serial No. 15/908,339).

16.     This is not the first patent infringement lawsuit brought by Sysmex against BCI regarding a patent issuing from an application which claims priority to the '830 application.  On December 11, 2018, Sysmex filed a lawsuit against BCI, asserting infringement of the '746 patent.

17.     On February 13, 2019, Sysmex dismissed without prejudice its lawsuit involving the '746 patent.

18.     At least the independent claims of the '350 and '351 patent are obvious in view of

the claims in one or more of the prior Sysmex patents issuing from the same chain of

applications, including at least the '746 patent.

**Sysmex's Prior Art Systems**

19.     More than one year prior to the filing date of the patents in suit, Sysmex made and

sold prior art hematology analyzers, including at least the XE-2100, XT-2000i and XT-1800i

analyzers, that were used for measuring both blood and body fluids.

20.     Sysmex or others had stated in printed publications and marketing materials that

such prior art hematology analyzers could be used for measuring both blood and body fluids.

Sysmex further printed and made manuals available for these analyzers, instructing users on how

to operate them for body fluid analysis.  These marketing materials and manuals were publicly

available prior to January 31, 2007.  These manuals and marketing materials constitute prior art

to the patent applications that became the patents in suit.

21.     The claims of the patents in suit cover Sysmex's own prior art products, or at best

cover only obvious software modifications of Sysmex's own prior art products.  These prior art

products measured both blood and body fluids.  One such Sysmex prior art product was the XE-

2100 hematology analyzer system.

22.     Several figures of the Asserted Patents are copied or derived from prior art printed

publications created by Sysmex.  More specifically, Sysmex's prior art hematology analyzers

sold prior to January 31, 2007, include the "XE-2100" unit, which Sysmex described in a printed

publication entitled, "Operator's Manual, Automated Hematology Analyzer, XE-2100, Main

Unit" ( the "XE-2100 Operator's Manual") and attached as Exhibit 1.   Sysmex printed and made

the XE-2100 Operator's Manual publicly available prior to January 31, 2007. This manual constitutes prior art to the Asserted Patent applications.

   a. Figure 1 of the Asserted Patents was copied from the prior art as a portion of Figure 1-1 of the prior art XE-2100 Operator's Manual. These figures are illustrated below (callout oval added to the Figure 1-1 of the XE-2100 Operator's Manual).



| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|

   b. The information of Figure 2 of the Asserted Patents likewise appears in the Sysmex prior art. Figure 7-25 of the XE-2100 Operator's Manual is entitled

"Electrical System Block Diagram of Main Unit," and includes the same components and arrangement as Fig. 2 of the Asserted Patents.



c.      Figure 3 of the Asserted Patents combines several figures from the prior

art XE-2100 Operator's Manual.   Figure 7-5 and 7-6 from the prior art manual are

reproduced below.

| Asserted Patents, Fig. 3 (Annotated) | Prior Art XE-2100 Operator's Manual (Annotated) |
| --- | --- |



Additional figures in the prior art XE-2100 that relate to Fig. 3 of the '350 patent include

Figs. 7-7 through 7-11, Fig. 7-15, and Fig. 7-17.  Each of these figures illustrates a

physical relationship between diluents, sample tubes, sample valve, and an optical

detector block.

d.      Figure 4 of the Asserted Patents is substantially identical to Figure 7-4 of

the prior art XE-2100 Operator's Manual.

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

e.      Figure 5 of the Asserted Patents is substantially identical to Figure 7-2 of

the prior art XE-2100 Operator's manual.

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

21

f.      Figure 6 of the Asserted Patents purports to "show[] the HGB detection unit."  This unit is substantially identical to that illustrated in Figure 7-8 of the prior art XE-2100 Operator's Manual (reproduced below with an oval added).



g.      The flowchart of Figure 7 of the Asserted Patents includes a description of an analyzer's operation for processing blood and for processing a body fluid.  The portion of the flowchart for processing body fluids includes several of the identical steps for processing blood.  The portion of the flowchart for processing blood was included with the prior art XE-2100 Operator's Manual.  In addition, Table 1-1 of the prior art

22

XE-2100 Operator's Manual describes the same sequence and further includes a "Post-analysis check."

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|
|  | |

h.      The screen layout of Figure 8 of the Asserted Patents is shown in several

illustrations of the prior art XE-2100 Operator's Manual.  Figure 2-13 is shown as an

example screen display of the prior art XE-2100 Operator's Manual.



i.      Figure 12 of the Asserted Patents is substantially identical to that

illustrated in Figure 7-12 of the prior art XE-2100 Operator's Manual.



23.      The XE-2100 Operator's Manual discloses every claimed hardware arrangement

in the '350 patent and the '351 patent, which were not included in any other reference before the

24

USPTO during prosecution of the Asserted Patents.  However, despite the significant overlap between the description of the Asserted Patents and the prior art XE-2100 Operator's Manual, Sysmex did not identify or acknowledge the XE-2100 Operator's Manual or any information in the figures or in the specification of the Asserted Patents as "prior art."

24.     In an unrelated Sysmex patent application, U.S. Patent Application Serial No. 11/374,109, ("the '109 application"), Sysmex submitted an Information Disclosure Statement on March 14, 2006, disclosing Chapter 7 of the XE-2100 OPERATOR'S MANUAL.  The '109 application was entitled "Sample Analyzer and Sample Analyzing Method" and pertained to analysis of blood on a hematology analyzer.  It published as U.S. Patent Publication No. 2006/0210438 under 35 U.S.C. § 122(b) on September 21, 2006, and later issued as U.S. Patent No. 9,243,993 on January 26, 2016.  The '109 application specifically references the Sysmex XE-2100 analyzer.  The submitted Chapter 7 of the XE-2100 Operators Manual, made before the critical date of the Asserted Patents, contains the majority of the prior art figures described above, which were also later included in the applications for the Asserted Patents.

25.     The '109 application lists as the first-named inventor Mr. Takaaki Nagai, a senior director of engineering at Sysmex.  Mr. Nagai is the same inventor who is first-named on the Asserted Patents.  On information and belief, from at least March 2006 to the present, Mr. Nagai has actively participated in the process of prosecuting Sysmex patent applications and reviewing patents and prior art.

26.     By no later than March 14, 2006, Sysmex, its attorneys, and inventors of the Asserted Patents, including at least Mr. Nagai, were aware of the XE-2100 Operator's Manual and particularly the contents of Chapter 7.  Nevertheless, Sysmex did not disclose the XE-2100

Operator's Manual as an item of prior art for the Asserted Patent applications or for any application to which the Asserted Patents claim the benefit of priority.

27.     The prior art Sysmex XE-2100 hematology analyzer was described as measuring and analyzing blood and body fluids.

a.     A printed publication created by Sysmex and entitled "XE-Series Body Fluid Application," a copy which is attached as Exhibit 2, described the use of the XE-series analyzers for both blood and body fluids.  This publication, which has a copyright date of 2004 and metadata showing a last modified date of 2006, is prior art to the Asserted Patents.

b.     The XE-Series Body Fluid Application publication further states "A logical step in blood cell analysis is the application of automated body fluid testing.  The XE-Series analyzers with XE pro software now brings the power of fluorescent flow cytometry to body fluid analysis."

c.     Sysmex applied for and received Food & Drug Administration ("FDA") approval for its XE-Series Body Fluid Application in 2004, under 510(K) No. 040073.  Sysmex updated its user manuals for the XE-2100 shortly thereafter to reflect the availability of the XE-2100 for body fluid use. The then-new "Appendix C: Body Fluid Application" section of the XE-2100 Information Processing Unit Operator's Manual ("XE-2100 IPU Manual") (*see, e.g.*, SCorp-Del00117686–702), for example, instructed the user to analyze body fluids on the XE-2100 using "manual mode" and setting the "Discrete" test in a substantially identical manner as described in the Asserted Patents:

| Asserted Patents | Prior Art XE-2100 IPU Manual Appendix C: Body Fluid Application |
|---|---|
| When specifying the BODY FLUID measurement mode, the operator specifies MANUAL mode as the take-up mode, [CBC+DIFF], [CBC+DIFF+RET], [CBC+DIFF+NRBC], or [CBC+DIFFNRBC+RET] as the DISCRETE test, and [BODY FLUID] as the type of sample. In step S4, the Col. 9, lines 35-39 | The body fluid Specimen can be analyzed with Manual Mode. CAUTION: • In case of analyzing body fluid specimens, use discrete mode of below from "Discrete" of the Sample No. Setting screen. - "3. CBC+DIFF" - "4. CBC+DIFF+RET" - "6. CBC+DIFF+NRBC" - "7. CBC+DIFF+NRBC+RET" |

28.     The XE-2100 IPU Manual also instructed users to run the XE-2100 differently for body fluid analysis.  For example, the XE-2100 IPU Manual instructed users to check background counts prior to analyzing body fluids to make sure they were in an acceptable range, and if not, to "perform an auto-rinse or blank measurement."  The XE-2100 IPU Manual further instructed users to "select 'Auto Rinse' on the function menu to execute an automatic rinse and background check" when specifically running the XE-2100 for body fluid analysis.  On information and belief, Sysmex printed and made the XE-2100 IPU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

29.     Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application included a version of the XE-Series Body Fluid Application publication as "a draft of the sales literature for the XE-2100 Series, automated hematology analyze (sic), body fluid application." Although Sysmex designated certain portions of its submission as confidential, Sysmex did not designate the draft XE-Series Body Fluid Application publication as confidential in its submission.  Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application was specifically referenced in a 2006 journal article, by Shen, P. et al., "Cholesterol Crystals Causing Falsely Elevated Automated Cell Count," American Journal of Clinical Pathology 125:358-363

27

(2006), stating "Several manufacturers of automated hematology instruments have obtained FDA approval for performing cell counts on body fluids (for example, Coulter LH750, Beckman Coulter, approval No. 510(K)050057; Sysmex XE-2100, Sysmex, Mundelein, IL, approval No. 510(K)040073; and Advia 120[cerebrospinal fluid WBC, WBC differential, and RBC counts], Bayer, Tarrytown, NY approval No. 510(K)022331)."

30.     Despite the relevance of the XE-2100's ability and usage to analyze body fluids in a similar manner and using identical hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the 2004 FDA filing for the XE-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XE-2100 to the USPTO during prosecution of the Asserted Patents.

31.     Sysmex sold other prior art hematology analyzers related to the XE-2100 that also had the ability to analyze body fluids in a manner similar to that claimed in the Asserted Patents. For example, in 2006 Sysmex received FDA approval for a Body Fluid Application on smaller hematology analyzers, the XT-1800i and XT-2000i, under FDA 510(K) No. 061150.  The XT-Series Body Fluid Application listed the XE-Series Body Fluid Application as a predicate device.

32.     As it did with the XE-Series, in 2006 Sysmex published a marketing publication, "XT-Series Body Fluid Application," (*see, e.g.*, SAI-Del00003411) and updated its XT-2000i/XT-1800i manuals to include a similar section instructing users on how to use those hematology analyzers to analyze body fluids other than blood.  Like the manuals for the XE-2100, the updated XT-2000i/XT-1800i Instructions For Use manuals ("XT-IFU Manual") (*see, e.g.*, SCorp-Del00117489–SCorp-Del00117500) included specific instructions by which the

28

analyzer was to operate for body fluid analysis, including selection of a manual mode and performing an auto-rinse to ensure background counts are reasonable.

33.     On information and belief, Sysmex printed and made the XT-IFU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

34.     Despite the relevance of the XT-2000i/XT-1800i's ability and usage to analyze body fluids in a similar manner and using at least similar hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XT-Series Body Fluid Application publication, the XT-IFU Manuals, the FDA submission on the XT-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XT-2000i/XT1800i to the USPTO during prosecution of the Asserted Patents.

35.     The XE-2100 contained every claimed hardware arrangement in the '350 patent and the '351 patent, and the software in the Sysmex prior art products either included every additional claimed feature, or at a minimum, would have been understood to be readily modified in a logical manner to include every additional claimed feature.

36.     At a minimum, therefore, the various matter claimed in the patents in suit are either anticipated by, or would have been obvious to a person of ordinary skill in the art based on, Sysmex's own prior art products.

**Prosecution of the Asserted Patents and Sysmex's Failure to Disclose Material Prior Art**

37.     On December 10, 2018 and March 25, 2019, the same dates that Sysmex Corporation filed, respectively, the '417 application that led to the '350 patent and the '694 application that led to the '351 patent, Sysmex's attorney, Mr. Tadashi Horie of the law firm

Brinks, Gilson & Lione, submitted with each application a "Certification and Request for Prioritized Examination." The USPTO granted Sysmex's requests for expedited examination.

38. With the '417 application, Sysmex, through the named inventors and prosecuting attorneys, filed Information Disclosure Statements on December 10, 2018 and March 6, 2019, listing over 200 references. The Information Disclosure Statements were signed by Mr. Horie. By this time, Sysmex, Mr. Nagai and/or Mr. Horie were aware of the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i. Sysmex, Mr. Nagai and/or Mr. Horie were also aware of the materiality of these prior art references and information to the patentability of the claims. Despite this awareness, Sysmex and its attorneys withheld from these Information Disclosure Statements the XE-2100 Operator's Manual (including Chapter7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids. Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.

39. On March 19, 2019, the USPTO mailed a Notice of Allowance for the '417 application. On April 17, 2019, the USPTO mailed a Notice of Allowance for the '694 application. Both Notices of Allowance gave as the sole reason for allowance that "the cited

prior art neither teaches nor fairly suggests a sample analyzer comprising" the listed elements of the then-independent claims.

40.     Rather than pay the issue fees, Sysmex instead re-opened prosecution for both of the Asserted Patent applications on June 17, 2019 by filing a Request for Continued Examination, including amendments that significantly amended claim language.  Sysmex also submitted additional Information Disclosure Statements on June 17, 2019 and on June 24, 2019, for each of the Asserted Patent applications.  Mr. Horie signed the Requests for Continued Examination and the Information Disclosure Statements for both applications.  Sysmex, through the named inventors and prosecuting attorneys, again withheld from the PTO the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.  Sysmex, Mr. Nagai and/or Mr. Horie were aware of the materiality of these prior art references and information to the patentability of the amended claims in the '417 and '694 applications.

41.     The PTO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and for the '417 application on July 10, 2019.  Both Notices of Allowance gave as the sole reason for allowance, "the cited prior art neither teaches nor fairly suggests a sample analyzer further comprising the recited controller programmed as claimed."

42.     Sysmex paid the issue fees for the '694 application on July 2, 2019 (five days after allowance), and for the '417 application on July 10, 2019 (the same day as allowance).  Mr. Horie signed the Issue Fee Transmittals for both applications.  The Asserted Patents both issued on September 3, 2019, less than nine months after Sysmex Corporation filed the '417 application and less than six months after it filed the '694 application.  Sysmex filed the present lawsuit asserting the Asserted Patents against BCI on the same day.

43.     Sysmex, the Sysmex inventors and prosecuting attorney intentionally withheld the prior art XE-2100 Operators Manual, the prior art XE-Series Body Fluid Application publication, the prior art XE-2100 IPU Manual including the Body Fluid Application appendix, and the prior art XE-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

44.     Sysmex, the Sysmex inventors and prosecuting attorney also intentionally withheld the prior art XT-Series Body Fluid Application publication, the XT-2000i/XT-1800i IFU Manual including the Body Fluid Application appendix, and the prior art XT-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

45.     In addition, Sysmex, the Sysmex inventors and prosecuting attorney intentionally did not inform the USPTO that portions of the Asserted Patent specification were copied or derived from the XE-2100 Operators Manual.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

46.     The Sysmex inventors and prosecuting attorney had an obligation to inform the USPTO that the claimed "analyzers" of the Asserted Patents could not be distinguished from the Sysmex prior art on the basis of hardware components, such as the claimed detectors.  Rather, the subject matter that Sysmex claimed as its invention differed from Sysmex's prior art XE-Series products, if at all, only with respect to software modifications.

47.     At least claim 1 of the '350 patent is anticipated by the sale, offer for sale, and/or use of the XE-2100 analyzer for body fluid analysis, as described in XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed the XE-2100 analyzer's approved, marketed, and document use for analysis of body fluids prior to the critical date.

48.     At least claim 1 of the '350 patent is anticipated by the prior art publications XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission insofar as they are considered a single reference.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed these publications during prosecution of the Asserted Patent applications.

49.     The USPTO further would not have issued the claims of the Asserted Patents (as apparently construed by Sysmex to cover the accused products) if Sysmex had disclosed that every claimed hardware arrangement was in the prior art XE-2100 products and that the software in the prior art XE-2100 products could be readily modified in a logical manner to include every additional claimed feature.

50.     It would have been obvious to a person of ordinary skill in the art to implement software changes on the XE-2100 to implement each of the various features claimed in the Asserted Patents.

51.     As a direct result of Sysmex's failures to cite material information to the USPTO, including failures by its employee, Mr. Nagai, and its attorney, Mr. Horie, the US Examiner was unaware of Sysmex's own prior art that either disclosed the claimed inventions or differed from them in only obvious ways.

52.     Sysmex was aware of its own prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, as described and identified above, during the prosecution of the Asserted Patents.

53.     Sysmex knew, during the prosecution of the Asserted Patents, that its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, was material to the patentability of the claims in the Asserted Patents.

54.     Sysmex made a deliberate decision to withhold its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, with an intent to deceive the US Examiner.

55.     But for Sysmex's intentional choice to withhold the prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, the claims of the Asserted Patents would not have issued.

56.     Accordingly, Sysmex's fraudulent conduct before the USPTO was inequitable, and the Asserted Patents are unenforceable.

## OTHER RELATED ACTS OF MISCONDUCT BY SYSMEX

57.     Sysmex, through its agents and counsel Brinks, Gilson & Lione ("Brinks"),

unlawfully used BCI's confidential, proprietary, and trade secret information to prosecute the

'417 and '694 applications from which the Asserted Patents issued.

58.     Since November 2017, Sysmex and BCI have been involved in another patent

infringement lawsuit entitled *Beckman Coulter Inc. v Sysmex America Inc*., Civil Action No.

1:17-cv-24049-DPG (S.D. Fla.), which BCI filed in the U.S. District Court for the Southern

District Court of Florida.  The Florida Court subsequently transferred the action to the Northern

District Court of Illinois, where it received Civil Action No. 1:18-cv-6563 ("the Illinois Action").

The Illinois Action, like this action, relates to automated laboratory equipment including

hematology analyzers.  Sysmex, through Brinks and Mr. Horie, took advantage of the discovery

process in the Illinois Action to access confidential, proprietary, and trade secret information

about BCI's analyzers, namely the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel

DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, UniCel DxH 900, UniCel

DxH 900 SMS, UniCel DxH 900-2, UniCel DxH 900-2 SMS, UniCel DxH 900-3, and UniCel

DxH 900-3 SMS hematology analyzers (collectively, the "DxH products").

59.     At all times after BCI produced confidential information through the discovery

process in the Illinois Action, Sysmex and any of its counsel that accessed confidential BCI

information had an obligation to refrain from misappropriating discovery materials for purposes

unrelated to the litigation.  Despite this obligation, Sysmex, through Brinks and Mr. Horie, used

BCI's confidential, proprietary, and trade secret information to amend the claims of the '417 and

'694 applications during prosecution in an attempt to reach the DxH products.  The patent claims

of the Asserted Patents were obtained so that Sysmex could accuse BCI of infringement in the

present action.  Sysmex did not have any patent claims that colorably covered any of BCI's

35

hematology instruments until after its counsel at Brinks obtained confidential information obtained through discovery in the Illinois Action.

60.     BCI has invested considerable time and resources in the research and development of the DxH products.  By misappropriating BCI's confidential, proprietary, and trade secret information relating to the DxH products, Sysmex, through Brinks and Mr. Horie, has not only undermined BCI's competitive position, but also forced BCI to spend significant amount of resources to defend a lawsuit that should not have been brought.

**BCI's Confidential, Proprietary, and Trade Secret Information**

61.     BCI is an industry leader in diagnostics and equipment for biomedical research and testing.  BCI's technologies improve the productivity of medical professionals and scientists supplying critical information for improving patient health and delivering trusted solutions for research and discovery.  BCI's technologies are used in thousands of hospitals and laboratory facilities worldwide, including those in the U.S.

62.     To maintain its position as an industry leader, BCI dedicates time and resources to innovation.  Through this process, BCI has accumulated a significant amount of confidential, proprietary, and trade secret information.  The success of BCI's business relies on this information.

63.     In fact, at least part of the competitive edge that BCI enjoys is owed to the confidential, proprietary, and trade secret information that it holds for the DxH products.  Such information includes know-how and facts concerning the development, testing, engineering, and functionality of the DxH products, as well as financial and marketing information relating to the manufacturing and sale of such products.  These trade secrets are neither shared with BCI's customers nor disclosed to the public.

36

64.     Source code is among the trade secrets that BCI holds closely.  As one of BCI's crown jewels, the source code for the DxH products contains intricate details relating to their operations and controls.  The software design for the DxH products also resides within the source code.  Similar to other trade secrets guarded by BCI, source code is not available or accessible to the public.  In fact, only a limited number of employees within BCI have access to the source code for the DxH products.  Keeping this information secret prevents BCI's competitors from reproducing or stealing BCI's crown jewels, enabling BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

**The Illinois Action and the Protective Order**

65.     On November 3, 2017, BCI filed a complaint against Sysmex in the Southern District Court of Florida, alleging, *inter alia*, that Sysmex's XN-Series hematology analyzers infringe United States Patent No. 6,581,012 ("the '012 patent").  *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:17-cv-24049-GAYLES (S.D. Fla.).  The '012 patent relates to an automated laboratory software architecture.

66.     On September 19, 2018, the Southern District Court of Florida transferred the case to the Northern District Court of Illinois. *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:18-cv-06563 (N.D. Ill.).  The Illinois Action is ongoing.

67.     Brinks represents Sysmex in the Illinois Action.

68.     Early in the Illinois Action—and before any confidential, propriety, and trade secret information was produced—Sysmex and BCI negotiated for and agreed to be bound by a protective order (the "Protective Order") to protect confidential information produced in discovery from improper disclosure and misuse.

69.     On July 11, 2018, Sysmex and BCI jointly moved the Southern District Court of Florida for entry of the Protective Order, acknowledging that the litigation "may require the production of documents and disclosure of testimony and other information involving trade secrets or confidential research and development or commercial information." (Joint Mot. For Entry of Protective Order, ¶ 1, ECF No. 62.)  The court entered the Protective Order as Docket Item No. 63.  A true and correct copy of the Protective Order is attached hereto as Exhibit 3.

70.     The Protective Order recognizes three categories of protected information.

71.     First, the Protective Order recognizes "Confidential Information" as:

> information concerning a Person's business operations, processes, and technical and development information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure], the disclosure of which is likely to harm, that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

(Protective Order, ¶ 2(c).)

72.     Second, the Protective Order recognizes "Highly Confidential Information – Attorney's Eyes Only" as:

> information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure]  that constitutes business or technical trade secrets or plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court, including particularly sensitive confidential information that a Person believes in good faith cannot be disclosed to a Recipient without threat of injury because such information contains trade secret or other proprietary or commercially sensitive information.

(Protective Order, ¶ 2(d).)

73.     Third, the Protective Order recognizes "Highly Confidential Information – Source Code" as:

> any source code (including comments contained therein), human-readable programming language text that defines software, firmware, or electronic hardware descriptions, object code, Register Transfer Level ("RTL") files, Hardware

Description Language ("HDL") tiles, or other hardware description language, live data (i.e. data as it exists residing in a database or databases), or pseudo-source-code (i.e., a notation resembling a programming language but not intended for actual compilation, which usually description of the computations to be carried out) ("Source Code") more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a court combines some of the structure of a programming language with an informal natural-language.

(Protective Order, ¶ 2(e).)

74.    Pursuant to Paragraph 4(a) of the Protective Order, any individual who receives information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" may use the information for the prosecution or defense of the infringement action, but not for any other purposes, such as patent prosecution.

75.    Pursuant to Paragraph 4(b) of the Protective Order, counsel for the parties are responsible for the control and distribution of information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code."

76.    Pursuant to Paragraph 4(c) of the Protective Order, information designated as "Confidential" may be disclosed only to a limited number of individuals, such as the opposing party's litigation counsel, two employees of that party, and experts retained specifically for the litigation.

77.    Pursuant to Paragraph 4(d) of the Protective Order, information designated as "Highly Confidential – Attorney's Eyes Only" or "Highly Confidential – Source Code" may be disclosed only to an even more limited number of individuals, such as the opposing party's litigation counsel and experts retained specifically for the litigation.

78.    Pursuant to Paragraphs 5(a) and 5(c) of the Protective Order, only those who are eligible to view information designated as "Highly Confidential – Source Code" may inspect—

but not copy—the opposing party's source code.  After inspection, limited hard copies of information designated as "Highly Confidential – Source Code" may be produced upon request.

79.     Pursuant to Paragraph 10 of the Protective Order, counsel for the parties are precluded from prosecuting certain patent applications during the pendency of the litigation. Specifically, Paragraph 10 contains a prosecution bar, which states as follows:

> Any person permitted to receive technical information from a producing party that is designated Highly Confidential – Attorney's Eyes Only, or Highly Confidential - Source Code information (collectively "Highly Sensitive Technical Material"), and who obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's Highly Sensitive Technical Material under this Order *shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals*.

(Protective Order, ¶ 10 (emphasis added).)

80.     Under the Protective Order, the parties and their counsel had a duty to maintain the secrecy of any information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" and to restrict the use of such information to only the purposes permitted under the Protective Order.

81.     The Protective Order remains binding on the parties and their counsel after the transfer of the case from Florida to the Northern District Court of Illinois.  In other words, those who receive information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" in the Illinois Action remain obligated to maintain the secrecy of the information and to limit the use of the information to only the purposes permitted under the Protective Order.

82.     Sysmex and BCI also negotiated for and agreed to be bound by a protective order in this Action (the "Delaware Protective Order") to protect confidential information produced in

discovery in this Action from improper disclosure and misuse.  The provisions of the Protective

Order and the Delaware Protective Order, and specifically the paragraphs cited above, are

identical.

### Mr. Horie and Brinks

83.     Mr. Horie is an attorney licensed in the State of Illinois.  Mr. Horie has not filed

an appearance in the Illinois Action, but is one of at least twelve Brinks attorneys who have

represented or assisted Sysmex in the Illinois Action at one point or another.

84.      According to Brinks's website, Mr. Horie has been practicing law at Brinks since

1992 and has been a shareholder at Brinks since 2003.  Brinks also represents Mr. Horie to the

public as having substantial expertise in patent prosecution and litigation with a "deep

background in electrical and computer-related technologies" such as "computer-controlled

medical diagnostic analyzers."

85.     Mr. Horie prosecutes and supervises the prosecution of patent applications on

behalf of Sysmex, including those that relate to "electrical and computer-related technologies"

and "computer-controlled medical diagnostic analyzers."  On information and belief, Mr. Horie

has prosecuted over 100 patent applications for Sysmex since 2003.

86.     Even though he has not filed an appearance with the court, Mr. Horie has been

significantly involved in defending Sysmex in the Illinois Action.  Among other things, Mr.

Horie has ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ attended at

least one deposition in which BCI's highly confidential information was discussed; clandestinely

received communications from BCI's counsel relating to confidential and/or highly confidential

information via a Brinks email distribution group; and attended a claim construction hearing for

the '012 patent.  Mr. Horie has accessed and reviewed confidential and highly confidential information produced by BCI, including technical information.

87.     In October 2020, as part of ongoing discovery in this Action, Sysmex requested an inspection of BCI's source code for the DxH products.  On October 27, Sysmex identified that Mr. Horie would accompany its technical expert for the source code inspection.  BCI objected to Mr. Horie's participation, citing the Protective Order, and asked for information regarding Mr. Horie's prosecution activities.  On October 28, Sysmex withdrew its request to have Mr. Horie participate in the inspection, without providing any additional information on Mr. Horie's prosecution activities.

88.     At all times relevant to this claim, Mr. Horie and Sysmex's attorneys of record at Brinks were aware of the Protective Order.

89.     At all times relevant to this claim, Sysmex and/or its counsel and Mr. Horie understood their duty under the Protective Order to maintain the secrecy of any confidential or highly confidential information, including source code information, that they receive from BCI and to restrict the use of such information to only the purposes permitted under the Protective Order.

90.     Sysmex and/or its counsel and Mr. Horie also understood their duty under the Protective Order's prosecution bar, which precludes Mr. Horie from "prepar[ing], prosecut[ing], supervis[ing], or assist[ing] in the preparation or prosecution of any patent application pertaining to the field of the invention" of the '012 patent during the pendency of the Illinois Action. (Protective Order, ¶ 10.)

