# EXHIBIT 1

John Roche
August 06, 2021

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

SYSMEX CORPORATION and                )
SYSMEX AMERICA, INC.,                 )
                                      )
           Plaintiffs,                )
                                      )
     vs.                              ) No. 19-1642-RGA-CJB
                                      )
BECKMAN COULTER, INC.,                )
                                      )
           Defendant.                 )
```

        The VIDEOTAPED REMOTE DEPOSITION of JOHN

ROCHE, pursuant to notice and pursuant to the Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Barbara Perkovich, CSR No. 084-004070,

Certified Shorthand Reporter, on the 6th day of

August 2021 at 9:00 a.m..

Page 14

1  opened and bounce back and forth between them.  So
2  I wouldn't say I reviewed the documents such as
3  the reports by Madisetti and Robinson, but I did
4  reference them when there were items in my report
5  that -- or reports that talked to something as,
6  again, the rebuttal items going back and forth
7  with language from different documents.
8         But I would not say I reviewed them at
9  all in their entirety.  But did open them up to
10 look for what the points or other references that
11 they were trying to make.
12      Q.   This is in preparation for your
13 deposition?
14      A.   Yes, sir.
15      Q.   Were there any other documents that you
16 reviewed to prepare for the deposition?
17           MR. FEIGELSON:  Objection I'm going to
18      instruct the witness not to answer.  It goes
19      to attorney work product or mental
20      impressions of the expert.
21 BY MR. SOBIERAJ:
22      Q.   Did you review any other documents to
23 prepare for the deposition that refreshed your
24 memory in any way or helped you remember something

Page 15

1  that you may have forgotten?
2       A.   As instructed by counsel, I will not
3  answer that question.
4       Q.   It's a different question.  He didn't
5  instruct you not to answer this question.  I'll
6  give him that opportunity, but if there is no
7  objection or instruction not to answer, then you
8  need to answer this last question.
9       A.   I apologize for missing the subtlety of
10 the difference between the two questions.  Would
11 you mind repeating your last incarnation of the
12 question?
13      Q.   Did you review any other documents to
14 prepare for your deposition that refreshed your
15 memory in any way or helped you remember something
16 that you may have forgotten?
17      A.   No.
18      Q.   Have you reviewed the expert report by
19 Dr. Martens at any time?
20      A.   I have not.
21      Q.   Have you reviewed the expert report by
22 Mr. Rosen at any time?
23      A.   If I could inquire, Mr. Rosen is the --
24 I'll answer no.  I believe I know who Mr. Rosen

Page 16

1  is, but I'm not sure.
2       Q.   He's BCI's damages expert in the case.
3       A.   Yeah, that's what I thought.  I have
4  not reviewed any report by Mr. Rosen.
5       Q.   Have you reviewed any expert reports by
6  David Haas, H-a-a-s, who is Sysmex's damages
7  expert in this case?
8       A.   I have not reviewed anything from
9  Mr. Haas, nor do I believe I've seen his name in
10 any of the correspondence between myself and
11 counsel.
12      Q.   Have you ever reviewed Dr. Madisetti's
13 opening report?
14      A.   Yes.  I believe I have seen various
15 things from Dr. Madisetti.  So I have seen that.
16 I can't say that I've read it in its entirety, but
17 I have seen it and have witnessed or whatever the
18 proper term would be, videos and things that he
19 has provided as part of his -- I believe as part
20 of his report.
21      Q.   Have you reviewed Dr. Madisetti's
22 rebuttal report in its entirety?
23      A.   I would say no.  I believe I have a
24 copy of it and there were items that might have

Page 17

1  been more along the paths that I'm more focused
2  on.
3       Q.   Have you read Dr. Madisetti's reply
4  report in its entirety?
5       A.   No.
6       Q.   Have you read it at all?
7       A.   I believe I have had a copy.  Could you
8  let me know when that was issued?
9       Q.   Sure.  That would have been July 16th,
10 2021.
11      A.   If I did review it, I don't recall.  I
12 certainly did not sit down and read the entirety
13 of the document.
14      Q.   Have you read the entirety of
15 Dr. Robinson's validity report?
16      A.   I apologize for not understanding some
17 of the timing.  Was that the 600-page document or
18 thereabouts?
19      Q.   Yeah, 600-plus pages.
20      A.   You would know I was lying if I said I
21 read the whole thing.  So no, I did not read the
22 entirety of Dr. Robinson's invalidity report.
23 There was, obviously, because of the subject
24 matter, a lot of repetition and various things.

