

**WILMINGTON**
RODNEY SQUARE

**Melanie K. Sharp**
P 302.571.6681
F 302.576.3333
msharp@ycst.com

October 21, 2021

**BY E-FILE**

The Honorable Christopher J. Burke
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

**REDACTED - PUBLIC VERSION**

Re:  *Sysmex Corp. & Sysmex America, Inc. v. Beckman Coulter, Inc.* No. 1:19-cv-01642-RGA-CJB

Dear Judge Burke:

Sysmex's motion to compel should be denied. (D.I. 372). The complete record makes clear that Sysmex is not entitled to the protected annotations made by BCI's technical expert, John Roche, nor is Sysmex entitled to re-depose Mr. Roche.

**I.   Factual Background**

Sysmex had a full and fair opportunity to examine Mr. Roche on his opinions. The deposition began in the morning of Friday, August 6, 2021. BCI granted Sysmex's counsel 7 hours and 20 minutes on the record to complete the initial examination of Mr. Roche, who answered the questions put to him to the best of his ability. Afterwards, BCI's counsel conducted a re-direct examination (42-minutes) based on the topics covered by Sysmex's attorney. Taking nearly a 20-minute break following the completion of the re-direct examination, Sysmex's counsel proceeded to aggressively re-cross Mr. Roche at 7:04 p.m. CDT and refused to estimate how long he needed to question the witness. (Ex. A at 233:2–6, 248:3–19.) BCI then informed Sysmex of Mr. Roche's flight plans, as BCI previously had no reason to believe that the deposition would last until the evening. (*Id.*) Sysmex's attorney was permitted almost 30 minutes of additional questioning for re-cross.

Following the additional time for re-cross, Sysmex's attorney insisted on an immediate meet and confer on the record regarding the production of certain annotations prepared by Mr. Roche. (*Id.* at 252:19–257:9.) Sysmex's counsel rejected BCI's request to go off the record, even briefly, to discuss how the issue might be resolved. (*Id.* at 252:9–255:15.) These demands came at 7:30 p.m. on a Friday evening, after Mr. Roche had provided *nearly 8 hours of cross-examination on the record*. Given real-world time constraints, the length of Mr. Roche's testimony, and Sysmex's refusal to permit the court reporter and videographer to go off the record for even a moment, BCI was left with no choice but to terminate the deposition.

Contrary to Sysmex's argument, Mr. Roche testified at length that he carefully considered Dr. Paul Robinson's arguments before responding to them in his reply. (*Id.* at 206:8–208:8.) Since Dr. Robinson repeated and re-repeated many of the same opinions using the same language in his expert report, Mr. Roche grouped those opinions into "classes" while also focusing on the non-repetitive portions of that report. (*Id.* at 208:1–213:8.) Through this process, Mr. Roche was able to identify the flaws in Dr. Robinson's logic. (*Id.* at 207:5–13, 208:2–8.) Further, Mr. Roche testified that the annotations presently sought by Sysmex were central to the drafting of his reply report. Mr. Roche created them as part of his drafting process as he evaluated Dr. Robinson's report, and he relied on them to formulate and prepare his rebuttal opinions. (*Id.* at 207:14–24, 236:4–23.)

Young Conaway Stargatt & Taylor, LLP
The Honorable Christopher J. Burke
October 21, 2021 - Page 2

**II.      Mr. Roche's Annotations Are Work Product and Exempt from Production**

Sysmex has no right to Mr. Roche's annotations because they are draft reports covered by Fed. R. Civ. P 26(b)(4).  As Mr. Roche explained, his annotations are "essentially the beginning of . . . [his] reply report."  (Ex. A at 236:5–12.)  Mr. Roche confirmed that he prepared these notes during his review of Dr. Robinson's opinions so that the information reflected in his notes would be later incorporated into his own report. (*Id*. at 236:16–23 ("I would create a comment next to Paragraph 15 or 425 [of Dr. Robinson's report] and put in the comments that became part of . . . the beginning of the rebuttal report.").)  In fact, Mr. Roche's testimony establishes that his annotations are preliminary drafts of his reply report.  *See In re Nat'l Hockey League Players' Concussion Inj. Litig.,* No. MDL142551SRNJSM, 2017 WL 684444, at *4 (D. Minn. Feb. 21, 2017) (protecting an annotated bibliography as a draft because an expert created the document and included the information in his report); *Deangelis v. Corzine*, No. 1:11-CV-07866-VM-JCF, 2016 WL 93862, at *5 (S.D.N.Y. Jan. 7, 2016) ("The documents were prepared not simply to aid [the expert] in drafting his report, but rather to form part of the report itself and were in fact included in preliminary versions of that report.  They are, in short, drafts of his report.").  Because drafts warrant work product protection "regardless of the form in which the draft[s] [are] recorded," Mr. Roche's annotations are not discoverable.  Fed. R. Civ. P 26(b)(4).

Sysmex's arguments otherwise are untenable for three reasons.  *First*, *Wenk v. O'Reilly,* No. 2:12-CV-474, 2014 WL 1121920, at *7 (S.D. Ohio Mar. 20, 2014), cited by Sysmex, undermines its assertions, as Fed. R. Civ. P.26(b)(4)(B) explicitly states that draft reports need not be "so labeled or be in any particular format."[1]  *Second*, BCI has not waived work product immunity via the shield and sword doctrine.  The classic shield and sword scenario occurs when a party affirmatively discloses a matter protected by privilege to prove a claim or defense while simultaneously invoking privilege to prevent discovery into that matter.  Here, Mr. Roche did not selectively reveal the substance of his annotations to support a legal issue.  His explanation of the existence and purpose of his drafts does not result in waiver.  *See Dutch Branch of Streamserve Dev, AB v. Exstream Software, LLC,* No. 08-343-SLR, 2009 WL 2705932, at *1 (D. Del. Aug. 26, 2009).  *Third*, Sysmex has neither shown that the annotations are relevant to any claim or defense nor articulated a substantial need or undue hardship.  *See Medicines Co. v. Mylan Inc*., No. 11-cv-1285, 2013 WL 2926944, at *5 (N.D. Ill. June 13, 2013).  In fact, Sysmex has not identified any specific testimony that it wants to verify.  To the extent that it seeks to confirm that Mr. Roche reviewed Dr. Robinson's report, Mr. Roche's testimony and reply already provide ample support.

