**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SYSMEX CORPORATION and SYSMEX AMERICA, INC.,

Plaintiffs,

v.

BECKMAN COULTER, INC.,

Defendant.

Civil Action No. 19-1642-JFB-CJB

## REPORT AND RECOMMENDATION

Presently before the Court in this patent infringement case is the portion of Defendant Beckman Coulter, Inc.'s ("BCI" or "Defendant") "Motion for Summary Judgment of Invalidity" (the "Motion"), filed pursuant to Federal Rule of Civil Procedure 56, in which it argues that Plaintiffs Sysmex Corporation and Sysmex America, Inc.'s ("Sysmex" or "Plaintiffs") asserted United States Patent Nos. 10,401,350 (the "'350 patent") and 10,401,351 (the "'351 patent") (collectively, the "asserted patents" or the "patents-in-suit") are directed to non-patent-eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"). (D.I. 410)[1] For the reasons set out below, the Court recommends that BCI's Motion be DENIED in this regard.

## I. BACKGROUND

Sysmex commenced this action on September 3, 2019. (D.I. 1) The case was thereafter referred to the Court to hear and resolve all pretrial matters through the case-dispositive motion deadline, as well as to handle the pre-trial conference. (D.I. 11; 3/2/22 Oral Order)

BCI filed the instant Motion on November 30, 2021, (D.I. 410), and briefing was completed on January 14, 2022, (D.I. 435). The Court heard oral argument on the Motion (as

[1] With its Motion, BCI also moved for summary judgment on additional grounds that have been addressed in previous Report and Recommendations. (D.I. 501; D.I. 506)

well as on other summary judgment and *Daubert* motions) by videoconference on February 25, 2022. (D.I. 486 (hereinafter, "Tr."))

The Court writes here primarily for the parties, and so any facts relevant to this Report and Recommendation will be discussed in Section III below.

## II. STANDARD OF REVIEW

The Court incorporates by reference the standard of review applicable to summary judgment motions and the legal standards relating to Section 101, which were set out in *S.I.SV.EL. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A v. Rhapsody Int'l Inc.*, Civil Action No. 18-69-MN-CJB, Civil Action No. 18-70-MN-CJB, 2019 WL 1102683, at *2-4 (D. Del. Mar. 8, 2019).

## III. DISCUSSION

At step one of the *Alice* inquiry, BCI argues that the asserted claims are directed to the abstract concept of "operating conventional sample analyzers in a 'distinct' body fluid mode" that "automatically collects, analyzes, and displays body fluid data." (D.I. 411 at 6 (internal citation omitted), 15; D.I. 435 at 10-11, 13) BCI treats claim 16 of the '351 patent as representative, and it contends that the elements making up that claim amount to nothing more than "abstract ideas, routine computer automation, and hardware conventional to the field of automated hematology analyzers[.]" (D.I. 411 at 15; *see also id.* at 4-15; D.I. 435 at 12) From there, BCI contends that the step two inquiry cannot save the asserted claims because there is nothing left to consider in the claims. (D.I. 411 at 15-16; *see also id.* at 4 ("[T]he asserted claims . . . . recite no features that can participate in step two."); D.I. 435 at 18)

Sysmex, for its part, disputes that claim 16 is representative of all other asserted claims. (D.I. 427 at 10) But beyond that, Sysmex retorts that claim 16 (and all of the asserted claims) are

directed to an "improved analyzer that includes a controller programmed for new operations for sensing, counting and displaying particular types of body fluid cell counts in [a] way that was not done in conventional analyzers." (*Id.* at 11-12)[2] In support of the idea that the asserted patents claim such an improved analyzer, Sysmex points in part to the patents' specification, which describes a previously-published patent application that disclosed a "blood cell analyzer which is capable of measuring cells in a body fluid" but unsuitably so, as the operator (not the analyzer) had to prepare the measurement sample, and the analyzer did not "disclose measurement operations suited to the fluid when measuring a body fluid." ('351 patent, col. 1:45-61 (*cited in* D.I. 427 at 2))[3] Sysmex also attacks BCI's step one analysis as implicating several disputed questions of fact that should defeat BCI's Motion. (D.I. 427 at 12-15; Tr. at 92; Sysmex's Summary Judgment Presentation, Slide 26) Finally, Sysmex argues that even if the asserted claims are directed to an abstract idea, they nevertheless disclose an inventive concept in providing "several technological solutions, individually and as an ordered combination, for analyzing body fluids with a very low number of cells that is more accurate and reliable than the prior art." (D.I. 427 at 15)