**Breach of the Protective Order and Misappropriation of BCI's Confidential Information**

91.     On information and belief, Sysmex, through Brinks and Mr. Horie, planned to file and maintain a counter-patent infringement suit against BCI as retaliation for accusing Sysmex of infringement.  In particular, Sysmex intended to advance the claim that the DxH products infringe Sysmex's own patents.  Because BCI contended in the Illinois Action that the DxH products practice the claims of the '012 patent, Sysmex had a unique opportunity (through discovery) to learn about the technical features of the DxH products before filing a counter-suit.

92.     By December 2018, BCI had produced over 65,000 pages of documents to Brinks in response to Sysmex's discovery requests.  Many documents were designated as "Highly Confidential – Attorney's Eyes Only," and contained *inter alia*, confidential, proprietary, and/or trade secret information concerning the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

93.     On December 11, 2018, Sysmex sued BCI in the District Court of Delaware, alleging, among other things, that the importation, offer for sale, sale, and exportation of the DxH products infringe the '746 patent.  *See Sysmex America, Inc. and Sysmex Corp. v. Beckman Coulter, Inc.*, No. 1:18-cv-01 951-CFC (D. Del) (the "First Delaware Action").  However, about two months later, and prior to BCI responding to the Complaint in that action, Sysmex filed a notice of voluntary dismissal of the case because it belatedly realized that the claims of the '746 patent were not infringed by the DxH products.

94.     On February 12, 2019, BCI produced to Brinks over 15,000 documents totaling over 125,000 pages in response to discovery requests served in the Illinois Action.  As most of these documents were designated as "Highly Confidential Information – Attorney's Eyes Only," this production contained a substantial amount of confidential, proprietary, and/or trade secret

43

information relating to the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

95.     In the meantime, Mr. Horie was prosecuting patent applications on behalf of Sysmex while being permitted access to BCI's confidential, proprietary, and trade secret information produced in discovery.  Mr. Horie filed the '417 application on December 10, 2018, filed the '694 application on March 25, 2019, and tended to the prosecution of those applications. The '417 and '694 applications were filed with "Track One" requests in order to expedite their examination by the USPTO.

96.     The subject matter of the '417 and '694 applications relates to the field of invention of the '012 patent.

97.     At no point during the pendency of the Illinois Action did Sysmex or Brinks take any measures to prevent Mr. Horie from reviewing BCI's confidential information.  Nor did Sysmex or Brinks enforce the prosecution bar against him.  The filing and prosecution of the '417 and '694 applications by Mr. Horie, therefore, violated at least the prosecution bar of the Protective Order.

98.     The USPTO mailed a Notice of Allowance for the '417 application on March 19, 2019 and a Notice of Allowance for the '694 application on April 17, 2019.  On information and belief, Sysmex intended to assert any patents issuing from the '417 and '694 applications against BCI—but first, it sought to determine whether the claims of the '417 and '694 applications, as allowed at that time, could either encompass or be amended to encompass the operation of the DxH products.  Instead of paying the issue fees, Sysmex, through Brinks and Mr. Horie, continued to use the tools of discovery to further access confidential, proprietary, and trade secret information relating to the DxH products.

44

99.     In late April 2019, a Brinks attorney of record in the Illinois Action, on behalf of Sysmex, requested an inspection of the source code for the DxH products pursuant to the Protective Order.

100.     Given that the Protective Order specifically provides for the protection of source code information in discovery, Sysmex and Brinks understood the source code for the DxH products is confidential and proprietary to BCI and constitutes trade secrets.

101.     Using discovery permitted under the Federal Rules of Civil Procedure, Sysmex inspected BCI's source code pursuant to the Protective Order.  From May 6, 2019 to May 9, 2019, Sysmex's technical expert and attorney of record examined the source code for the DxH products.

102.     After inspecting the code in the Illinois Action, Sysmex, through Brinks, requested that BCI produce printouts and native files of certain portions of this source code pursuant to Protective Order.

103.     On June 12, 2019, BCI produced the requested printed materials and designated them as "Highly Confidential – Source Code" under the Protective Order.

104.     Accordingly, by June 12, 2019, Mr. Horie, along with other Brinks attorneys, had access to a substantial amount of confidential, proprietary, and trade secret information from BCI relating to (1) the source code for the DxH products and (2) the development, testing, technical features, engineering, and/or functionality of the DxH products.  Despite awareness and knowledge of the Protective Order, Mr. Horie did not cease prosecuting patent applications on behalf of Sysmex, and neither Sysmex nor its counsel took any steps to prevent Mr. Horie's continued prosecution of patent applications.

105.     On June 17, 2019, five days after receiving hard copies of BCI's source code

production, Mr. Horie re-opened prosecution for both of the '417 and '694 applications by filing

Requests for Continued Examination, including a large number of amendments to the claims in

each application.  In the '417 application, Mr. Horie amended 16 of the previously allowed 20

claims and added 8 new claims.  In the '694 application, Mr. Horie amended 20 of previously

allowed 28 claims and added 1 new claim.

106.     These amendments significantly changed the claim language and scope of the

'417 and '694 applications.

107.     As an example, independent claims 1 and 12 of the '417 application and

independent claim 1 of the '694 application were amended to include a feature of a sensing

operation that when "performed in the body fluid mode [is] different, at least partially, from the

sensing operation performed in the measuring mode."  This feature was neither present in the

claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the

'694 application as allowed on April 17, 2019. These patent claims are also materially different

from the patent claims of the '746 patent that Sysmex initially asserted but later withdrew in the

First Delaware Action.

108.     As another example, independent claim 19 of the '417 application, dependent

claims 3-6 and 18 of the '417 application, and dependent claim 17 of the '694 application were

amended to include a feature of "automatically initiating" a pre-washing process.  This feature

was neither present in the claims of the '417 application as allowed on March 19, 2019 nor

present in the claims of the '694 application as allowed on April 17, 2019.

109.     Mr. Horie submitted these claim amendments and new claims after he and/or

others under his supervision had access to confidential information for the DxH products,

including technical information designated by BCI as "Highly Confidential - Attorney's Eyes Only" and/or "Highly Confidential - Source Code," through discovery in the Illinois Action.  On information and belief, Sysmex used Mr. Horie to obtain patents that could cover the features of the DxH products as part of its plan to initiate a retaliatory patent infringement action against BCI.

110.    Mr. Horie, along with the other Brinks attorneys, understood the Protective Order's prohibition against misuse of BCI's confidential, proprietary, and trade secret information, including the information designated as "Highly Confidential – Source Code." Sysmex, through the actions of Mr. Horie, breached the Protective Order at least because it appropriated BCI's trade secret information, e.g., source code, for a purpose unrelated to its defense in the Illinois Action.

111.    The USTPO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and a new Notice of Allowance for the '417 application on July 10, 2019.  Sysmex promptly paid the issue fees.

112.    The Asserted Patents issued from the '417 and '697 applications on September 3, 2019 without further claim amendments.  The Asserted Patents misappropriated the source code information and/or other highly confidential information that Brinks received from BCI in the Illinois Action.

113.    On the same day that the Asserted Patents issued, Sysmex filed the present action against BCI, claiming that the DxH products infringe the Asserted Patents.  Sysmex's promptness in the filing of the present action, at the very least, indicates an eagerness to pursue a retaliatory patent infringement suit against BCI.

**Continued Breach of the Protective Order**

114.    After the issuance of the Asserted Patents, Mr. Horie has continued to file and prosecute patent applications on behalf of Sysmex.  BCI is unaware of any restriction in Mr. Horie's access to BCI's confidential, proprietary, and trade secret information since the issuance of the Asserted Patents.  Nor is BCI aware of any measure taken by Sysmex or Brinks to enforce the prosecution bar of the Protective Order against Mr. Horie.

115.    Since the entry of the Protective Order in July 2018 for the Illinois Action in the Southern District Court of Florida, Mr. Horie has prosecuted at least 50 patent applications for Sysmex, including the Asserted Patent applications.  A list of presently known Sysmex patent applications that Mr. Horie has prosecuted since July 2018 is attached as Exhibit 4.

116.    The subject matter of many of these applications relates to the field of invention of the '012 patent.

117.    Mr. Horie's prosecution of these applications is a violation of at least the prosecution bar of the Protective Order.

118.    In January 2021, BCI took the deposition of Mr. Horie.  During the deposition, Mr. Horie did not dispute that (1) ██████████████████████████████████████; (2) ███████████████████████████████████████████████████; and (3) ████████ ████████████████████.

**First Counterclaim**

**(Declaration of Non-Infringement of the '350 Patent)**

119.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-118.

120.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, *inter alia*, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '350 Patent.

121.     The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '350 Patent, either directly, contributorily or by inducement, literally or by equivalents.

122.     BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '350 Patent.

**Second Counterclaim**

**(Declaration of Non-Infringement of the '351 Patent)**

123.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-122.

124.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '351 Patent.

125.     The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '351 Patent, either directly, contributorily or by inducement, literally or by equivalents.

126.     BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '351 Patent.

**Third Counterclaim**

**(Declaration of Invalidity of the '350 Patent)**

127.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-126.

128.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '350 Patent.

129.     The claims of the '350 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

130.     The claims of the '350 Patent are invalid for double patenting.

131.     BCI is entitled to a judicial determination and declaration that the claims of the '350 Patent are invalid.

**Fourth Counterclaim**

**(Declaration of Invalidity of the '351 Patent)**

132.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-131.

133.     A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '351 Patent.

134.     The claims of the '351 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

135.     The claims of the '351 Patent are invalid for double patenting.

136.    BCI is entitled to a judicial determination and declaration that the claims of the '351 Patent are invalid.

## Fifth Counterclaim

## (Inequitable Conduct)

137.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-136.

138.    Based on Plaintiffs' filing of this lawsuit and BCI's denial of Plaintiffs' allegations, an actual controversy has arisen and now exists between BCI and Plaintiffs as to the enforceability of the '350 and '351 Patents.

139.    As described above, at least one inventor and at least one prosecuting patent attorney concealed material information from the United States Patent and Trademark Office ("USPTO") during prosecution of the Asserted Patents.  Such at least one inventor and at least one prosecuting patent attorney concealed material information with an intent to deceive the USPTO.

140.    The '350 Patent and '351 Patent are unenforceable due to inequitable conduct by such at least one inventor and at least one prosecuting patent attorney.

## Sixth Counterclaim

## (The Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.)

141.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-140.

142.    This cause of action arises under the Defend Trade Secrets Act, U.S.C. § 1836 *et seq.*

143.     The Defend Trade Secrets Act defines "trade secret" as any "form and type[] of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

144.     At least BCI's information that is designated as "Highly Confidential – Source Code" in the Illinois Action, including the DxH source code, is a trade secret as defined by the Defend Trade Secrets Act.

145.     This information is not generally known or readily ascertainable by the public. As detailed above, BCI has taken reasonable and affirmative steps to keep the information secret, including, but not limited to, (1) having Sysmex agree to the Protective Order before producing any documents in the Illinois Action; (2) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only a limited number of individuals; (3) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only purposes related to the Illinois Action and not for any other purposes; (4) requiring that Sysmex's counsel refrain from prosecuting any patent applications relating to the field of invention as the '012 patent when counsel has access to information designated as "Highly Confidential – Source Code;" and (5) restricting levels of access to its DxH source code by individuals within BCI.

146.     BCI's information designated as "Highly Confidential – Source Code" derives independent economic value from maintaining its secrecy.  The source code for the DxH products relates to their operations and controls and contains the software design.  Keeping this

52

information secret from the public prevents BCI's competitors from replicating or stealing the source code, which enables BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

147.    At all times relevant to this claim, and pursuant to the Protective Order, Sysmex, through Brinks, had a legal duty to maintain the secrecy of the information designated as "Highly Confidential – Source Code" and to limit its use to only the purposes permitted under the Protective Order and not for any other purposes such as patent prosecution.

148.    Despite its legal duty, Sysmex, through Brinks and Mr. Horie, used at least BCI's information designated as "Highly Confidential – Source Code" to prosecute the '417 and '694 applications from which the Asserted Patents issued.

149.    Sysmex, through Brinks and Mr. Horie, has misappropriated BCI's trade secrets.

150.    Sysmex's conduct was malicious, deliberate, and willful.

151.    BCI has been damaged by Sysmex's misappropriation of trade secrets at least because it has been forced to spend its monetary resources in defending against the present patent infringement action that, but for Sysmex's misappropriation of BCI's trade secrets, could not have been brought by Sysmex.

152.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B)(i) and (ii), BCI is entitled to an award of monetary damages.

153.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C), BCI is entitled to exemplary damages.

154.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D), BCI is entitled to reasonable attorneys' fees.

### Seventh Counterclaim

**(Breach of Contract)**

155.    BCI realleges and incorporates by reference its allegations in the preceding

paragraphs 1-154.

156.    The Protective Order is a valid and enforceable contract between BCI and

Sysmex.

157.    The Protective Order is supported by valuable consideration, including, but not

limited to, BCI's agreement to maintain the confidentiality of any of Sysmex's information

designated as "Confidential," "Highly Confidential Information – Attorney's Eyes Only," and

"Highly Confidential Information – Source Code."

158.    BCI has duly performed all of the terms, conditions, and covenants required to be

performed under the Protective Order, to the extent those obligations have not otherwise been

excused, prevented, and/or waived by Sysmex.

159.    Sysmex, through its counsel and Mr. Horie, obtained, received, had access to,

and/or otherwise learned, in whole or in part, BCI's technical information designated as

"Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential –

Source Code."

160.    Sysmex, through its counsel and Mr. Horie, has breached Paragraph 4(a) of the

Protective Order at least by using BCI's information designated as "Confidential," "Highly

Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code" in the

prosecution of the '417 and '694 applications from which the Asserted Patents issued.

161.    Sysmex, through its counsel and Mr. Horie, breached Paragraph 10 of the

Protective Order at least by preparing, prosecuting, supervising, or assisting in the preparation or

prosecution of one or more patent applications pertaining to the field of the invention of the '012

54

patent, including the '417 and '694 applications from which the Asserted Patents issued. Sysmex's prosecution of the '417 and '694 applications, through its counsel and Mr. Horie, occurred after or while obtaining, receiving, having access to, and/or otherwise learning, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

162.    As a direct and proximate result of the breach, BCI has suffered and continues to suffer harm, including the expenditures that it has incurred in defending against the present patent infringement action that, but for Sysmex's breach of the Protective Order, could not have been brought by Sysmex.

## PRAYER FOR RELIEF

WHEREFORE, BCI prays that the Court enter judgment in its favor and against Counterclaim-Defendants as follows:

a.    Dismissing the Complaint with prejudice and entering a judgment in BCI and against Plaintiffs/Counterclaim-Defendants;

b.    Denying each request for relief made by Plaintiffs.

c.    Declaring that BCI has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, any valid claims of the '350 Patent and the '351 Patent;

d.    Declaring that the claims of the '350 Patent and the '351 Patent are invalid;

e.    Declaring that the '350 Patent and the '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents before the U.S. Patent & Trademark Office;

f.    Declaring that Sysmex has violated the Defend Trade Secrets Act due to its misappropriation of BCI's trade secrets;

g.    Declaring that Sysmex has breached the Protective Order;

h.    Declaring this case is exceptional and awarding BCI its attorneys' fees pursuant to 35 U.S.C. § 285;

i.    Awarding BCI monetary damages due to Sysmex's violation of the Defend Trade Secrets Act and Sysmex's breach of the Protective Order;

j.    Declaring that BCI's trade secrets have been maliciously and willfully misappropriated by Sysmex and awarding exemplary damages and reasonable attorneys' fees pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b)(3)(C) and (D);

k.    Declaring that Sysmex is an involuntary trustee of the subject matter disclosed and claimed in the Asserted Patents in constructive trust for the benefit of BCI;

l.    Awarding BCI its costs and expenses in defending against Plaintiff's claims; and

m.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Defendant BCI hereby demands trial by jury in this action.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

LEYDIG, VOIT & MAYER, LTD
David M. Airan
Wesley O. Mueller
Nicole E. Kopinski
Aaron R. Feigelson
Wallace H. Feng
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL  60601-6745
(312) 616-5600

*Attorneys for Beckman Coulter, Inc.*

Dated: April 10, 2021

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on April 10, 2021 I caused to be electronically filed a true and correct copy of First Amended Answer and Counterclaims of Defendant Beckman Coulter, Inc. with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on April 10, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

James R. Sobieraj
Robert S. Mallin
Joshua James
Daniel A. Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
ashoffstall@brinksgilson.com

/s/  Melanie K. Sharp

_____

Melanie K. Sharp (No. 2501)

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BECKMAN COULTER, INC., | ) ) | |
| Defendant. | ) ) | Civil Action No. 1:19-cv-01642-RGA |
| ——————————————— | ) ) | **JURY TRIAL DEMANDED** |
| BECKMAN COULTER, INC., | ) ) | ██████████████████ |
| Counterclaim-Plaintiff | ) ) | |
| v. | ) ) | Judge Richard G. Andrews |
| SYSMEX CORPORATION and SYSMEX AMERICA, INC., | ) ) ) | |
| Counterclaim-Defendants. | ) ) | |

**~~FIRST~~SECOND AMENDED ANSWER AND COUNTERCLAIMS OF
DEFENDANT BECKMAN COULTER, INC.**

Defendant Beckman Coulter, Inc. ("BCI"), by and through its undersigned attorneys, hereby answers each of the numbered paragraphs of the Complaint filed September 3, 2019, by Plaintiffs Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively "Plaintiffs"). Except as expressly admitted below, BCI denies each allegation of Plaintiffs' Complaint.

**NATURE OF THE ACTION**

1.     BCI admits that this action purports to state a claim under the patent laws of the United States for infringement of United States Patent Nos. 10,401,350 entitled "Sample

Analyzer and Computer Program Product" ("the '350 Patent") and 10,401,351 entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").  BCI admits that Exhibits A and B appear to be copies of the '350 patent and '351 patent, respectively.  BCI denies the remaining allegations in paragraph 1.


**THE PARTIES**

2.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

3.      BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the complaint, and therefore denies same.

4.      BCI admits that the Plaintiffs are named on the face of the patents in suit as the purported assignees of the '350 and '351 Patents.

5.      Admitted.

6.      BCI admits that it makes, offers to sell, sell and exports hematology analyzer systems, including products sold as the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, DxH 900, DxH 900 SMS, DxH 900-2, DxH 900-2 SMS, DxH 900-3, and DxH 900-3 SMS, which Plaintiffs identify as "the Accused Products."  BCI denies that Plaintiffs further characterizations of the Accused Products are accurate, and further denies that any of the Accused Products infringe the '350 and '351 Patents.

**Jurisdiction and Venue**

7.      This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest that purported patent infringement claims arise under the Patent Laws of the United States, Title 35 of the United States Code.

8.      This Paragraph contains legal conclusions to which no answer is required.  BCI does not contest this Court's subject matter jurisdiction over a purported patent claim.

9.      To the extent this Paragraph contains legal conclusions, no answer is required. BCI admits that it is incorporated in the State of Delaware and does business in Delaware, and it does not contest that this Court may exercise personal jurisdiction over it for purposes of this action.  BCI denies the remaining allegations of this paragraph.

10.     This paragraph contains legal conclusions to which no answer is required.  BCI does not contest venue in this district for purposes of this action, but it disputes that this is the most appropriate or convenient venue for this action.

### THE PATENTS

11.     BCI admits that the '350 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '350 Patent was duly and legally issued, denies that the '350 Patent is valid, and denies that the '350 Patent is enforceable.

12.     Denied.

13.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '350 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

14.     BCI admits that '351 Patent purports on its face to have issued on September 3, 2019.  BCI denies that the '351 Patent was duly and legally issued, denies that the '351 Patent is valid, and denies that the '351 Patent is enforceable.

15.     Denied.

16.     BCI denies that this Paragraph accurately describes the specification or claimed subject matter of the '351 Patent.  BCI is without knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph and therefore denies the same.

## THE ACCUSED PRODUCTS

17.    BCI admits that the Accused Products are sold as "hematology analyzers." To the extent this Paragraph contains conclusions of law, including regarding the scope of the '350 and '351 Patent claims or the alleged infringement, including based on this paragraph's use of the terms such as "analyzer," "a plurality of detectors" and "multi-mode detector," no answer is required and BCI disputes Plaintiffs' characterizations of the '350 and '351 patent.

18.    This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that it products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

19.    This paragraph includes the term "analyzer," which is also recited in the asserted patent claims, and BCI denies that its products infringe any asserted claim.  BCI denies the remaining allegations in this Paragraph, including those identified as the Accused Products.

20.    Because BCI denies that its products infringe any asserted claims, BCI denies the allegations of this paragraph.

21.    Denied.

22.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

23.    BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 23 of the Complaint as calling for a legal conclusion, and therefore denies the same.

24.    BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

4

25.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 25 of the Complaint as calling for a legal conclusion, and therefore denies the same.

26.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

27.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 27 of the Complaint as calling for a legal conclusion, and therefore denies the same.

28.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

29.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 29 of the Complaint as calling for a legal conclusion, and therefore denies the same.

30.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

31.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 31 of the Complaint as calling for a legal conclusion, and therefore denies the same.

32.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

33.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 33 of the Complaint as calling for a legal conclusion, and therefore denies the same.

34.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

35.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 35 of the Complaint as calling for a legal conclusion, and therefore denies the same.

36.     BCI admits that Claim 1 of the '350 Patent contains, in part, the language set forth in this paragraph.

37.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 37 of the Complaint as calling for a legal conclusion, and therefore denies the same.

38.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

39.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July

2015, respectively.  BCI objects to the remaining allegations of paragraph 39 of the Complaint as calling for a legal conclusion, and therefore denies the same.

40.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

41.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 41 of the Complaint as calling for a legal conclusion, and therefore denies the same.

42.     BCI admits that Claim 1 of the '351 Patent contains, in part, the language set forth in this paragraph.

43.     BCI admits that Exhibits E is a document entitled "Performance Evaluation of Body Fluids on the UniCel DxH 800 Coulter Cellular Analysis System," published in 2009.  BCI objects to the remaining allegations of paragraph 43 of the Complaint as calling for a legal conclusion, and therefore denies the same.

44.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

45.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 45 of the Complaint as calling for a legal conclusion, and therefore denies the same.

46.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

7

47.     BCI objects to the allegations of paragraph 47 as calling for a legal conclusion, and therefore denies the same.

48.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

49.     BCI objects to the allegations of paragraph 49 as calling for a legal conclusion, and therefore denies the same.

50.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

51.     BCI objects to the allegations of paragraph 51 as calling for a legal conclusion, and therefore denies the same.

52.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

53.     BCI objects to the allegations of paragraph 53 as calling for a legal conclusion, and therefore denies the same.

54.     BCI admits that Claim 1 of the '351 Patent contains, in part, the quoted language in this paragraph.

55.     BCI admits that Exhibits C and D are Instructions for Use, dated August 2014, and an RUO Addendum for "UniCel DxH Series with System Manager Software," dated July 2015, respectively.  BCI objects to the remaining allegations of paragraph 54 of the Complaint as calling for a legal conclusion, and therefore denies the same.

56.     Denied.

**COUNT I – [Alleged] Patent Infringement: U.S. Patent No. 10,401,350**

57.     BCI restates and incorporates each of its responses to paragraph 1-56 as if fully set forth above.

58.     Denied.

59.     BCI admits that it is not presently aware that it is directly licensed to the '350 patent or that Plaintiffs provided "authority" in connection with the '350 patent.  BCI is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same.  BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '350 Patent.  BCI denies all remaining allegations of this paragraph.

60.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '350 patent are satisfied at least as of the date of service of this complaint upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies all remaining allegations of this paragraph.

61.     Denied.

**COUNT II – [Alleged] Patent Infringement: U.S. Patent No. 10,401,351**

62.     BCI restates and incorporates each of its responses to paragraph 1-61 as if fully set forth above.

63.     Denied.

64.     BCI admits that it is not presently aware that it is directly licensed to the '351 patent or that Plaintiffs have provided "authority" in connection with the '351 patent.  BCI is

9

without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64 of the Complaint with respect to licenses that BCI is not a direct party to but may be a beneficiary of, and therefore denies the same.  BCI denies that any license or "authority" is required "to practice the subject matter claimed by the '351 Patent.  BCI denies all remaining allegations of this paragraph.

65.     This paragraph contains vague legal conclusions to which no answer is required. It is unclear what Plaintiffs intend by the statement "[t]he notice provisions of 35 U.S.C. § 287 with respect to the '351 patent are satisfied at least as of the date of service of this complaint upon BCI."  BCI admits that 35 U.S.C. § 287(a) includes the following two sentences:  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."  BCI denies all remaining allegations of this paragraph.

66.     Denied.

### RESPONSE TO PRAYER FOR RELIEF

BCI denies all allegations not specifically admitted herein, and further denies that Plaintiffs are entitled to the judgment and relief requested in the Prayer for Relief.  Rather, the Complaint should be dismissed with prejudice with a finding of no infringement and invalidity in favor of BCI.

### AFFIRMATIVE DEFENSES

Without any admission as to the burden of proof, burden of persuasion, or the truth of any allegation in Plaintiffs' Complaint, BCI states the following affirmative defenses:

10

**First Affirmative Defense**

Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**Second Affirmative Defense**

BCI has not infringed, and does not infringe any claim of the '350 Patent and '351 Patent, literally, under the doctrine of equivalents, directly or indirectly, contributorily, by inducement, or in any other manner.

**Third Affirmative Defense**

The asserted claims of the '350 Patent and of the '351 Patent are invalid for failing to comply with the conditions and requirements for patentability set forth in the United States Patent Laws, including, without limitation, in 35 U.S.C. §§ 101, 102, 103, 112, for double patenting, and the rules, regulations, and laws pertaining thereto.

**Fourth Affirmative Defense**

Plaintiffs' allegations are inadequate to state a claim of willfulness under 35 U.S.C. § 285.

**Fifth Affirmative Defense**

Plaintiffs cannot satisfy the requirements applicable to their request for injunctive relief and have an adequate remedy at law.

**Sixth Affirmative Defense**

As described in detail below with respect to BCI's Fifth Counterclaim, the '350 Patent and '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents while prosecuting the '350 Patent and '351 Patent before the U.S. Patent & Trademark Office.

### Seventh Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands.  Plaintiffs, through their attorney agents, obtained access to confidential information of Defendant, which it then wrongfully misappropriated, in violation of a Protective Order issued by the U.S. District Court for the Northern District of Illinois, to draft and prosecute the claims of '350 Patent and '351 Patents.  As a result of this conduct, Plaintiffs are barred from enforcing the '350 Patent and the '351 Patent against Defendant.

BCI reserves the right to assert all affirmative and other defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defenses, at law or in equity, that may now or in the future be available based on discovery, any other factual investigation, or any other development relating to this case or any other action.

## COUNTERCLAIMS

Defendant Beckman Coulter, Inc. ("BCI") incorporates herein by reference the admissions, allegations, denials and Affirmative Defenses contained in the Answer above as if fully set forth herein. For its Counterclaims against Plaintiffs/Counterclaim-Defendants Sysmex Corporation ("Sysmex") and Sysmex America, Inc. ("SAI") (collectively, "Counterclaim-Defendants") BCI states as follows:

### THE PARTIES

1.      BCI is a Delaware corporation having its principal place of business in Brea, California.

2.      According to the Complaint, Sysmex America, Inc. is a Delaware corporation having its principal place of business at 577 Aptakisic Road, Lincolnshire, Illinois 60069.

12

3.      According to the Complaint, Sysmex Corporation is a Japan corporation having its principal place of business at 1-5-1 Wakinohama-kaigandori, Chuo-ku, Kobe, Hyogo, Japan.

**JURISDICTION AND VENUE**

4.      These counterclaims arise under the Patent Laws of the United States, 35 U.S.C. § 1 et seq and, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*, (collectively, the "Federal Counterclaims") and breach of contract under the laws of the State of Illinois.  This Court has jurisdiction over the subject matter of thesethe Federal Counterclaims under 28 U.S.C. §§ 1331 and 1338(a) because the Counterclaims involve questions of federal law and regulation, and pursuant to 28 U.S.C. §§ 1367(a), because the Federal Counterclaims are so related to the claims in this action as to form part of the same case or controversy under Article III of the United States Constitution.  This Court also has supplemental jurisdiction over the breach of contract counterclaim because such claims are so related to the Federal Counterclaims and the claims of this action as to form part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over Sysmex and SAI because, among other reasons, these Counterclaim-Defendants have consented and subjected themselves to the jurisdiction of this Court by filing their Complaint against BCI.

6.      To the extent that venue is appropriate for Counterclaim-Defendants' claim against BCI, venue is also appropriate in this Court for BCI's counterclaims.