Page 18

1  And, obviously, I appreciate having
2  some hard copies that I just showed you to go
3  through versus trying to go through a document
4  like that on a computer where there's many things
5  that seem like you're reading, you know, something
6  very similar.
7           I would say I read through the early --
8  early portions, very detailed, and formed some
9  opinions on that report. But certainly did not
10 read the entirety of the document. It came at a
11 very late time where we had to reply to some of
12 those items, so it was a very cursory look at the
13 depth of what Dr. Robinson was providing.
14      Q.   What's your best estimate of the
15 percentage of Dr. Robinson's 600-plus page
16 validity report that you did review?
17      A.   I'm not sure where the cutoff would
18 have been. Obviously, when you're going through a
19 computer file it's a little bit different, but I
20 would say probably the first 20 percent, quarter
21 of it, before -- if I'm using the term properly --
22 the claims construction or the -- going through
23 the various items.
24           But I certainly looked through the

Page 19

1  early parts in depth with, you know, probably what
2  I intended, with all good conscious, to read the
3  entire thing. I got through the early portions
4  focused on, you know, various subject matter.
5           MR. SOBIERAJ: John, let's bring up PDX
6      163.
7  BY MR. SOBIERAJ:
8      Q.   Can you see that on the screen,
9  Mr. Roche?
10     A.   I see PDX 0163 Mitchell Rosen from, it
11 looks like, August 3rd, 2021.
12     Q.   Are you looking at Box.com?
13     A.   Yes, I am.
14     Q.   I see the sticker. You see it says
15 Expert Report of J. Paul Robinson Concerning
16 Validity of U.S. Patent Number and then it's got
17 the patent numbers?
18     A.   Yes. So is the title incorrect? Yes,
19 I see now, when I don't read the title, it says
20 expert report, yes.
21     Q.   Right, right. It was marked as Exhibit
22 163 during the deposition of Mr. Rosen, that's why
23 there is a reference here. I'm not going to ask
24 you to read the whole document.

Page 20

1           I just want you to look at the table of
2  contents on the next two pages and tell me if that
3  refreshes your recollection of which portions of
4  Dr. Robinson's report that you reviewed in detail.
5  And you can scroll up and down as well through
6  that table.
7      A.   I'd say I would be fairly confident I
8  got through Roman Numeral 8, Opinions D and I can
9  scroll through the document?
10     Q.   Yeah, if you want to, sure. You can
11 also pull it up on Box.com if that's easier for
12 you to navigate?
13     A.   Yeah, right now I'm looking at it on
14 Box. I don't know if there is a pdf, it's on my
15 computer so I'm -- I remember seeing the old
16 culture counter picture. I'll scroll through it a
17 little faster.
18          I would estimate that I was probably --
19 I guess I remember some of the names now are
20 familiar that I wasn't unfamiliar with before,
21 that he references. I would, you know, estimate I
22 read in detail through 120, 130 and then --
23     Q.   Page or paragraph number?
24     A.   I'm sorry, page. So let's say roughly

Page 21

1  283.
2      Q.   Paragraph 283 or Page 283?
3      A.   Paragraph 283, Page 127, before I
4  realized I would never -- I was not going to be
5  able to respond by reading through at the pace I
6  was going. So I looked more cursorily at the --
7  most of the rest of the document.
8           MR. SOBIERAJ: John, can you bring up
9      Document PDX 162.
10 BY MR. SOBIERAJ:
11     Q.   This is entitled, Reply Expert Report
12 of J. Paul Robinson Concerning the Infringement of
13 U.S. Patent Numbers 10,401,350, and 10,401,351.
14     A.   Yes, I have that in front of me.
15     Q.   Did you review this document in detail?
16          MR. FEIGELSON: Objection to the form.
17          THE WITNESS: I certainly was given the
18     document and I definitely read the document.
19 BY MR. SOBIERAJ:
20     Q.   Did you discuss Dr. Robinson's reply
21 report with anyone?
22          MR. FEIGELSON: I'm just going to
23     caution the witness. You can answer the
24     question yes or no, but if there are any

Page 206

1  MR. FEIGELSON: We've given an extra 20
2  minutes here, but obviously you can do as you
3  wish. But I have some questions for
4  Mr. Roche that I would like to get in before
5  it gets later in the day.
6            EXAMINATION
7  BY MR. FEIGELSON:
8     Q.   Mr. Roche, do you recall this morning
9  counsel asking you, Mr. Sobieraj asking you about
10 Dr. Robinson's invalidity expert report?
11    A.   Yes.
12    Q.   That is the 600-plus page report?
13    A.   Yes.
14    Q.   And just to clarify your testimony,
15 Mr. Roche, you indicated that his report was over
16 600 pages and that you just skimmed portions of
17 the report. Can you explain why you did that?