**III.     Sysmex Is Not Entitled to Reopen Mr. Roche's Deposition**

Sysmex's request to reopen Mr. Roche's deposition should also be denied.  Mr. Roche had testified for more than 8 hours in his deposition in this case and for nearly *12 hours* in two depositions for a co-pending *inter partes* review (IPR) between the parties, which relates to the same subject matter as the present litigation and on which Sysmex has relied in this litigation.  (Ex. B.)  A re-deposition now is unwarranted, as Sysmex identifies no topic for which it seeks to re-depose Mr. Roche.  Mr. Roche has provided meaningful and detailed responses in his deposition, in marked contrast to the long-winded and evasive testimony provided by Sysmex's expert, Dr. Robinson.  (Ex. C.)  In any event, Sysmex will likely have an opportunity to depose Mr. Roche again after service of a supplemental report.  (D.I. 373.)  No good cause exists to allow Sysmex yet another bite of the apple.  *See Haskins v. First American Title Ins. Co*., No. 10-5044 (RMB/JS), 2013 WL 5410531, at *6 (D.N.J Sept. 26, 2013).

---

[1] *Windowizards, Inc. v. Charter Oak Fire Ins. Co*., No. 13-7444, 2015 WL 1402352 (E.D. Pa. Mar. 26, 2015), also cited by Sysmex, does not address the protection of notes later incorporated into an expert report.

**Young Conaway Stargatt & Taylor, LLP**
The Honorable Christopher J. Burke
October 21, 2021 - Page 3

Respectfully,

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)

cc:      Counsel of Record, Kelly F. Farnan, Esq. (by e-mail)

28737206.1

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SYSMEX CORPORATION and          )
SYSMEX AMERICA, INC.,           )
                                )
        Plaintiffs,             )
                                )
    vs.                         ) No. 19-1642-RGA-CJB
                                )
BECKMAN COULTER, INC.,          )
                                )
        Defendant.              )


        The VIDEOTAPED REMOTE DEPOSITION of JOHN

ROCHE, pursuant to notice and pursuant to the Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Barbara Perkovich, CSR No. 084-004070,

Certified Shorthand Reporter, on the 6th day of

August 2021 at 9:00 a.m..

John Roche
August 06, 2021

```
 1   REMOTE APPEARANCES:

 2   CROWELL & MORING, LLP
     BY:  MR. JAMES SOBIERAJ
 3   455 North Cityfront Plaza Drive
     Suite 3600
 4   Chicago, Illinois 60611
     (312) 321-4200
 5   jsobieraj@crowell.com
          Appearing on behalf of the Plaintiffs;
 6
     LEYDIG, VOIT & MAYER, LTD.
 7   BY:  MR. AARON R. FEIGELSON
     Two Prudential Plaza
 8   180 North Stetson Avenue
     Suite 4900
 9   Chicago, Illinois 60601
     (312) 616-5600
10   afeigelson@leydig.com
          Appearing on behalf of the Defendant.
11

12   ALSO PRESENT:  John Schmitzer, Videographer

13

14

15

16

17

18

19

20

21

22

23

24
```

John Roche
August 06, 2021

```
 1              MR. FEIGELSON:  We've given an extra 20

 2         minutes here, but obviously you can do as you

 3         wish.  But I have some questions for

 4         Mr. Roche that I would like to get in before

 5         it gets later in the day.

 6                   EXAMINATION

 7   BY MR. FEIGELSON:

 8         Q.      Mr. Roche, do you recall this morning

 9   counsel asking you, Mr. Sobieraj asking you about

10   Dr. Robinson's invalidity expert report?

11         A.      Yes.

12         Q.      That is the 600-plus page report?

13         A.      Yes.

14         Q.      And just to clarify your testimony,

15   Mr. Roche, you indicated that his report was over

16   600 pages and that you just skimmed portions of

17   the report.  Can you explain why you did that?

18         A.      I think in the previous questioning we

19   went through, let's say the core front of the

20   document, that was the basis of my either reply or

21   rebuttal report, I forget which one.  And then the

22   balance of the rest of the document had a lot of

23   repetitiveness from the claims.

24              So I went through them quickly.
```

John Roche
August 06, 2021

1    Skimming might not be the best term, but to scroll

2    down and look for repetitiveness and then go

3    through it.  It was still hours to go through the

4    skimming.

5         Q.    Other than the repetitiveness, those

6    portions, did you consider the portions that

7    weren't repetitive in Dr. Robinson's report?

8         A.    Absolutely.  I think I started my

9    rebuttal or reply or whatever term it was, on the

10   items I disagreed with his characterization,

11   especially concerning, red cells -- being able to

12   count red cells -- or white cells in the red cell

13   electrical detector.

14        Q.    You mentioned that you prepared a reply

15   report to Dr. Robinson's reports.  Did you

16   carefully consider all of the paragraphs of

17   Dr. Robinson's report that you responded to in

18   your reply?

19             MR. SOBIERAJ:  Objection, leading.

20             THE WITNESS:  Yes, I believe I

21   annotated, on the documents that I can write

22   on, I annotated the details of the 600-page

23   document fairly well in the document I was

24   reviewing.

John Roche
August 06, 2021

1    BY MR. FEIGELSON:

2         Q.     Did you choose which sections of

3    Dr. Robinson's report required a reply?

4         A.     Yes.   I went through the items and

5    replied specifically, and hopefully in depth, to

6    the ones that are nonrepetitive in nature.   And

7    the ones that were repetitive in nature, we had

8    grouped into the mode classes.

9         Q.     Let's actually look at your reply.   So

10   this is PDX 187.   Can you look at Paragraph 40 on

11   Page 22.

12        A.     Yes.

13        Q.     And in the second sentence of Paragraph

14   40 it says, "For example, Dr. Robinson repeatedly

15   notes over 20 times in Paragraphs 238, 249, 311,

16   348, 472, 489, 508, 519, 570, 611, 639, 646, 684,

17   724, 766, 844, 856, 865, 964, 1016, 1026, 1034,

18   1047, 1359, and 1368, that the presequence process

19   of the patents include steps of running a cell

20   free blank sample to check for the background

21   counts against the threshold as well as automated

22   prewashing."

23             Do you see that sentence, Mr. Roche?

24        A.     Yes, I do.

John Roche
August 06, 2021

1    Q.    And did you carefully consider -- I'm

2   going to strike that.

3         You list -- so you listed out all of

4   these paragraphs where Dr. Robinson repeated this

5   statement, correct?