The Court begins at *Alice*'s step one, which is where the parties focused nearly all of their attention in their briefing. In doing so, the Court will address claim 16—the claim that BCI says is representative of all asserted claims. As part of its step one inquiry, the Court asks: (1) What

---

[2] 35 U.S.C. § 101 teaches that any "new and useful . . . machine . . . or any new or useful improvement thereof" constitutes patent-eligible subject matter. (*See* D.I. 427 at 5)

[3] In addition to highlighting this aspect of the specification, Sysmex also cites to articles that discuss prior art blood analyzers that did not have dedicated body fluid measurement modes capable of measuring body fluid samples; these analyzers also had problems with reliability. (D.I. 427 at 2 (citing D.I. 428, exs. 53-55, 56 at 396, 400))

is claim 16 directed to?; and (2) Does whatever claim 16 is directed to amount to an abstract idea?

How does the Court make this determination? In this type of a case, the relevant inquiry at step one is whether the claims are directed to an improvement in computing devices or other technology (in which case the claim would be patent-eligible), or whether they are simply directed to a "process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool" (in which case they would be directed to an abstract idea, and the Court would then proceed to *Alice*'s step two). *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("We look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.").

At the start, it is worth noting that both parties agree that claim 16 is a claim to a sample analyzer that has a body fluid measuring mode that differs in operation from its blood measuring mode. (D.I. 411 at 3, 6; D.I. 427 at 11-12; D.I. 417, ex. 19 at ¶ 144)[4] That is what the claim says, after all. But what *is* disputed is how the claimed sample analyzer should be properly characterized for purposes of the step one analysis. (Sysmex's Summary Judgment Presentation, Slide 20; Tr. at 88-89)

[4] The Court recommended that "a body fluid measuring mode" be construed to mean "a sample analyzer operation mode, different from the blood measuring mode, used for measuring cells in a body fluid sample[,]" (D.I. 230 at 35), a construction that the District Court adopted over BCI's objections, (D.I. 493 at 10). Every asserted claim includes the "body fluid measuring mode" limitation. (*See* D.I. 427 at 6-7)

In that regard, BCI argues that claim 16 simply describes an abstract idea. Key to BCI's argument here is its repeated assertion that the sample analyzer in the claim is programmed to automatically follow entirely *conventional* processes. This is seen in the following excerpts from BCI's briefing:

- "[A] controller programmed to automatically follow *known rules* [such as initiating a pre-wash of the detectors before body fluid analysis] is not patentable subject matter." (D.I. 411 at 2 (emphasis added));

- "The remaining elements of claim 16 address two automated sets of instructions [including] the 'body fluid measuring mode.' . . . BCI's LH 750 system literally offered a distinct 'Body Fluid mode' by 2004, almost three years before Sysmex filed its original patent application." (*Id.* at 7 (internal citations omitted); *see also id.* at 2-3, 8);

- The "second clause [of claim 16] introduces 'detectors' that sense cells in blood and body fluids" but prior art analyzers such as the LH 750 and XE-2100 included detectors that did just that, such that the claimed "*conventional* detectors" are irrelevant to the *Alice* analysis. (*Id.* at 8 (emphasis added); *see also* D.I. 435 at 12 n.3 ("Here, it is undisputed that the claims use detectors *in a conventional manner*.") (emphasis added));

- "The . . . body fluid mode[] [is] merely [an] ineligible collection[] of generalized steps to be performed on a computer using *conventional* computer activity." (D.I. 411 at 10 (internal quotation marks and citation omitted) (emphasis added));

- "[T]he seventh clause [of claim 16] recites performing a *conventional* body fluid sensing operation in response to another user input." (*Id.* at 11 (emphasis added));

- "The eighth clause [of claim 16] finally identifies a difference between the blood and body fluid modes by reciting a pre-washing step" but this concept was conventional because it was "previously described in operator's manuals for the conventional workstations sold by both BCI and Sysmex[;]" "a controller programmed to automatically apply instructions that BCI (and Sysmex) published in 2004 [instructing users to always initiate a pre-wash before

analyzing body fluid] is patent[-]ineligible subject matter." (*Id.* at 12-13; *see also* D.I. 435 at 15-16);

- "What is allegedly 'new' is organizing *conventional* blood and body fluid protocols into modes." (D.I. 435 at 11 (emphasis added)); and

- "[S]teps that generically spell out what it means to apply a *conventional* body fluid protocol on a sample analyzer cannot confer patent eligibility." (*Id.* at 12 (internal quotation marks and citation omitted) (emphasis added))