7.      There is an actual and justiciable controversy between the parties as to the infringement, validity and enforceability of United States Patent No. 10,401,350, entitled "Sample Analyzer and Computer Program Product" ("the '350 Patent") and United States Patent No. 10,401,351, entitled "Sample Analyzer and Computer Program Product" ("the '351 Patent").

## BACKGROUND

8.      The asserted Sysmex '350 Patent and '351 Patent (collectively, "the Asserted

Patents") purport to describe an improvement in hematology analyzers.   The "Field of the

Invention" section of the specification states "[t]he present invention relates to a sample analyzer

and computer program product capable of measuring not only blood, but also body fluids other

than blood such as cerebrospinal fluid (spinal fluid), fluid of the thoracic cavity (pleural fluid),

abdominal fluid and the like."  This description of the invention inaccurately and misleadingly

suggests that prior art systems measured only blood whereas the purportedly novel analyzer of

the patent application measured both blood and body fluids.  However, several years before

Sysmex filed its earliest related patent application, both BCI and Sysmex had made, used and

described hematology systems for measuring both blood and body fluids.

9.      BCI and Sysmex are competitors.  Prior to the critical date of the '350 and '351

patents, both parties made and sold automated hematology analyzers, which performed blood

and body fluid tests in clinical laboratories.  These analyzers measured and reported information

about the composition of cells in blood and body fluid samples.  For example, the prior art

analyzers measured red blood cell counts, white blood counts, hemoglobin and other parameters

for blood.  The prior art analyzers also are capable of measuring and reporting body fluid

information such as total nucleated cell counts.

### The Sysmex Patents in Suit

10.      A copy of the '350 patent is attached as Exhibit A to Plaintiffs' Complaint.

11.      A copy of the '351 patent is attached as Exhibit B to Plaintiffs' Complaint.

12.      By paragraph 4 of their Complaint, Plaintiffs allege that they are "the assignees of

the Patents, and are the co-owners of the entire right, title, and interest in and to the Patents,

14

including the right to enforce and to recover damages for any current or past infringement of the Patents."

13.     The critical date of the '350 patent for prior art purposes is no earlier than January 31, 2007.

    a.     Sysmex's '350 patent issued from U.S. Patent Application Serial No. 16/214,417 ("the '417 application"), which Sysmex filed on December 10, 2018. Through a series of continuation applications, the '417 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

    b.     Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective filing date of the '350 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '417 application claims priority.

14.     The critical date of the '351 patent for prior art purposes is also no earlier than January 31, 2007.

    a.     Sysmex's '351 patent issued from U.S. Patent Application Serial No. 16/363,694 ("the '694 application"), which Sysmex filed on March 25, 2019.  Through a series of continuation applications, the '694 application claims priority to U.S. Patent Application Serial No. 12/023,830 ("the '830 application"), which Sysmex filed in the United States on January 31, 2008.

    b.     Although the '830 application purports to claim priority to earlier Japanese applications filed on February 1, 2007, and March 30, 2007, the earliest possible effective

filing date of the '351 patent for purposes of prior art under 35 U.S.C. § 102(b) (pre-AIA) is January 31, 2008, the date of the earliest United States application to which the '694 application claims priority.

      c.     At least certain claims of the '351 patent are not entitled to the benefit of any priority prior to its filing date of March 25, 2019 because they claim subject matter that was not disclosed in any earlier patent application to which the benefit of priority was claimed.

15.     The patents in suit issued from a long chain of applications claiming priority to the '830 application. Sysmex obtained at least four earlier patents from this chain of applications, all having the same patent specification and drawings. These patents include U.S. Patent 8,440,140 (the '140 patent), which issued on May 13, 2013 from the '830 application; U.S. Patent 8,968,661 ("the '661 patent"), which issued on March 3, 2015 from a continuation (U.S. Patent Application Serial No. 13/891,667) of the '830 application; U.S. Patent 9,933,414, which issued on April 3, 2018 from a further continuation application (U.S. Patent Application Serial No. 14/595,319); and U.S. Patent 10,151,746 ("the '746 patent"), which issued on December 11, 2018 from yet another continuation application (U.S. Patent Application Serial No. 15/908,339).

16.     This is not the first patent infringement lawsuit brought by Sysmex against BCI regarding a patent issuing from an application which claims priority to the '830 application. On December 11, 2018, Sysmex filed a lawsuit against BCI, asserting infringement of the '746 patent.

17.     On February 13, 2019, Sysmex dismissed without prejudice its lawsuit involving the '746 patent.

18.     At least the independent claims of the '350 and '351 patent are obvious in view of the claims in one or more of the prior Sysmex patents issuing from the same chain of applications, including at least the '746 patent.

**Sysmex's Prior Art Systems**

19.     More than one year prior to the filing date of the patents in suit, Sysmex made and sold prior art hematology analyzers, including at least the XE-2100, XT-2000i and XT-1800i analyzers, that were used for measuring both blood and body fluids.

20.     Sysmex or others had stated in printed publications and marketing materials that such prior art hematology analyzers could be used for measuring both blood and body fluids. Sysmex further printed and made manuals available for these analyzers, instructing users on how to operate them for body fluid analysis.  These marketing materials and manuals were publicly available prior to January 31, 2007.  These manuals and marketing materials constitute prior art to the patent applications that became the patents in suit.

21.     The claims of the patents in suit cover Sysmex's own prior art products, or at best cover only obvious software modifications of Sysmex's own prior art products.  These prior art products measured both blood and body fluids.  One such Sysmex prior art product was the XE-2100 hematology analyzer system.

22.     Several figures of the Asserted Patents are copied or derived from prior art printed publications created by Sysmex.  More specifically, Sysmex's prior art hematology analyzers sold prior to January 31, 2007, include the "XE-2100" unit, which Sysmex described in a printed publication entitled, "Operator's Manual, Automated Hematology Analyzer, XE-2100, Main Unit" ( the "XE-2100 Operator's Manual") and attached as Exhibit 1.   Sysmex printed and made

the XE-2100 Operator's Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

      a.     Figure 1 of the Asserted Patents was copied from the prior art as a portion of Figure 1-1 of the prior art XE-2100 Operator's Manual.  These figures are illustrated below (callout oval added to the Figure 1-1 of the XE-2100 Operator's Manual).

| Asserted Patents | Prior Art XE-2100 Operator's Manual |
| --- | --- |
|  | |

      b.     The information of Figure 2 of the Asserted Patents likewise appears in the Sysmex prior art.  Figure 7-25 of the XE-2100 Operator's Manual is entitled

"Electrical System Block Diagram of Main Unit," and includes the same components and arrangement as Fig. 2 of the Asserted Patents.



19

c.      Figure 3 of the Asserted Patents combines several figures from the prior art XE-2100 Operator's Manual.   Figure 7-5 and 7-6 from the prior art manual are reproduced below.

| Asserted Patents, Fig. 3 (Annotated) | Prior Art XE-2100 Operator's Manual (Annotated) |
|---|---|
|  | |

Additional figures in the prior art XE-2100 that relate to Fig. 3 of the '350 patent include Figs. 7-7 through 7-11, Fig. 7-15, and Fig. 7-17.  Each of these figures illustrates a physical relationship between diluents, sample tubes, sample valve, and an optical detector block.

d.      Figure 4 of the Asserted Patents is substantially identical to Figure 7-4 of

the prior art XE-2100 Operator's Manual.



e.      Figure 5 of the Asserted Patents is substantially identical to Figure 7-2 of

the prior art XE-2100 Operator's manual.



21

f.      Figure 6 of the Asserted Patents purports to "show[] the HGB detection

unit."  This unit is substantially identical to that illustrated in Figure 7-8 of the prior art

XE-2100 Operator's Manual (reproduced below with an oval added).



| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|

g.      The flowchart of Figure 7 of the Asserted Patents includes a description of

an analyzer's operation for processing blood and for processing a body fluid.  The

portion of the flowchart for processing body fluids includes several of the identical steps

for processing blood.  The portion of the flowchart for processing blood was included

with the prior art XE-2100 Operator's Manual.  In addition, Table 1-1 of the prior art

XE-2100 Operator's Manual describes the same sequence and further includes a "Post-analysis check."



h.    The screen layout of Figure 8 of the Asserted Patents is shown in several illustrations of the prior art XE-2100 Operator's Manual.  Figure 2-13 is shown as an example screen display of the prior art XE-2100 Operator's Manual.



| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|

i.    Figure 12 of the Asserted Patents is substantially identical to that illustrated in Figure 7-12 of the prior art XE-2100 Operator's Manual.



| Asserted Patents | Prior Art XE-2100 Operator's Manual |
|---|---|

23.    The XE-2100 Operator's Manual discloses every claimed hardware arrangement in the '350 patent and the '351 patent, which were not included in any other reference before the

24

USPTO during prosecution of the Asserted Patents.  However, despite the significant overlap between the description of the Asserted Patents and the prior art XE-2100 Operator's Manual, Sysmex did not identify or acknowledge the XE-2100 Operator's Manual or any information in the figures or in the specification of the Asserted Patents as "prior art."

24.     In an unrelated Sysmex patent application, U.S. Patent Application Serial No. 11/374,109, ("the '109 application"), Sysmex submitted an Information Disclosure Statement on March 14, 2006, disclosing Chapter 7 of the XE-2100 OPERATOR'S MANUAL.  The '109 application was entitled "Sample Analyzer and Sample Analyzing Method" and pertained to analysis of blood on a hematology analyzer.  It published as U.S. Patent Publication No. 2006/0210438 under 35 U.S.C. § 122(b) on September 21, 2006, and later issued as U.S. Patent No. 9,243,993 on January 26, 2016.  The '109 application specifically references the Sysmex XE-2100 analyzer.  The submitted Chapter 7 of the XE-2100 Operators Manual, made before the critical date of the Asserted Patents, contains the majority of the prior art figures described above, which were also later included in the applications for the Asserted Patents.

25.     The '109 application lists as the first-named inventor Mr. Takaaki Nagai, a senior director of engineering at Sysmex.  Mr. Nagai is the same inventor who is first-named on the Asserted Patents.  On information and belief, from at least March 2006 to the present, Mr. Nagai has actively participated in the process of prosecuting Sysmex patent applications and reviewing patents and prior art.

26.     By no later than March 14, 2006, Sysmex, its attorneys, and inventors of the Asserted Patents, including at least Mr. Nagai, were aware of the XE-2100 Operator's Manual and particularly the contents of Chapter 7.  Nevertheless, Sysmex did not disclose the XE-2100

25

Operator's Manual as an item of prior art for the Asserted Patent applications or for any application to which the Asserted Patents claim the benefit of priority.

27.     The prior art Sysmex XE-2100 hematology analyzer was described as measuring and analyzing blood and body fluids.

a.     A printed publication created by Sysmex and entitled "XE-Series Body Fluid Application," a copy which is attached as Exhibit 2, described the use of the XE-series analyzers for both blood and body fluids.  This publication, which has a copyright date of 2004 and metadata showing a last modified date of 2006, is prior art to the Asserted Patents.

b.     The XE-Series Body Fluid Application publication further states "A logical step in blood cell analysis is the application of automated body fluid testing.  The XE-Series analyzers with XE pro software now brings the power of fluorescent flow cytometry to body fluid analysis."

c.     Sysmex applied for and received Food & Drug Administration ("FDA") approval for its XE-Series Body Fluid Application in 2004, under 510(K) No. 040073.  Sysmex updated its user manuals for the XE-2100 shortly thereafter to reflect the availability of the XE-2100 for body fluid use. The then-new "Appendix C: Body Fluid Application" section of the XE-2100 Information Processing Unit Operator's Manual ("XE-2100 IPU Manual") (*see, e.g.*, SCorp-Del00117686–702), for example, instructed the user to analyze body fluids on the XE-2100 using "manual mode" and setting the "Discrete" test in a substantially identical manner as described in the Asserted Patents:

26

| Asserted Patents | Prior Art XE-2100 IPU Manual Appendix C: Body Fluid Application |
|---|---|
| When specifying the BODY FLUID measurement mode, the operator specifies MANUAL mode as the take-up mode, [CBC+DIFF], [CBC+DIFF+RET], [CBC+DIFF+NRBC], or [CBC+DIFFNRBC+RET] as the DISCRETE test, and [BODY FLUID] as the type of sample. In step S4, the<br><br>Col. 9, lines 35-39 | The body fluid Specimen can be analyzed with Manual Mode.<br><br>CAUTION:  • In case of analyzing body fluid specimens, use discrete mode of below from "Discrete" of the Sample No. Setting screen.<br>   - "3. CBC+DIFF"<br>   - "4. CBC+DIFF+RET"<br>   - "6. CBC+DIFF+NRBC"<br>   - "7. CBC+DIFF+NRBC+RET" |

28.     The XE-2100 IPU Manual also instructed users to run the XE-2100 differently for body fluid analysis.  For example, the XE-2100 IPU Manual instructed users to check background counts prior to analyzing body fluids to make sure they were in an acceptable range, and if not, to "perform an auto-rinse or blank measurement."  The XE-2100 IPU Manual further instructed users to "select 'Auto Rinse' on the function menu to execute an automatic rinse and background check" when specifically running the XE-2100 for body fluid analysis.  On information and belief, Sysmex printed and made the XE-2100 IPU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

29.     Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application included a version of the XE-Series Body Fluid Application publication as "a draft of the sales literature for the XE-2100 Series, automated hematology analyze (sic), body fluid application."  Although Sysmex designated certain portions of its submission as confidential, Sysmex did not designate the draft XE-Series Body Fluid Application publication as confidential in its submission.  Sysmex's 2004 FDA submission for the XE-Series Body Fluid Application was specifically referenced in a 2006 journal article, by Shen, P. et al., "Cholesterol Crystals Causing Falsely Elevated Automated Cell Count," American Journal of Clinical Pathology 125:358-363

27

(2006), stating "Several manufacturers of automated hematology instruments have obtained FDA approval for performing cell counts on body fluids (for example, Coulter LH750, Beckman Coulter, approval No. 510(K)050057; Sysmex XE-2100, Sysmex, Mundelein, IL, approval No. 510(K)040073; and Advia 120[cerebrospinal fluid WBC, WBC differential, and RBC counts], Bayer, Tarrytown, NY approval No. 510(K)022331)."

30.     Despite the relevance of the XE-2100's ability and usage to analyze body fluids in a similar manner and using identical hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the 2004 FDA filing for the XE-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XE-2100 to the USPTO during prosecution of the Asserted Patents.

31.     Sysmex sold other prior art hematology analyzers related to the XE-2100 that also had the ability to analyze body fluids in a manner similar to that claimed in the Asserted Patents. For example, in 2006 Sysmex received FDA approval for a Body Fluid Application on smaller hematology analyzers, the XT-1800i and XT-2000i, under FDA 510(K) No. 061150.  The XT-Series Body Fluid Application listed the XE-Series Body Fluid Application as a predicate device.

32.     As it did with the XE-Series, in 2006 Sysmex published a marketing publication, "XT-Series Body Fluid Application," (*see, e.g.*, SAI-Del00003411) and updated its XT-2000i/XT-1800i manuals to include a similar section instructing users on how to use those hematology analyzers to analyze body fluids other than blood.  Like the manuals for the XE-2100, the updated XT-2000i/XT-1800i Instructions For Use manuals ("XT-IFU Manual") (*see, e.g.*, SCorp-Del00117489–SCorp-Del00117500) included specific instructions by which the

analyzer was to operate for body fluid analysis, including selection of a manual mode and performing an auto-rinse to ensure background counts are reasonable.

33.     On information and belief, Sysmex printed and made the XT-IFU Manual publicly available prior to January 31, 2007.  This manual constitutes prior art to the Asserted Patent applications.

34.     Despite the relevance of the XT-2000i/XT-1800i's ability and usage to analyze body fluids in a similar manner and using at least similar hardware as described and claimed in the Asserted Patents, Sysmex did not disclose the prior art XT-Series Body Fluid Application publication, the XT-IFU Manuals, the FDA submission on the XT-Series Body Fluid Application, or any other information regarding analyzing body fluids on the XT-2000i/XT1800i to the USPTO during prosecution of the Asserted Patents.

35.     The XE-2100 contained every claimed hardware arrangement in the '350 patent and the '351 patent, and the software in the Sysmex prior art products either included every additional claimed feature, or at a minimum, would have been understood to be readily modified in a logical manner to include every additional claimed feature.

36.     At a minimum, therefore, the various matter claimed in the patents in suit are either anticipated by, or would have been obvious to a person of ordinary skill in the art based on, Sysmex's own prior art products.

**Prosecution of the Asserted Patents and Sysmex's Failure to Disclose Material Prior Art**

37.     On December 10, 2018 and March 25, 2019, the same dates that Sysmex Corporation filed, respectively, the '417 application that led to the '350 patent and the '694 application that led to the '351 patent, Sysmex's attorney, Mr. Tadashi Horie of the law firm

Brinks, Gilson & Lione, submitted with each application a "Certification and Request for Prioritized Examination."  The USPTO granted Sysmex's requests for expedited examination.

38.     With the '417 application, Sysmex, through the named inventors and prosecuting attorneys, filed Information Disclosure Statements on December 10, 2018 and March 6, 2019, listing over 200 references.  The Information Disclosure Statements were signed by Mr. Horie. By this time, Sysmex, Mr. Nagai and/or Mr. Horie were aware of the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i.  Sysmex, Mr. Nagai and/or Mr. Horie were also aware of the materiality of these prior art references and information to the patentability of the claims.  Despite this awareness, Sysmex and its attorneys withheld from these Information Disclosure Statements the XE-2100 Operator's Manual (including Chapter7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.

39.     On March 19, 2019, the USPTO mailed a Notice of Allowance for the '417 application. On April 17, 2019, the USPTO mailed a Notice of Allowance for the '694 application.  Both Notices of Allowance gave as the sole reason for allowance that "the cited

prior art neither teaches nor fairly suggests a sample analyzer comprising" the listed elements of the then-independent claims.

40.    Rather than pay the issue fees, Sysmex instead re-opened prosecution for both of the Asserted Patent applications on June 17, 2019 by filing a Request for Continued Examination, including amendments that significantly amended claim language.  Sysmex also submitted additional Information Disclosure Statements on June 17, 2019 and on June 24, 2019, for each of the Asserted Patent applications.  Mr. Horie signed the Requests for Continued Examination and the Information Disclosure Statements for both applications.  Sysmex, through the named inventors and prosecuting attorneys, again withheld from the PTO the XE-2100 Operator's Manual (including Chapter 7), the XE-Series Body Fluid Application publication, the XE-2100 IPU Manual, the FDA submission for the XE-Series Body Fluid Application, and any information or publications regarding the ability to analyze body fluids on the XE-2100, XT-2000i and XT-1800i's. Sysmex also withheld from the PTO its prior sales activities regarding its XE-2100 hematology analyzers for use with body fluids.  Sysmex also withheld from the PTO any information regarding customer usage of the XE-2100, XT-2000i and XT-1800i for analyzing body fluids prior to the critical date using the XE-Series or XT-Series Body Fluid Applications.  Sysmex, Mr. Nagai and/or Mr. Horie were aware of the materiality of these prior art references and information to the patentability of the amended claims in the '417 and '694 applications.

41.    The PTO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and for the '417 application on July 10, 2019.  Both Notices of Allowance gave as the sole reason for allowance, "the cited prior art neither teaches nor fairly suggests a sample analyzer further comprising the recited controller programmed as claimed."

42.     Sysmex paid the issue fees for the '694 application on July 2, 2019 (five days after allowance), and for the '417 application on July 10, 2019 (the same day as allowance).  Mr. Horie signed the Issue Fee Transmittals for both applications.  The Asserted Patents both issued on September 3, 2019, less than nine months after Sysmex Corporation filed the '417 application and less than six months after it filed the '694 application.  Sysmex filed the present lawsuit asserting the Asserted Patents against BCI on the same day.

43.     Sysmex, the Sysmex inventors and prosecuting attorney intentionally withheld the prior art XE-2100 Operators Manual, the prior art XE-Series Body Fluid Application publication, the prior art XE-2100 IPU Manual including the Body Fluid Application appendix, and the prior art XE-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

44.     Sysmex, the Sysmex inventors and prosecuting attorney also intentionally withheld the prior art XT-Series Body Fluid Application publication, the XT-2000i/XT-1800i IFU Manual including the Body Fluid Application appendix, and the prior art XT-Series Body Fluid Application FDA submission from the USPTO during the prosecution of the Asserted Patents.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

45.     In addition, Sysmex, the Sysmex inventors and prosecuting attorney intentionally did not inform the USPTO that portions of the Asserted Patent specification were copied or derived from the XE-2100 Operators Manual.  This was material information that the Sysmex inventors and prosecuting attorney were aware of and should have disclosed.

32

46.     The Sysmex inventors and prosecuting attorney had an obligation to inform the USPTO that the claimed "analyzers" of the Asserted Patents could not be distinguished from the Sysmex prior art on the basis of hardware components, such as the claimed detectors.  Rather, the subject matter that Sysmex claimed as its invention differed from Sysmex's prior art XE-Series products, if at all, only with respect to software modifications.

47.     At least claim 1 of the '350 patent is anticipated by the sale, offer for sale, and/or use of the XE-2100 analyzer for body fluid analysis, as described in XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed the XE-2100 analyzer's approved, marketed, and document use for analysis of body fluids prior to the critical date.

48.     At least claim 1 of the '350 patent is anticipated by the prior art publications XE-2100 Operator's Manual, XE-2100 IPU Manual, XE-Series Body Fluid Application publication, and XE-Series Body Fluid Application FDA submission insofar as they are considered a single reference.  The USPTO would not have issued at least claim 1 of the '350 patent if Sysmex had disclosed these publications during prosecution of the Asserted Patent applications.

49.     The USPTO further would not have issued the claims of the Asserted Patents (as apparently construed by Sysmex to cover the accused products) if Sysmex had disclosed that every claimed hardware arrangement was in the prior art XE-2100 products and that the software in the prior art XE-2100 products could be readily modified in a logical manner to include every additional claimed feature.

50.     It would have been obvious to a person of ordinary skill in the art to implement software changes on the XE-2100 to implement each of the various features claimed in the Asserted Patents.

51.     As a direct result of Sysmex's failures to cite material information to the USPTO, including failures by its employee, Mr. Nagai, and its attorney, Mr. Horie, the US Examiner was unaware of Sysmex's own prior art that either disclosed the claimed inventions or differed from them in only obvious ways.

52.     Sysmex was aware of its own prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, as described and identified above, during the prosecution of the Asserted Patents.

53.     Sysmex knew, during the prosecution of the Asserted Patents, that its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, was material to the patentability of the claims in the Asserted Patents.

54.     Sysmex made a deliberate decision to withhold its own prior art Sysmex manuals, publication, FDA submission, and information regarding sales and usage, as described and identified above, with an intent to deceive the US Examiner.

55.     But for Sysmex's intentional choice to withhold the prior art Sysmex manuals, publications, FDA submissions, and information regarding sales and usage, the claims of the Asserted Patents would not have issued.

56.     Accordingly, Sysmex's fraudulent conduct before the USPTO was inequitable, and the Asserted Patents are unenforceable.

## OTHER RELATED ACTS OF MISCONDUCT BY SYSMEX

57.     Sysmex, through its agents and counsel Brinks, Gilson & Lione ("Brinks"), unlawfully used BCI's confidential, proprietary, and trade secret information to prosecute the '417 and '694 applications from which the Asserted Patents issued.

58.     Since November 2017, Sysmex and BCI have been involved in another patent infringement lawsuit entitled *Beckman Coulter Inc. v Sysmex America Inc.*, Civil Action No. 1:17-cv-24049-DPG (S.D. Fla.), which BCI -filed in the U.S. District Court for the Southern District Court of Florida.  The Florida Court subsequently transferred the action to the Northern District Court of Illinois, where it received Civil Action No. 1:18-cv-6563 ("the Illinois Action"). The Illinois Action, like this action, relates to automated laboratory equipment including hematology analyzers.  Sysmex, through Brinks and Mr. Horie, took advantage of the discovery process in the Illinois Action to access confidential, proprietary, and trade secret information about BCI's analyzers, namely the UniCel DxH 600, UniCel DxH 800, UniCel DxH 801, UniCel DxH 1600, UniCel DxH 1601, UniCel DxH 2400, UniCel DxH 2401, UniCel DxH 900, UniCel DxH 900 SMS, UniCel DxH 900-2, UniCel DxH 900-2 SMS, UniCel DxH 900-3, and UniCel DxH 900-3 SMS hematology analyzers (collectively, the "DxH products").

59.     At all times after BCI produced confidential information through the discovery process in the Illinois Action, Sysmex and any of its counsel that accessed confidential BCI information had an obligation to refrain from misappropriating discovery materials for purposes unrelated to the litigation.  Despite this obligation, Sysmex, through Brinks and Mr. Horie, used BCI's confidential, proprietary, and trade secret information to amend the claims of the '417 and '694 applications during prosecution in an attempt to reach the DxH products.  The patent claims of the Asserted Patents were obtained so that Sysmex could accuse BCI of infringement in the present action.  Sysmex did not have any patent claims that colorably covered any of BCI's

hematology instruments until after its counsel at Brinks obtained confidential information obtained through discovery in the Illinois Action.

60.     BCI has invested considerable time and resources in the research and development of the DxH products.  By misappropriating BCI's confidential, proprietary, and trade secret information relating to the DxH products, Sysmex, through Brinks and Mr. Horie, has not only undermined BCI's competitive position, but also forced BCI to spend significant amount of resources to defend a lawsuit that should not have been brought.

### BCI's Confidential, Proprietary, and Trade Secret Information

61.     BCI is an industry leader in diagnostics and equipment for biomedical research and testing.  BCI's technologies improve the productivity of medical professionals and scientists supplying critical information for improving patient health and delivering trusted solutions for research and discovery.  BCI's technologies are used in thousands of hospitals and laboratory facilities worldwide, including those in the U.S.

62.     To maintain its position as an industry leader, BCI dedicates time and resources to innovation.  Through this process, BCI has accumulated a significant amount of confidential, proprietary, and trade secret information.  The success of BCI's business relies on this information.

63.     In fact, at least part of the competitive edge that BCI enjoys is owed to the confidential, proprietary, and trade secret information that it holds for the DxH products.  Such information includes know-how and facts concerning the development, testing, engineering, and functionality of the DxH products, as well as financial and marketing information relating to the manufacturing and sale of such products.  These trade secrets are neither shared with BCI's customers nor disclosed to the public.

36

64.     Source code is among the trade secrets that BCI holds closely.  As one of BCI's crown jewels, the source code for the DxH products contains intricate details relating to their operations and controls.  The software design for the DxH products also resides within the source code.  Similar to other trade secrets guarded by BCI, source code is not available or accessible to the public.  In fact, only a limited number of employees within BCI have access to the source code for the DxH products.  Keeping this information secret prevents BCI's competitors from reproducing or stealing BCI's crown jewels, enabling BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

**The Illinois Action and the Protective Order**

65.     On November 3, 2017, BCI filed a complaint against Sysmex in the Southern District Court of Florida, alleging, *inter alia*, that Sysmex's XN-Series hematology analyzers infringe United States Patent No. 6,581,012 ("the '012 patent").  *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:17-cv-24049-GAYLES (S.D. Fla.).  The '012 patent relates to an automated laboratory software architecture.

66.     On September 19, 2018, the Southern District Court of Florida transferred the case to the Northern District Court of Illinois. *See Beckman Coulter, Inc. v. Sysmex America, Inc. and Sysmex Corp.,* No. 1:18-cv-06563 (N.D. Ill.).  The Illinois Action is ongoing.

67.     Brinks represents Sysmex in the Illinois Action.

68.     Early in the Illinois Action—and before any confidential, propriety, and trade secret information was produced—Sysmex and BCI negotiated for and agreed to be bound by a protective order (the "Protective Order") to protect confidential information produced in discovery from improper disclosure and misuse.

69.     On July 11, 2018, Sysmex and BCI jointly moved the Southern District Court of Florida for entry of the Protective Order, acknowledging that the litigation "may require the production of documents and disclosure of testimony and other information involving trade secrets or confidential research and development or commercial information." (Joint Mot. For Entry of Protective Order, ¶ 1, ECF No. 62.)  The court entered the Protective Order as Docket Item No. 63.  A true and correct copy of the Protective Order is attached hereto as Exhibit 3.

70.     The Protective Order recognizes three categories of protected information.

71.     First, the Protective Order recognizes "Confidential Information" as:

information concerning a Person's business operations, processes, and technical and development information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure], the disclosure of which is likely to harm, that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

(Protective Order, ¶ 2(c).)