18    A.   I think in the previous questioning we
19 went through, let's say the core front of the
20 document, that was the basis of my either reply or
21 rebuttal report, I forget which one. And then the
22 balance of the rest of the document had a lot of
23 repetitiveness from the claims.
24         So I went through them quickly.

Page 207

1  Skimming might not be the best term, but to scroll
2  down and look for repetitiveness and then go
3  through it. It was still hours to go through the
4  skimming.
5     Q.   Other than the repetitiveness, those
6  portions, did you consider the portions that
7  weren't repetitive in Dr. Robinson's report?
8     A.   Absolutely. I think I started my
9  rebuttal or reply or whatever term it was, on the
10 items I disagreed with his characterization,
11 especially concerning, red cells -- being able to
12 count red cells -- or white cells in the red cell
13 electrical detector.
14    Q.   **You mentioned that you prepared a reply**
15 **report to Dr. Robinson's reports. Did you**
16 **carefully consider all of the paragraphs of**
17 **Dr. Robinson's report that you responded to in**
18 **your reply?**
19         **MR. SOBIERAJ: Objection, leading.**
20         **THE WITNESS: Yes, I believe I**
21 **annotated, on the documents that I can write**
22 **on, I annotated the details of the 600-page**
23 **document fairly well in the document I was**
24 **reviewing.**

Page 208

1  BY MR. FEIGELSON:
2     Q.   Did you choose which sections of
3  Dr. Robinson's report required a reply?
4     A.   Yes. I went through the items and
5  replied specifically, and hopefully in depth, to
6  the ones that are nonrepetitive in nature. And
7  the ones that were repetitive in nature, we had
8  grouped into the mode classes.
9     Q.   Let's actually look at your reply. So
10 this is PDX 187. Can you look at Paragraph 40 on
11 Page 22.
12    A.   Yes.
13    Q.   And in the second sentence of Paragraph
14 40 it says, "For example, Dr. Robinson repeatedly
15 notes over 20 times in Paragraphs 238, 249, 311,
16 348, 472, 489, 508, 519, 570, 611, 639, 646, 684,
17 724, 766, 844, 856, 865, 964, 1016, 1026, 1034,
18 1047, 1359, and 1368, that the presequence process
19 of the patents include steps of running a cell
20 free blank sample to check for the background
21 counts against the threshold as well as automated
22 prewashing."
23         Do you see that sentence, Mr. Roche?
24    A.   Yes, I do.

Page 209

1     Q.   And did you carefully consider -- I'm
2  going to strike that.
3         You list -- so you listed out all of
4  these paragraphs where Dr. Robinson repeated this
5  statement, correct?
6     A.   Correct.
7     Q.   Can we look at Paragraph 52 of your
8  reply, please. And in Paragraph 52, at the end of
9  the second line, again you see a sentence that
10 says that, In Paragraph 191 of Dr. Robinson's
11 report he repeats a paragraph a number of times;
12 is that correct? In at least 10 places?
13    A.   That's correct.
14    Q.   Can we turn to Paragraph 56, which is
15 on Page 29. And here you write that Dr. Robinson
16 again repeats throughout his report a
17 misinterpretation of an unreliable reliance on
18 general attorney arguments made in a BCI brief,
19 correct?
20         MR. SOBIERAJ: Mr. Roche, you have to
21 slow down, you're not giving me a chance to
22 make objections. I object to all these
23 questions as leading. And I'm going to
24 have -- I object to the last question as

John Roche
August 06, 2021

Page 230

```
 1        MR. SOBIERAJ:  Objection.  Leading.
 2        THE WITNESS:  I do.
 3   BY MR. FEIGELSON:
 4   Q.   Are you saying that every claim of the
 5   asserted patents have a trivial difference from
 6   the prior art analyzers?
 7        MR. SOBIERAJ:  Objection.  Leading.
 8   BY MR. FEIGELSON:
 9   Q.   Let me rephrase the question.  Are you
10   saying that every claim of the asserted patents
11   are actually different from the prior art
12   analyzers?
13        MR. SOBIERAJ:  Objection.  Leading.
14        THE WITNESS:  Sorry, I'm a little
15   tired.  The claims of the asserted patent at
16   best only claim trivial modifications to
17   those of the prior art analyzers.
18   BY MR. FEIGELSON:
19   Q.   And you referred to the automated
20   prewash as the best example of one of these
21   trivial differences form the prior art.  Do you
22   remember that?