6    A.    Correct.

7    Q.    Can we look at Paragraph 52 of your

8   reply, please.  And in Paragraph 52, at the end of

9   the second line, again you see a sentence that

10  says that, In Paragraph 191 of Dr. Robinson's

11  report he repeats a paragraph a number of times;

12  is that correct?  In at least 10 places?

13   A.    That's correct.

14   Q.    Can we turn to Paragraph 56, which is

15  on Page 29.  And here you write that Dr. Robinson

16  again repeats throughout his report a

17  misinterpretation of an unreliable reliance on

18  general attorney arguments made in a BCI brief,

19  correct?

20        MR. SOBIERAJ:  Mr. Roche, you have to

21        slow down, you're not giving me a chance to

22        make objections.  I object to all these

23        questions as leading.  And I'm going to

24        have -- I object to the last question as

John Roche
August 06, 2021

1        leading as well.

2              MR. FEIGELSON:  Counsel, you've had

3        plenty of time to make your objections and

4        you still can.

5              MR. SOBIERAJ:  That's not true.

6   BY MR. FEIGELSON:

7        Q.      Mr. Roche, in Paragraph 56 of your

8   reply you state that Dr. Robinson repeats a

9   misinterpreted attorney argument throughout his

10  brief, correct?

11             MR. SOBIERAJ:  Objection, leading.

12             THE WITNESS:  I'm sorry, could you

13       point me to...

14  BY MR. FEIGELSON:

15       Q.      The first line of Paragraph 56 you say

16  that, "Dr. Robinson repeats throughout his report

17  a misinterpretation of and an unreasonable

18  reliance on general attorney argument made in a

19  BCI brief"?

20             MR. SOBIERAJ:  Objection.

21             THE WITNESS:  Yes, that's what it says.

22  BY MR. FEIGELSON:

23       Q.      And you then list at least 17 places in

24  Dr. Robinson's report where he included that

John Roche
August 06, 2021

1    statement; is that correct?

2              MR. SOBIERAJ:  Objection, leading.

3              THE WITNESS:  That's what the report

4        says.

5    BY MR. FEIGELSON:

6        Q.      Can you look at Paragraph 61 of your

7    reply.  See Paragraph 61?

8        A.      Yes, I do.

9        Q.      And in Paragraph 61 you list out over

10   32 paragraphs where Dr. Robinson has included the

11   same argument, correct?

12             MR. SOBIERAJ:  Objection, leading.

13             THE WITNESS:  Yes.

14   BY MR. FEIGELSON:

15      Q.      Sorry, that was Paragraph 61 that I was

16   just referring to.

17      A.      Yes, the same argument is made in all

18   the paragraphs listed.

19      Q.      And in Paragraph 62, you make a

20   reference to at least six different paragraphs of

21   Dr. Robinson's report that includes the same

22   statement, correct?

23             MR. SOBIERAJ:  Objection, leading.

24             THE WITNESS:  Yes, that's correct.

John Roche
August 06, 2021

1   BY MR. FEIGELSON:

2        Q.      And in Paragraph 63, you list at least

3   18 different paragraphs that include the same

4   argument -- the same words of Dr. Robinson,

5   correct?

6              MR. SOBIERAJ:  Objection, leading.

7              THE WITNESS:  Yes, that's what the

8        report says.

9   BY MR. FEIGELSON:

10       Q.      Let's look at Paragraph 78.  Paragraph

11  78, on the second and third line, you again list

12  at least 17 unique paragraphs where Dr. Robinson

13  provides the same opinion, correct?

14             MR. SOBIERAJ:  Objection, leading.

15             THE WITNESS:  Yes, that's correct.

16  BY MR. FEIGELSON:

17       Q.      Let's look at Paragraph 83.  In

18  Paragraph 83, you cite to 9 different paragraphs

19  of Dr. Robinson's report, correct?

20             MR. SOBIERAJ:  Objection, leading.

21             THE WITNESS:  Yes.

22  BY MR. FEIGELSON:

23       Q.      And you cite them that in each of those

24  paragraphs Dr. Robinson makes the same statement,

John Roche
August 06, 2021

1    correct?

2        A.       He does.

3            MR. SOBIERAJ:  Objection.

4    BY MR. FEIGELSON:

5        Q.       And you determined from your review of

6    Dr. Robinson's report that all of these sets of

7    paragraphs that we listed were the same, correct?

8        A.       Correct.

9            MR. SOBIERAJ:  Objection, leading.

10   BY MR. FEIGELSON:

11       Q.       Mr. Roche, let's look at Exhibit C of

12   your opening report, which is PDX 185.  And I

13   would like you to turn to Page 3 of Exhibit C,

14   please.  Do you have that in front of you?

15       A.       I am there.  I'm not sure if they're

16   going to catch up on the screen or not.

17       Q.       I'm sorry that's the wrong exhibit.

18   I'm thinking of Exhibit E to your report.  Can you

19   look at Exhibit E to your report, please?  Do you

20   have that in front of you?

21       A.       Exhibit E comparison with the XE-2100

22   analyzers.

23       Q.       And then on Page 3, can you look at

24   Page 3?

John Roche
August 06, 2021

```
 1            MR. SOBIERAJ:  At least 10.
 2            THE VIDEOGRAPHER:  Going off the
 3     record.  The time is 23:46 UTC.
 4              (Break taken.)
 5            THE VIDEOGRAPHER:  We are back on the
 6     record, the time is 00:04 UTC.  Please
 7     proceed.
 8                FURTHER EXAMINATION
 9  BY MR. SOBIERAJ:
10       Q.    Mr. Roche, during the questioning by
11  Mr. Feigelson, you indicated that you had made
12  some annotations on your expert reports which
13  would provide some indication of which paragraphs
14  you had reviewed in Dr. Robinson's report,
15  correct?
16            MR. FEIGELSON:  Objection.
17       Mischaracterizes the witness's testimony.
18            THE WITNESS:  My thought process was to
19       get a Word -- I'm sorry, to take the pdf and
20       to invert it to Word so I could make notes or
21       comments within the document and to search
22       the document more efficiently.
23  BY MR. SOBIERAJ:
24       Q.    Which document are you referring to?
```

John Roche
August 06, 2021

1    report, as a pdf and then you converted it to a

2    Word document?

3         A.    Yes, that's correct.

4         Q.    And in that Word document, you made

5    annotations in various forms; is that correct?