Sysmex, however, noted that BCI's arguments implicate material disputes of fact regarding whether the claimed sample analyzers do in fact only utilize conventional processes. (D.I. 427 at 12-15; Sysmex's Summary Judgment Presentation, Slide 26) For example, Sysmex points to record evidence such as the following:

- Sysmex's expert, Dr. J. Paul Robinson, opines in several paragraphs as to why BCI's prior art LH 750 system does not include the claimed system—i.e., because the LH 750 system *operates the same* whether it is measuring body fluid or blood samples, whereas the claimed system does not. (D.I. 417, ex. 16 at ¶¶ 188-97; *see also, e.g.*, D.I. 133 at 4);

- The claimed detectors are not used in a conventional manner because the prior art LH 750 and XE-2100 systems "did not use a detector that sensed cells in both a blood measuring mode and a body fluid measuring mode, which is what the claim requires" and "[c]laim 16 provides the technological solution of using at least one detector in both the blood and body fluid modes." (D.I. 427 at 13-14 (citing D.I. 417, ex. 16 at ¶¶ 188-219, 656-84));

- BCI makes no showing of conventionality with respect to the portion of the claim limitation in claim 16 relating to "pre-washing said multi-mode detector" that requires that the controller be programmed "not to introduce the prepared body fluid [measurement] sample into said multi-mode detector before said pre-washing is completed[.]" (*Id.* at 14 (quoting '351 patent, col. 21:14-17));

- The prior art instructions regarding pre-washing differ from the claimed automated pre-washing in that the prior art instructions were optional, purely manual and did not involve a controller. (*Id.*

at 15; D.I. 417, ex. 16 at ¶¶ 196, 232; D.I. 417, ex. 23 at 196-98); and

- BCI's own study regarding the body fluid analysis of its DxH 800 device highlighted that the device's "dedicated analysis cycle for body fluids" "alleviates the technologist from the error prone and labor intensive manual method of body fluid analysis." (D.I. 428, ex. 48 at 6 (cited in D.I. 427 at 15))

In response to this comeback from Sysmex, BCI retorts in its reply brief that Sysmex's arguments are "weak[]" and that Sysmex failed to identify any issues of fact that are material. (D.I. 435 at 15)[5] On that note, BCI now asserted that it "does not matter" whether the claimed distinct body fluid mode was conventional, as "organizing activity into a dedicated mode is an unpatentable abstraction[.]" (*Id.*; *see also* D.I. 411 at 3 ("Distinct 'modes of operation' are merely 'restatements' of an ineligible concept.")) For this proposition, BCI cited in support to *Thompson v. TCT Mobile, Inc.*, Civil Action No. 19-899-RGA-SRF, 2020 WL 1531333 (D. Del. Mar. 31, 2020). (D.I. 411 at 3, 6, 9, 10; D.I. 435 at 14-15)

In the Court's view, BCI has failed to show that summary judgment is warranted, for four reasons.

First, one of the central premises on which this portion of BCI's Motion is based—i.e., that a claim to a mode or modes of operation is necessarily a claim to an abstract idea—is just simply incorrect. It is not the case that a claim is *per se* abstract because it is directed to computer technology that manages different modes of operation. To the contrary, whether such

[5] BCI suggests that Sysmex's position that fact issues preclude granting BCI's Motion is undermined by Sysmex's *Daubert* motion, "which argued that patent eligibility should be decided as a matter of law." (D.I. 435 at 15) But Sysmex clearly stated there that "patent eligibility under [Section] 101 is a question of law *that may contain underlying issues of fact*." (D.I. 407 at 41 (emphasis added) (citing *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020))

a claim is ineligible for patenting in this context all depends on *what the claimed modes of operation do*, and the extent to which utilization of those modes amounts to *an improvement in the ways that computers function*. During oral argument, even BCI's counsel acknowledged this fact. (D.I. 427 at 11 n.5; Tr. at 51-52); *see also, e.g.*, *Olympus Corp. v. Maxell, Ltd.*, C.A. No. 18-216 (MN), 2018 WL 5962471, at *6 (D. Del. Nov. 14, 2018) (holding at step one that claims directed to a recording/play-back apparatus utilizing a controller to monitor and control different modes of operation and power consumption of the apparatus were not directed to an abstract idea, as the focus of the claim was to an improved camera).