72.     Second, the Protective Order recognizes "Highly Confidential Information – Attorney's Eyes Only" as:

information within the scope of Rule 26(c)(1)(G) [of the Federal Rules of Civil Procedure]  that constitutes business or technical trade secrets or plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court, including particularly sensitive confidential information that a Person believes in good faith cannot be disclosed to a Recipient without threat of injury because such information contains trade secret or other proprietary or commercially sensitive information.

(Protective Order, ¶ 2(d).)

73.     Third, the Protective Order recognizes "Highly Confidential Information – Source Code" as:

any source code (including comments contained therein), human-readable programming language text that defines software, firmware, or electronic hardware descriptions, object code, Register Transfer Level ("RTL") files, Hardware

38

Description Language ("HDL") tiles, or other hardware description language, live data (i.e. data as it exists residing in a database or databases), or pseudo-source-code (i.e., a notation resembling a programming language but not intended for actual compilation, which usually description of the computations to be carried out) ("Source Code") more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a court combines some of the structure of a programming language with an informal natural-language.

(Protective Order, ¶ 2(e).)

74.     Pursuant to Paragraph 4(a) of the Protective Order, any individual who receives information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" may use the information for the prosecution or defense of the infringement action, but not for any other purposes, such as patent prosecution.

75.     Pursuant to Paragraph 4(b) of the Protective Order, counsel for the parties are responsible for the control and distribution of information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code."

76.     Pursuant to Paragraph 4(c) of the Protective Order, information designated as "Confidential" may be disclosed only to a limited number of individuals, such as the opposing party's litigation counsel, two employees of that party, and experts retained specifically for the litigation.

77.     Pursuant to Paragraph 4(d) of the Protective Order, information designated as "Highly Confidential – Attorney's Eyes Only" or "Highly Confidential – Source Code" may be disclosed only to an even more limited number of individuals, such as the opposing party's litigation counsel and experts retained specifically for the litigation.

78.     Pursuant to Paragraphs 5(a) and 5(c) of the Protective Order, only those who are eligible to view information designated as "Highly Confidential – Source Code" may inspect—

but not copy—the opposing party's source code.  After inspection, limited hard copies of information designated as "Highly Confidential – Source Code" may be produced upon request.

79.     Pursuant to Paragraph 10 of the Protective Order, counsel for the parties are precluded from prosecuting certain patent applications during the pendency of the litigation. Specifically, Paragraph 10 contains a prosecution bar, which states as follows:

> Any person permitted to receive technical information from a producing party that is designated Highly Confidential – Attorney's Eyes Only, or Highly Confidential - Source Code information (collectively "Highly Sensitive Technical Material"), and who obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's Highly Sensitive Technical Material under this Order *shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals*.

(Protective Order, ¶ 10 (emphasis added).)

80.     Under the Protective Order, the parties and their counsel had a duty to maintain the secrecy of any information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" and to restrict the use of such information to only the purposes permitted under the Protective Order.

81.     The Protective Order remains binding on the parties and their counsel after the transfer of the case from Florida to the Northern District Court of Illinois.  In other words, those who receive information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only," or "Highly Confidential – Source Code" in the Illinois Action remain obligated to maintain the secrecy of the information and to limit the use of the information to only the purposes permitted under the Protective Order.

82.     Sysmex and BCI also negotiated for and agreed to be bound by a protective order in this Action (the "Delaware Protective Order") to protect confidential information produced in

discovery in this Action from improper disclosure and misuse.  The provisions of the Protective Order and the Delaware Protective Order, and specifically the paragraphs cited above, are identical.

### Mr. Horie and Brinks

83.     Mr. Horie is an attorney licensed in the State of Illinois.  Mr. Horie has not filed an appearance in the Illinois Action, but is one of at least twelve Brinks attorneys who have represented or assisted Sysmex in the Illinois Action at one point or another.

84.     According to Brinks's website, Mr. Horie has been practicing law at Brinks since 1992 and has been a shareholder at Brinks since 2003.  Brinks also represents Mr. Horie to the public as having substantial expertise in patent prosecution and litigation with a "deep background in electrical and computer-related technologies" such as "computer-controlled medical diagnostic analyzers."

85.     Mr. Horie prosecutes and supervises the prosecution of patent applications on behalf of Sysmex, including those that relate to "electrical and computer-related technologies" and "computer-controlled medical diagnostic analyzers."  On information and belief, Mr. Horie has prosecuted over 100 patent applications for Sysmex since 2003.

86.     Even though he has not filed an appearance with the court, Mr. Horie has been significantly involved in defending Sysmex in the Illinois Action.  Among other things, Mr. Horie has ███████████████████████████████████████████ ███████████████████████████████████████████; attended at least one deposition in which BCI's highly confidential information was discussed; clandestinely received communications from BCI's counsel relating to confidential and/or highly confidential information via a Brinks email distribution group; and attended a claim construction hearing for

41

the '012 patent.  Mr. Horie has accessed and reviewed confidential and highly confidential information produced by BCI, including technical information.

87.     In October 2020, as part of ongoing discovery in this Action, Sysmex requested an inspection of BCI's source code for the DxH products.  On October 27, Sysmex identified that Mr. Horie would accompany its technical expert for the source code inspection.  BCI objected to Mr. Horie's participation, citing the Protective Order, and asked for information regarding Mr. Horie's prosecution activities.  On October 28, Sysmex withdrew its request to have Mr. Horie participate in the inspection, without providing any additional information on Mr. Horie's prosecution activities.

88.     At all times relevant to this claim, Mr. Horie and Sysmex's attorneys of record at Brinks were aware of the Protective Order.

89.     At all times relevant to this claim, Sysmex and/or its counsel and Mr. Horie understood their duty under the Protective Order to maintain the secrecy of any confidential or highly confidential information, including source code information, that they receive from BCI and to restrict the use of such information to only the purposes permitted under the Protective Order.

90.     Sysmex and/or its counsel and Mr. Horie also understood their duty under the Protective Order's prosecution bar, which precludes Mr. Horie from "prepar[ing], prosecut[ing], supervis[ing], or assist[ing] in the preparation or prosecution of any patent application pertaining to the field of the invention" of the '012 patent during the pendency of the Illinois Action. (Protective Order, ¶ 10.)

**Breach of the Protective Order and Misappropriation of BCI's Confidential Information**

91.     On information and belief, Sysmex, through Brinks and Mr. Horie, planned to file and maintain a counter-patent infringement suit against BCI as retaliation for accusing Sysmex of infringement.  In particular, Sysmex intended to advance the claim that the DxH products infringe Sysmex's own patents.  Because BCI contended in the Illinois Action that the DxH products practice the claims of the '012 patent, Sysmex had a unique opportunity (through discovery) to learn about the technical features of the DxH products before filing a counter-suit.

92.     By December 2018, BCI had produced over 65,000 pages of documents to Brinks in response to Sysmex's discovery requests.  Many documents were designated as "Highly Confidential – Attorney's Eyes Only," and contained *inter alia*, confidential, proprietary, and/or trade secret information concerning the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

93.     On December 11, 2018, Sysmex sued BCI in the District Court of Delaware, alleging, among other things, that the importation, offer for sale, sale, and exportation of the DxH products infringe the '746 patent.  *See Sysmex America, Inc. and Sysmex Corp. v. Beckman Coulter, Inc.*, No. 1:18-cv-01 951-CFC (D. Del) (the "First Delaware Action").  However, about two months later, and prior to BCI responding to the Complaint in that action, Sysmex filed a notice of voluntary dismissal of the case because it belatedly realized that the claims of the '746 patent were not infringed by the DxH products.

94.     On February 12, 2019, BCI produced to Brinks over 15,000 documents totaling over 125,000 pages in response to discovery requests served in the Illinois Action.  As most of these documents were designated as "Highly Confidential Information – Attorney's Eyes Only," this production contained a substantial amount of confidential, proprietary, and/or trade secret

information relating to the research, development, testing, technical features, engineering, functionality, manufacture, sales and/or marketing of the DxH products.

95.     In the meantime, Mr. Horie was prosecuting patent applications on behalf of Sysmex while being permitted access to BCI's confidential, proprietary, and trade secret information produced in discovery.  Mr. Horie filed the '417 application on December 10, 2018, filed the '694 application on March 25, 2019, and tended to the prosecution of those applications. The '417 and '694 applications were filed with "Track One" requests in order to expedite their examination by the USPTO.

96.     The subject matter of the '417 and '694 applications relates to the field of invention of the '012 patent.

97.     At no point during the pendency of the Illinois Action did Sysmex or Brinks take any measures to prevent Mr. Horie from reviewing BCI's confidential information.  Nor did Sysmex or Brinks enforce the prosecution bar against him.  The filing and prosecution of the '417 and '694 applications by Mr. Horie, therefore, violated at least the prosecution bar of the Protective Order.

98.     The USPTO mailed a Notice of Allowance for the '417 application on March 19, 2019 and a Notice of Allowance for the '694 application on April 17, 2019.  On information and belief, Sysmex intended to assert any patents issuing from the '417 and '694 applications against BCI—but first, it sought to determine whether the claims of the '417 and '694 applications, as allowed at that time, could either encompass or be amended to encompass the operation of the DxH products.  Instead of paying the issue fees, Sysmex, through Brinks and Mr. Horie, continued to use the tools of discovery to further access confidential, proprietary, and trade secret information relating to the DxH products.

44

99.     In late April 2019, a Brinks attorney of record in the Illinois Action, on behalf of Sysmex, requested an inspection of the source code for the DxH products pursuant to the Protective Order.

100.     Given that the Protective Order specifically provides for the protection of source code information in discovery, Sysmex and Brinks understood the source code for the DxH products is confidential and proprietary to BCI and constitutes trade secrets.

101.     Using discovery permitted under the Federal Rules of Civil Procedure, Sysmex inspected BCI's source code pursuant to the Protective Order.  From May 6, 2019 to May 9, 2019, Sysmex's technical expert and attorney of record examined the source code for the DxH products.

102.     After inspecting the code in the Illinois Action, Sysmex, through Brinks, requested that BCI produce printouts and native files of certain portions of this source code pursuant to Protective Order.

103.     On June 12, 2019, BCI produced the requested printed materials and designated them as "Highly Confidential – Source Code" under the Protective Order.

104.     Accordingly, by June 12, 2019, Mr. Horie, along with other Brinks attorneys, had access to a substantial amount of confidential, proprietary, and trade secret information from BCI relating to (1) the source code for the DxH products and (2) the development, testing, technical features, engineering, and/or functionality of the DxH products.  Despite awareness and knowledge of the Protective Order, Mr. Horie did not cease prosecuting patent applications on behalf of Sysmex, and neither Sysmex nor its counsel took any steps to prevent Mr. Horie's continued prosecution of patent applications.

105.    On June 17, 2019, five days after receiving hard copies of BCI's source code production, Mr. Horie re-opened prosecution for both of the '417 and '694 applications by filing Requests for Continued Examination, including a large number of amendments to the claims in each application.  In the '417 application, Mr. Horie amended 16 of the previously allowed 20 claims and added 8 new claims.  In the '694 application, Mr. Horie amended 20 of previously allowed 28 claims and added 1 new claim.

106.    These amendments significantly changed the claim language and scope of the '417 and '694 applications.

107.    As an example, independent claims 1 and 12 of the '417 application and independent claim 1 of the '694 application were amended to include a feature of a sensing operation that when "performed in the body fluid mode [is] different, at least partially, from the sensing operation performed in the measuring mode."  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019. These patent claims are also materially different from the patent claims of the '746 patent that Sysmex initially asserted but later withdrew in the First Delaware Action.

108.    As another example, independent claim 19 of the '417 application, dependent claims 3-6 and 18 of the '417 application, and dependent claim 17 of the '694 application were amended to include a feature of "automatically initiating" a pre-washing process.  This feature was neither present in the claims of the '417 application as allowed on March 19, 2019 nor present in the claims of the '694 application as allowed on April 17, 2019.

109.    Mr. Horie submitted these claim amendments and new claims after he and/or others under his supervision had access to confidential information for the DxH products,

including technical information designated by BCI as "Highly Confidential - Attorney's Eyes Only" and/or "Highly Confidential - Source Code," through discovery in the Illinois Action.  On information and belief, Sysmex used Mr. Horie to obtain patents that could cover the features of the DxH products as part of its plan to initiate a retaliatory patent infringement action against BCI.

110.    Mr. Horie, along with the other Brinks attorneys, understood the Protective Order's prohibition against misuse of BCI's confidential, proprietary, and trade secret information, including the information designated as "Highly Confidential – Source Code." Sysmex, through the actions of Mr. Horie, breached the Protective Order at least because it appropriated BCI's trade secret information, e.g., source code, for a purpose unrelated to its defense in the Illinois Action.

111.    The USTPO mailed a new Notice of Allowance for the '694 application on June 27, 2019, and a new Notice of Allowance for the '417 application on July 10, 2019.  Sysmex promptly paid the issue fees.

112.    The Asserted Patents issued from the '417 and '697 applications on September 3, 2019 without further claim amendments.  The Asserted Patents misappropriated the source code information and/or other highly confidential information that Brinks received from BCI in the Illinois Action.

113.    On the same day that the Asserted Patents issued, Sysmex filed the present action against BCI, claiming that the DxH products infringe the Asserted Patents.  Sysmex's promptness in the filing of the present action, at the very least, indicates an eagerness to pursue a retaliatory patent infringement suit against BCI.

**Continued Breach of the Protective Order**

114.    After the issuance of the Asserted Patents, Mr. Horie has continued to file and prosecute patent applications on behalf of Sysmex.  BCI is unaware of any restriction in Mr. Horie's access to BCI's confidential, proprietary, and trade secret information since the issuance of the Asserted Patents.  Nor is BCI aware of any measure taken by Sysmex or Brinks to enforce the prosecution bar of the Protective Order against Mr. Horie.

115.    Since the entry of the Protective Order in July 2018 for the Illinois Action in the Southern District Court of Florida, Mr. Horie has prosecuted at least 50 patent applications for Sysmex, including the Asserted Patent applications.  A list of presently known Sysmex patent applications that Mr. Horie has prosecuted since July 2018 is attached as Exhibit 4.

116.    The subject matter of many of these applications relates to the field of invention of the '012 patent.

117.    Mr. Horie's prosecution of these applications is a violation of at least the prosecution bar of the Protective Order.

118.    In January 2021, BCI took the deposition of Mr. Horie.  During the deposition, Mr. Horie did not dispute that (1) ███████████████████████████████; (2) ███████████████████████████████████████████████; and (3) ████████ ████████████████████

**First Counterclaim**

**(Declaration of Non-Infringement of the '350 Patent)**

~~57.~~119.          BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~56~~118.

58.120.          A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, *inter alia*, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '350 Patent.

59.121.          The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '350 Patent, either directly, contributorily or by inducement, literally or by equivalents.

60.122.          BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '350 Patent.

## Second Counterclaim

## (Declaration of Non-Infringement of the '351 Patent)

61.123.          BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-60122.

62.124.          A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the issue of whether BCI's hematology analyzers would infringe any valid or enforceable claim of the '351 Patent.

63.125.          The manufacture, use, offer for sale, or sale of any BCI hematology analyzer does not infringe, and has never infringed, any valid and enforceable claim of the '351 Patent, either directly, contributorily or by inducement, literally or by equivalents.

64.126.          BCI is entitled to a judicial determination and declaration that it does not infringe any valid, non-abandoned and enforceable claim of the '351 Patent.

**Third Counterclaim**

**(Declaration of Invalidity of the '350 Patent)**

~~65.~~127.      BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~64~~126.

~~66.~~128.      A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '350 Patent.

~~67.~~129.      The claims of the '350 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

~~68.~~130.      The claims of the '350 Patent are invalid for double patenting.

~~69.~~131.      BCI is entitled to a judicial determination and declaration that the claims of the '350 Patent are invalid.

**Fourth Counterclaim**

**(Declaration of Invalidity of the '351 Patent)**

~~70.~~132.      BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-~~69~~131.

~~71.~~133.      A present, genuine, and justiciable controversy exists between BCI and Counterclaim-Defendants regarding, inter alia, the invalidity of the '351 Patent.

~~72.~~134.      The claims of the '351 Patent are invalid, in whole or in part, for failure to satisfy one or more of the requirements of U.S.C. Title 35, including, without limitation, §§ 101, 102, 103, and 112 thereof.

~~73.~~135.      The claims of the '351 Patent are invalid for double patenting.

74.136.        BCI is entitled to a judicial determination and declaration that the claims of the '351 Patent are invalid.

**Fifth Counterclaim**

**(Inequitable Conduct)**

75.137.        BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-74136.

76.138.        Based on Plaintiffs' filing of this lawsuit and BCI's denial of Plaintiffs' allegations, an actual controversy has arisen and now exists between BCI and Plaintiffs as to the enforceability of the '350 and '351 Patents.

77.139.        As described above, at least one inventor and at least one prosecuting patent attorney concealed material information from the United States Patent and Trademark Office ("USPTO") during prosecution of the Asserted Patents.  Such at least one inventor and at least one prosecuting patent attorney concealed material information with an intent to deceive the USPTO.

78.140.        The '350 Patent and '351 Patent are unenforceable due to inequitable conduct by such at least one inventor and at least one prosecuting patent attorney.

**Sixth Counterclaim**

**(The Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.)**

141.    BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-140.

142.    This cause of action arises under the Defend Trade Secrets Act, U.S.C. § 1836 *et seq.*

143.    The Defend Trade Secrets Act defines "trade secret" as any "form and type[] of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

144.    At least BCI's information that is designated as "Highly Confidential – Source Code" in the Illinois Action, including the DxH source code, is a trade secret as defined by the Defend Trade Secrets Act.

145.    This information is not generally known or readily ascertainable by the public. As detailed above, BCI has taken reasonable and affirmative steps to keep the information secret, including, but not limited to, (1) having Sysmex agree to the Protective Order before producing any documents in the Illinois Action; (2) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only a limited number of individuals; (3) requiring that Sysmex limit the disclosure of BCI's information designated as "Highly Confidential – Source Code" to only purposes related to the Illinois Action and not for any other purposes; (4) requiring that Sysmex's counsel refrain from prosecuting any patent applications relating to the field of invention as the '012 patent when counsel has access to information designated as "Highly Confidential – Source Code;" and (5) restricting levels of access to its DxH source code by individuals within BCI.

146.    BCI's information designated as "Highly Confidential – Source Code" derives independent economic value from maintaining its secrecy.  The source code for the DxH products relates to their operations and controls and contains the software design.  Keeping this

information secret from the public prevents BCI's competitors from replicating or stealing the source code, which enables BCI to maintain its competitive edge in the U.S. and global market for diagnostics and biomedical research and testing equipment.

147.    At all times relevant to this claim, and pursuant to the Protective Order, Sysmex, through Brinks, had a legal duty to maintain the secrecy of the information designated as "Highly Confidential – Source Code" and to limit its use to only the purposes permitted under the Protective Order and not for any other purposes such as patent prosecution.

148.    Despite its legal duty, Sysmex, through Brinks and Mr. Horie, used at least BCI's information designated as "Highly Confidential – Source Code" to prosecute the '417 and '694 applications from which the Asserted Patents issued.

149.    Sysmex, through Brinks and Mr. Horie, has misappropriated BCI's trade secrets.

150.    Sysmex's conduct was malicious, deliberate, and willful.

151.    BCI has been damaged by Sysmex's misappropriation of trade secrets at least because it has been forced to spend its monetary resources in defending against the present patent infringement action that, but for Sysmex's misappropriation of BCI's trade secrets, could not have been brought by Sysmex.

152.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B)(i) and (ii), BCI is entitled to an award of monetary damages.

153.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C), BCI is entitled to exemplary damages.

154.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D), BCI is entitled to reasonable attorneys' fees.

**Seventh Counterclaim**

**(Breach of Contract)**

155.     BCI realleges and incorporates by reference its allegations in the preceding paragraphs 1-154.

156.     The Protective Order is a valid and enforceable contract between BCI and Sysmex.

157.     The Protective Order is supported by valuable consideration, including, but not limited to, BCI's agreement to maintain the confidentiality of any of Sysmex's information designated as "Confidential," "Highly Confidential Information – Attorney's Eyes Only," and "Highly Confidential Information – Source Code."

158.     BCI has duly performed all of the terms, conditions, and covenants required to be performed under the Protective Order, to the extent those obligations have not otherwise been excused, prevented, and/or waived by Sysmex.

159.     Sysmex, through its counsel and Mr. Horie, obtained, received, had access to, and/or otherwise learned, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

160.     Sysmex, through its counsel and Mr. Horie, has breached Paragraph 4(a) of the Protective Order at least by using BCI's information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code" in the prosecution of the '417 and '694 applications from which the Asserted Patents issued.

161.     Sysmex, through its counsel and Mr. Horie, breached Paragraph 10 of the Protective Order at least by preparing, prosecuting, supervising, or assisting in the preparation or prosecution of one or more patent applications pertaining to the field of the invention of the '012

54

patent, including the '417 and '694 applications from which the Asserted Patents issued. Sysmex's prosecution of the '417 and '694 applications, through its counsel and Mr. Horie, occurred after or while obtaining, receiving, having access to, and/or otherwise learning, in whole or in part, BCI's technical information designated as "Confidential," "Highly Confidential – Attorney's Eyes Only" and "Highly Confidential – Source Code."

162.     As a direct and proximate result of the breach, BCI has suffered and continues to suffer harm, including the expenditures that it has incurred in defending against the present patent infringement action that, but for Sysmex's breach of the Protective Order, could not have been brought by Sysmex.

## PRAYER FOR RELIEF

WHEREFORE, BCI prays that the Court enter judgment in its favor and against Counterclaim-Defendants as follows:

a.     Dismissing the Complaint with prejudice and entering a judgment in BCI and against Plaintiffs/Counterclaim-Defendants;

b.     Denying each request for relief made by Plaintiffs.

c.     Declaring that BCI has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, any valid claims of the '350 Patent and the '351 Patent;

d.     Declaring that the claims of the '350 Patent and the '351 Patent are invalid;

e.     Declaring that the '350 Patent and the '351 Patent are unenforceable due to the inequitable conduct of Sysmex and/or its agents before the U.S. Patent & Trademark Office;

f.     Declaring that Sysmex has violated the Defend Trade Secrets Act due to its misappropriation of BCI's trade secrets;

g.    Declaring that Sysmex has breached the Protective Order;

h.    Declaring this case is exceptional and awarding BCI its attorneys' fees pursuant to 35 U.S.C. § 285;

~~g~~i.    Awarding BCI monetary damages due to Sysmex's violation of the Defend Trade Secrets Act and Sysmex's breach of the Protective Order;

j.    Declaring that BCI's trade secrets have been maliciously and willfully misappropriated by Sysmex and awarding exemplary damages and reasonable attorneys' fees pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b)(3)(C) and (D);

k.    Declaring that Sysmex is an involuntary trustee of the subject matter disclosed and claimed in the Asserted Patents in constructive trust for the benefit of BCI;

l.    Awarding BCI its costs and expenses in defending against Plaintiff's claims; and

~~h~~m.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Defendant BCI hereby demands trial by jury in this action.

56

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ ~~Steven W. Lee~~Melanie K. Sharp

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
~~Steven W. Lee (No. 6676)~~
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
~~slee@ycst.com~~

LEYDIG, VOIT & MAYER, LTD
David M. Airan
Wesley O. Mueller
Nicole E. Kopinski
Aaron R. Feigelson
Wallace H. Feng
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL 60601-6745
(312) 616-5600

Dated: ~~October 1, 2020~~April 10, 2021

*Attorneys for Beckman Coulter, Inc.*

57

## CERTIFICATE OF SERVICE

I, ~~Steven W. Lee~~Melanie K. Sharp, Esquire, hereby certify that on ~~October 1, 2020,~~April 10, 2021 I caused to be electronically filed a true and correct copy of First Amended Answer and Counterclaims of Defendant Beckman Coulter, Inc. with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on ~~October 1, 2020,~~April 10, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL:**

James R. Sobieraj
Robert S. Mallin
Joshua James
~~Andrea L. Shoffstall~~
Daniel A. Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
ashoffstall@brinksgilson.com

*/s/ ~~Steven W. Lee~~ Melanie K. Sharp*
_____
~~Steven W. Lee~~Melanie K. Sharp (No. ~~6676~~2501)

# EXHIBIT C

Case 1:19-cv-01642-PGG-SLC   Document 249   Filed 04/21/21   Page 124 of 209
Case 1:17-cv-24049-DPG   Document 63   Entered on FLSD Docket 07/12/2018   Page 1 of 15
7355

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

BECKMAN COULTER, INC.,

     Plaintiff,

          v.

SYSMEX CORPORATION, and
SYSMEX AMERICA, INC.

     Defendants.

**Case No. 1:17-cv-24049-GAYLES**

## PROTECTIVE ORDER

**THIS MATTER** came before the Court on the Joint Motion for Entry of Protective Order

filed by Plaintiff, BECKMAN COULTER, INC. and Defendants, SYSMEX AMERICA, INC. and

SYSMEX CORPORATION (all collectively, the "Parties"), filed July 11, 2018 [D.E. No. 62]

(the "Joint Motion") and the Court, having considered the Joint Motion, the agreement of the

parties and after being fully advised in the premises, hereby enters the following protective order

pursuant to Rule 26(c)(1), *Federal Rule of Civil Procedure*:

    1.    The Parties have represented that they, and potentially third parties, will be

producing documents and providing testimony and other information involving trade secrets or

confidential research and development or commercial information, the disclosure of which is likely

to cause harm to the party producing such information.

    2.    Definitions:

    a.    "Party" means a named party in this case. "Person" means an individual or an

entity. "Recipient" means a Person who receives information via the discovery process in this case.

    b.    "Litigation" means the above captioned case, *Beckman Coulter, Inc. v. Sysmex*

*Corp. et al.*, Case No. 1:17-cv-24049-GAYLES, and *Sysmex Corp. et al. v. Beckman Coulter, Inc.*, Case No. 1:18-cv-740, pending in the United States District Court for the Northern District of Illinois, Eastern Division, and any appeals therefrom.

      c.    "Confidential" information is information concerning a Person's business operations, processes, and technical and development information within the scope of Rule 26(c)(1)(G), the disclosure of which is likely to harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court.

      d.    "Highly Confidential – Attorney's Eyes Only" information is information within the scope of Rule 26(c)(1)(G) that constitutes business or technical trade secrets or plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a Court, including particularly sensitive confidential information that a Person believes in good faith cannot be disclosed to a Recipient without threat of injury because such information contains trade secret or other proprietary or commercially sensitive information.

      e.    "Highly Confidential – Source Code" information is any source code (including comments contained therein), human-readable programming language text that defines software, firmware, or electronic hardware descriptions, object code, Register Transfer Level ("RTL") files, Hardware Description Language ("HDL") files, or other hardware description language, live data (i.e. data as it exists residing in a database or databases), or pseudo-source-code (i.e., a notation resembling a programming language but not intended for actual compilation, which usually combines some of the structure of a programming language with an informal natural-language

description of the computations to be carried out) ("Source Code") more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that Person's competitive position, or the disclosure of which would contravene an obligation of confidentiality to a third person or to a court.

      f.      Information is not Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code if it is disclosed in a printed publication, is lawfully within the public domain, was known to the Recipient without obligation of confidentiality before the designating Person disclosed it, or is or becomes known to the Recipient by means not constituting a breach of this Order or other obligation. Information is likewise not Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential –Source Code if a person lawfully obtained it independently of the Litigation.

      3.      <u>Designation of Information as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code:</u>

      a.      A Person's designation of information as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code means that the Person believes in good faith, upon reasonable inquiry, that the information qualifies as such.

      b.      A Person designates information in a document or thing as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code by clearly and prominently marking or otherwise designating the information as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." A Person may make documents or things containing Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information available for inspection and copying without designating them as confidential without forfeiting a claim of confidentiality, so long as the designating Person causes copies of the documents or things to be

3

marked as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code at the time they are provided to the Recipient.  The Parties agree to treat all material made available for inspection, and the information contained therein, as Highly Confidential – Attorney's Eyes Only until such time as the information is marked, if at all, and delivered to the Recipient.

       c.      A Person designates information in deposition testimony as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code by stating on the record at the deposition that the information is Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code or by advising the opposing Party and the stenographer and videographer in writing, within twenty-one (21) calendar days after receipt of the final deposition transcript, that the information is Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code.  All deposition testimony will be treated as Highly Confidential – Attorney's Eyes Only until the expiration of the 21-day period for designation of confidentiality. If a Person present at a deposition is not authorized under this Protective Order to receive Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information to be disclosed by counsel or the witness at the deposition under the terms of this Protective Order, that Person shall leave the deposition room while such information is being disclosed or used during the deposition.

       d.      A Person's failure to designate information as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code at the time of production or within the 21-day deposition designation period does not constitute forfeiture of a claim of confidentiality as to any information, document, thing, interrogatory answer, admission, pleading or testimony.

       e.      A Person who has designated information as Confidential, Highly Confidential –

Attorney's Eyes Only, or Highly Confidential – Source Code may withdraw the designation by written notification to all Parties in the case.

f.      If a Party disputes a designation of information as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code, the Party shall notify the Person that designated the information as confidential. The written notice shall provide the basis for the dispute, identifying the specific document[s] or thing[s] as to which the designation is disputed and propose a new designation for such materials. The Party and the designating Person shall then meet and confer to attempt to resolve the dispute without involvement of the Court. If they cannot resolve the dispute, the proposed new designation shall be applied twenty-one (21) calendar days after notice of the dispute, unless within that 21-day period, the designating Person files a motion with the Court to maintain the original designation. The designating Person bears the burden of proving that the information is properly designated as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code. The information shall remain subject to the original designation until the Court rules on the dispute. A Party's failure to contest a designation of information as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code is not an admission that the information was properly designated as such, nor is a Party under any obligation to challenge designations within a set period of time after production.