23   A.   I do.
24        MR. SOBIERAJ:  Objection.  Leading.
```

Page 231

```
 1   Lack of foundation.
 2   BY MR. FEIGELSON:
 3   Q.   And can you look at the '350 patent,
 4   please.  And look at Claim 1 of the '350 patent.
 5   Does the '350 patent require an automated prewash?
 6   A.   Requires a sensing operation,
 7   comprising operation for preparing for
 8   measurement.
 9   Q.   Do the words prewash appear in Claim 1
10   of the '350 patent?
11   A.   They do not.
12   Q.   Look at Claim 3 of the '350 patent.  Do
13   the words automatically initiated prewashing
14   appear in Claim 3 of the '350 patent?
15   A.   Yes, on or about Line 28.
16   Q.   So does Claim 1 of the '350 patent
17   require an automated prewash?
18        MR. SOBIERAJ:  Objection.  Leading.
19        THE WITNESS:  No, it does not.
20   BY MR. FEIGELSON:
21   Q.   Let's look at Claim 1 of the '351
22   patent.  Well, before we do that, let's look at
23   your rebuttal report, Mr. Roche.  Can we look at
24   your rebuttal report on Paragraph 23 of your
```

Page 232

```
 1   rebuttal.  Do you recall Mr. Sobieraj asked you
 2   questions regarding Paragraph 23 of your rebuttal
 3   report?
 4   A.   Yes, I do.
 5   Q.   And he asked you a question, if it was
 6   your opinion that preparing for measurements must
 7   include automated initiated prewashing in Claim 1
 8   of both patents.  Do you recall that question?
 9        MR. SOBIERAJ:  Objection.  Leading.
10        THE WITNESS:  I do.
11   BY MR. FEIGELSON:
12   Q.   You just looked at Claim 1 of the '350
13   patent and did you see the words prewash in Claim
14   1 of the '350 patent?
15   A.   I did not.
16   Q.   Do you see the word prewash in the
17   words of the '351 Claim 1?
18   A.   I do not.
19        MR. FEIGELSON:  Thank you, Mr. Roche.
20   I am done with my questioning.
21        MR. SOBIERAJ:  I would like to take a
22   break.  I'm going to come back, I'll have
23   some questions.
24        MR. FEIGELSON:  5 minutes?  10 minutes?
```

Page 233

```
 1        MR. SOBIERAJ:  At least 10.
 2        THE VIDEOGRAPHER:  Going off the
 3   record.  The time is 23:46 UTC.
 4             (Break taken.)
 5        THE VIDEOGRAPHER:  We are back on the
 6   record, the time is 00:04 UTC.  Please
 7   proceed.
 8             FURTHER EXAMINATION
 9   BY MR. SOBIERAJ:
10   Q.   Mr. Roche, during the questioning by
11   Mr. Feigelson, you indicated that you had made
12   some annotations on your expert reports which
13   would provide some indication of which paragraphs
14   you had reviewed in Dr. Robinson's report,
15   correct?
16        MR. FEIGELSON:  Objection.
17   Mischaracterizes the witness's testimony.
18        THE WITNESS:  My thought process was to
19   get a Word -- I'm sorry, to take the pdf and
20   to invert it to Word so I could make notes or
21   comments within the document and to search
22   the document more efficiently.
23   BY MR. SOBIERAJ:
24   Q.   Which document are you referring to?
```

Page 234

1  A.    I thought your question was on
2  Dr. Robinson's report.
3       Q.    Yes, okay.  Okay.  I just wanted to
4  make sure we are talking about the same thing.
5       A.    I did not print it out.
6       Q.    Do you have a copy on your computer
7  with you that has Dr. Robinson's report with your
8  annotations?
9       A.    I do not, no.  I'm not sure what's on
10 the computer.  I am using Leydig computer.
11      Q.    I'm sorry, what type of computer?
12      A.    Leydig computer.  I don't have my
13 computer with me.  I have no electronic devices,
14 as you inquired earlier in the day.
15      Q.    Did you bring a personal computer with
16 you to Chicago?
17      A.    Yes, I brought several.
18      Q.    Where are they?
19      A.    In the luggage room.
20      Q.    So you could access those computers and
21 look on them for Dr. Robinson's report that
22 includes your annotations; is that correct?
23            MR. FEIGELSON:  Objection.
24            THE WITNESS:  One of the computers I

Page 235

1  have I know I could not access that document,
2  because it's a client computer.  The other
3  computer, I may be able to access the files
4  through One Drive.
5  BY MR. SOBIERAJ:
6       Q.    Which computer did you use to review
7  Dr. Robinson's report and make annotations?
8       A.    I reviewed Dr. Robinson's report in my
9  home using my office computer.