6         A.    Yes.  So to -- for example, I would add

7    a comment, you know, it was essentially the

8    beginning of my -- either the reply report or the

9    rebuttal report, I'm not sure which, to bring in

10   figures or, I think there was some spreadsheets

11   that I created to do some of the math based on

12   numbers that Dr. Robinson had proposed.

13        Q.    And would those spreadsheets provide an

14   indication of which paragraphs of Dr. Robinson's

15   report you reviewed carefully?

16        A.    The -- they were basically pasted in as

17   comment fields.  So, you know, you use Word to

18   create a comment.  I would create a comment next

19   to Paragraph 15 or 425 and put in the comments

20   that became part of my rebuttal items on, like I

21   said, as the beginning of the rebuttal report.

22   And then clean that up to create the prose of that

23   report.

24        Q.    When you say a comment, are you talking

John Roche
August 06, 2021

1        Mr. Narisada, correct?

2             A.     Yes, it does.

3                 MR. FEIGELSON:   Counsel, before you ask

4        another question, we've been going for 23

5        minutes now.   I need to know how long you're

6        planning to go.   We can give you 5 more

7        minutes and then Mr. Roche needs to take a

8        flight.   We have been extremely generous

9        already.

10                MR. SOBIERAJ:   I appreciate the 5

11       minutes, but I'll probably need more time

12       than that the way this is going.

13                MR. FEIGELSON:   We have been on the

14       record for 8 hours and 25 minutes and it's

15       7:28 p.m. on a Friday in Chicago.

16                     Mr. Roche needs to catch a flight

17       to get to San Francisco, so I will give you 5

18       more minutes, then we need to close the

19       deposition.

20                MR. SOBIERAJ:   I'm not going to agree

21       that the deposition is closed, but I'll make

22       as much progress as I can in the next 5

23       minutes.

24

John Roche
August 06, 2021

```
 1        are, but with removing the hematology items

 2        from the terms Madisetti and Robinson

 3        provided, I would assume he would be

 4        qualified as a POSA.

 5   BY MR. SOBIERAJ:

 6        Q.     Under Dr. Robinson's standard, you're

 7   saying he's qualified?

 8             MR. FEIGELSON:  We're done.  That's the

 9        end of the questions.  We need to go.

10             MR. SOBIERAJ:  I'm not agreeing to end

11        the deposition.

12             MR. FEIGELSON:  We don't have a choice.

13             MR. SOBIERAJ:  Yes, we do.

14             MR. FEIGELSON:  We don't.

15             MR. SOBIERAJ:  You opened a lot of

16        doors, Counsel.  I still have quite a few

17        more questions to ask.  I'm keeping the

18        deposition open.

19                 And if you're going to instruct

20        the witness not to answer any more questions,

21        I would like you to stay on the record so we

22        can have a meet and confer about -- because

23        I'm officially requesting on the record here

24        that we receive an unaltered copy of the Word
```

John Roche
August 06, 2021

 1     document that Mr. Roche created of

 2     Dr. Robinson's 600-and-some page validity

 3     report which includes the annotations made by

 4     Mr. Roche.  Will you agree to produce that?

 5          MR. FEIGELSON:  We will not, it's work

 6     product as you know, it's protected under

 7     Rule 26(a), but we need to stop today's

 8     deposition.

 9          MR. SOBIERAJ:  Can we have a meet and

10     confer on that issue?

11          MR. FEIGELSON:  We can go off the

12     record.

13          MR. SOBIERAJ:  Can we have a meet and

14     confer?

15          MR. FEIGELSON:  We can go off the

16     record and discuss it.

17          MR. SOBIERAJ:  We've got a record,

18     let's have a meet and confer on the record.

19          MR. FEIGELSON:  It is 7:35 on a Friday

20     night.  We have been on the record since 9:00

21     a.m. this morning.  Mr. Roche has a flight to

22     catch, I need to leave as well.  We can talk

23     about this on Monday or over the weekend.  We

24     can discuss it off the record.

John Roche
August 06, 2021

1          MR. SOBIERAJ:  If we can discuss it off

2     the record now, why can't we discuss it on

3     the record now?

4          MR. FEIGELSON:  We can go off the

5     record.  Thank you.

6          MR. SOBIERAJ:  No, I'm not agreeing to

7     go off the record, I want to have this

8     discussion on the record.

9          MR. FEIGELSON:  We are going to leave,

10    as I've told you.  It's 7:36.  I'm happy to

11    have a discussion with you, Jim.  And we can

12    have that discussion off the record.

13         MR. SOBIERAJ:  I'm not agreeing to go

14    off the record.

15         MR. FEIGELSON:  Well, people need to

16    eat and I think it's not being courteous to

17    John and to Barb and to the witness who needs

18    to catch a flight.  So we have to leave.

19         MR. SOBIERAJ:  Can we have the meet and

20    confer?

21         MR. FEIGELSON:  We can schedule a meet

22    and confer.

23         MR. SOBIERAJ:  Can we do it right now?

24         MR. FEIGELSON:  We can do this off the

John Roche
August 06, 2021

```
 1    record.  In Delaware it's not -- it's not

 2    advisable to have these discussions on the

 3    record.  You can call your local counsel.

 4         MR. SOBIERAJ:  That's not true.  You

 5    had a court reporter for a meet and confer.

 6    You insisted on it.

 7         MR. FEIGELSON:  In front of the witness

 8    during a deposition, it is not appropriate to

 9    do this.  We can have our discussion off the

10    record without the witness being present.

11         MR. SOBIERAJ:  He can step outside the

12    room while we have our discussion on the

13    record.

14         MR. FEIGELSON:  Jim, we can discuss

15    this.

16         MR. SOBIERAJ:  We are, I'm happy to

17    discuss this.  You had a court reporter for a

18    meet and confer.

19         MR. FEIGELSON:  We are going off the

20    record now.  I'm sorry, we have to go off the

21    record.  Mr. Roche, thank you for your time

22    today.  I know it's been a long day.  You can

23    leave.

24         MR. SOBIERAJ:  Just to make it clear, I
```

John Roche
August 06, 2021

1    haven't agreed to end the deposition.

2         THE VIDEOGRAPHER:  Yeah, I need both

3    parties to agree to go off the record.  Do

4    you want to stay on?

5         MR. SOBIERAJ:  For a little bit.  I

6    notice that Mr. Roche has left and

7    Mr. Feigelson has left, but they -- well,

8    they are not on the screen, but they haven't

9    signed off, they haven't left Zoom.