Second (and relatedly), the *Thompson* case—the case that BCI relies on for the idea that providing a device with separate modes of operation is a "textbook abstract idea" because such modes are "merely 'restatements' of an ineligible concept[,]" (D.I. 411 at 3, 5; *see also* D.I. 435 at 14-15; Tr. at 50-51)—does not in fact stand for that (extremely broad) proposition, (Tr. at 51-52). In *Thompson*, the asserted claims at issue related to devices and methods for screening notifications when a "Nighttime Mode" (a mode that inhibited a phone's ability to receive a message) is activated. 2020 WL 1531333, at *1. At step one, the *Thompson* Court found that the claims were simply directed to the abstract idea of "screening communications." *Id.* at *5. And the Court rejected the plaintiff's argument that the claims recited non-abstract subject matter because, *inter alia*, the claims recited "separate concrete modes of operation." *Id.* at *7-8. But the reason why the *Thompson* Court did so was *not* because the Court held that all "modes of operation" are simply restatements of an abstract idea. Instead, it came to this conclusion because, in that particular case, it found, *inter alia*, that: (1) the asserted patents' specification "broadly describe[d]" the invention and the Nighttime Mode feature in a way that suggested that the claims were simply directed to "screening communications" (which was a fundamental

practice); (2) the claim language was "broadly worded" to suggest the same; and (3) the "separate concrete modes of operation" at issue were "merely restatements of the abstract idea[.]" *Id.* at *5-8 (internal quotation marks and citations omitted).

The facts at play here seem different than in *Thompson*. Here claim 16 recites a sample analyzer with a body fluid measuring mode that differs from the blood measuring mode by performing particular physical operations (i.e., by utilizing an automated pre-washing feature)—and the patent specification indicates that this claimed sample analyzer is an improvement over the prior art. (*See* '351 patent, col. 1:45-61) Claim 16 does not seem akin to a claim that simply adds generic computer components to a fundamental practice (such as "screening communications") as in *Thompson*. 2020 WL 1531333, at *8. Instead the claim "remov[es] the once-necessary human intervention from a fundamentally mechanical process" in a way that—if Sysmex is right with respect to the issues of fact described above—would improve upon prior art systems. *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, 414 F. Supp. 3d 947, 956-57 (E.D. Tex. 2019); *see also, e.g.*, *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370 (Fed. Cir. 2020) (holding that claims directed to "an improved medical device that achieves speedier, more accurate, and clinically significant detection of two specific medical conditions out of a host of possible heart conditions" were not directed to an abstract idea, where the record did not support the assertion that "doctors long used the claimed diagnostic processes"); *Northwestern Univ. v. Univ. Robots A/S*, C.A. No. 21-149 (MN), C.A. No. 21-150 (MN), 2022 WL 903892, at *6 (D. Del. Mar. 28, 2022).

Third, contrary to BCI's argument, it *does* matter whether utilization of the claimed distinct body fluid mode was conventional or not. As was noted above, the step one analysis here entirely boils down to whether the claims are directed to *an improvement in computing*

*devices or other technology* (as opposed to an abstract idea for which computers are invoked merely as a tool). *See Enfish*, 822 F.3d at 1335-36; *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).[6] If the claimed body fluid mode amounts to an unconventional utilization of computer technology/functionality, then claim 16 will be patent eligible. And here, the record indicates that there is at least a material dispute of fact on that question.[7] This is indicated by the above-referenced portions of the specification suggesting that

---

[6] In its briefing, BCI contends that claim 16 is simply directed to collecting, analyzing and displaying results from a body fluid sample. (D.I. 411 at 5-6; D.I. 435 at 11; Tr. at 46) In doing so, BCI likens the claim to those found to be patent ineligible in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). (D.I. 411 at 5; D.I. 435 at 12 ("Likewise, here, steps that 'generically spell out' what it means to apply *a conventional body fluid protocol* on a sample analyzer 'cannot confer patent eligibility.'") (citation omitted) (emphasis added); Tr. at 54-55) In that case, the United States Court of Appeals for the Federal Circuit found that claims directed to systems and methods for performing real-time performance monitoring of an electric power grid—by collecting and analyzing data and displaying the results—failed under Section 101 because they did not "go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology." *Elec. Power Grp.*, 830 F.3d at 1351. Here, however, with the claim limitations describing particular operations that allegedly differed from how prior art analyzers operated with respect to body fluid samples, the Court disagrees that the claim should meet the same fate as in *Elec. Power Grp.* (D.I. 427 at 8 n.3); *see also, e.g.*, *TaKaDu Ltd. v. Innovyze, Inc.*, Civil Action No. 21-291-RGA, 2022 WL 684409, at *5-6 (D. Del. Mar. 8, 2022) (finding that even though the claims, on one level, involved "collecting, analyzing, and reporting data[,]" because they taught "particular ways of achieving data analysis" they were "directed toward a technological improvement").