4.     <u>Use and Disclosure of Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information:</u>

a.     Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information may be used only in connection with the Litigation, and not for any other purpose, including any proceedings before the United States Patent and Trademark Office and/or any foreign proceedings.

b.      Control and distribution of all information protected by this Protective Order shall be the responsibility of the attorneys of record and any Person having possession, custody, or control of such information pursuant to this Protective Order.

c.      Absent written permission from the designating Person or further order by the Court, the Recipient may not disclose Confidential information to any Person other than the following: (i) a Party's outside litigation counsel of record, including necessary paralegal, secretarial and clerical personnel assisting such counsel; (ii) employees of a Party whose primary job responsibility is to handle legal matters for the Party; (iii) no more than two (2) employees of a Party directly involved in the Litigation and whose access to the information is reasonably required to supervise, manage, or participate in this case; (iv) stenographers and/or videographers, and personnel assisting the stenographers and/or videographers; (v) experts, consultants, including trial consultants and survey or mock jury participants, and their respective staffs; (vi) the Court and personnel assisting the Court; (vii) entities retained for the purpose of document hosting and processing; and (viii) any other person with the prior written consent of the designating Person. Prior to disclosing information subject to this Protective Order to any Person identified in categories 4(c)(ii), (iii), (v), (vii), and (viii) above, and subject to the further conditions identified in 4(e) below, the Person must review the Protective Order and agree to be bound by the provisions of the Protective Order by signing a copy of Appendix A, which signature shall be maintained by counsel for the Recipient. Notwithstanding the foregoing, Persons identified in categories 4(c)(ii) and (iii) may only have access to the following categories of Confidential Information: (a) Confidential Information either already filed under seal with the Court or included for review with draft pleadings prepared by Persons in category 4(c)(i), (b) Confidential Information contained in expert reports, and (c) Confidential Information disclosed in written discovery responses,

including any mandatory disclosures such as infringement and invalidity contentions.

        d.      Absent written permission from the designating Person or further order by the Court, the Recipient may not disclose Highly Confidential – Attorney's Eyes Only or Highly Confidential – Source Code information to any Person other than those identified in paragraph 4(c)(i), (iv), (v), (vi), (vii), and (viii). Prior to disclosing information subject to this Protective Order to any Person identified in categories 4(c) (v), (vii) and (viii) above, and subject to the further conditions identified in 4(e) below, the Person must review the Protective Order and agree to be bound by the provisions of the Protective Order by signing a copy of Appendix A, which signature shall be maintained by counsel for the Recipient.

        e.      A party may not disclose Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information to a technical or damages expert or consultant pursuant to paragraph 4(c) or 4(d) of this Protective Order until the Party proposing to make the disclosure serves the designating Person with a written identification of the technical or damages expert or consultant along with a copy of his or her curriculum vitae that sets forth the full name of the expert or consultant and the city and state of his or her primary residence, the expert's or consultant's current employer(s), each Person or entity from whom the expert or consultant has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, and identifies (by name and number of the case, filing date, and location of court) any litigation in which the expert or consultant has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years. If the designating Person has good cause to object to the disclosure (which does not include challenging the qualifications of the expert or consultant), it must serve the Party

proposing to make the disclosure with a written objection within ten (10) calendar days after service of the identification.  Unless the Parties resolve the dispute within twenty-one (21) calendar days after service of the objection, the designating Person must move the Court promptly for a ruling, and the Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information may not be disclosed to the expert or consultant without the Court's approval.

       f.       Notwithstanding paragraphs 4(a), (c), (d), and (e) information subject to this Protective Order may be disclosed on a confidential basis and only for purposes of the Litigation to: (i) any employee of the designating Party who had access to the information as part of the ordinary course of his or her employment; (ii) the author of the information; and (iii) any Person, whether or not affiliated with the designating Party, who is identified in the document as a recipient of the information.

       g.      A Party who wishes to disclose Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information to a Person not authorized under paragraph 4(c), (d), (e), or (f) must first make a reasonable attempt to obtain the designating Person's permission.  If the Party is unable to obtain permission, it may move the Court to obtain permission.

       5.     <u>Highly Confidential – Source Code information:</u> Human-readable computer program code files may be made available only for inspection, not produced except as provided for below, and shall be designated as "Highly Confidential – Source Code."  Source Code files so designated for inspection, and authorized excerpts thereof designated for production, shall be made available only to Persons who are authorized under paragraph 4(d) and 4(e) to receive Highly Confidential – Source Code information.  The following restrictions shall also apply to disclosures

of Highly Confidential – Source Code information:

     a.     The Source Code files shall be made available for inspection, not production, in the United States at the offices of the producing party or one of its affiliates or its outside counsel, at a mutually agreed, reasonable location and date upon request of an inspecting Party made at least five (5) business days in advance of the date for inspection, on a single, non-networked and secure standalone computer provided by the designating Person during normal business hours, in its native format, at the offices of counsel for designating Person, or in a mutually convenient location. The computer shall be equipped with search and review tools as reasonably requested and provided by the Party requesting the inspection. The computer shall be password protected, maintained in a secure, locked area during storage. Prior to the first inspection of any requested Highly Confidential – Source Code, the Recipient, shall provide ten (10) business days notice of the Highly Confidential – Source Code that it wishes to inspect. A list of names of Persons who will view the Highly Confidential – Source Code computer will be provided in conjunction with any written (including email) notice requesting inspection.

     b.     The Source Code shall be made available for inspection in a secured room without Internet access or network access to other computers. The secured computers shall be disabled from having external storage devices attached to it and otherwise be restricted as appropriate to prevent and protect against unauthorized copying, transmission, removal, or other transfer of any Highly Confidential – Source Code information outside or away from the secured computer, and the inspecting Party shall not copy, remove, or otherwise transfer any portion of the Source Code onto any recordable media or recordable device.

     c.     The inspecting Party may request, and shall, absent objection, receive within five (5) business days, paper copies of limited portions of Source Code that are reasonably necessary

for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purpose of reviewing the Code outside of the secured computer. Without a finding of good cause by the Court, the Recipient may not print more than an agreed number of consecutive pages of Source Code or print a total of 20% of the total Highly Confidential – Source Code information for any program, program file or application. Having not yet had the opportunity to review the source code, BCI initially agrees to Sysmex's limit of fifteen (15) pages, rather than BCI's proposal of twenty-five (25). However, to the extent any party believes this limit is not sufficient to provide for meaningful review, the parties agree to cooperate to revise this limit to a suitable number of pages, and may submit their dispute to the Court if necessary for resolution. Subject to that restriction, the Persons inspecting the Source Code may take notes relating to the Source Code, but may not copy any actual lines of the Highly Confidential – Source Code information into the notes. No copies of all or any portion of the Highly Confidential – Source Code information may leave the room in which the Code is inspected except as otherwise provided in this Protective Order. Further, no other written or electronic record of the Highly Confidential – Source Code information is permitted except as otherwise provided in this Protective Order. The designating Person may visually monitor the activities of the Recipient's representative(s) during any Highly Confidential – Source Code review, and may monitor the files/information being reviewed by the Recipient's representative(s), but shall not review any notes taken by the Recipient's representative(s).

      d.     The designating Person may object to providing the requested paper copies within five (5) business days of the request for copies. If after meeting and conferring the designating Person and the Recipient cannot resolve any objections, the Recipient may seek a Court resolution of whether the requested Highly Confidential – Source Code is reasonably necessary to any case

10

preparation activity. In the event the matter is put before the Court, the Recipient shall have the burden of proving that the paper copies are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial.

     e.      The Recipient shall store any such paper copies of Highly Confidential – Source Code information at either: 1) the offices of its outside counsel, consultants or experts identified pursuant to Paragraph 4(e); or 2) at an off-site storage facility, maintained by a third party agreed upon by the Parties; under secure conditions that prevent access by anyone other than the counsel and technical advisors qualified for access. The Recipient may make no more than two duplicate paper copies for use by outside counsel or technical experts, the duplicate copies to be stored under the same secure conditions. The paper copies may be used under secure conditions in depositions and in court filings and proceedings.

     f.      The Recipient shall not make any additional electronic copies or other images of any printed pages of Highly Confidential – Source Code information or any other documents or things reflecting Highly Confidential – Source Code information that has been designated by the designating Person as "HIGHLY CONFIDENTIAL – SOURCE CODE," and may make additional electronic or paper copies of selected portions of Highly Confidential – Source Code information only as authorized in 5(e) and when reasonably necessary for use in depositions, expert reports, or court filings and proceedings.

     6.      <u>Inadvertent Disclosure</u>: Inadvertent disclosures of information protected by the attorney-client privilege or the work product doctrine shall be handled in accordance with Federal Rule of Evidence 502. Information unintentionally produced or disclosed without designation as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information may be retroactively designated in the same manner and shall be treated appropriately

from the date written notice of the designation is provided to the Recipient.

7.       a. Filing Under Seal With The Court:  This Protective Order does not, by itself, authorize the filing of any document under seal.  No document may be filed under seal without prior leave of court.  A Party wishing to file under seal a document containing information it has designated as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code, the Party must move the Court, consistent with Local Rules of the Court for permission to file the document under seal.  If a Party obtains permission to file a document under seal, it must also (unless excused by the Court) file a public-record version that excludes any Confidential, Highly Confidential – Attorney's Eyes Only, Highly Confidential – Source Code information.

b. If a Party wishes to file in the public record a document that another producer has designated as Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code, the Party shall provide at least five business days advance written notice to the producer of the document  so that the producer may move the Court to require that the document be filed under seal.  If within five business days of receiving such notice the producer moves the Court for permission for the document to be filed under seal, the Party wishing to file the document shall file the document under seal unless the Court denies the producer's motion prior to the time that the document is filed.  The producer of the document shall also within the aforementioned five business day period provide the Party with a public-record version of the document that redacts any Confidential, Highly Confidential – Attorney's Eyes Only, Highly Confidential – Source Code information such that the redacted version of the document may be filed in the public record.

8.      Document Disposal: Upon the conclusion of the Litigation, each Party must return to the designating Person all documents and copies of documents containing the designating

Person's Confidential, Highly Confidential – Attorney's Eyes Only, or Highly Confidential –
Source Code information, and must destroy all notes, memoranda, or other materials derived from
or in any way revealing Confidential, Highly Confidential – Attorney's Eyes Only, or Highly
Confidential – Source Code information. Alternatively, the Party may destroy all documents and
copies of documents containing Confidential, Highly Confidential – Attorney's Eyes Only, and
Highly Confidential – Source Code information. The Party returning or destroying Confidential,
Highly Confidential – Attorney's Eyes Only, or Highly Confidential – Source Code information
must promptly certify in writing its compliance with the requirements of this paragraph.
Notwithstanding the requirements of this paragraph, a Party and its counsel may retain one
complete set of all documents filed with the Court, remaining subject to all requirements of this
Protective Order.

      9.    <u>Effect on Party's Use of Its Own Information</u>:  Nothing in this Protective Order
shall restrict any Party to the Litigation or its attorneys from disclosing or using, in any manner
and for any purpose, its own Confidential, Highly Confidential – Attorney's Eyes Only, or Highly
Confidential – Source Code.

      10.    <u>Prosecution Bar</u>: Any person permitted to receive technical information from a
producing party that is designated Highly Confidential – Attorney's Eyes Only, or Highly
Confidential – Source Code information (collectively "Highly Sensitive Technical Material"), and
who obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's
Highly Sensitive Technical Material under this Order shall not prepare, prosecute, supervise, or
assist in the preparation or prosecution of any patent application pertaining to the field of the
invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor,
predecessor, or other affiliate during the pendency of this Action and for one year after its

conclusion, including any appeals. For sake of clarity, all attorneys of either Party may participate, supervise and assist in any and all *Inter Partes* Review (IPR), Post-Grant Review, or Covered Business Method proceedings related to the patent/s-in-suit, even if they have received and/or reviewed Highly Sensitive Technical Material.

11.     <u>Amendments by the Parties:</u>  The Parties may seek to amend this Protective Order by filing a joint stipulation identifying the modification.

12.     <u>Survival of Obligations:</u>     This Protective Order's obligations regarding Confidential, Highly Confidential – Attorney's Eyes Only, and Highly Confidential – Source Code information survive the final disposition of the Litigation until a Party agrees otherwise in writing or a court order otherwise directs. "Final disposition," as used in this Protective Order, shall be deemed to be the later of (1) dismissal of all claims and defenses in the Litigation, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of the Litigation, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

DONE AND ORDERED in Chambers at Miami, Florida this 12th day of July, 2018.


_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


cc:     United States District Judge Darrin P. Gayles
         Counsel of Record

## EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I,_____, [print or type full name], of

_____[print or type full address], declare under penalty of perjury that I have read

in its entirety and understand the Protective Order that was issued by the United States District

Court for the Southern District of Florida on _____[date] in the case of *Beckman Coulter, Inc.*

*v. Sysmex Corp, et al.*, Case No. 1:17-cv-24049-GAYLES (Southern District of Florida,

Miami). I agree to comply with and be bound by all the terms of this Protective Order, and I

understand and acknowledge that failure to so comply could expose me to sanctions and

punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner

any information or item that is subject to this Protective Order to any person or entity except in

strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Southern District of Florida for the purpose of enforcing the terms of this Protective Order, even

if such enforcement proceedings occur after termination of this action.

This_____day of_____, 2018.

_____
Signature

# EXHIBIT D

From: **Bokar, Erik** ebokar@brinksgilson.com
Subject: RE: BCI v. Sysmex - Defendants' Request for Inspection of BCI's Source Code
Date: May 3, 2019 at 6:16 PM
To: Feigelson, Aaron afeigelson@leydig.com

Aaron,

As of now, we expect our review to take place Monday through Thursday next week. Shivarudrappa Satish and/or I will be attending and plan to arrive around 9 AM on Monday.

Regards,
Erik

**Erik Bokar**
Intellectual Property Attorney
312.840.3294 **I** Direct
ebokar@brinksgilson.com
Bokar Biography
www.brinksgilson.com



**Assistant:** Sandra Gray
312.245.3417 **I** sgray@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **I** 455 N. Cityfront Plaza Drive **I** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Wednesday, April 24, 2019 6:56 PM
**To:** Bokar, Erik <ebokar@brinksgilson.com>
**Cc:** BGLSysmex012Team <BGLSysmex012Team@brinksgilson.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>
**Subject:** [EXT] Re: BCI v. Sysmex - Defendants' Request for Inspection of BCI's Source Code

Erik,

We are working to install the requested tools per your request, and confirm that the inspection will occur at Leydig's Chicago office.  Please provide additional details (specific dates and timing) as they become apparent.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney

Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)

The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.

On Apr 19, 2019, at 12:30 PM, Bokar, Erik <ebokar@brinksgilson.com> wrote:

Aaron,

Pursuant to Paragraph 5(a) of the Protective Order, Defendants request an inspection of the source code used with BCI's DxH-series systems, including DxH 600, DxH 800, DxH 801, DxH 1600, DxH 1601, DxH 2400, DxH 2401, DxH 900, DxH 900 SMS, DxH 900-2, DxH 900-2 SMS, DxH 900-3, and DxH 900-3 SMS, on May 6 – May 10.  The persons viewing the code will be Erik Bokar and/or Satish Shivarudrappa.  Please confirm that the code will be made available for inspection at Leydig's Chicago office.

For the inspection, please download and install copies of Notepad++ Text Editor, SciTools Understand, Beyond Compare (https://www.scootersoftware.com/download.php), and Microsoft Visual Studio (community version) (https://visualstudio.microsoft.com/downloads/) on the machine hosting the source code for the DxH series products. We will supply our own license keys.

Best,
Erik

**Erik Bokar**
Intellectual Property Attorney
312.840.3294 **I** Direct
ebokar@brinksgilson.com
Bokar Biography
www.brinksgilson.com



**Assistant:** Sandra Gray
312.245.3417 **I** sgray@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **I** 455 N. Cityfront Plaza Drive **I** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this

are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

# EXHIBIT E

LAW OFFICES

# LEYDIG, VOIT & MAYER, LTD.

A PROFESSIONAL CORPORATION

Erika R. Staggs
estaggs@leydig.com
(312) 552-3410

CHICAGO
WASHINGTON, D.C.
BOULDER, COLORADO
SAN FRANCISCO BAY AREA
FRANKFURT AM MAIN, GERMANY

LEYDIG, VOIT & MAYER, LTD.
TWO PRUDENTIAL PLAZA, SUITE 4900
CHICAGO, ILLINOIS 60601-6745
TELEPHONE: (312) 616-5600
FACSIMILE: (312) 616-5700
WWW.LEYDIG.COM

June 12, 2019

*VIA HAND DELIVERY*

Erik M. Bokar, Esq.
BRINKS GILSON & LIONE
NBC Tower, Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611

     **Re:**    ***Beckman Coulter, Inc. ("BCI") v. Sysmex America, Inc. ("SAI") and Sysmex Corporation ("Sysmex Corp.") (collectively, "Sysmex"),***
         **Case No. 1:18-cv-06563 (N.D. Ill.)**

Dear Mr. Bokar:

    BCI has shipped via messenger a document production including requested printouts of BCI source code, labeled BCI-SC00001-45. Also included is a USB drive containing requested native files of the Understand-Generated materials from Sysmex's source code inspection, labeled BCI-SC00046-59.

    These materials have been designated HIGHLY CONFIDENTIAL - SOURCE CODE," pursuant to the Protective Order entered in this case (D.I. 63), and the materials should be treated accordingly.

               Sincerely,

               LEYDIG, VOIT & MAYER, LTD.

By:                           Erika R. Staggs
                           Litigation Paralegal

Enclosures

# EXHIBIT F



CERTIFICATE OF EFS FILING UNDER 37 CFR §1.8

I hereby certify that this correspondence is being electronically transmitted to the United States Patent and Trademark Office, Commissioner for Patents, via the EFS pursuant to 37 CFR §1.8 on the below date:

Date: June 17, 2019          Name: Tadashi Horie, Reg. No. 40,437          Signature: /Tadashi Horie/

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Appln. of: Takaaki NAGAI et al.

| | | |
|---|---|---|
| Appln. No.: | 16/214,417 | Examiner: SINES, BRIAN J |
| Filed: | December 10, 2018 | Art Unit: 1797 |
| For: | SAMPLE ANALYZER AND COMPUTER PROGRAM PRODUCT | Conf. No.: 1811 |

Attorney Docket No.: 11333/948

Mail Stop Amendment
Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

## AMENDMENT

Dear Sirs:

Please enter the following amendments:

Amendments to the claims are reflected in the listing of the claims that begins on page 2 of this communication.

Remarks begin on page 11 of this communication.

**Listing of the Claims:**

1. (Currently Amended)        A sample analyzer comprising:

a plurality of detectors each configured to ~~optically or electrically~~ sense cells in a sample ~~for measurement of the cells in the sample~~, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which ~~comprises~~ is selected from a group consisting ~~one~~ of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in [[the]] a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, [[or]] and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring cells in the body fluid sample, wherein a respective sequence of operations for measuring cells in the blood sample and in the body fluid sample comprises (a) a sensing operation comprising operations of preparing for measurement and operating a detector to sense the cells in the sample and (b) an analyzing operation comprising operations of analyzing sample measurements and displaying analysis results, the sensing operation performed in the body fluid measuring mode being different, at least partially, from the sensing operation performed in the blood measuring mode, and further wherein the plurality of detectors includes one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode, the controller programmed to:

perform the ~~sequence of~~ sensing operation[[s]] in the blood measuring mode to: introduce the blood sample into a multi-mode detector; operate said multi-mode detector to sense cells in the introduced blood sample; and derive blood-sample measurements of ~~individual~~ cells in the introduced blood sample; and

perform the ~~sequence of~~ sensing operation[[s]] in the body fluid measuring mode to: introduce the body fluid sample into said multi-mode detector; operate said multi-mode detector to sense cells in the introduced body fluid sample; and derive body-fluid-sample measurements of ~~individual~~ cells in the introduced body fluid sample.

2

2. (Currently Amended)       The sample analyzer according to claim 1, wherein

the ~~sequence of~~sensing operation[[s]] performed in the blood measuring mode comprises ~~an operation of~~ sensing the cells in the introduced blood sample for a first measurement time~~, using said multi-mode detector~~, and

the ~~sequence of~~ sensing operation performed in the body fluid measuring mode comprises ~~an operation of~~ sensing the cells in the introduced body fluid sample for a second measurement time~~, using said multi-mode detector~~, wherein the second measurement time is longer than the first measurement time according to a cell concentration of the sample.

3. (Currently Amended)       The sample analyzer according to claim 1, wherein the ~~sequence of~~sensing operation[[s]] performed in the body fluid measuring mode comprises ~~an operation of~~ automatically initiating pre-washing said multi-mode detector to reduce a carryover effect on measurements of the cells in the body fluid sample, wherein ~~said pre-washing~~the controller is programmed to automatically initiate said pre-washing~~occur~~ before introducing the body fluid sample into said multi-mode detector during said ~~sequence of~~sensing operation[[s]] in the body fluid measuring mode.

4. (Currently Amended)       The sample analyzer according to claim 3, wherein [[an]]the operation of pre-washing said multi-mode detector is automatically initiated~~performed~~ in the sensing operation in the body fluid measuring mode ~~before introducing the body fluid sample into said multi-mode detector is~~but not included automatically initiated in the ~~sequence of~~sensing operation[[s]] ~~performed~~ in the blood measuring mode.

5. (Currently Amended)       The sample analyzer according to ~~claim 3~~claim 4, wherein the operation of automatically initiated pre-washing includes using solution different from solution for washing said multi-mode detector in the blood measuring mode.

6. (Currently Amended)       The sample analyzer according to ~~claim 1~~claim 5, wherein the operation of automatically initiated pre-washing includes using a solution specifically prepared for the operation of automatically initiated pre-washing~~in both the blood measuring mode and~~

3

the body fluid measuring mode, the sample is mixed with one or more reagent before being sensed for measurement.

7. (Currently Amended)      The sample analyzer according to claim 1, wherein the ~~sequence of analyzing~~ operation[[s]] performed in the body fluid measuring mode comprises operations of: analyzing the <u>body-fluid-sample</u> measurements ~~of the cells in the introduced body fluid sample,;~~ and counting a type of cells among the cells in the introduced body fluid sample <u>based on the analyzed body-fluid-sample measurements</u>.

8. (Currently Amended)      The sample analyzer according to ~~claim 6~~<u>claim 7</u>, wherein the ~~sequence of~~ <u>analyzing</u> operation[[s]] performed in the body fluid measuring mode comprises ~~an~~ operation<u>s</u> of counting ~~at least one of~~ mono-nucleated cells [[or]]<u>and</u> poly-nucleated cells among the cells in the introduced body fluid sample <u>and separately displaying in a screen a count of the mono-nucleated cells and a count of the poly-nucleated cells</u>.

9. (Currently Amended)      The sample analyzer according to ~~claim 5~~<u>claim 8</u>, wherein the ~~sequence of~~<u>analyzing</u> operation[[s]] performed in the body fluid measuring mode comprises [[an]] operation<u>s</u> of calculating a relative amount of the ~~at least one of~~ mono-nucleated cells [[or]]<u>and</u> a relative amount of the poly-nucleated cells <u>and separately displaying in a screen the relative amount of the mono-nucleated cells and the relative amount of the poly-nucleated cells</u>.

10. (Currently Amended)      The sample analyzer according to ~~claim 5~~<u>claim 9</u>, wherein the ~~sequence of~~<u>analyzing</u> operation[[s]] performed in the ~~blood~~<u>body fluid</u> measuring mode comprises an operation of counting <u>a total of nucleated cells</u>~~white blood cells~~.

11. (Currently Amended)      The sample analyzer according to claim 1, wherein the controller is programmed to:

    introduce a cell-free sample into said multi-mode detector, the cell-free sample having no cells contained in the cell-free sample; and

    sense the cell-free sample by said multi-mode detector, and

4

SYSMEXUS0000197

the controller is further programmed to analyze [[the]] measurements of the cell-free sample and count cells carried over into the cell-free sample from a test sample previously measured.

12. (Currently Amended)      A sample analyzer comprising:

a plurality of detectors each configured to optically or electrically sense cells in a sample for measurement of the cells in the sample, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected from a group consisting comprises one of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in [[the]]a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, [[or]] and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring cells in the body fluid sample, wherein a respective sequence of operations for measuring cells in the blood sample and in the body fluid sample comprises (a) a sensing operation comprising: operations of preparing for measurement and operating a detector to sense the cells in the sample and (b) an analyzing operation comprising operations of analyzing sample measurements and displaying analysis results, the sensing operation performed in the body fluid measuring mode being different, at least partially, from the sensing operation performed in the blood measuring mode, and further wherein the plurality of detectors includes one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode, the controller programmed to:

perform the sequence ofsensing operation[[s]] in the blood measuring mode to: introduce the blood sample into a multi-mode detector; operate said multi-mode detector to sense cells in the introduced blood sample; and derive blood-sample measurements of individual cells in the introduced blood sample, and further perform wherein the sequence ofanalyzing operation[[s]] performed in the blood measuring mode comprises operations of analyzingto: analyze the blood-sample measurements; of the individual cells in the introduced blood sample, and counting count a particular type of cells in the introduced blood sample based on the analyzed blood-sample measurements; and

5

perform the ~~sequence of~~<u>sensing</u> operation[[s]] in the body fluid measuring mode to: introduce the body fluid sample into said multi-mode detector; operate said multi-mode detector to sense cells in the introduced body fluid sample; and derive <u>body-fluid-sample</u> measurements of ~~individual~~ cells in the introduced body fluid sample, <u>and further perform</u> ~~wherein~~ the ~~sequence of~~<u>analyzing</u> operation[[s]] ~~performed~~ in the body fluid measuring mode ~~comprises operations of analyzing~~ <u>to: analyze</u> the <u>body-fluid-sample</u> measurements<u>;</u> ~~of the individual cells in the introduced body fluid sample,~~ and ~~counting~~ <u>count</u> the particular type of cells in the introduced body fluid sample <u>based on the analyzed body-fluid-sample measurements</u>.

13. (Original)  The sample analyzer according to claim 12, wherein the particular type of cells are blood cells.

14. (Original) The sample analyzer according to claim 12, wherein the particular type of cells are white blood cells or a subclass of the white blood cells.

15. (Original)  The sample analyzer according to claim 12, wherein the particular type of cells are red blood cells.

16. (Original)  The sample analyzer according to claim 12, wherein the particular type of cells are platelets.

17. (Currently Amended)      The sample analyzer[[s]] according to claim 12, wherein ~~the controller is programmed to operate said multi-mode detector~~ <u>the sensing operation performed</u> in the blood measuring mode <u>comprises</u> ~~for a first measurement time to sense~~<u>sensing</u> the particular type of cells in the introduced blood sample <u>for a first measurement time</u>, and

~~the controller is programmed to operate said multi-mode detector~~ <u>the sensing operation performed</u> in the body fluid measuring mode <u>comprises</u>~~for a second measuring time to sense~~ <u>sensing</u> the particular type of cells in the introduced body fluid sample <u>for a second measurement time</u>, wherein the second measurement time is longer than the first measurement time according to a cell concentration of the sample.

6

SYSMEXUS0000199

18. (Currently Amended)      The sample analyzer[[s]] according to claim 12, wherein the ~~sequence of~~ sensing operation[[s]] performed in the body fluid measuring mode comprises ~~an operation of~~ automatically initiating pre-washing said multi-mode detector to reduce a carryover effect on measurements of the body fluid sample, wherein ~~said pre-washing~~the controller is programmed to automatically initiate said pre-washing~~occur~~ before introducing the body fluid sample into said multi-mode detector during said ~~sequence of~~sensing operation[[s]] in the body fluid measuring mode, and wherein said automatically initiated pre-washing includes more than one washing of said multi-mode detector.

19. (Currently Amended)      A sample analyzer comprising:

      a plurality of detectors each configured to ~~optically or electrically~~ sense cells in a sample ~~for measurement of the cells in the sample~~, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which ~~comprises one~~is selected from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in [[the]]a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, [[or]] and intraperitoneal rinse;

      a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring cells in the body fluid sample, and wherein the plurality of detectors includes one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode, the controller programmed to:

            perform the sequence of operations in the blood measuring mode to: introduce the blood sample into a multi-mode detector; operate said multi-mode detector to sense cells in the introduced blood sample; and derive blood-sample measurements of ~~individual~~ cells in the introduced blood sample; and

            perform the sequence of operations in the body fluid measuring mode to: introduce the body fluid sample into said multi-mode detector; operate said multi-mode detector to sense cells in the introduced body fluid sample; and derive body-fluid-sample measurements of ~~individual~~ cells in the introduced body fluid sample,

7

wherein the sequence of operations performed in the body fluid measuring mode
comprises ~~an operation of~~ automatically initiating pre-washing said multi-mode detector to
reduce a carryover effect on the body-fluid-sample measurements ~~of the body fluid sample~~,
wherein the controller ~~said pre-washing~~ is programmed to ~~occur~~automatically initiate said pre-
washing before introducing the body fluid sample into said multi-mode detector during said
sequence of operations in the body fluid measuring mode.

20. (Currently Amended)      A sample analyzer comprising:

a plurality of detectors each configured to ~~optically or electrically~~ sense cells in a sample
~~for measurement of the cells in the sample~~, the sample selectively comprising (i) a blood sample
or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood,
which ~~comprises one~~is selected from a group consisting of cerebrospinal fluid, thoracic fluid,
abdominal fluid, fluid collected in [[the]]a cardiac sac, synovial fluid, dialysate from peritoneal
dialysis, [[or]] and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring
mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence
of operations for measuring cells in the blood sample, and the body fluid measuring mode
includes a sequence of operations for measuring cells in the body fluid sample, the controller
programmed to:

perform the sequence of operations in the blood measuring mode to: ~~introduce the
blood sample into one of the plurality detectors; operate said one of the plurality of detectors to
optically sense cells in the introduced blood sample; and derive measurements of individual cells
in the introduced blood sample, wherein the sequence of operations performed in the blood
measuring mode comprises operations of analyzing the~~ analyze blood-sample measurements of
~~the individual~~ cells in the ~~introduced~~ blood sample~~, and counting~~; count each of five types of
white blood cells in the ~~introduced~~ blood sample; and separately display in a screen a count of
each of said five types of white blood cells; and

perform the sequence of operations in the body fluid measuring mode to:
~~introduce the body fluid sample into and operate another of the plurality of detectors to
electrically sense individual cells in the introduced body fluid sample; and derive measurements
of individual cells in the introduced body fluid sample, wherein the sequence of operations~~

8

SYSMEXUS0000201

performed in the body fluid measuring mode comprises operations of analyzing the analyze body-fluid-sample measurements of the individual cells in the introduced body fluid sample, and counting each of ; count mono-nucleated cells and poly-nucleated cells in the introduced body fluid sample; and separately display in a screen a count of the mono-nucleated cells and a count of the poly-nucleated cells.

21. (New)    A sample analyzer comprising:

a plurality of detectors each configured to optically or electrically sense cells in a sample, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring cells in the body fluid sample, the controller programmed to:

(A) perform the sequence of operations in the body fluid measuring mode to: sense cells in a first body fluid sample; analyze first measurements of the cells sensed in the first body fluid sample; and count red blood cells in the first body fluid sample, and

(B) perform the sequence of operations in the body fluid measuring mode to: sense cells in a second body fluid sample; analyze second measurements of the cells sensed in the second body fluid sample; count mono-nucleated cells and poly-nucleated cells in the second body fluid sample; and separately display in a screen a count of the red blood cells, a count of the mono-nucleated cells and a count of the poly-nucleated cells.

22. (New)    The sample analyzer according to claim 1, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode until the body fluid measuring mode is manually switched to the blood measuring mode.

9

SYSMEXUS0000202

23. (New)      The sample analyzer according to claim 12, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode for measuring cells in one body fluid sample until the body fluid measuring mode is manually switched to the blood measuring mode.

24. (New)      The sample analyzer according to claim 19, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode for measuring cells in one body fluid sample until the body fluid measuring mode is manually switched to the blood measuring mode.

25. (New)      The sample analyzer according to claim 20, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode for measuring cells in one body fluid sample until the body fluid measuring mode is manually switched to the blood measuring mode.

26. (New)      The sample analyzer according to claim 21, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode for measuring cells in one body fluid sample until the body fluid measuring mode is manually switched to the blood measuring mode.

27. (New)      The sample analyzer according to claim 3, wherein said automatically initiated pre-washing includes more than one washing of said multi-mode detector.

28. (New)      The sample analyzer according to claim 19, wherein said automatically initiated pre-washing includes more than one washing of said multi-mode detector.

SYSMEXUS0000203

REMARKS

I.    Status of the Claims

Claims 1-28 are pending, of which claims 1, 12, 19, 20 and 21 are in independent form.


Respectfully submitted,

June 17, 2019                                      /Tadashi Horie/
Date                                              Tadashi Horie (Reg. No. 40,437)
                                                  Attorney for Applicant(s)

11

SYSMEXUS0000204

# EXHIBIT G



CERTIFICATE OF EFS FILING UNDER 37 CFR §1.8

I hereby certify that this correspondence is being electronically transmitted to the United States Patent and Trademark Office, Commissioner for Patents, via the EFS pursuant to 37 CFR §1.8 on the below date:

Date: June 17, 2019        Name: Tadashi Horie, Reg. No. 40,437        Signature: /Tadashi Horie/

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Appln. of: Takaaki NAGAI et al.

| | | | |
|---|---|---|---|
| Appln. No.: | 16/363,694 | Examiner: | SINES, BRIAN J |
| Filed: | March 25, 2019 | Art Unit: | 1797 |
| For: | Sample Analyzer and Computer Program Product | Conf. No.: | 2135 |

Attorney Docket No.:   11333-965

Mail Stop Amendment
Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

## AMENDMENT

Dear Sirs:

Please amend the claims as follows:

Amendments to the claims are reflected in the listing of the claims that begins on page 2 of this communication.

Remarks begin on page 15 of this communication.

1

SYSMEXUS0000408

**Listing of the Claims:**

1. (Currently Amended)    A sample analyzer comprising:

a plurality of detectors each configured to ~~optically or electrically~~ sense ~~blood~~ cells in a sample ~~for measurement of the blood cells in the sample~~, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the body fluid sample, ~~which is different, at least partially, from the sequence of operations for measuring blood cells in the blood sample~~, and wherein a respective sequence of operations for measuring ~~blood~~ cells in the blood sample and in the body fluid sample comprises (a) a sensing operation comprising[[:]] <u>operations of preparing for measurement and operating a detector to sense cells in the sample</u> ~~preparing a measurement sample; introducing the prepared measurement sample into a detector; and operating the detector to sense blood cells in the prepared measurement sample~~ and (b) an analyzing operation comprising[[:]] <u>operations of</u> analyzing <u>sample</u> measurements <u>from the sensing operation</u> ~~of blood cells from the detector;~~ and displaying analysis results, <u>the sensing operation performed in the body fluid measuring mode being different, at least partially, from the sensing operation performed in the blood measuring mode,</u> and further wherein the plurality of detectors include one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode,

the controller programmed to:

display <u>on an input screen</u> (1) at least two sample-type options, ~~displayed separately from each other, for selection of one of the at least two sample-type options, which is selectable independently from another of the at least two sample-type options, wherein the at least two sample-type options comprise~~ <u>that comprise</u> concurrent display of a blood sample option and a body fluid sample option <u>each independently selectable from the other on the input</u>

2

screen and (2) one or more test-~~type options~~ modes[[,]] ~~separately~~ displayed separately from a selected one of the at least two sample-type options, ~~for selection of one of the one or more test-type options, said one of the one or more test-type options being selectable independently from selection of any one of the at least two sample-type options,~~ wherein ~~a selected one of~~selecting the body fluid sample option from the at least two sample-type options and ~~a selected one of~~ setting a test mode from the one or more test-~~type options~~ modes is based on respective discrete user inputs ~~are displayed~~ separately received in[[on]] [[a]]the input screen;

in response to [[both]] (I) a user input, on the input screen, of selecting ~~selection of~~ the blood sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, ~~selection~~ of setting [[the]] one test mode from the displayed one or more test-~~type options~~modes, perform the sensing operation in the blood measuring mode to: prepare a blood measurement sample from the blood sample; introduce at least part of the prepared blood measurement sample into a multi-mode detector; and operate said multi-mode detector to sense ~~blood~~ cells in the introduced blood measurement sample, and further perform the analyzing operation in the blood measuring mode to: analyze ~~first~~blood-sample measurements~~, from said multi-mode detector,~~ of ~~individual blood~~ cells sensed in the introduced blood measurement sample; and display analysis results ~~from~~of the ~~first~~blood-sample measurements [[in]]on a first test result screen; and

in response to [[both]] (I) a user input, ~~selection~~on the input screen, of selecting the body fluid sample option from the displayed at least two test-sample options and (II) an additional user input, on the input screen, ~~selection~~ of setting [[the]]said one or a different test mode from the displayed one or more test-~~type options~~ modes, perform the sensing operation in the body fluid measuring mode to: prepare a body fluid measurement sample from the body fluid sample; introduce at least part of the prepared body fluid measurement sample into said multi-mode detector; and operate said multi-mode detector to sense ~~blood~~ cells in the introduced body fluid measurement sample, and further perform the analyzing operation in the body fluid measuring mode to: analyze ~~second~~body-fluid-sample measurements~~, from said multi-mode detector,~~ of the ~~individual~~ cells sensed in the introduced body fluid measurement sample; and display analysis results ~~from~~of the ~~second~~body-fluid-sample measurements [[in]]on a second test result screen~~, wherein the first test result screen is different from the second test result screen~~.

3

2. (Currently Amended)        The sample analyzer according to claim 1, wherein the sensing operation performed in the blood measuring mode comprises an operation of sensing the ~~blood~~ cells in the introduced blood measurement sample for a first measurement time~~, using said multi-mode detector~~, and

the sensing operation performed in the body fluid measuring mode comprises an operation of sensing the ~~blood~~ cells in the introduced body fluid measurement sample for a second measurement time~~, using said multi-mode detector~~, wherein the second measurement time is longer than the first measurement time according to a cell concentration of the sample.

3. (Original)   The sample analyzer according to claim 2, wherein a ratio between the first and second measurement times falls within a predetermined range.

4. (Original)   The sample analyzer according to claim 1, wherein the prepared blood measurement sample and the prepared body fluid measurement sample contain blood and body fluid, respectively, in an equal amount.

5. (Original)   The sample analyzer according to claim 1, wherein the prepared blood measurement sample and the prepared body fluid measurement sample contain a reagent in an equal amount.

6. (Original)   The sample analyzer according to claim 1, further comprising a conveyor device, wherein the sensing operation performed in the body fluid measuring mode comprises ~~an operation to~~ automatically transport~~ing~~ a sample container to a position for aspiration of the body fluid sample from the sample container.

7. (Currently Amended)        A sample analyzer comprising:

a plurality of detectors comprising at least one optical detector for optically sensing ~~blood~~ cells in a sample ~~for measurement of the blood cells in the sample~~ [[or]] and at least one electrical detector for electrically sensing ~~blood~~ cells in the sample ~~for measurement of the blood cells in the sample~~, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected

4

SYSMEXUS0000411

from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the body fluid sample~~, which is different, at least partially, from the sequence of operations for measuring blood cells in the blood sample~~, and wherein a respective sequence of operations for measuring ~~blood~~ cells in the blood sample and in the body fluid sample comprises (a) a sensing operation comprising[[:]] operations of preparing for measurement and operating a detector to sense cells in the sample ~~preparing a measurement sample, introducing the prepared measurement sample into a detector; and operating the detector to sense blood cells in the prepared measurement sample,~~ and (b) an analyzing operation comprising[[:]] operations of analyzing measurements from the sensing operation ~~of blood cells from the detector;~~ and displaying analysis results, and further wherein the plurality of detectors include one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode,

the controller programmed to:

display on an input screen (1) at least two sample-type options~~, separately displayed from each other, for selection of one of the at least two sample-type options, which is selectable independently from another of the at least two sample-type options, wherein the at least two sample-type options comprise~~ that comprise concurrent display of a blood sample option and a body fluid sample option each independently selectable from the other on the input screen and (2) one or more test-~~type options~~modes[[,]] ~~separately~~ displayed separately from a selected one of the at least two sample-type options~~, for selection of one of the one or more test-type options, said one of the one or more test-type options being selectable independently from selection of any one of the at least two sample-type options, wherein a selected one of the at least two sample-type options and a selected one of the one or more test-type options are displayed separately on [[a]] screen~~;

in response to [[both]] (I) a user input, on the input screen, of selecting ~~selection of~~ the blood sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, ~~selection~~ of setting [[the]] one test mode from the

5

displayed one or more test ~~type options~~ modes, perform the sensing operation in the blood measuring mode to: prepare a blood measurement sample from the blood sample; introduce at least part of the prepared blood measurement sample into an optical detector; and operate the optical detector to optically sense white blood cells in the introduced blood measurement sample, and further perform the analyzing operation in the blood measuring mode to: analyze ~~first~~blood-sample measurements~~, from the optical detector,~~ of ~~individual~~ the white blood cells sensed in the introduced blood measurement sample; count each of five types of white blood cells based on the analyzed ~~first~~blood-sample measurements; and display a count of each of the five types of white blood cells; and

in response to [[both]] (I) a user input, on the input screen, ~~selection~~ of selecting the body fluid sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, ~~selection~~ of setting [[the]] said one or a different test mode from the displayed one or more test ~~type options~~ modes, perform the sensing operation in the body fluid measuring mode to: prepare a body fluid measurement sample from the body fluid sample; introduce at least part of the prepared body fluid measurement sample into an electrical ~~multi-mode~~ detector; operate said ~~multi-mode~~electrical detector to electrically sense cells in the introduced body fluid measurement sample, and further perform the analyzing operation in the body fluid measuring mode to: analyze ~~second~~body-fluid-sample measurements~~, from said multi-mode detector,~~ of ~~individual~~ cells sensed in the introduced body fluid measurement sample; count ~~each of~~ mono-nucleated cells and poly-nucleated cells based on the analyzed ~~second~~body-fluid-sample measurements; and separately display in a screen a count of ~~each of~~ the mono-nucleated cells and a count of the poly-nucleated cells.

8. (Currently Amended)       The sample analyzer according to claim 7, wherein the analyzing operation performed in the blood measuring mode comprises operations to obtain a total count of the white blood cells sensed in the introduced blood measurement sample and display the total count of the white blood cells, and the analyzing operation performed in the body fluid measuring mode comprises operations to obtain a total count of nucleated cells~~combined count of the mono-nucleated cells and the poly-nucleated cells~~ sensed in the introduced body fluid measurement sample and display the ~~combined~~total count of the nucleated cells.

6

SYSMEXUS0000413

9. (Currently Amended)      The sample analyzer according to claim 8, wherein the analyzing operation performed in the blood measuring mode comprises ~~an operation to~~ display~~ing~~ a first test result screen for displaying test results obtained in the blood measuring mode, and the analyzing operation performed in the body fluid measuring mode comprises ~~an operation to~~ display~~ing~~ a second test result screen for displaying test results obtained in the body fluid measuring mode~~, wherein the first test result screen is different from the second test result screen~~.

10. (Original)  The sample analyzer according to claim 9, wherein the first test result screen comprises first and second separate screen regions for displaying test results, wherein the first screen region is configured to display the total count of the white blood cells sensed in the introduced blood measurement sample, and the second screen region is configured to display the count of each of the five types of the white blood cells.

11. (Currently Amended)      The sample analyzer according to claim 10, wherein the second test result screen comprises third screen region for displaying test results, wherein the third screen region is configured to separately display the count of ~~each of~~ the mono-nucleated cells and the count of the poly-nucleated cells.

12. (Currently Amended)      The sample analyzer according to claim11, wherein the analyzing operation performed in the body fluid measuring mode comprises ~~an operation to calculate~~ calculating a relative cell amount ~~between~~of the mono-nucleated cells and a relative cell amount of the poly-nucleated cells sensed in the introduced body fluid measurement sample, and

        the third screen region is configured to separately display the relative cell amount ~~between~~of the mono-nucleated cells and the relative cell amount of the poly-nucleated cells~~, in addition to the count of each of the mono-nucleated cells and the poly-nucleated cells~~.

13. (Currently Amended)      The sample analyzer according to claim 11, wherein the second test result screen comprises a fourth screen region separate from the third screen region, wherein the fourth screen region is configured to display [[a]]the total count of the nucleated cells.

7

SYSMEXUS0000414

14. (Original)  The sample analyzer according to claim 13, wherein the second test result screen comprises a fifth screen region separate from the third and fourth screen regions, the fifth screen region being configured to display a flagging result representing a disease suspicion.

15. (Currently Amended)     The sample analyzer according to claim 7, wherein the analyzing operation performed in the body fluid measuring mode comprises ~~an operation to remove~~ removing a red blood cell ghost from the ~~second~~body-fluid-sample measurements.

16. (Currently Amended)     A sample analyzer comprising:

a plurality of detectors each configured to ~~optically or electrically~~ sense ~~blood~~ cells in a sample ~~for measurement of the blood cells in the sample~~, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring ~~blood~~ cells in the body fluid sample~~, which is different, at least partially, from the sequence of operations for measuring blood cells in the blood sample~~, and wherein a respective sequence of operations for measuring ~~blood~~ cells in the blood sample and in the body fluid sample comprises a sensing operation comprising[[:]] operations of preparing for [[a]] measurement ~~sample; introducing the prepared measurement sample into a detector;~~ and operating [[the]]a detector to sense ~~blood~~ cells in the ~~prepared measurement~~ sample, and further wherein the plurality of detectors include one or more multi-mode detectors configured to operate in both the blood measuring mode and the body fluid measuring mode,

the controller programmed to:

display on an input screen (1) at least two sample-[[ ]]type options~~, separately displayed from each other, for selection of one of the at least two sample-type options, which is selectable independently from another of the at least two sample-type options, wherein the at~~

8

least two sample-type options that comprise concurrent display of a blood sample option and a body fluid sample-type option each independently selectable from the other on the input screen, and (2) one or more test-type options modes[[,]] separately displayed separately from a selected one of the at least two sample type options, for selection of one of the one or more test-type options, said one of the one or more test-type options being selectable independently from selection of any one of the at least two sample-type options, wherein selecting the body fluid sample option from a selected one of the at least two sample-type options and a selected one of setting a test mode from the one or more test-type options modes is based on respective discrete user inputs are displayed separately received in [[on]] [[a]]the input screen from;

in response to [[both]] (I) a user input, on the input screen, of selecting selection of the blood sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, selection of setting [[the]] one test mode from the displayed one or more test-type options modes, perform the sensing operation in the blood measuring mode to: prepare a blood measurement sample from the blood sample; introduce at least part of the prepared blood measurement sample into a multi-mode detector; and operate said multi-mode detector to sense blood cells in the introduced blood measurement sample; and

in response to [[both]] (I) a user input, of selecting selection of both the body fluid sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, selection of setting [[the]]said one or a different test mode from the displayed one or more test-type options modes, perform the sensing operation in the body fluid measuring mode to: prepare a body fluid measurement sample from the body fluid sample; introduce at least part of the prepared body fluid measurement sample into said multi-mode detector; and operate said multi-mode detector to sense blood cells in the introduced body fluid measurement sample,

wherein the sensing operation performed in the body fluid measuring mode comprises an operation of pre-washing said multi-mode detector to reduce a carryover effect on measurements of the body fluid measurement sample, wherein the controller is programmed to automatically initiate said pre-washing, in response to selection of the body fluid sample option and additional selection of said one of the one or more test-type options, during said sensing operation in the body fluid measuring mode before introduction of the body fluid measurement sample into said

9

SYSMEXUS0000416

multi-mode detector, and the controller is programmed not to introduce the prepared body fluid measurement sample into said multi-mode detector before said pre-washing is completed.

17. (Currently Amended)    The sample analyzer according to claim 16, wherein said pre-washing is automatically initiated in the sensing operation in the body fluid measuring mode but not includedautomatically initiated in the sensing sequence of operation[[s]] for measuring cells in the blood measurement sample performed in the blood measuring mode.

18.(Original)   The sample analyzer according to claim 16, wherein said pre-washing includes using a solution specifically prepared for said pre-washing.

19. (Original)  The sample analyzer according to claim 16, wherein the controller is programmed to perform a blank check in which the controller:

introduces a cell-free sample into said multi-mode detector, the cell-free sample having no cells contained in the cell-free sample;

senses the cell-free sample by said multi-mode detector; and

analyzes measurements of the cell-free sample and count cells carried over into the cell-free sample from a test sample previously measured.

20. (Currently Amended)    The sample analyzer according to claim 20claim 19, wherein the controller is programmed to perform the blank check automatically without a manual operation by a user to initiate the blank check.

21. (Currently Amended)    The sample analyzer according to claim 16, wherein said pre-washing includes more than one washing of said multi-mode detector during the same sensing operation in the body fluid measuring modethe controller is programmed to automatically perform said pre-washing more than once during said sensing operation before introduction of the body fluid measurement sample into said multi-mode detector.

22. (Currently Amended)    The sample analyzer according to claim 21, further comprising a post-detection chamber communicating with said multi-mode detector, wherein the post-

10

SYSMEXUS0000417

detection chamber is located above said multi-mode detector and configured to receive and temporary store the measurement sample, which is already sensed by said multi-mode detector, for adjustment of pressure at said multi-mode detector, and further wherein the post-detection chamber automatically receives, more than once at a time interval, a solution used in said pre-washing during the same sensing operation in the body fluid measuring mode.

23. (Currently Amended)    The sample analyzer according to claim 16, further comprising a conveyor device, wherein the sensing operation performed in the body fluid measuring mode comprises an operation to automatically transporting a sample container to a position for aspiration of the body fluid sample from the sample container.

24. (Currently Amended)    A sample analyzer comprising:

a plurality of detectors each configured to optically or electrically sense blood cells in a sample for measurement of the blood cells in the sample, the sample selectively comprising (i) a blood sample or (ii) a body fluid sample, wherein the body fluid sample contains body fluid, other than blood, which is selected from a group consisting of cerebrospinal fluid, thoracic fluid, abdominal fluid, fluid collected in a cardiac sac, synovial fluid, dialysate from peritoneal dialysis, and intraperitoneal rinse;

a controller programmed to selectively operate the sample analyzer in a blood measuring mode or a body fluid measuring mode, wherein the blood measuring mode includes a sequence of operations for measuring blood cells in the blood sample, and the body fluid measuring mode includes a sequence of operations for measuring blood cells in the body fluid sample, which is different at least partially from the sequence of operations for measuring blood cells in the blood sample, and wherein a respective sequence of operations for measuring blood cells in the blood sample and in the body fluid sample comprises (a) a sensing operation comprising[[ ]] operations of preparing for [[a]] measurement sample; introducing the prepared measurement sample into a detector; and operating [[the]]a detector to sense blood cells in the prepared measurement sample, and (b) an analyzing operation comprising[[:]] operations of analyzing sample measurements from the sensing operation of blood cells from the detector; and displaying analysis results, and further wherein the plurality of detectors include one or more multi-mode

11

SYSMEXUS0000418

detectors configured to operate in both the blood measuring mode and the body fluid measuring mode,

the controller programmed to:

display on an input screen (1) at least two sample-type options~~, separately displayed from each other, for selection of one of the at least two sample-type options, which is selectable independently from another of the at least two sample-type options, wherein the at least two sample-type options~~ that comprise concurrent display of a blood sample option and a body fluid sample option each selectable independently from the other on the input screen and (2) one or more test~~-type options~~ modes[[,]] displayed separately from a selected one of the at least two sample-type options, ~~for selection of one of the one or more test-type options, said one of the one or more test-type options being selectable independently from selection of any one of the at least two sample-type options, wherein a selected one of the at least two sample-type options and a selected one of the one or more test-type options are displayed separately on a screen~~;

in response to [[both]] (I) a user input, on the input screen, ~~selection~~ of selecting the body fluid sample option from the displayed at least two sample-type options and (II) an additional user input, on the input screen, ~~selection~~ of setting [[the]] one test mode from the displayed one or more test~~-type options~~ modes,

(A) perform the sensing operation in the body fluid measuring mode to: prepare a first body fluid measurement sample from the body fluid sample; and ~~introduce the first body fluid measurement sample into said one or more multi-mode detectors; operate said one or more multi-mode detectors to~~ sense ~~red blood~~ cells in the ~~introduced~~ first body fluid measurement sample, and further perform the analyzing operation in the body fluid measuring mode to: analyze first measurements~~, from said one or more multi-mode detectors,~~ of ~~individual blood~~ the cells sensed in the ~~introduced~~ first body fluid measurement sample and count red blood cells based on the analyzed first measurements, and

(B) perform the sensing operation in the body fluid measuring mode to: prepare a second body fluid measurement sample from the body fluid sample; and ~~introduce the second body fluid measurement sample into said one or more multi-mode detectors; and operate said one or more multi-mode detectors to~~ sense ~~individual~~ cells in the ~~introduced~~ second body fluid measurement sample, and further perform the analyzing operation in the body fluid measuring

12

SYSMEXUS0000419

mode to: analyze second measurements, ~~from said one or more multi-mode detectors,~~ of the ~~individual~~ cells sensed in the ~~introduced~~ second body fluid measurement sample; and count ~~each of~~ mono-nucleated cells and poly-nucleated cells based on the analyzed second measurements, wherein the controller is programmed to <u>separately</u> display <u>in a screen</u> a count ~~of each~~ of the red blood cells, <u>a count of</u> the mono-nucleated cells and <u>a count of</u> the poly-nucleated cells[[,]]<u>.</u>

~~wherein the analyzing operation performed in the blood measuring mode comprises an operation to display a first test result screen for displaying test results obtained in the blood measuring mode, and the analyzing operation performed in the body fluid measuring mode comprises an operation to display a second test result screen for displaying test results obtained in the body fluid measuring mode, wherein the first test result screen is different from the second test result screen.~~

25. (Currently Amended)     The sample analyzer according to claim 24, <u>wherein the analyzing operation performed in the blood measuring mode comprises displaying a first test result screen for displaying test results obtained in the blood measuring mode, and the analyzing operation performed in the body fluid measuring mode comprises displaying a second test result screen for displaying test results obtained in the body fluid measuring mode, and</u>

wherein the second test result screen comprises first and second separate screen regions for displaying test results, wherein the first screen region is configured to display a total count of nucleated cells sensed in the ~~introduced~~ second body fluid measurement sample, and the second screen region[[s]] is configured to <u>separately</u> display the count of ~~each of~~ the mono-nucleated cells and <u>the count of</u> the poly-nucleated cells sensed in the ~~introduced~~ second body fluid measurement sample.

26. (Currently Amended)     The sample analyzer according to claim 25, wherein the analyzing operation performed in the body fluid measuring mode comprises ~~an operation to~~ ~~calculate~~ <u>calculating a</u> relative cell amount[[s]] ~~between~~<u>of</u> the mono-nucleated cells and <u>a relative cell amount of</u> the poly-nucleated cells in the ~~introduced~~ second body fluid measurement sample, and the second screen region is configured to <u>separately</u> display the relative cell amount[[s]] ~~between~~<u>of</u> the mono-nucleated cells and <u>the relative cell amount of</u> the poly-nucleated cells~~, in addition to the count of each of the mono-nucleated cells and the poly-nucleated cells~~.

13

SYSMEXUS0000420

27. (Original)  The sample analyzer according to claim 26, wherein the second test result screen comprises a third screen region separate from the first and second screen regions, the third screen region being configured to display a flagging result representing a disease suspicion.

28. (Currently Amended)        The sample analyzer according to claim 24, wherein the analyzing operation performed in the body fluid measuring mode comprises ~~an operation to remove~~ removing a red blood cell ghost from the second measurements ~~from the multi-mode detector~~ by application of a threshold to the second measurements ~~from the multi-mode detector~~.

29. (New)        The sample analyzer according to claim 1, wherein the controller is programmed to remain in the body fluid measuring mode after completing the sequence of operations in the body fluid measuring mode for measuring cells in a body fluid sample until the body fluid measuring mode is manually switched to the blood measuring mode.

14

SYSMEXUS0000421

REMARKS

I.      Status of the Claims

        Claims 1-29 are pending, of which claims 1, 7, 16 and 24 are in independent form.


                                                Respectfully submitted,

June 17, 2019                                   /Tadashi Horie/
Date                                            Tadashi Horie (Reg. No. 40,437)
                                                Attorney for Applicant(s)


15

SYSMEXUS0000422

# EXHIBIT H

**From:** James, Joshua jjames@brinksgilson.com
**Subject:** RE: Sysmex v. BCI (D. Del.): Source Code Inspection
**Date:** October 28, 2020 at 3:55 PM
**To:** Feigelson, Aaron afeigelson@leydig.com
**Cc:** Kopinski, Nicole nkopinski@leydig.com, Beckman-Sysmex-Litigation Beckman-Sysmex-Litigation@leydig.com, msharp@ycst.com , Steven W. Lee SLee@ycst.com, BGLSysmex012Team BGLSysmex012Team@brinksgilson.com, Farnan, Kelly E. Farnan@RLF.com, Delcollo, Renee Mosley delcollo@rlf.com

Aaron,

<mark>Due to your objection, Tadashi will not accompany Mr. Satish tomorrow.</mark> I will accompany Mr. Satish instead.

Regards,

Josh

**Joshua James**
Intellectual Property Attorney
312.840.3270 **|** Direct
630.217.8444 **|** Mobile
jjames@brinksgilson.com
James Biography
www.brinksgilson.com



**Assistant:** Claire Popoca
312.245.3498 **|** cpopoca@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **|** 455 N. Cityfront Plaza Drive **|** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Wednesday, October 28, 2020 3:23 PM
**To:** James, Joshua <jjames@brinksgilson.com>
**Cc:** Kopinski, Nicole <nkopinski@leydig.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>; msharp@ycst.com; Steven W. Lee <SLee@ycst.com>; BGLSysmex012Team <BGLSysmex012Team@brinksgilson.com>; Farnan, Kelly E. <Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>
**Subject:** [EXT] Re: Sysmex v. BCI (D. Del.): Source Code Inspection

Josh,

The locked computer with the DxH code should be in the same state with the same tools and licenses as when Mr. Satish was here last year. We cannot verify whether his licenses are active or not. We will try to install the additional GitBash tool, but cannot guarantee it can be done on this short notice. We should be able to provide an extra monitor.

.

We note that Tadashi Horie has not filed an appearance in this case, nor has he signed the Protective Order.  Because Mr. Horie has been active in the prosecution of Sysmex patent applications, his participation here is problematic.  Can you provide details as to Mr. Horie's involvement with Sysmex patent matters?  In particular, please list all Sysmex patent applications that Mr. Horie has worked on in the last six months.  In the interim, we object to Mr. Horie's participation in tomorrow's inspection.

-aaron


Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)
The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.


On Oct 27, 2020, at 4:27 PM, James, Joshua <jjames@brinksgilson.com> wrote:

Aaron,

It is our understanding that the following tools are installed on the locked computer from Mr. Satish's previous inspection in October 2019:

- Beyond Compare
- Visual Studio
- SciTools Understand
· Notepad++ Text Editor

If any of these tools are no longer on the locked computer, please install them. Also, because it has been about a year since the last inspection, please confirm that the licenses for the tools are active.

In addition to the tools listed above, please install Git Bash (https://gitforwindows.org/) onto the locked computer. Also, if the laptop screen is smaller than 15", please provide a monitor for the laptop that is 15" or more.

Tadashi Horie from Brinks Gilson & Lione will be accompanying Mr. Satish, so please add him to your security list.

Regards,

Regards,

Josh

**Joshua James**
Intellectual Property Attorney
312.840.3270 **I** Direct
630.217.8444 **I** Mobile
jjames@brinksgilson.com
James Biography
www.brinksgilson.com



**Assistant:** Claire Popoca
312.245.3498 **I** cpopoca@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **I** 455 N. Cityfront Plaza Drive **I** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named
above and may constitute a privileged and confidential communication. If
you are not the intended recipient, please do not read, copy, use, or
disclose this message. Please notify the sender by replying to this
message, and then delete the message from your system. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Tuesday, October 27, 2020 12:00 PM
**To:** James, Joshua <jjames@brinksgilson.com>
**Cc:** Kopinski, Nicole <nkopinski@leydig.com>; Beckman-Sysmex-
Litigation <Beckman-Sysmex-Litigation@leydig.com>; msharp@ycst.com;
Steven W. Lee <SLee@ycst.com>; BGLSysmex012Team
<BGLSysmex012Team@brinksgilson.com>; Farnan, Kelly E.
<Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>
**Subject:** [EXT] Re: Sysmex v. BCI (D. Del.): Source Code Inspection

Josh,

BCI is agreeable to expediting the Protective Order process and confirming that it has no
present objection to Mr. Satish's inspection of the DxH source code, as he has done
previously. The locked computer contains the same code and tools from Mr. Satish's
previous inspection in October 2019. Please let us know if anyone will be joining Mr.
Satish so we can make arrangements with building security for the inspection on
October 29 and 30.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)

(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)

The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.

On Oct 26, 2020, at 5:21 PM, James, Joshua <jjames@brinksgilson.com> wrote:

Aaron,

Thank you for making the DxH source code available on October 29 and 30. Our reviewer is Shivarudrappa Satish, who was already cleared under the protective order in the Illinois case and has already inspected BCI source code in the Illinois case.

Please find attached an executed Exhibit A from the Delaware protective order. Paragraph 4(e) of both the Illinois and Delaware protective orders requires the same information for experts to be cleared. Mr. Satish has confirmed that no new information needs to be added to the information he disclosed for clearance under the Illinois protective order.

We do not want Mr. Satish to travel to Chicago unnecessarily, so please confirm that the DxH source code will be available on October 29 and 30 and that BCI does not object to Mr. Satish reviewing the source code.

Regards,

Josh

**Joshua James**
Intellectual Property Attorney
312.840.3270 **|** Direct
630.217.8444 **|** Mobile
jjames@brinksgilson.com
James Biography
www.brinksgilson.com



**Assistant:** Claire Popoca
312.245.3498 **|** cpopoca@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **|** 455 N. Cityfront Plaza Drive **|** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Monday, October 26, 2020 11:11 AM
**To:** James, Joshua <jjames@brinksgilson.com>
**Cc:** Kopinski, Nicole <nkopinski@leydig.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>; msharp@ycst.com; Steven W. Lee <SLee@ycst.com>; BGLSysmex012Team <BGLSysmex012Team@brinksgilson.com>; Farnan, Kelly E. <Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>
**Subject:** [EXT] Re: Sysmex v. BCI (D. Del.): Source Code Inspection

Josh,

We disagree with your assessment that concerns from the pandemic should somehow require a party to send its source code to a destination outside of its control.  We also note that Sysmex has not provided the requisite notice as outlined in the Protective Order, such as an identification of the reviewer.  Nevertheless, given your expert's willingness to travel and in light of the global situation, we can expedite the process and make the DxH source code available at our offices in Chicago this week, assuming the reviewer is someone already cleared under the Protective Order.  Please identify the reviewer and let us know if Thursday and/or Friday (October 29/30) is acceptable.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)
The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.

# EXHIBIT I

1
                    UNITED STATES DISTRICT COURT
2                             OF THE
                    NORTHERN DISTRICT ILLINOIS
3

4                   CASE NO.:  1:18-CV-06563

5

   BECKMAN COULTER, INC.
6
        Plaintiff,
7
    -vs-
8
   SYSMEX AMERICA, INC., and
9  SYSMEX CORPORATION,

10      Defendants.
   _____/
11

12      HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

13            DEPOSITION OF GERARDO GARCIA

14
              Saturday, November 9, 2019
15               9:07 a.m. – 5:17 p.m.

16        Esquire Deposition Solutions, LLC
              44 West Flagler Street
17             Miami, Florida 33130

18

19

20

21

22  Reported By:
   Guerlin Kelly Boyd, Court Reporter
23  Notary Public, State of Florida

24

25



1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4         NICOLE E. KOPINSKI, ESQ.
          LEYDIG, VOIT & MAYER, LTD.
5         2 Prudential Plaza
          Suite 4900
6         Chicago, Illinois 60601
          (312) 616-5624
7         nkopinski@leydig.com

8

9         On behalf of the Defendant:

10        JAMES R. SOBIERAJ, ESQ.
          TADASHI HORIE, ESQ.
11        BRINKS GILSON & LIONE
          455 North Cityfront Plaza Drive
12        Suite 3600
          Chicago, Illinois 60611
13        (312) 321-4200
          jsobieraj@brinkgilson.com
14        thorie@brinkgilson.com

15   ALSO PRESENT:

16

17        ROBERT PACHECO, VIDEOGRAPHER

18                        -   -   -

19

20

21

22

23

24

25



# EXHIBIT J



**Leydig, Voit & Mayer, Ltd.**
www.leydig.com

Aaron R. Feigelson, Ph.D.
afeigelson@leydig.com
(312) 616-5637

February 1, 2021

*VIA EMAIL*

Counsel of Record
Brinks, Gilson & Lione, P.C.
NBC Tower, Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611

> **Re:** ***Sysmex America, Inc. and Sysmex Corporation v. Beckman Coulter, Inc.,***
> **Case No. 1:19-cv-01642-RGA-CJB (D. Del.)**

Counsel,

We write regarding issues arising from the recent deposition of Tadashi Horie on January 15, 2021.

### Protective Order Violations by Mr. Horie and Brinks, Gilson & Lione

The Protective Orders governing the use of confidential information in the Illinois and Delaware cases contain a prosecution bar provision that limits the scope of involvement in patent prosecution activity. In particular, the Protective Order states that anyone who "obtains, receives has access to, or otherwise learns, in whole or in part, the other Party's Highly Sensitive Technical Material under this Order shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent/s-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals."

Despite the broad prohibition in the Protective Orders, Mr. Horie's deposition testimony confirmed that he has ███████████████████████████████████████████████████████ . Mr. Horie has had access to Beckman Coulter's Highly Sensitive Technical Material at least as a member of Brinks' email distribution group, BGLSysmex012Team@brinksgilson.com, where he has privately received confidential Beckman Coulter materials. In addition, Mr. Horie has attended depositions in these litigations, including depositions where highly confidential Beckman Coulter documents were presented as exhibits.

Mr. Horie nonetheless continued to prosecute dozens of Sysmex patent applications covering hematology analyzers and other inventions in the fields of the asserted patents. He also was unable to identify any protective measures taken by the Brinks firm that would prevent his prosecution of these Sysmex applications or limit his access to confidential Beckman Coulter

---

Two Prudential Plaza, Suite 4900 | 180 N. Stetson Avenue | Chicago, IL 60601-6731 | **T** 312-616-5600 | **F** 312-616-5700

Chicago, Illinois | Alexandria, Virginia | Boulder, Colorado | San Francisco Bay Area | Frankfurt am Main, Germany

Counsel of Record
February 1, 2021
Page 2

information in view of his ongoing prosecution work.  Indeed, Mr. Horie sought to personally inspect Beckman Coulter's computer source code in October 2020.

In light of these serious violations of the Protective Orders, Beckman Coulter is considering an appropriate course of action.  In the interim, please confirm by close of business **Tuesday, February 2, 2021**, that the following remedial measures have been taken:

1) Mr. Horie is no longer prosecuting or assisting in the prosecution or preparation of any Sysmex patent applications;

2) Mr. Horie is no longer a member of the BGLSysmex012Team email distribution list;

3) Brinks has restricted all access to Beckman Coulter confidential material, both physical and electronic, by Mr. Horie and any others who are involved in Sysmex patent prosecution in the field of hematology analyzers;

4) Mr. Horie will not participate in the preparation of any Sysmex witness for deposition, nor will he attend any depositions in this litigation; and

5) You will identify all persons who were involved in Sysmex patent prosecution in the field of hematology analyzers in the past three (3) years, and separately, all persons who have worked on the Sysmex litigations.

### **Improper Assertions of Privilege and Work Product Immunity**

During Mr. Horie's deposition, Mr. Mallin instructed him not to answer nearly 150 questions posed by the questioning attorney during the deposition.  Many of these instructions were without basis in any attorney-client communications or work product.  For example, Mr. Mallin instructed Mr. Horie not to answer questions regarding:

- The existence—not the content—of communications with his client, Sysmex, during this litigation. (25:14-26:6).

- Whether he was on an email distribution list (31:20-25; 39:9-15), and whether he received an email from opposing counsel (34:2-8).

- General legal concepts unrelated to the substance of the case, such as the purpose of a prosecution bar (44:14-19), explaining a Track One request (70:7-11), or explaining a FDA 510(k) (168:15-169:4).

- His understanding of a document that he was unfamiliar with (89:13-22).

- Photographs in a document he did not prepare and that he did not recall previously seeing (94:18-24).

- The identity of a signator on a public document (98:11-19).

Counsel of Record
February 1, 2021
Page 3

- Whether he had seen an XE-2100 hematology analyzer in person (112:23-113:3)

- Whether Sysmex provided any information to Mr. Horie regarding the XE-2100 (135:1-7)

- The content of Sysmex prior art manuals and marketing materials (138:18-139:2; 148:23-149:4; 159:4-12; 163:19-164:24)

- Mr. Horie's practice of informing clients about events during the prosecution of patent applications (186:11-21)

The examples above are representative, and are far from a complete listing of the improper privilege and work product assertions.  Indeed, instructions not to answer appear on over 100 pages of the 219-page transcript.  It is unquestionable that none of the exemplary questions above sought or required the divulging of any attorney-client communications or work product.

Because of the consistent misapplication of attorney-client privilege and work product immunity, Beckman Coulter requests that Mr. Horie be made available again for deposition, at Sysmex's expense.

### Waiver of Privilege Regarding Mr. Horie's Knowledge of Prior Art

Sysmex withheld from the USPTO numerous prior art references regarding Sysmex's XE-2100 and XT-Series analyzers and how those analyzers were used to process body fluids.  As a result, Beckman Coulter has counterclaimed that the asserted Sysmex patents are unenforceable due to the inequitable conduct of various individuals, including Mr. Horie.  Accordingly, Mr. Horie's and at least the Sysmex inventors' knowledge of these references is highly relevant to this counterclaim.

Mr. Horie spontaneously and self-servingly volunteered for at least some of the withheld references that the first time he saw them was after Beckman Coulter filed its counterclaim (e.g., 105:14-106:10, 130:4-6, 133:13–24, 145:11–14). Yet, when asked further questions testing the veracity of his testimony, Sysmex's attorney asserted privilege and instructed Mr. Horie not to answer (e.g., 126:5-127:13, 134:16-135:19, 145:19–146:11).  By allowing Mr. Horie to testify as to his knowledge of the withheld prior art when it is helpful to Sysmex, but then asserting privilege to prevent investigation as to facts that might undermine that testimony, Sysmex has impermissibly used the privilege as both a sword and a shield.  Sysmex has thus waived any attorney-client privilege as to the question of Mr. Horie's knowledge of the withheld prior art, and Mr. Horie must be made available again for deposition and ready to fully answer questions regarding his knowledge of the various references.

3

Counsel of Record
February 1, 2021
Page 4

### **Improper Coaching and Speaking Objections**

It has been unfortunate that nearly all depositions of Sysmex witnesses thus far have included improper speaking objections by Sysmex's counsel, in contravention of the well-established practice followed by the District of Delaware.  We will address this general issue in a separate letter.

With Mr. Horie's deposition, however, there were multiple instances not only of improper objections, but overt coaching.  For example, Mr. Mallin repeatedly told the witness to take time reviewing documents and not to speculate, (e.g., 71:3-5, 109:24-110:4, 137:15-17) and went so far as interrupting the witness's answers to do so, (e.g., "Don't guess" (204:8-18)).  For this additional reason, Mr. Horie should be presented again so he can provide full and complete testimony in accordance with both the Federal and Local rules.

Please let us know when Mr. Horie will be made available to complete his deposition subject to the terms discussed above.  If you do not intend to produce Mr. Horie again, or if you cannot confirm that you have taken all of the requested measures above with respect to the Protective Order violations, let us know your availability for a meet and confer this week so that we may bring these serious matters to the Court's attention.


Very truly yours,

LEYDIG, VOIT & MAYER, LTD.

By:

Aaron R. Feigelson

# EXHIBIT K

**From:** **Feigelson, Aaron** afeigelson@leydig.com
**Subject:** Re: Sysmex v. Beckman Coulter 19-1642 (RGA-CJB): Correspondence re Issues Arising from Tadashi Horie Deposition
**Date:** March 18, 2021 at 4:15 PM
**To:** Farnan, Kelly E. Farnan@RLF.com
**Cc:** Sobieraj, James jsobieraj@brinksgilson.com, Mallin, Robert rmallin@brinksgilson.com, James, Joshua jjames@brinksgilson.com, Parrish, Daniel dparrish@brinksgilson.com, Delcollo, Renee Mosley delcollo@rlf.com, Mueller, Wesley wmueller@leydig.com, David Airan dairan@leydig.com, Kopinski, Nicole nkopinski@leydig.com, Feng, Wallace wfeng@leydig.com, Sharp, Melanie msharp@ycst.com, Beckman-Sysmex-Litigation Beckman-Sysmex-Litigation@leydig.com

Kelly,

We agree that these are serious violations at issue and we have treated this matter accordingly.  In my letter of February 1, we identified steps Sysmex could take to help address ongoing concerns.  We participated in a lengthy meet and confer on February 5 during which we reached impasse based on Sysmex's representations, and continued thereafter to provide information in writing to try to bring about a resolution.  Despite these efforts, Sysmex has steadfastly refused to voluntarily correct its past and ongoing violations (tacitly admitting impasse), and has prolonged the dispute and stonewalled multiple efforts to schedule a meet and confer. Moreover, Sysmex has still not provided any explanation as to why it contends that the prosecution of the '350 and '351 patents was permitted under the prosecution bar of the Illinois protective order.

We are not aware of any reason why we need to supply you with a copy of a proposed amended pleading, as we have made our bases for the amendments quite clear in our correspondence. Similarly, the non-monetary sanctions we will seek have been clear in our many communications, including not only the specific measures described in my letter of February 1, but also a waiver of Sysmex's right to pursue the '350 and '351 infringement claims against Beckman Coulter, and such other relief as the Court deems appropriate under these circumstances.

We are and have been at impasse on both violation and remedy.  To the extent you believe an additional meet and confer is necessary, we are prepared to meet any time on Monday, March 22.  If we do not hear from you by the close of business tomorrow confirming your availability for a time certain, we will bring this matter to the court's attention

-aaron


Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)
The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication. Thank you.

On Mar 15, 2021, at 11:15 AM, Farnan, Kelly E. <Farnan@RLF.com> wrote:

Aaron,

As we've expressed previously, BCI is making serious allegations that deserve a serious and substantive meet and confer.  In order to facilitate the meet and confer process, we have asked for but still have not received the following information:

(1)  An explanation as to how Mr. Horie allegedly violated the protective order, including especially how you contend that the patent applications you have identified fall within the scope of the Delaware protective order;
(2)  The specific monetary and non-monetary relief you will seek from the Court; and
(3)  A copy of the proposed amended pleading.

We would appreciate receiving this information so that we can meaningfully consider it.

Kelly

Kelly

---

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Friday, March 12, 2021 6:45 PM
**To:** Sobieraj, James <jsobieraj@brinksgilson.com>
**Cc:** Mallin, Robert <rmallin@brinksgilson.com>; James, Joshua <jjames@brinksgilson.com>; Parrish, Daniel <dparrish@brinksgilson.com>; Farnan, Kelly E. <Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>; Mueller, Wesley <wmueller@leydig.com>; Airan, David <dairan@leydig.com>; Kopinski, Nicole <nkopinski@leydig.com>; Feng, Wallace <wfeng@leydig.com>; Sharp, Melanie <msharp@ycst.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>
**Subject:** Re: Sysmex v. Beckman Coulter 19-1642 (RGA-CJB): Correspondence re Issues Arising from Tadashi Horie Deposition

* EXTERNAL EMAIL *

Jim,

We are and have been at impasse on this issue.  There have now been several rounds of emails, yet Sysmex continues to refuse to take any corrective action or further meet and confer.  We have already met and conferred on this.  Additional delay is unwarranted.

Even though we have provided more than ample explanation of our bases for our positions and for the relief we seek, as an accommodation we would be happy to have an additional brief discussion between 3:00 and 5:00 Central on Monday, March 15, or before noon on Tuesday, March 16.  **Let us know by Monday at Noon Central if you can attend**.  Please also be prepared to discuss your position that the '350 and '351 patents—and any of the other Sysmex patent applications we have so identified—fall outside the scope of the prosecution bar of the Illinois protective order.

This matter is ripe and we will not defer contacting chambers beyond Tuesday absent an acceptable commitment from Sysmex to address these serious protective order breaches and their consequences.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)
The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.

On Mar 12, 2021, at 9:37 AM, Sobieraj, James <jsobieraj@brinksgilson.com> wrote:

Aaron:

Your email does not address many of the points raised in my February 14 email, which was sent over three weeks ago. We were not at impasse then because you have not provided an explanation of the basis for your position.  Your March 9 email still fails in that regard as it merely makes the *ipse dixit* assertion that "[t]hese applications plainly 'pertain

[] to the field of the invention of the patent/s-in-suit."  You still have not provided an explanation as to how any of the identified applications pertain to the field of the invention of any patent-in-suit.  Such explanation will be critical to any alleged prosecution bar violation brought before the Court, and we are entitled to understand the basis for your allegation.  For example, you have not even provided an explanation as to how U.S. Patent Applications 15/622,702 and 16/353,140 (which you marked as DDX 28 and 29 during Mr. Horie's deposition and now claim are violations of the Delaware Protective Order) pertain to the field of the invention of any patent-in-suit.  Please provide that explanation promptly.

Additionally, to the extent you are alleging that the prosecution of the '350 and '351 patents violated the protective order in the Illinois case, please explain how those patents fall within the scope of the limited prosecution bar of the Illinois Protective Order which is directed to the field of the invention of the U.S. Patent No. 6,581,012.

In addition, your March 9 email raises new issues that were not addressed in our prior meet and confer.  For example, this is the first time you have raised monetary sanctions, and your email does not identify the amount you intend to seek or the basis for any monetary sanctions.  Your letter also does not identify the type of non-monetary sanctions you intend to seek.  Please provide us with that information and any authority you have to support the request.  Further, your email raises for the first time the possibility of seeking leave to file new amended counterclaims and affirmative defenses, but you have not provided us with a draft of your proposed amended answer and counterclaims.  Please provide the proposed pleading so we can consider and understand the basis for your proposed counterclaims/affirmative defenses and consult with our client.

Please advise us as to when you will provide us with the requested information and address the other points raised in my February 14 email so that we can have a meaningful meet and confer.

Jim

**Jim Sobieraj**
Intellectual Property Attorney
312.321.4226 **|** Direct
630.561.2884 **|** Mobile
jsobieraj@brinksgilson.com
www.brinksgilson.com



**Assistant:** Laura Markham
312.245.3479 **|** lmarkham@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **|** 455 N. Cityfront Plaza Drive **|** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Tuesday, March 9, 2021 7:58 PM
**To:** Sobieraj, James <jsobieraj@brinksgilson.com>
**Cc:** Mallin, Robert <rmallin@brinksgilson.com>; James, Joshua <jjames@brinksgilson.com>; Parrish, Daniel <dparrish@brinksgilson.com>; Farnan, Kelly E. <Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>; Mueller, Wesley <wmueller@leydig.com>; Airan, David <dairan@leydig.com>; Kopinski, Nicole <nkopinski@leydig.com>; Feng, Wallace <wfeng@leydig.com>; Sharp, Melanie <msharp@ycst.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>

**Subject:** [EXT] Re: Sysmex v. Beckman Coulter 19-1642 (RGA-CJB): Correspondence re Issues Arising from Tadashi Horie Deposition

Jim,

We are following up with you regarding the issue of Sysmex's violations of the Illinois and Delaware protective orders. We understand your position that Sysmex does not consider Mr. Horie's prosecution of any of the 50 Sysmex patent applications identified in my email—including the applications leading to the '350 and '351 patents asserted in this litigation—to be a violation of either protective order. We disagree. These applications plainly "pertain[] to the field of the invention of the patent/s-in-suit," and at least Mr. Horie prosecuted them after he had access to BCI's "Highly Sensitive Technical Material" that had been produced in the Illinois litigation, including access to BCI source code. What is more, Mr. Horie submitted substantive amendments to the claims that issued thereafter. We are clearly at an impasse on this issue.

The remedial measures we requested were not intended as a complete remedy for Sysmex's violations. Rather, they were intended to provide temporary relief to allow the parties to continue ongoing discovery in good faith. Sysmex's refusal to implement these basic measures or to provide a complete and forthright disclosure surrounding them, however, frustrates that ability. For example, in your response #3, below, you acknowledge that Mr. Horie has had "access to BCI confidential information," but you misleadingly claim, "As you know, [Leydig] has provided Mr. Horie" with such access. We did not allow such access to Mr. Horie, nor did BCI provide Mr. Horie with any such access. Instead, when Sysmex sought to allow Mr. Horie to view BCI's source code in October 2020, we promptly raised the issue with you. Additionally, although you now make general statements about your firm restricting access to BCI confidential information, you have not provided any details of such restrictions (including, e.g., when they were first implemented) and, more importantly, the extent to which they apply and have applied to Mr. Horie.

In light of the past and continuing violations by Mr. Horie and Sysmex, BCI intends to seek the following relief from the Delaware district court:

> a) Monetary and non-monetary sanctions for violations of the Delaware protective order under Fed. R. Civ. P. Rule 37. This is based on Mr. Horie's continued prosecution of at least the patent applications so identified (with a "D" in the February 12 listing).

> b) Leave to amend its answer to add an affirmative defense that Sysmex's claims are barred by the doctrine of unclean hands. Mr. Horie amended the claims of the '350 and '351 patent applications on June 17, 2019, attempting to more closely track the operations performed by BCI's DxH analyzers as reflected in BCI's source code. This amendment came after BCI had produced confidential information in the Illinois case, and less than a month after Sysmex and its technical expert inspected the DxH source code there. As an integral part of the litigation team (during the time of his prosecution activities regarding Sysmex patent applications), Mr. Horie has had unrestricted access to BCI's confidential information from the outset of discovery in the Illinois case. It follows that Sysmex cannot equitably assert these patents against BCI.

> c) Leave to amend its answer to add a counterclaim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, due to Sysmex's misappropriation of BCI's trade secret information, including the DxH source code, through at least Mr. Horie.

> d) Leave to amend its answer to add a counterclaim for breach of contract, due to Sysmex's violations of the Illinois protective order, as described previously.

As noted above, we are at an impasse on item a), and we are prepared to bring it to the court's attention. Although we do not expect you will agree to BCI's relief sought by items b) - d), we are nonetheless available for a meet and confer on the morning of Thursday, March 11 or anytime Friday, March 12. If we do not hear from you by the end of Thursday, March 11, we will understand that the parties have reached impasse on these three items, as well.

Please let us know promptly.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.

Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)

The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law.  If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication.  Thank you.

On Feb 14, 2021, at 6:31 PM, Sobieraj, James <jsobieraj@brinksgilson.com> wrote:

Aaron:

As you know, we were awaiting an identification of the alleged prosecution bar violations in this case, as your February 1 letter conflated the Illinois and Delaware cases, and we did not receive that information until the close of business on Friday, February 12. We note that the list attached to your February 12 email adds seven applications that were not included on the list you provided on February 5.  Is the February 12 list the complete list of applications you intend to take up with the Court if we reach an impasse?   If not, please provide a supplemental list so that we are informed of every application that you contends to involve a violation of the protective order.

Meanwhile, we have been giving consideration to the demands made on page 2 of your February 1, 2021 letter, and respond to each as follows:

1)  Your first demand encompasses "any Sysmex patent application," but the prosecution bar in the Delaware Protective Order is limited to "any patent application pertaining to the field of the invention of the patents-in-suit."  It appears that you have simply identified applications where Mr. Horie may have filed a paper without any consideration of the limited scope of the prosecution bar.  We are not aware of any violation of the prosecution bar by Mr. Horie. Please explain your basis for alleging that the applications on your February 12 list meet the subject matter limitation of the prosecution bar.  ؛

2)  We have noticed that your firm has stopped using the BGLSysmex012Team email distribution list.   We do not understand your basis for demanding that we cannot use this email distribution list for our own communications, as that activity is not prohibited under the prosecution bar.

3)  As you know, your firm has provided Mr. Horie with access to BCI confidential information, and we are not aware of any violation of the protective order by Mr. Horie.  Brinks has taken steps to restrict access to BCI's confidential documents to others in the Brinks firm. For example, BCI's electronic documents have been stored in folders in a restricted access server drive.  We have conducted an investigation and did not find any instances where any attorneys or patent agents who possibly prosecuted patent applications prohibited by the prosecution bar accessed those folders.  We do not understand your reference to "physical."

4) We do not understand your basis for demanding Mr. Horie cannot participate in the preparation of any Sysmex witness for deposition, nor attend any depositions in this litigation, as that activity is not prohibited under the prosecution bar.

5) Please explain the basis for your demands that we identify "all persons who were involved in Sysmex patent applications in the field of hematology analyzers for the past three (3) years" and "all persons who have worked on the Sysmex litigations". Further, your demand ignores the limitations on the prosecution bar and the fact that the Delaware protective order was entered less than 13 months ago.

As previously explained, BCI is making serious allegations and we need to understand BCI's basis for those allegations. As you have not provided an explanation of BCI's basis, we are not at impasse.

We will respond separately to the allegations in your February 1 letter regarding objections at Mr. Horie's deposition.

Jim

**Jim Sobieraj**                                    <image002.jpg>
Intellectual Property Attorney
312.321.4226 **|** Direct
630.561.2884 **|** Mobile
jsobieraj@brinksgilson.com
www.brinksgilson.com

**Assistant:** Laura Markham
312.245.3479 **|**
lmarkham@brinksgilson.com

**BRINKS GILSON & LIONE**
NBC Tower - Suite 3600 **|** 455 N. Cityfront Plaza Drive **|** Chicago, IL 60611

**Please Note:** This message is intended for the individual or entity named above and may constitute a privileged and confidential communication. If you are not the intended recipient, please do not read, copy, use, or disclose this message. Please notify the sender by replying to this message, and then delete the message from your system. Thank you.

---

**From:** Feigelson, Aaron <afeigelson@leydig.com>
**Sent:** Friday, February 12, 2021 4:46 PM
**To:** Sobieraj, James <jsobieraj@brinksgilson.com>
**Cc:** Mallin, Robert <rmallin@brinksgilson.com>; James, Joshua <jjames@brinksgilson.com>; Parrish, Daniel <dparrish@brinksgilson.com>; Farnan, Kelly E. <Farnan@RLF.com>; Delcollo, Renee Mosley <delcollo@rlf.com>; Mueller, Wesley <wmueller@leydig.com>; Airan, David <dairan@leydig.com>; Kopinski, Nicole <nkopinski@leydig.com>; Feng, Wallace <wfeng@leydig.com>; Sharp, Melanie <msharp@ycst.com>; Beckman-Sysmex-Litigation <Beckman-Sysmex-Litigation@leydig.com>
**Subject:** [EXT] Re: Sysmex v. Beckman Coulter 19-1642 (RGA-CJB): Correspondence re Issues Arising from Tadashi Horie Deposition

**Caution - External Email**
Jim.

Despite several communications, Plaintiffs have not explained why Mr. Horie's continued prosecution of Sysmex patent applications did not violate the Protective Orders in both the Illinois and Delaware actions, which contain identical prosecution bars. And although you already have this information, we again provide, as a courtesy, the attached list of the patent applications that specifically identifies applications known at this time to be implicated by each of the Illinois and Delaware Protective Orders. We believe that we are now at an impasse on our request that Plaintiffs take the remedial measures outlined in my letter. We understand from your lack of acknowledgment that these measures have not been taken.

We also had expected to hear from you regarding the other items in my February 1 letter, namely whether you will be producing Mr. Horie again as a deposition witness, ready to testify on waived and non-privileged topics, and without improper speaking objections. Having not heard from you on these issues, we understand that we are at an impasse there, as well.

-aaron

Aaron R. Feigelson, Ph.D.
Attorney
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza - Suite 4900
180 North Stetson Avenue
Chicago, IL 60601-6731
(312) 616-5600 (tel - general)
(312) 616-5637 (tel - direct)
(312) 616-5700 (fax)
http://www.leydig.com (website)
arf@leydig.com (e-mail)
The information contained in this communication is confidential and may contain information that is privileged and/or exempt from disclosure under applicable law. If you have received this communication in error, please notify me immediately and delete the original and all copies of this communication. Thank you.

**CAUTION RLF:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# EXHIBIT L

From: **Farnan, Kelly E.** Farnan@RLF.com
Subject: Sysmex v. BCI - Motion to Amend
Date: March 29, 2021 at 2:38 PM
To: Sharp, Melanie msharp@ycst.com, Feigelson, Aaron afeigelson@leydig.com
Cc: Beckman-Sysmex-Litigation Beckman-Sysmex-Litigation@leydig.com, BGLSysmex012Team
BGLSysmex012Team@brinksgilson.com, Delcollo, Renee Mosley delcollo@rlf.com

Melanie and Aaron,

Following up on our meet and confer last week, based on our discussion and our understanding of your proposal with respect to an additional unclean hands defense, we can advise that Sysmex will oppose BCI's request to add an affirmative defense of unclean hands at this time.

Kelly


Kelly E. Farnan
Richards, Layton & Finger, P.A.
920 North King St.
Wilmington, DE 19801
Direct Dial:    (302) 651-7705
E-Mail:        farnan@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

# EXHIBIT M

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                          January 15, 2021
Highly Confidential

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4

 5   SYSMEX CORPORATION and

 6   SYSMEX AMERICA, INC.,

 7                    Plaintiffs,

 8          vs.                   C.A. No.: 19-1642-RGA-CJB

 9   BECKMAN COULTER, INC.,

10                    Defendant.

11   _____

12

13                  *** HIGHLY CONFIDENTIAL***

14

15        The Videotaped Deposition of TADASHI HORIE,

16        Appearing Remotely from Chicago, Illinois,

17        Commencing at 9:35 a.m.,

18        Friday, January 15, 2021,

19        Before Rebecca L. Russo, CSR-2759, RMR, CRR.

20        Appearing Remotely from Kent County, Michigan.

21

22

23

24

25
```

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                                  January 15, 2021
Highly Confidential

---

Page 2

```
 1   REMOTE APPEARANCES:
 2
 3   ROBERT S. MALLIN
 4   JAMES R. SOBIERAJ
 5   DAVID S. FLEMING
 6   Brinks Gilson & Lione
 7   455 North Cityfront Plaza Drive
 8   NBC Tower - Suite 3600
 9   Chicago, Illinois 60611
10   312.321.4200
11   rmallin@brinksgilson.com
12   jsobieraj@brinksgilson.com
13   dfleming@brinksgilson.com
14        Appearing on behalf of the Plaintiffs.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   AARON R. FEIGELSON
 2   WESLEY O. MUELLER
 3   Leydig Voit & Mayer Ltd
 4   Two Prudential Plaza
 5   180 North Stetson Avenue
 6   Suite 4900
 7   Chicago, Illinois 60601
 8   312.616.5600
 9   afeigelson@leydig.com
10   wmueller@leydig.com
11        Appearing on behalf of the Defendants.
12
13
14
15   ALSO PRESENT:
16   Travis Jewell - US Legal Support Video Technician
17      (Appearing Remotely Via Zoom)
18
19
20
21
22
23
24
25
```

Page 4

```
 1               TABLE OF CONTENTS
 2
 3   WITNESS                                    PAGE
 4   TADASHI HORIE
 5
 6   EXAMINATION BY MR. FEIGELSON                  9
 7
 8               EXHIBITS
 9   EXHIBIT                                    PAGE
10   (Exhibits remotely introduced and
11      provided electronically to the reporter)
12
13   DEPOSITION EXHIBIT DDX-0026              31
14      (Email from Nicole Kopinski dated
15   08-05-2020)
16   DEPOSITION EXHIBIT DDX-0027              35
17      (Email from
18   postmaster@brinkshofer.com dated
19   08-05-2020)
20   DEPOSITION EXHIBIT DDX-0028              51
21      (US Patent Application Publication
22   No. US 2017/0363651)
23   DEPOSITION EXHIBIT DDX-0029              52
24      (US Patent Application Publication
25   No. US 2019/0285520)
```

Page 5

```
 1   DEPOSITION EXHIBIT DDX-0030              57
 2      (Email Chain Re Source Code
 3   Inspection)
 4   DEPOSITION EXHIBIT DDX-0031              62
 5      (US Patent No. 10,151,746)
 6   DEPOSITION EXHIBIT DDX-0032              68
 7      (File History for Patent No.
 8   10,151,746)
 9   DEPOSITION EXHIBIT DDX-0033              88
10      (Technical Testing of a Beckman
11   Coulter LH 750)
12   DEPOSITION EXHIBIT DDX-0034             104
13      (Sysmex Operator's Manual -
14   Automated Hematology Analyzer
15   XE-2100)
16   DEPOSITION EXHIBIT DDX-0035             113
17      (First Amended Answer and
18   Counterclaims of Defendant Beckman
19   Coulter, Inc.)
20   DEPOSITION EXHIBIT DDX-0036             131
21      (Sysmex Operator's Manual -
22   Automated Hematology Analyzer
23   XE-2100)
24   DEPOSITION EXHIBIT DDX-0037             144
25      (XE-Series Body Fluid Application)
```

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                          January 15, 2021
Highly Confidential

---

Page 34

1  BY MR. FEIGELSON:
2  Q.   Okay.  Do you have any reason to believe that you
3       received this email despite your name not appearing on
4       it?
5                 MR. MALLIN:  Objection, calls for
6       speculation, calls for attorney-client communication,
7       work product immunity.
8                 I'll instruct the witness not to answer.
9  BY MR. FEIGELSON:
10 Q.   Are you following your attorney's instruction?
11 A.   Yes.
12 Q.   Do you see the email address BGLSysmex012Team in that
13      "To" field?
14 A.   Yes.
15 Q.   Do you know what that is?
16 A.   I don't know.
17 Q.   Is it --
18 A.   Somebody set that up, yeah.
19 Q.   Is it an email distribution group?
20 A.   It looks like, yes.
21 Q.   Are you a member of that group?
22 A.   I don't know.  I didn't set this up.
23                MR. FEIGELSON:  Let's pull up Exhibit B,
24      Travis.
25

---

Page 35

1                 MARKED FOR IDENTIFICATION:
2                 DEPOSITION EXHIBIT DDX-0027
3                 10:13 a.m.
4                 (Remotely introduced and provided
5                 electronically to the reporter)
6  BY MR. FEIGELSON:
7  Q.   So on the screen now, Mr. Horie, is DDX-0027, do you
8       se that?
9  A.   Can you wait for a second?  My screen is not being
10      updated, sorry.
11 Q.   Okay.
12 A.   Yeah.  I'm still seeing the previous email.
13                VIDEO TECHNICIAN:  This is Travis.  You
14      might need to refresh the page.
15                THE WITNESS:  Yeah, I'm doing that.
16 BY MR. FEIGELSON:
17 Q.   Mr. Horie, are you looking at the Box account on a
18      different screen or are you looking at the video
19      screen of this deposition?
20 A.   Box account.  I'm looking at the Box account.
21 Q.   Can you look at the video screen for the deposition?
22 A.   Yeah, but I like to see the document on the Box
23      account.
24 Q.   Fair enough.
25                MR. FEIGELSON:  Travis, you can assist,

---

Page 36

1       maybe you need to refresh that.
2                 THE WITNESS:  No.
3                 MR. MALLIN:  Are you unable to get in the
4       Box account, is that it?
5                 THE WITNESS:  Yeah.
6                 MR. MALLIN:  Can I try and see if I can
7       help him a moment here?
8                 MR. FEIGELSON:  Yeah.
9                 MR. MALLIN:  That didn't work.  Which
10      exhibit number is it?
11                MR. FEIGELSON:  DDX-0027.
12                MR. MALLIN:  Okay.  I think that's it.
13                THE WITNESS:  Thank you, Robert.
14 BY MR. FEIGELSON:
15 Q.   Mr. Horie, are you now looking at DDX-0027?
16 A.   I think so, yes.
17 Q.   And this is an email apparently printed by Nicole
18      Kopinski.  It says it's from
19      postmaster@brinkshofer.com to thorie@brinksgilson.com.
20      Do you see that?
21 A.   Yeah, I can see my email address in the "To" line.
22 Q.   And the content of this email says:  Delivery is
23      delayed to these recipients or groups.
24                And it gives your email address.  Is that
25      correct?

---

Page 37

1  A.   Well, I don't know the context of this email, but I
2       can see the line that says "delivery is delayed," yes.
3  Q.   All right.
4                 MR. FEIGELSON:  Travis, if we can scroll
5       down to page 3 of this email, which includes all of
6       the headers.
7  BY MR. FEIGELSON:
8  Q.   And if we scroll down a little bit, about two-thirds
9       of the way down the page, you can see there it says
10      from Nicole Kopinski to Andrea Shoffstall,
11      BGLSysmex012Team, Kelly Farnan, and Renee Mosley
12      Delcollo.  Do you see that, on page 3?
13                MR. FEIGELSON:  You can highlight that,
14      Travis.
15 BY MR. FEIGELSON:
16 Q.   Mr. Horie, the videographer has highlighted that
17      portion on the video screen.
18 A.   Oh, thank you very much.  Yup.
19 Q.   Do you see that section?
20 A.   Sorry.
21 Q.   Do you see that?
22 A.   The highlighted lines, yes.
23 Q.   Right.  And just above that there's the time of
24      Wednesday, the 5th of August, 2020, 4:49 a.m.  Do you
25      see that?

---

TADASHI HORIE                                                January 15, 2021
Highly Confidential

---

Page 38

1  A.   The 5th, Wednesday, 2020, 4:49:23?
2  Q.   **Right.  So, Mr. Horie, this is a returned email that**
3       **was received in response to the email that was sent**
4       **that we just saw as Exhibit 26.**
5              MR. MALLIN:  Objection, foundation.
6  A.   That's a returned email?
7  BY MR. FEIGELSON:
8  Q.   **Do you agree here that your law firm server was**
9       **attempting to deliver Ms. Kopinski's email to you?**
10             MR. MALLIN:  Objection, foundation.
11      Objection, calls for speculation.
12 A.   I don't remember seeing this email, so I can't tell.
13 BY MR. FEIGELSON:
14 Q.   **Why would Ms. Kopinski receive an email from your law**
15      **firm, the delivery of her email was delayed in**
16      **reaching you?**
17 A.   I don't know.
18             MR. MALLIN:  Object -- hold on.  Objection,
19      calls for -- form, calls for speculation.  Objection,
20      attorney-client -- to the extent it seeks
21      attorney-client communications or work product
22      immunity.  To the extent it seeks any attorney-client
23      communication or work product immunity, I will
24      instruct the witness not to answer.
25             If you can answer outside of that, you can

Page 39

1       go ahead and answer if you -- I think you sort of did
2       answer, but go ahead.
3  A.   I will follow my attorney's advice.
4  BY MR. FEIGELSON:
5  Q.   **So you have no idea why Ms. Kopinski would receive**
6       **this email saying that delivery of her email was not**
7       **reaching you, is that your testimony?**
8  A.   I have no idea, because I didn't receive this.
9  Q.   **Mr. Horie, isn't it a more plausible explanation that**
10      **you're a member of the email distribution group**
11      **BGLSysmex012Team?**
12             MR. MALLIN:  Objection, form, calls for
13      speculation, attorney-client communication and work
14      product immunity, including his mental impressions.
15             I'll instruct the witness not to answer.
16 BY MR. FEIGELSON:
17 Q.   **You're following your attorney's instruction?**
18 A.   Yes.
19 Q.   **So you don't know, as you sit here, whether you're a**
20      **member of the BGLSysmex012Team email distribution**
21      **list?**
22 A.   Again, I didn't send the group email out, so I have no
23      idea.
24 Q.   **You don't recall receiving emails regarding this**
25      **litigation from opposing counsel?**

Page 40

1  A.   Can you be more specific?  Who's the opposing counsel?
2  Q.   **Leydig Voit & Mayer.**
3  A.   The attorneys at the Leydig Voit?
4  Q.   **Correct.**
5  A.   Sorry, I don't remember.
6  Q.   **So, Mr. Horie, what you're telling the jury is that**
7       **you don't remember receiving any emails from attorneys**
8       **at Leydig Voit for either of the Delaware litigation**
9       **or the Illinois litigation, is that right?**
10 A.   What do you mean by "receiving"?
11 Q.   **They showed up in your inbox.**
12 A.   Routed from somewhere or coming to my email program
13      privately?
14 Q.   **Yes.**
15 A.   Which one?
16 Q.   **What do you understand receiving an email to mean,**
17      **Mr. Horie?**
18 A.   There are two meanings; just receiving these, somebody
19      forward it to me, or coming to my account directly.
20 Q.   **We can take both cases.  Coming directly, you're**
21      **telling the jury that you have no recollection of**
22      **receiving an email directly from any Leydig attorney**
23      **regarding the Illinois or Delaware litigations?**
24 A.   That's correct, and I don't remember if somebody
25      forward it to me.

Page 41

1  Q.   **Do you recall receiving any emails at all, whether**
2       **forwarded or not, from Leydig attorneys regarding the**
3       **Illinois or Delaware cases?**
4  A.   I'm not sure.
5  Q.   **That's what you're telling the jury, that you're not**
6       **sure that you recall receiving these emails?**
7  A.   That's correct.
8  Q.   **Mr. Horie, we said before, you have not filed an**
9       **appearance in the Illinois or the Delaware litigation,**
10      **right?**
11 A.   I believe so.
12 Q.   **You believe that you have not filed an appearance?**
13 A.   Correct.
14 Q.   **Does Brinks Gilson & Lione have any system in place to**
15      **filter any confidential information that is sent to**
16      **the BGLSysmex012Team email group?**
17             MR. MALLIN:  Hold on one second.
18             Object, foundation, to the extent it calls
19      for -- objection, form, to the extent it calls for
20      speculation.
21             You may answer.
22 A.   I'm sorry, I don't understand what you are asking.
23 BY MR. FEIGELSON:
24 Q.   **I'm going to say the question again.**
25             **Does Brinks Gilson & Lione have any systems**

---

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                    January 15, 2021
Highly Confidential

Page 42

1  in place to filter any confidential information that
2  is sent to the BGLSysmex012Team email group?
3            MR. MALLIN:  Same, same objection;
4  foundation, form, to the extent it calls for
5  speculation.
6  A.  I don't know if it is related, but you have to have an
7  authorization to access some files or directories in
8  the firm.
9  BY MR. FEIGELSON:
10  Q.  You don't know if that's related to email filtering?
11  A.  I don't know.
12  Q.  Do you have authorization to see those files in the
13  directories that you just referred to?
14            MR. MALLIN:  Hold on one second.
15  Objection, form, vague.
16  BY MR. FEIGELSON:
17  Q.  You can answer.
18  A.  Sorry, what was the question, email filtering?
19  Q.  Mr. Horie, you testified that you have to have
20  authorization to access some files or directory in the
21  firm.  My question to you is if you have such
22  authorization.
23            MR. MALLIN:  Objection, form, vague.
24  A.  I guess I have authorization to access Sysmex's files.
25

Page 43

1  BY MR. FEIGELSON:
2  Q.  Those are Sysmex's files for the Delaware case and the
3  Illinois case?
4  A.  I have to try, but I guess so, yeah, because -- well,
5  right, sorry.
6  Q.  So you do have authorization to access
7  litigation-related files for the Illinois and Delaware
8  cases, is that right?
9  A.  I have to try --
10            MR. MALLIN:  Objection, form, vague.
11            You can answer the question.
12  A.  I have to try to see if I have authorization.
13  BY MR. FEIGELSON:
14  Q.  Mr. Horie, are you aware that there's a protective
15  order in this case that governs the disclosure of
16  confidential documents and information?
17  A.  I guess so, yeah.
18  Q.  And are you aware that there's a protective order
19  that's also in place in the Illinois litigation?
20  A.  I guess so.
21  Q.  Are you familiar with the terms of those protective
22  orders?
23  A.  Are you asking -- if you're asking only the meaning of
24  the term, yes.
25  Q.  Are you familiar with what -- with the terms of the

Page 44

1  orders themselves, what they prohibit, what they
2  allow?
3  A.  In general term, yes.
4  Q.  Are you familiar that those protective orders contain
5  a prosecution bar?
6  A.  Well, I have to see, I have to see the protective
7  order.
8  Q.  So you don't know whether or not they include a
9  prosecution bar, as you sit here today?
10  A.  I have to see the protective order.
11  Q.  Have you ever heard of a prosecution bar in a
12  protective order?
13  A.  In general term, yes.
14  Q.  What's your general understanding of the purpose of a
15  prosecution bar in a protective order?
16            MR. MALLIN:  Objection, calls for
17  attorney-client communication, work product immunity.
18  I'll instruct the witness not to answer.  It includes
19  mental impressions, as well.
20  BY MR. FEIGELSON:
21  Q.  So I'm not asking for protective order in this case or
22  what your understanding of that order is, but as an
23  attorney, Mr. Horie, who prosecutes patents, I'm
24  asking for your understanding, generally, of the
25  purpose of a prosecution bar in a protective order.

Page 45

1            MR. MALLIN:  And I will instruct him not to
2  answer to the extent it seeks attorney-client
3  communication and work product immunity, including his
4  mental impressions.
5            If you want to show him the protective
6  order, go ahead and show him, Aaron.
7  BY MR. FEIGELSON:
8  Q.  You're following your attorney's advice?
9  A.  Yes.
10            MR. FEIGELSON:  Travis, let's put up
11  PDX-0001, which I believe is the 350 patent.
12            MR. MALLIN:  I don't see it yet.  Is it
13  in -- have you guys -- is it in there yet?
14            MR. FEIGELSON:  It should be in the master
15  directory.  It's an exhibit that was already used --
16            MR. MALLIN:  Oh, I don't know --
17            MR. FEIGELSON:  -- PDX-0001.  But Travis
18  should move it over, I believe.
19            VIDEO TECHNICIAN:  I'm moving it right now.
20            THE WITNESS:  Okay, let me know.
21            VIDEO TECHNICIAN:  It's in there.  Let me
22  refresh your page.
23            MR. MALLIN:  Do you see it in there now?
24            THE WITNESS:  No.
25            MR. MALLIN:  Hold on one second.

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                    January 15, 2021
Highly Confidential



                                          Page 174
1   BY MR. FEIGELSON:
2   Q.   You're following that instruction?
3   A.   Yes.
4   Q.   Mr. Horie, did Sysmex inventors provide you with any
5        documentation regarding the XE-2100 or the XT-2000i
6        during the prosecution of the 350 and 351 patents?
7               MR. MALLIN:  Objection to the extent it
8        calls for attorney-client communications and work
9        product, including his mental impression.
10              I'll instruct the witness -- and objection,
11       form, and I'll instruct the witness not to answer.
12  BY MR. FEIGELSON:
13  Q.   Are you following that instruction?
14  A.   Yes.
15  Q.   So I want to be clear here, and this might be more to
16       counsel, you're claiming that you had no knowledge of
17       certain of these documents until after these patents
18       issued, but you're hiding behind privilege regarding
19       any, any possibility that you could have been provided
20       with that information prior?
21              MR. FEIGELSON:  I want to understand, is
22       that the position that you're taking, Counsel?
23              MR. MALLIN:  That is not the position that
24       we're taking.
25              MR. FEIGELSON:  Well, that's how it sounds.

                                          Page 175
1        You're not allowing us to explore the possibility of
2        Mr. Horie having had that knowledge that he's claiming
3        now not to have.  You're using privilege as a shield.
4               MR. MALLIN:  No, we're not.  We're
5        asserting attorney-client privilege and work product
6        immunity as appropriate, so ...
7               MR. FEIGELSON:  If that's -- well, you make
8        that claim, but this is an issue, and we're going to
9        have to go to the Court for it.  It's not fair to use
10       privilege in this manner to preclude us from exploring
11       how Mr. Horie might have obtained knowledge that he's
12       affirmatively saying he didn't have.
13              MR. MALLIN:  Well, you have your position.
14       Our position is that you're seeking attorney-client
15       communication and work product immunity, including his
16       mental impressions, and we're instructing him not to
17       answer.  So you can move on.
18              MR. FEIGELSON:  Okay, and we will, and we
19       consider that Mr. Horie's admission that he, that he
20       did not have knowledge -- or his claim that he did not
21       have any knowledge of these documents until the
22       litigation, after litigation was filed constitutes a
23       waiver of that privilege, and we will seek to go
24       behind that.
25              Let's move on.  Let's look at the -- can

                                          Page 176
1        you bring up Exhibit ZC, Zeta Charlie?  This will be
2        Exhibit 42.
3                    MARKED FOR IDENTIFICATION:
4                    DEPOSITION EXHIBIT DDX-0042
5                    3:15 p.m.
6                    (Remotely introduced and provided
7                    electronically to the reporter)
8   BY MR. FEIGELSON:
9   Q.   Mr. Horie, do you have that document in front of you?
10       Mr. Horie?
11  A.   89 pages?
12  Q.   That's the -- so this is the privilege log that was
13       produced by Sysmex in this litigation.  Yes, 89 pages.
14  A.   Okay, mmm-hmm.
15  Q.   And you have that in front of you?
16  A.   Yes.
17
18
19
20
21
22
23
24
25

                                          Page 177
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.
TADASHI HORIE                                          January 15, 2021
Highly Confidential



Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                              January 15, 2021
Highly Confidential



Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                          January 15, 2021
Highly Confidential



Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE                                      January 15, 2021
Highly Confidential



Beckman Coulter, Inc. preserves its objection that certain Sysmex redactions are not proper.

TADASHI HORIE
Highly Confidential

January 15, 2021



Page 208

1   BY MR. FEIGELSON:
2   Q.   Mr. Horie, how often have you visited Japan in the
3        last five years?
4   A.   In total, you mean?
5   Q.   Yes.
6   A.   Probably close to twenty trips.
7   Q.   About four a year, is that right?
8   A.   About four a year, yes.
9   Q.   Do you go there to visit family?
10  A.   Unfortunately, my family is living far west from
11       Tokyo, so I didn't have a chance to visit my family.
12  Q.   Oh, okay.  When you go to Japan, do you visit clients
13       in Japan?
14  A.   Yes.
15  Q.   Do you ever go to Sysmex headquarters in Kobe?
16  A.   Yes, I have.
17  Q.   When's the last time you were there?  I'm guessing
18       it's more than a year ago, or maybe --
19            MR. MALLIN:  That's probably a fair guess.
20  A.   You know, I'm guessing, probably November or October
21       of 2019.
22  BY MR. FEIGELSON:
23  Q.   Did you go by yourself or did another attorney from
24       Brinks Gilson & Lione accompany you?
25  A.   I usually go there by myself, alone, yeah.

Page 206

Page 207

3   Q.   Mr. Horie, did you provide advice regarding US
4        litigation strategy to Sysmex?
5            MR. MALLIN:  Objection to the extent it
6        calls for attorney-client communication and work
7        product immunity.  I'll instruct the witness not to
8        answer.
9   BY MR. FEIGELSON:
10  Q.   You're following the advice?
11  A.   Yes.
12            MR. MALLIN:  Are we at a good place for a
13       break?  We've been going a little over an hour.
14            MR. FEIGELSON:  We can take a break.  Want
15       to do ten minutes, five, ten minutes?  I don't think
16       we have too much more.
17            MR. MALLIN:  Sure.
18            VIDEO TECHNICIAN:  Going off the video
19       record.  The time is now 2107 UTC.
20            (Off the record at 4:07 p.m.)
21            (Back on the record at 4:19 p.m.)
22            VIDEO TECHNICIAN:  Back on the video
23       record.  The time is now 2119 UTC.
24            Go ahead.

Page 209

## <u>CERTIFICATE OF SERVICE</u>

I, Melanie K. Sharp, Esquire, hereby certify that on April 10, 2021 I caused to be electronically filed a true and correct copy of Letter Brief in Support of Beckman Coulter, Inc.'s Motion for Leave to Amend its Second Amended Answer and Counterclaims against Sysmex Corporation and Sysmex America, Inc., with the Clerk of the Court using CM/ECF, which will send notification to the following counsel of record:

Kelly E. Farnan
Renée Mosley Delcollo
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
farnan@rlf.com
delcollo@rlf.com

I further certify that on April 10, 2021, I caused a copy of the foregoing document to be served on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

## <u>BY E-MAIL:</u>

James R. Sobieraj
Robert S. Mallin
Joshua James
Daniel A. Parrish
Brinks Gilson & Lione
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611
jsobieraj@brinksgilson.com
rmallin@brinksgilson.com
jjames@brinksgilson.com
ashoffstall@brinksgilson.com

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)