10      Q.    So where -- and was that in a Word file
11 or a pdf file where you made the annotations?
12            MR. FEIGELSON:  Objection to the form.
13            THE WITNESS:  My annotations are in a
14      word document.  I convert the -- use one of
15      the Adobe tools to convert the pdf to a Word
16      document.  It doesn't do very well with the
17      figures or other things, but does a good job
18      on the text.  So you can add comments,
19      search, use the tools of Word as opposed to
20      the pdf.
21 BY MR. SOBIERAJ:
22      Q.    I think I understand.  Let me just
23 summarize to be sure.  So did you receive
24 Dr. Robinson's validity report, the 600-some page

Page 236

1  report, as a pdf and then you converted it to a
2  Word document?
3       A.    Yes, that's correct.
4       Q.    And in that Word document, you made
5  annotations in various forms; is that correct?
6       A.    Yes.  So to -- for example, I would add
7  a comment, you know, it was essentially the
8  beginning of my -- either the reply report or the
9  rebuttal report, I'm not sure which, to bring in
10 figures or, I think there was some spreadsheets
11 that I created to do some of the math based on
12 numbers that Dr. Robinson had proposed.
13      Q.    And would those spreadsheets provide an
14 indication of which paragraphs of Dr. Robinson's
15 report you reviewed carefully?
16      A.    The -- they were basically pasted in as
17 comment fields.  So, you know, you use Word to
18 create a comment.  I would create a comment next
19 to Paragraph 15 or 425 and put in the comments
20 that became part of my rebuttal items on, like I
21 said, as the beginning of the rebuttal report.
22 And then clean that up to create the prose of that
23 report.
24      Q.    When you say a comment, are you talking

Page 237

1  about comments that you can put in balloons or
2  bubbles in the margin of a Word document?
3       A.    Yes.
4       Q.    On Dr. -- let's stick with
5  Dr. Robinson --
6       A.    As an example, I would have maybe
7  pasted that, used a snip, as opposed to copying
8  the whole thing and I would have taken the snip
9  out of the figure that Dr. Robinson had and put it
10 in the Word document.  And then you saw some of
11 the math that I created, I would have probably had
12 that in -- the math done in a spreadsheet for the
13 equation that I had listed.  And then just used
14 that as a --
15      Q.    Let's -- I'm sorry, I thought you were
16 done.  Go ahead.
17      A.    Used that as kind of my central reply,
18 which is very difficult to manage in the
19 generated -- the Word document that became the
20 essence of the reply report.
21            And Dr. Robinson, specifically, from
22 whatever page, especially on page -- beginning on
23 Page 10 of the reply report, concerning the
24 electrical detector.

Page 238

1  Q.  You're going way beyond the question I
2  asked.  Let's go back.  I want to stick, right
3  now, with some questions directed to
4  Dr. Robinson's over 600-page validity report that
5  you converted into a Word document.  Did you add
6  any highlighting to that Word document?
7       MR. FEIGELSON:  I'm going to object.
8       That's privileged under work product.  I'm
9       going to instruct the witness not to answer.
10      THE WITNESS:  Based on counsel's
11      recommendation, I'll decline to answer.
12 BY MR. SOBIERAJ:
13  Q.  Would any highlighting you've added
14 indicate which paragraphs you reviewed carefully?
15      MR. FEIGELSON:  I'm going to repeat my
16      objection and instruct the witness not to
17      answer as work product protection.
18 BY MR. SOBIERAJ:
19  Q.  On that document, that Word version of
20 Dr. Robinson's report, did you put any comments
21 in, you know -- in a balloon comment form on any
22 paragraphs which would be indicative of the
23 careful review you made of that paragraph?
24      MR. FEIGELSON:  I'm going to instruct

Page 239

1       the witness not to answer, as protected under
2       work product.
3  BY MR. SOBIERAJ:
4   Q.  Are you going to follow that
5  instruction?
6   A.  Based on counsel's recommendation, I
7  will decline to answer.
8   Q.  And will you decline to answer the
9  earlier question about whether you highlighted any
10 portions of Dr. Robinson's report?
11      MR. FEIGELSON:  I'm going to instruct
12      the witness not to answer as protected under
13      work product.
14      THE WITNESS:  Based on counsel's
15      recommendation, I'll decline to answer.
16 BY MR. SOBIERAJ:
17  Q.  Okay.  Maybe we can shorten this up in
18 this way:  If Mr. Feigelson instructs you not to
19 answer any question in the future, will you follow
20 his instruction and not answer the question?
21      MR. FEIGELSON:  Objection, that's not a
22      fair question, Counsel.
23 BY MR. SOBIERAJ:
24  Q.  Okay.  Let's do one at a time, then.

Page 240

1  While you've been in Chicago preparing for your
2  deposition, have you been able to access the Word
3  version of Dr. Robinson's report that includes
4  your annotations?
5   A.  I certainly have not tried.  I focused
6  on the three reports that I generated.
7   Q.  And can you access that word document
8  now, remotely, using one of your computers?
9   A.  I would assume so.  Not now, I don't
10 have a computer or internet connection.
11  Q.  Okay --
12  A.  The document is available.
13  Q.  You said you have two computers in the
14 room next door, right?  That's a yes?
15  A.  Yes.  I'm sorry, yes.
16  Q.  Okay.  Could you take one of those
17 computers, bring it into the room where you are
18 now, which has internet access, right?  That's why
19 we can communicate by Zoom, right?
20      MR. FEIGELSON:  Objection.  It's
21      speculative.  Lacks foundation.
22 BY MR. SOBIERAJ:
23  Q.  Are you in a room now, Mr. Roche, that
24 has internet connection?

Page 241

1   A.  Right now I'm on a computer that has an
2  ether net connection to the computer.
3   Q.  Okay.  If there was a Wi-Fi connection
4  in the conference you're in, could you take one of
5  the computers that is in the luggage room next
6  door, bring it into the conference room you're
7  sitting in now and make a connection through the
8  internet to access the Word version you made of
9  Dr. Robinson's report that includes your
10 annotations?
11      MR. FEIGELSON:  Objection.
12      Hypothetical.  Incomplete hypothetical.
13      THE WITNESS:  I'm not 100 percent sure,
14      but probably not at this point.  No.
15 BY MR. SOBIERAJ:
16  Q.  Why not?  Why not at this point?
17  A.  I'm not sure I would remember my
18 password.
19  Q.  How do you keep track of your password,
20 then?  If you don't remember it, do you have it
21 written down somewhere?
22  A.  Probably poorly, but...
23      MR. SOBIERAJ:  Okay, I would like to
24      have Mr. Roche get one of his computers from

Page 242

1  the luggage room next door, get an internet
2  connection, I'm sure the Leydig firm has a
3  good internet connection, and bring up the
4  Word version of Dr. Robinson's report that
5  includes the annotations that he referred to
6  during the examination by Mr. Feigelson.
7       MR. FEIGELSON:  We're not agreeing to
8  that on grounds of work product, among other
9  things.  I would also say, Counsel, that we
10 are starting to approach the 20 minute mark.
11 Mr. Roche has a flight to catch and we will
12 have a hard stop very soon.
13 BY MR. SOBIERAJ:
14      Q.   Mr. Roche, do you refuse to bring your
15 computer in from the other room and see if you can
16 access Dr. Robinson's report that has your
17 annotations that you referred to during the
18 questioning by Mr. Feigelson?
19      MR. FEIGELSON:  Objection to the form
20 of the question.  And I instruct the witness
21 not to answer on the grounds of work product.
22 BY MR. SOBIERAJ:
23      Q.   Before Mr. Feigelson -- I'm sorry, go
24 ahead, Mr. Roche.

Page 243

1       A.   Based on counsel's recommendation, I
2  will not answer the question.
3       Q.   Before Mr. Feigelson asked you any
4  questions, did he tell you he was going to ask you
5  some questions?
6       A.   No, he did not.
7       Q.   Were you surprised he asked you so many
8  questions?
9       A.   Yes, I was.
10      Q.   What was going through your mind when
11 he was asking you all those questions?
12      MR. FEIGELSON:  Objection.  Calls for
13 mental impressions and I instruct the witness
14 not to answer.
15      THE WITNESS:  Based on counsel's
16 recommendation, I'll decline to answer.
17 BY MR. SOBIERAJ:
18      Q.   During questions by Mr. Feigelson, he
19 identified some portions of the depositions of
20 Mr. Nagai, Mr. Narisada and Mr. Fukuma that were
21 cited in this some of the exhibits to your report.
22 Do you recall that?
23      A.   Yes.
24      Q.   Did you ever receive the entire

Page 244

1  transcripts of the depositions of Mr. Nagai,
2  Mr. Narisada and Mr. Fukuma?
3       A.   Yes, I did.
4       Q.   Did you review the entirety of those
5  deposition transcripts?
6       A.   I did not.
7       Q.   How did you know to review the portions
8  that are cited in your -- in the exhibits to your
9  report?
10      MR. FEIGELSON:  Object and instruct the
11 witness not to answer to the extent that it
12 involves any -- any work product.
13      THE WITNESS:  Based on counsel's
14 recommendation, I will not answer the
15 question.
16 BY MR. SOBIERAJ:
17      Q.   Are there any portions of the Nagai,
18 Narisada or Fukuma depositions cited in your
19 report that you identified for inclusion in your
20 report, independent of Beckman Coulter's counsel?
21      MR. FEIGELSON:  I'm going to caution
22 the witness.  You can answer, but, again, to
23 the extent that it involves any work product
24 with attorneys, I would instruct you not to

Page 245

1  answer.
2       THE WITNESS:  Based on counsel's
3  recommendation, I'll not answer that
4  question.
5  BY MR. SOBIERAJ:
6       Q.   Did you receive the entirety of
7  Mr. Grace's deposition transcript?
8       A.   I belief there were two I have, yes, I
9  did.
10      Q.   Did you review the entirety of both of
11 those deposition transcripts?
12      A.   I did not review the entirety of the
13 transcript.
14      Q.   Did you review -- well, strike that.
15      How did you know which portions of
16 Mr. Grace's deposition transcript to review and
17 include in your report?
18      A.   By recommendations from counsel.
19      Q.   Did you review any portions of
20 Mr. Grace's report that were not recommended by
21 counsel?  Strike that.
22      Did you review any portions of
23 Mr. Grace's deposition transcripts that were not
24 recommended to you by counsel?

Page 250

1  article or just portions of it?
2          MR. FEIGELSON:  Objection to form.
3          THE WITNESS:  I recall reading the
4      paper for the multicenter trial on the Advia.
5  BY MR. SOBIERAJ:
6      Q.    The entire paper?
7      A.    Yes, I believe so.
8      Q.    How about Item No. 4 on materials
9  considered?  It's Advia2120, slash, 2120i
10 Hematology System Operator's Guide.  Did you
11 review the entirety of that document?
12     A.    Yes, I believe so.
13     Q.    It's over 900 pages.  You read all 900
14 and some pages?
15         MR. FEIGELSON:  Objection, form.
16     Mischaracterizes witness's testimony.
17         THE WITNESS:  Yeah, I don't recall
18     reading the 900 pages.  I probably looked for
19     the key sections related to the body fluids
20     or methods of system.
21         MR. FEIGELSON:  One more question,
22     Counsel, and then we're done.
23 BY MR. SOBIERAJ:
24     Q.    I have more questions, but I want

Page 251

1  Mr. Roche to be instructed not to do anything to
2  alter, delete or otherwise tamper with the Word
3  file of Dr. Robinson's report that has the
4  annotations that are on his computer.  Will you
5  agree to do that,
6  Mr. Roche?
7      A.    Certainly.
8      Q.    And then one more question, does
9  Dr. Martens' meet your standard of a POSA?
10     A.    Who?
11     Q.    Dr. Martens.
12         MR. FEIGELSON:  Objection to the extent
13     it's outside the scope of the witness's
14     report.
15         THE WITNESS:  I think the idealized
16     description for a POSA that I had excluded
17     Dr. Robinson, Dr. Madisetti and Dr. Martens.
18     With the focus being on clinical hematology
19     which, as I said before, was more
20     self-serving to me and probably a very small
21     number of people.
22         So with the description of a POSA
23     provided by Dr. Robinson and Dr. Madisetti, I
24     don't know what Dr. Martens' qualifications

Page 252

1      are, but with removing the hematology items
2      from the terms Madisetti and Robinson
3      provided, I would assume he would be
4      qualified as a POSA.
5  BY MR. SOBIERAJ:
6      Q.    Under Dr. Robinson's standard, you're
7  saying he's qualified?
8          MR. FEIGELSON:  We're done.  That's the
9      end of the questions.  We need to go.
10         MR. SOBIERAJ:  I'm not agreeing to end
11     the deposition.
12         MR. FEIGELSON:  We don't have a choice.
13         MR. SOBIERAJ:  Yes, we do.
14         MR. FEIGELSON:  We don't.
15         MR. SOBIERAJ:  You opened a lot of
16     doors, Counsel.  I still have quite a few
17     more questions to ask.  I'm keeping the
18     deposition open.
19         And if you're going to instruct
20     the witness not to answer any more questions,
21     I would like you to stay on the record so we
22     can have a meet and confer about -- because
23     I'm officially requesting on the record here
24     that we receive an unaltered copy of the Word

Page 253

1      document that Mr. Roche created of
2      Dr. Robinson's 600-and-some page validity
3      report which includes the annotations made by
4      Mr. Roche.  Will you agree to produce that?
5          MR. FEIGELSON:  We will not, it's work
6      product as you know, it's protected under
7      Rule 26(a), but we need to stop today's
8      deposition.
9          MR. SOBIERAJ:  Can we have a meet and
10     confer on that issue?
11         MR. FEIGELSON:  We can go off the
12     record.
13         MR. SOBIERAJ:  Can we have a meet and
14     confer?
15         MR. FEIGELSON:  We can go off the
16     record and discuss it.
17         MR. SOBIERAJ:  We've got a record,
18     let's have a meet and confer on the record.
19         MR. FEIGELSON:  It is 7:35 on a Friday
20     night.  We have been on the record since 9:00
21     a.m. this morning.  Mr. Roche has a flight to
22     catch, I need to leave as well.  We can talk
23     about this on Monday or over the weekend.  We
24     can discuss it off the record.

```
                                           Page 254
 1        MR. SOBIERAJ:  If we can discuss it off
 2   the record now, why can't we discuss it on
 3   the record now?
 4        MR. FEIGELSON:  We can go off the
 5   record.  Thank you.
 6        MR. SOBIERAJ:  No, I'm not agreeing to
 7   go off the record, I want to have this
 8   discussion on the record.
 9        MR. FEIGELSON:  We are going to leave,
10   as I've told you.  It's 7:36.  I'm happy to
11   have a discussion with you, Jim.  And we can
12   have that discussion off the record.
13        MR. SOBIERAJ:  I'm not agreeing to go
14   off the record.
15        MR. FEIGELSON:  Well, people need to
16   eat and I think it's not being courteous to
17   John and to Barb and to the witness who needs
18   to catch a flight.  So we have to leave.
19        MR. SOBIERAJ:  Can we have the meet and
20   confer?
21        MR. FEIGELSON:  We can schedule a meet
22   and confer.
23        MR. SOBIERAJ:  Can we do it right now?
24        MR. FEIGELSON:  We can do this off the

                                           Page 255
 1   record.  In Delaware it's not -- it's not
 2   advisable to have these discussions on the
 3   record.  You can call your local counsel.
 4        MR. SOBIERAJ:  That's not true.  You
 5   had a court reporter for a meet and confer.
 6   You insisted on it.
 7        MR. FEIGELSON:  In front of the witness
 8   during a deposition, it is not appropriate to
 9   do this.  We can have our discussion off the
10   record without the witness being present.
11        MR. SOBIERAJ:  He can step outside the
12   room while we have our discussion on the
13   record.
14        MR. FEIGELSON:  Jim, we can discuss
15   this.
16        MR. SOBIERAJ:  We are, I'm happy to
17   discuss this.  You had a court reporter for a
18   meet and confer.
19        MR. FEIGELSON:  We are going off the
20   record now.  I'm sorry, we have to go off the
21   record.  Mr. Roche, thank you for your time
22   today.  I know it's been a long day.  You can
23   leave.
24        MR. SOBIERAJ:  Just to make it clear, I

                                           Page 256
 1   haven't agreed to end the deposition.
 2        THE VIDEOGRAPHER:  Yeah, I need both
 3   parties to agree to go off the record.  Do
 4   you want to stay on?
 5        MR. SOBIERAJ:  For a little bit.  I
 6   notice that Mr. Roche has left and
 7   Mr. Feigelson has left, but they -- well,
 8   they are not on the screen, but they haven't
 9   signed off, they haven't left Zoom.
10        So I want to give them a chance
11   to reconsider and come back.  If they leave
12   Zoom, then there is not much I can do.
13        Aaron, are you there?  I see your
14   computer is still one.  It's ben over 5
15   minutes, Mr. Feigelson has walked out of the
16   room.  He refused to have a meet and confer
17   on the record.  The witness apparently has
18   left the room.  It looks like he's still --
19   he's still connected to Zoom, but no one is
20   there.  No one is responding.
21        So they're not even here to agree
22   to end the deposition now.  They're not even
23   here to go off the record now.  So I don't
24   want to keep the court reporter and

                                           Page 257
 1   videographer any longer.  I'm sorry, you
 2   know, you've had to stick around as long as
 3   you have.  I guess I'm not sure, though, can
 4   we end the deposition?
 5        So since Mr. Feigelson is not
 6   here.  We are going to go off the record.
 7        THE VIDEOGRAPHER:  We are going off the
 8   record.  The time is 00:43 minutes UTC.  We
 9   are now off the record.
10
11        (Ending Time:  7:43 p.m.)
```