10        So I want to give them a chance

11   to reconsider and come back.  If they leave

12   Zoom, then there is not much I can do.

13        Aaron, are you there?  I see your

14   computer is still one.  It's ben over 5

15   minutes, Mr. Feigelson has walked out of the

16   room.  He refused to have a meet and confer

17   on the record.  The witness apparently has

18   left the room.  It looks like he's still --

19   he's still connected to Zoom, but no one is

20   there.  No one is responding.

21        So they're not even here to agree

22   to end the deposition now.  They're not even

23   here to go off the record now.  So I don't

24   want to keep the court reporter and

John Roche
August 06, 2021

1        videographer any longer.   I'm sorry, you

2   know, you've had to stick around as long as

3   you have.   I guess I'm not sure, though, can

4   we end the deposition?

5                So since Mr. Feigelson is not

6   here.  We are going to go off the record.

7           THE VIDEOGRAPHER:  We are going off the

8   record.  The time is 00:43 minutes UTC.  We

9   are now off the record.

10

11                (Ending Time:  7:43 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| SYSMEX CORPORATION and SYSMEX AMERICA, INC. <br><br> Plaintiffs, <br><br> v. <br><br> BECKMAN COULTER, INC., <br><br> Defendant. | C.A. No.: 19-1642-RGA-CJB <br><br> **JURY TRIAL DEMANDED** <br><br> **HIGHLY CONFIDENTIAL – SOURCE CODE** |

**REPLY EXPERT REPORT OF VIJAY MADISETTI, PH.D. REGARDING
INFRINGEMENT OF U.S. PATENT NOS. 10,401,350 AND 10,401,351**

is incorrect. ███████████████████████████████████████████████████████████

███████████████████████████████████████████ *See, e.g.,* ¶¶ 62-63 of my

Opening Report. Additionally, I identified several operations performed by the Accused Products

because that is required by the claims. The claims require "a controller programmed to selectively

operate the sample analyzer in a blood measuring mode or a body fluid measuring mode," wherein

the modes include several operations. Therefore, in addition to identifying the controller in the

Accused Products, I also identified the claimed operations performed by the Accused Products.

12.      Martens appears to ignore the plain and ordinary meaning of a controller. Martens

disagrees with the following definition: "[t]he plain and ordinary meaning of a controller is, from

a functionality perspective, an element that controls another element." Martens Report ¶ 34.

Therefore, Martens disagrees with Roche. In an IPR proceeding involving certain claims from the

'351 patent, Roche provided that definition during his deposition. IPR2020-01503, Roche Tr. at

54:1-15. Also, Martens misconstrues the definitions of a controller in the technical literature. *See*

Martens Report ¶ 35-37. For example, the IBM Dictionary of Computing defines a "controller"

as a "*device that coordinates and controls the operation of one or more input/output devices,*

*such as workstations, and synchronizes the operation of the system as a whole.*" Madisetti Ex.

19 at 145 (emphasis added). Also, Newton's Telecom Dictionary defines a "controller" as "*a*

*device which controls the operation of another piece of equipment.*" Madisetti Ex. 21 at 152

(emphasis added). The IEEE Standard Dictionary of Electrical and Electronics Terms defines

"controller" as a "*device or group of devices that serves to govern, in some predetermined*

*manner, the electric power delivered to the apparatus to which it is connected.*" Madisetti Ex.

20 at 217 (emphasis added). ███████████████████████████████████████

███████████████████████████████████████████████████████████. Martens

HIGHLY CONFIDENTIAL – SOURCE CODE

## XII.   CLOSING REMARKS

57.    If requested, I will testify regarding the opinions reached and the analysis set forth in this Report.

58.    I expressly reserve the right to supplement this Report as requested in response to new information, including but not limited to subsequent rulings by the Court, newly-published court opinions, or based upon my review of the opinion(s) of Defendant's expert(s), additional specific scientific literature or information from Defendant or other relevant developments.

59.    At trial, I may give a tutorial on any matters discussed in this report. I may also prepare and use demonstratives, charts, and other visual aids for any testimony in this case.

Vijay K. Madisetti, Ph.D.

Johns Creek, GA
July 16, 2021

**HIGHLY CONFIDENTIAL – SOURCE CODE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SYSMEX CORPORATION AND SYSMEX AMERICA, INC. | ) ) ) |  |
| PLAINTIFFS, | ) ) ) | C.A. NO.:  19-1642-RGA-CJB |
| V. | ) ) ) | JURY TRIAL DEMANDED |
| BECKMAN COULTER, INC., | ) ) ) | HIGHLY CONFIDENTIAL – SOURCE CODE |
| DEFENDANT. | ) ) ) ) |  |

**EXPERT REPORT OF J. PAUL ROBINSON CONCERNING THE VALIDITY OF U.S. PATENT NOS. 10,401,350 AND 10,401,351**

resistance which this cell opposed in the field causes an increase of the voltage **required for the constancy of the current in accordance with Ohm's law. The** voltage pulse generated by the passage of this cell is proportional to the resistance opposed, so to its volume without consideration of form. *Id.,* 1:22-30

* * *
Counting and detection of the volume are provided by resistivity measurements. For this, a current is applied to the terminals of two electrodes situated on each side of orifice 12, namely an anode formed by end piece 8 of the discharge duct and a cathode formed of the internal injection nozzle 16. Counting of the leucocytes is then carried out during passage of the solution 20 through the calibrated orifice 12, each cell passing through the orifice causes an increase of the resistivity of the medium situated between the electrodes 8, 16, thus creating a voltage pulse proportional to the volume of the leucocyte. *Id.,* 5:14-26

*Id.,* ¶¶ 124-125.

Thus, Lefevre expressly discloses that it was well known that electrical detectors were used to measure changes in the resistance between electrodes caused by passing cells (including white blood cells), and to generate voltage pulses that are directly proportional to the volume (i.e. size) of the cell. Roche agrees. IPR2020-1503 Ex. 2068, 192:23-193:13. Lefevre also teaches that this method of electrical resistivity analysis allows white blood cells to be differentiated, according to their size. IPR2020-01503 Ex. 1047, 1:49-51; *see also* Grace 30(b)(6) dep., 193:14-194:7. Lefevre further discloses that the electrical detector alone generates a histogram that shows the presence of distinct populations of white blood cells. IPR2020-01503 Ex. 1047, Fig. 3, 6:36-43; *see also* Grace 30(b)(6) dep., 202:7-10, 204:5-13.

## C.      The Evolution of Body Fluid Analysis

70.      **The analysis of body fluids is "medically important in the diagnosis of infectious** and other inflammatory processes, hemorrhage, and malignancies that may involve body cavities **and the central nervous system (CNS)." SAI-**Del00122938.  Tests on body fluid are often needed quickly **to manage medical emergencies or because "specimen integrity is good for only a few**

22

denied BCI's IPR petitions in each of IPR2020-01500, IPR2020-01501 and IPR2020-01502.  The denials of institution of these IPR submissions also support my opinion and contradict Roche to the extent he is arguing that these figures somehow establish that the claims of the '350 and '351 patent are invalid.

## IX.   CLOSING REMARKS

1392.   If requested, I will testify regarding the opinions reached and the analysis set forth in this Report.

1393.   I expressly reserve the right to supplement this Report as requested in response to new information, including but not limited to subsequent rulings by the Court, newly-published court opinions, or based upon my review of the opinion(s) of Defendant's expert(s), additional specific scientific literature or information from Defendant or other relevant developments.

1394.   At trial, I may give a tutorial on any matters discussed in this report. I may also prepare and use demonstratives, charts, and other visual aids for any testimony in this case.

Respectfully submitted,

J. Paul Robinson

Dated:  June 25, 2021

John Roche
April 28, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE PATENT TRIAL AND APPEAL BOARD

BECKMAN COULTER, INC.,            )
                                  )
                                  )
Petitioner,                       )    Case
                                  )    IPR2020-01503
v.                                )
                                  )    U.S. Patent No.
SYSMEX CORPORATION AND            )    10,401,351
SYSMEX AMERICA, INC.,             )

Patent Owner.

The discovery videotaped video teleconference deposition of JOHN ROCHE, called by the Patent Owner, for examination, pursuant to notice, taken remotely before LAURA MUKAHIRN, CSR, RPR, CRR, within and for the County of Cook and State of Illinois, on April 28, 2021, scheduled to commence at 10:00 o'clock a.m. CST.

BCI v. SYSMEX, IPR2020-01503
SYSMEX Exhibit 2068.00001

# EXHIBIT C

            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE

SYSMEX CORPORATION and          )
SYSMEX AMERICA, INC.,           )
                                )
            Plaintiffs,          )
                                )       No.
   vs.                          )       19-1642-RGA-CJB
                                )
BECKMAN COULTER, INC.,          )
                                )
            Defendant.           )


          HIGHLY CONFIDENTIAL - SOURCE CODE


              The discovery videotaped video

teleconference deposition of J. PAUL ROBINSON,

PH.D., called by the Defendant, for examination,

pursuant to notice, taken remotely before LAURA

MUKAHIRN, CSR, RPR, CRR, within and for the

County of Cook and State of Illinois, on July

28, 2021, scheduled to commence at 9:00 o'clock

a.m. CST.

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

```
 1    A P P E A R A N C E S:

 2       CROWELL & MORING LLP
         BY:  MR. JAMES SOBIERAJ
 3            MR. JOSHUA JAMES
         jsobieraj@crowell.com
 4       jjames@crowell.com
         455 North Cityfront Plaza Drive
 5       Suite 3600
         Chicago, Illinois 60611
 6       (312) 321-4200
              Appeared on behalf of the Plaintiffs;
 7
         LEYDIG, VOIT & MAYER, LTD.
 8       BY:  MR. AARON FEIGELSON
              MR. WALLACE FENG
 9       afeigelson@leydig.com
         wfeng@leydg.com
10       Two Prudential Plaza
         Suite 4900
11       180 North Stetson Avenue
         Chicago, Illinois 60601
12       (312)616-5600
              Appeared on behalf of the Defendant.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    Figure 2.  Therefore, in my opinion, a POSA

2    would understand that the specification does

3    disclose a controller that operates a multi-mode

4    detector to sense cells.

5    BY MR. FEIGELSON:

6        Q.   And that last sentence, Dr. Robinson,

7    what exactly would the POSA understand was

8    disclosed in the specification as a controller?

9        A.   Well, if we go to the patent and look

10   at Column 8, just above where you quoted, in

11   Line 30:  Microcomputer 6 is provided with a

12   controller 63 configured with -- excuse me --

13   configured by a memory for the control processor

14   and the operation of the control processor and a

15   data analyzing unit 64 configured by memory for

16   the analysis processor and the operation of the

17   analysis processor.  And it goes on then, with

18   my quote:  The controller 63 controls the device

19   8 configured by a sampler, not shown in the

20   drawing, for automatically supplying blood

21   collection tubes and a fluid system and the like

22   for preparing and measuring samples as well as

23   performing other controls.

24            So I believe the specification the POSA

25   would be drawn to the specification to make that

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    conclusion.

2        Q.   So what is it specifically that the

3    POSA would understand to be the controller?

4        MR. SOBIERAJ:  Objection.  Asked and

5    answered.

6        THE WITNESS:  As I stated, in Column 8 in

7    Line 30, the microcomputer 6 is provided with

8    the controller 63 -- and you'll note that is

9    shown in Figure 2 -- configured by a memory for

10   the control processor and the operation of the

11   control processor and the data analyzing unit 64

12   configured by a memory for the analysis

13   processor and the operation of the analysis

14   processor.  The controller 63 controls the

15   device 8 configured by a sampler not shown in

16   the drawing for automatically supplying blood

17   collection tubes and a fluid system and the like

18   for preparing samples as well as performing

19   other controls.  I think it's very clear.

20   BY MR. FEIGELSON:

21       Q.   What do you think is clear?

22       A.   Can you expand on that?  That's a very

23   broad question what I think is clear.

24       Q.   You made the statement, sir.  You said

25   you think it's very clear.  What do you think is

J. Paul Robinson, Ph.D.   Highly Confidential - Source Code
July 28, 2021

1    very clear?

2        A.    I think you asked me why a POSA would

3    understand that the specification discloses a

4    controller, but I'm not exactly sure.  That is

5    what I understood the question to be.

6        Q.    So I'm not asking why -- sorry.  I'm

7    not asking why a POSA would think that.  I'm

8    asking what the POSA would understand to be the

9    controller in your opinion?

10       MR. SOBIERAJ:  Objection.  Asked and

11   answered.

12       THE WITNESS:  Well, the specification

13   identifies this when it identifies 63 which

14   would be a nonlimiting example specified by the

15   patent.  And so a POSA would evaluate those

16   statements and come to a conclusion based on

17   looking at Figure 2 as it was stated and the

18   statements in the specification.

19   BY MR. FEIGELSON:

20       Q.    I just want to make sure I understand

21   your opinion, Dr. Robinson.  When you say that a

22   POSA would understand that the specification

23   does disclose a controller that operates a

24   multi-mode detector to send cells, are you

25   referring to controller 63?

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    MR. SOBIERAJ:  Objection to the form of the

2  question.

3    THE WITNESS:  What I've stated in my report

4  is that the specification discloses the

5  controller 63 controls the device 8 configured

6  by a sampler -- not shown in the drawing -- for

7  automatically supplying blood collection tubes

8  and a fluid system and the like for preparing

9  and measuring cells as well as performing other

10  controls.  And I go on to say that the

11  controller, control unit, 63 is a component of

12  microcomputer 6 as shown in Figure 2.

13  BY MR. FEIGELSON:

14    Q.   So are you referring to the controller

15  63 as the disclosed controller that a POSA would

16  understand is operating a multi-mode detector to

17  sense cells?

18    MR. SOBIERAJ:  Objection to the form of the

19  question.  Asked and answered.

20    THE WITNESS:  What I'm saying is that the

21  specification in -- from 830 down to 844

22  explains to a POSA what a controller is.

23  BY MR. FEIGELSON:

24    Q.   And can you explain that to the jury,

25  please, what the POSA would understand the

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    controller to be?

2        MR. SOBIERAJ:  Objection.  Asked and

3    answered.

4        THE WITNESS:  The specification discloses the

5    controller 63 controls the device 8 configured

6    by a sampler -- not shown in the drawing -- for

7    automatically supplying blood collection tubes

8    and the fluid system or the like for preparing

9    and measuring samples as well as performing

10   other controls.  The controller, control unit,

11   63 is a component of microcomputer 6 as shown in

12   Figure 2.

13   BY MR. FEIGELSON:

14       Q.   My question, sir, is for you to explain

15   to the jury exactly what the POSA would

16   understand from that to be the controller.

17       MR. SOBIERAJ:  Objection.  Asked and

18   answered.

19       THE WITNESS:  It's very clear.  The

20   specification discloses the controller 63

21   controls the device 8 configured by a sampler --

22   not shown in the drawing -- for automatically

23   supplying blood collection tubes and a fluid

24   system and the like for preparing and measuring

25   samples as well as performing other controls.

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    The controller, control unit, 63 is a component

2    of microcomputer 6 as shown in Figure 2.

3    BY MR. FEIGELSON:

4         Q.    Now, you've been reading that paragraph

5    for each time I've asked -- or tried to ask the

6    question.  But you're not answering my question

7    directly, sir.  So I'm going to ask it again.

8    You give the opinion that a POSA would

9    understand that the specification discloses a

10   controller that operates a multi-mode detector

11   to sense cells.  Correct?

12        MR. SOBIERAJ:  I want to -- first I want to

13   object to your statement that the witness is not

14   answering your question directly as being

15   incorrect.  And I also want to object to the

16   repeated question as having been asked and

17   answered.

18   BY MR. FEIGELSON:

19        Q.    You can answer.

20        A.    Could you repeat the question?

21        Q.    You give the opinion that a POSA would

22   understand that the specification discloses a

23   controller that operates a multi-mode detector

24   to sense cells, correct?

25        A.    Yes.

J. Paul Robinson, Ph.D.   Highly Confidential - Source Code
July 28, 2021

1        Q.    What is that controller, sir?

2        MR. SOBIERAJ:  Objection.  Asked and

3    answered.

4        THE WITNESS:  Specification discloses the

5    controller 63 controls the device 8 configured

6    by a sampler -- not shown in the drawing -- for

7    automatically supplying blood collection tubes

8    and the fluid system and the like for preparing

9    and measuring samples as well as performing

10   other controls.  The controller, control unit,

11   63 is a component of microcomputer 6 as shown in

12   Fig. 2.  This is very clear.

13   BY MR. FEIGELSON:

14       Q.    So I'm not asking you to read the

15   specification, Dr. Robinson.  I'm asking for you

16   to tell the jury what is the controller that

17   you're identifying?

18       MR. SOBIERAJ:  Objection.  Asked and answered

19   many times.

20       THE WITNESS:  I believe the specification is

21   the best place to point to the jury to what a

22   controller is.

23   BY MR. FEIGELSON:

24       Q.    And what would you tell the jury a

25   controller is?

1        MR. SOBIERAJ:  Objection.  Asked and

2   answered.

3        THE WITNESS:  I would read 830 to 844.  The

4   microcomputer 6 is provided with a controller 63

5   configured by a memory for the control processor

6   and the operation of the control processor and a

7   data analyzing unit 64 configured by a memory

8   for the analysis processor and the operation of

9   the analysis processor.  The controller 63

10   controls the device 8 configured by a sampler

11   not shown in the drawing for automatically

12   supplying blood collection tubes and a fluid

13   system and the like for preparing and measuring

14   samples as well as performing other controls.

15   BY MR. FEIGELSON:

16        Q.   And you believe that's clear to a jury

17   as to what a POSA would understand the

18   controller to be?

19        A.   I think the best explanation to the

20   jury is perhaps what is in the specification.

21        Q.   So are you identifying controller 63 as

22   the controller that a POSA would understand is

23   operating the multi-mode detector to sense

24   cells?

25        MR. SOBIERAJ:  Objection to the form of the

J. Paul Robinson, Ph.D.   Highly Confidential - Source Code
July 28, 2021

1    question.

2        THE WITNESS:  I stand by my statement on Page

3    60, and I'm happy to read it again if you would

4    like.

5    BY MR. FEIGELSON:

6        Q.   I've read it, and I've heard you read

7    it multiple times.  I'm trying to understand

8    what you're saying and make sure the jury can

9    understand it, too.  So I'm giving you an

10   opportunity to do that again if you choose,

11   Dr. Robinson.  Would you like to explain to the

12   jury and the Court what exactly is the

13   controller that you believe a POSA would

14   understand is disclosed to operate a multi-mode

15   detector to sense cells?

16       MR. SOBIERAJ:  Objection.  Asked and

17   answered.

18       THE WITNESS:  Yes.  I'm happy to do that.  I

19   would say to the jury the specification in 834

20   discloses that the controller 63 controls the

21   device 8 configured by a sampler which is not

22   shown in the drawing for automatically supplying

23   blood collection tubes and a fluid system and

24   the like for preparing and measuring samples as

25   well as performing other controls.

J. Paul Robinson, Ph.D.   Highly Confidential - Source Code
July 28, 2021

1    BY MR. FEIGELSON:

2        Q.   Anything else?

3        A.   The controller, control unit, 63 is a

4    component of microcomputer 6 as shown in

5    Figure 2.

6        Q.   And that's your identification of what

7    a controller is that would be understood by a

8    POSA to operate the multi-mode detector to sense

9    cells?

10       MR. SOBIERAJ:   Objection to the form of the

11   question.

12       THE WITNESS:   I stand by the statements that

13   I've made in my report.

14   BY MR. FEIGELSON:

15       Q.   If your children came to you and asked

16   you what a controller was, what would you tell

17   them?

18       MR. SOBIERAJ:   Objection.   Outside the scope

19   of his report.

20       THE WITNESS:   It's a hypothetical question,

21   and I try to avoid hypothetical questions.

22   BY MR. FEIGELSON:

23       Q.   So you wouldn't be able to tell them

24   what a controller was?

25       MR. SOBIERAJ:   Objection.

J. Paul Robinson, Ph.D.   Highly Confidential - Source Code
July 28, 2021

```
 1        THE WITNESS:  It probably wouldn't matter

 2   what I told them.  They probably would ignore it

 3   anyway.

 4   BY MR. FEIGELSON:

 5        Q.   I'm asking what you would tell them.

 6   It matters to me what you would tell them.

 7        A.   I don't think any of my children would

 8   ask that sort of question, to be honest, because

 9   none of them are engineers or technology people.

10        Q.   And neither -- the jury might not

11   include engineers or technology people either.

12   So what would you tell them a controller is?

13        MR. SOBIERAJ:  Objection.  Objection to the

14   form of the question.

15        THE WITNESS:  But the jury are not children,

16   so I don't know how to answer that.

17   BY MR. FEIGELSON:

18        Q.   You don't know what you would tell the

19   jury what a controller is?

20        MR. SOBIERAJ:  Objection to the form of the

21   question.

22        THE WITNESS:  It's a hypothetical question.

23   BY MR. FEIGELSON:

24        Q.   If the judge were to ask you:

25   Dr. Robinson, what do you understand a
```

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    controller to be?  What would you tell the

2    judge?

3        A.    I would tell the judge:  Judge, open

4    the patent.  Look at Column 8 in Line 30.  And

5    it would -- and I would read to the judge the

6    microcomputer 6 is provided with a controller 63

7    configured by a memory for the control processor

8    and the operation of the control processor and a

9    data analyzing unit 64 configured by a memory

10   for the analysis processor and the operation of

11   the analysis processor.  The controller 63

12   controls the device 8 configured by a sampler --

13   not shown in the drawing -- I may not say that.

14   I may drop that little piece out for the judge

15   because he'd know that -- for automatically

16   supplying blood collection tubes and a fluid

17   system and the like for preparing and measuring

18   samples as well as performing other controls.

19   So that's what I would tell the judge.

20       Q.    Okay.

21       MR. FEIGELSON:  Rob, can we move over a new

22   exhibit?  This will be 322, and it's the file --

23   it's called lasers.PDF.

24                (DDX Deposition Exhibit

25                 No. 322 was remotely

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1    that --

2        A.   I'm sorry.  I can't hear you.

3        Q.   Who wrote the report that we are

4    talking about now?

5        A.   Who wrote the report?  I directed the

6    report, I spoke with attorneys, I researched,

7    evaluated documents, edited documents, and

8    worked with several attorneys over a significant

9    period of time.

10       Q.   Did you write Paragraph 235 yourself?

11       A.   I don't recall which paragraphs I

12   wrote.  I wrote so many paragraphs that I would

13   not be able to identify specifically which

14   paragraphs that I wrote.

15       Q.   But just to be clear, Dr. Robinson, as

16   you sit here, you cannot identify any places

17   other than Dr. Madisetti's report where you're

18   understanding that the XE-5000 is covered by

19   claims of the asserted patents; is that correct?

20       MR. SOBIERAJ:  Objection.  Mischaracterizes

21   his past testimony.

22       THE WITNESS:  I believe I've stated that any

23   additional opinions or opinions that I may have

24   are in my report, and I stand by them.

25   BY MR. FEIGELSON:

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1     Q.    How can you stand by them if you don't

2  know what they are?

3     A.    I repeat:  I don't recall if I have an

4  opinion on this.  If I do have an opinion on it,

5  it will be in my report.  And if it is in my

6  report, then I stand by it.

7     Q.    How can you stand by something that you

8  don't even know if it exists?

9     A.    This is a hypothetical question, and I

10  try to avoid hypothetical questions.

11     Q.    This is not a hypothetical question.

12  This is a real question.  How can you stand by

13  an opinion that you may or may not have?

14     MR. SOBIERAJ:  Objection to the form of the

15  question.

16     THE WITNESS:  I've made it clear that this is

17  a very long report.  It's very detailed, and

18  there are a lot of opinions in it.  And any

19  opinion that I have on this topic, if it is in

20  the report, I stand by it.

21  BY MR. FEIGELSON:

22     Q.    So you're just speculating that there

23  may be other opinions as a basis for your

24  understanding that the XE-5000 is covered,

25  correct?

J. Paul Robinson, Ph.D.  Highly Confidential - Source Code
July 28, 2021

1        MR. SOBIERAJ:  Objection.  Form of the

2    question.

3        THE WITNESS:  I try to avoid speculation.

4    BY MR. FEIGELSON:

5        Q.    But you can't point me to any paragraph

6    in your report that provides any basis other

7    than Dr. Madisetti's report for your

8    understanding that the XE-5000 is covered,

9    correct?

10       A.    I've already stated that there may be

11   other opinions I have made on this topic.  I do

12   not recall.  And if I have made those opinions,

13   then I stand by them.

14       Q.    And you blindly stand by them, right?

15       MR. SOBIERAJ:  Objection.  Form of the

16   question.

17       THE WITNESS:  I provided a report that has a

18   considerable number of opinions in it.  If I

19   have made an opinion on this topic, I stand by

20   it.

21   BY MR. FEIGELSON:

22       Q.    Whether I can ask a question about it

23   or not, correct?

24       MR. SOBIERAJ:  Objection.  Form of the

25   question.