[7] It seems a bit unusual to be discussing a material factual dispute at *Alice*'s step one, as that step ultimately "presents a legal question[.]" *CardioNet*, 955 F.3d at 1372. But the parties focused most of their attention on step one, and courts have recognized that the answer at step one can sometimes turn on underlying factual disputes. *See, e.g.*, *Palo Alto Rsch. Ctr., Inc. v. Facebook, Inc.*, Case No.: 2:20-cv-10753-AB-MRW, 2021 WL 1583906, at *9 (C.D. Cal. Mar. 16, 2021) ("The Court concludes that factual issues [relating to claim terms and the claimed improvements provided by the invention] at Step One preclude it from resolving eligibility on a motion to dismiss."); *CBA Envtl. Servs., Inc. v. Toll Bros. Inc.*, 403 F. Supp. 3d 403, 414 (D.N.J. 2019) (concluding at step one that "the language of the claims, as well as the specification's disparagement of conventional machinery, presents an issue as to whether the machinery is generic" and noting at step two a factual dispute "for the same reasons laid out in step one"); *cf.*

the claimed invention was a step forward in the realm of body fluid analysis, and by the above-referenced extrinsic evidence to the same effect cited by Sysmex. (Tr. at 95); *CardioNet*, 955 F.3d at 1373 (noting that it is permissible for a court to look to extrinsic evidence in assessing a step one question).

Fourth, the Court observes that the United States Court of Appeals for the Federal Circuit has described an abstract idea as a "disembodied concept . . . untethered from any real-world application." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring) (internal quotation marks and citation omitted); *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("The concept of providing out-of-region access to regional broadcast content is an abstract idea, as that term is used in the section 101 context. It is a broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it."). To be sure, the fact that the claimed sample analyzer is a physical thing, or the fact that claim 16 contains a lengthy description of the analyzer's many limitations, does not necessarily mean that the claim is patent-eligible. But on the other hand, it does also seem that claim 16—a claim to a sample analyzer with various physical components that, *inter alia*, utilizes a sensing operation that makes use of a controller to automatically initiate a pre-wash of a multi-mode detector (all before a body fluid measurement sample is introduced into that detector)—is difficult to characterize as simply

---

*Kajeet, Inc. v. Qustodio, LLC*, Case No. SA CV18-01519 JAK (PLAx), 2019 WL 13149922 at *6-7 (C.D. Cal. Feb. 28, 2019) (assuming without deciding at step one that the claims were drawn to an abstract idea while noting that "[a]lthough in many instances, the *Alice* step one inquiry turns solely on the patent intrinsic record, the position that there cannot be underlying factual disputes in an *Alice* step one inquiry is not supported by legal authority. Indeed, the general rule is that there is always the possibility of the need for factual determinations in connection with an analysis about the scope of the patent intrinsic record."). That is what is happening here.

amounting to a "disembodied concept."  Claim 16 sure sounds a lot more like it is describing a "real-world application," as opposed to an "untethered" abstraction.

In sum, the Court agrees with Sysmex that summary judgment in BCI's favor on claim 16 is not warranted as to this Section 101 issue.  And since that is the case as to BCI's purportedly representative claim, it is also the case as to all other asserted claims.  *Cf. F45 Training Pty Ltd. v. Body Fit Training USA Inc.*, C.A. No. 20-1194-LPS, 2021 WL 2779130, at *5 (D. Del. July 2, 2021) ("[G]iven my conclusion that Claim 1 is not patent ineligible, the Court will accept for purposes of the pending motion that Claim 1 is representative of all claims of the '576 patent. Therefore, on Fossil's own logic, all claims of the '576 patent are not patent ineligible.  I will only address, therefore, Claim 1."); *eBuddy Techs. B.V. v. LinkedIn Corp.*, Civil Action No. 20-1501-RGA-CJB, 2021 WL 7209517, at *10 (D. Del. Nov. 29, 2021), *report and recommendation adopted*, 2022 WL 733996 (D. Del. Mar. 11, 2022).

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that the Motion be DENIED to the extent that it asserts that summary judgment should be granted because the asserted patents are patent-ineligible pursuant to Section 101.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov. Objections to this Report and Recommendation are due by **June 7, 2022**. Responses to any objections are due by **June 10, 2022**.

Dated: June 2, 2022

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE